UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| ————————————————— x | | |
| RICHARD MEDOFF, Individually and On Behalf Of All Others Similarly Situated, | : | Civil Action No. |
| | : | |
| Plaintiff, | : | CLASS ACTION COMPLAINT |
| | : | |
| | : | **JURY TRIAL DEMANDED** |
| vs. | : | |
| | : | CA09- 554S |
| CVS CAREMARK CORPORATION, THOMAS M. RYAN, DAVID RICKARD, HOWARD McCLURE, | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |
| ————————————————— x | | |

Plaintiff Richard Medoff, by his attorneys, alleges the following based on the investigation of counsel which included a review of United States Securities and Exchange Commission ("SEC") filings by CVS Caremark Corporation ("CVS" or the "Company"), press releases issued by CVS, transcripts of CVS earnings calls with analysts, securities analysts' reports about the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.     This is a securities class action on behalf of all persons who acquired the common stock of CVS during the period between May 5, 2009 and November 4, 2009 ("the Class Period"), alleging that Defendants committed violations of the Securities Exchange Act of 1934 ('the Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, promulgated by the SEC, 17 C.F.R. §240.10b-5, during the Class Period.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the claims asserted in this Complaint pursuant to § 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331.

3.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§1391(b) and (c). Defendants maintain their principal executive office at One CVS Drive, Woonsocket, Rhode Island 02895. Certain acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this district.

4.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate wire and telephone communications.

## CLASS ACTION ALLEGATIONS

5.       Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all persons who acquired the common stock of CVS during the Class Period (the "Class"). Excluded from the Class are Defendants, members of their immediate families, and officers and directors of CVS and their immediate families.

6.       The members of the Class are so numerous and geographically dispersed across the country that joinder of all members is impracticable. Tens of millions of shares of CVS common stock (ticker symbol "CVS") were traded on the New York Stock Exchange ("NYSE") during the Class Period.

7.       Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and each member of the Class purchased the Company's common stock during the Class Period and sustained injury as a result.

8.       Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

9.       A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable, and the damages suffered by individual members of the Class may be relatively small, making the expense and burden of individual litigation an impossible hurdle for members of the Class to seek redress individually for the wrongs done to them. There will be no difficulty in the management of the Class as a class action.

10.       Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether Defendants' acts and omissions as alleged in the Complaint violated the Exchange Act, and

(b)     Whether the members of the Class have sustained damages, and if so, what is the proper measure of damages.

## PARTIES

11.     Plaintiff Richard Medoff acquired the common stock of CVS during the Class Period and was damaged as the result of Defendants' wrongdoing alleged in this Complaint, as set forth in his certification, attached hereto.

12.     Defendant CVS, since its March 2007 $22 billion acquisition of pharmacy benefits manager Caremark Rx Inc. ("Caremark"), is a fully integrated pharmacy services company and operates in two business segments: pharmacy services and retail pharmacy. The pharmacy services business includes CVS's pharmacy benefit management business, commonly known as the PBM business, which was acquired in the Caremark acquisition in 2007. The PBM business is the principal component of the pharmacy services business segment.

13.     Defendant Thomas M. Ryan ("Ryan") was, at all relevant times, the Company's Executive Chairman, President and Chief Executive Officer.

14.     Defendant David Rickard ("Rickard") was, at all relevant times, the Company's Chief Financial Officer.

15.     Defendant Howard McClure ("McClure"), was, at all relevant times, President of Caremark Pharmacy Services, the division of CVS which includes its PBM business.

## SUBSTANTIVE ALLEGATIONS

16.     The PBM business is a critical component of CVS's revenues and profits. Historically it has accounted for approximately 50% of CVS's revenues and has been a significant contributor to CVS's profits. The PBM business, which negotiates drug prices with drug

manufacturers for companies and governments, enters into contracts with those organizations to provide services for the term of the contract. Each year, the PBM business enters into contracts with it clients to provide service for the following year. Thus, each subsequent year's revenues and operating profits are virtually predetermined in the current year based on the number and dollar value of the contracts signed in the current year for the subsequent year. For example, CVS's PBM business 2009 financial results are based on the contracts signed in 2008 and its 2010 financial results are determined by the contracts entered into in 2009. The PBM business faces stiff competition from numerous stand-alone PBM companies, including Express Scripts and Medco Health Solutions Inc.

17.     Defendant McClure was during the Class Period, President of Caremark Pharmacy Services, the division of CVS which included the PBM business. With the belated disclosure of the problems at the PBM business and their financial impact on CVS on November 5, 2009, defendants also announced the sudden "retirement" of McClure, aged 52. Immediately prior to his announced retirement, McClure had sold 500,000 shares of CVS common stock during the Class Period for proceeds of more than $17 million. The sales prices of the shares McClure sold were inflated by the fraudulent conduct of defendants, as alleged herein.

18.     Commencing in at least 2009, but unbeknownst to the market, CVS was having serious problems in operating the PBM business which were adversely affecting its ability to maintain its existing clients as their contracts came up for renewal for the 2010 year. The Company's problems were not experienced by its stand alone competitors and, as admitted by defendant Ryan, flowed, in large measure, from the integrated nature of CVS's business. CVS, in marketing its PBM product, emphasized the strengths of CVS's retail pharmacy business at the expense of the superiority of its PBM business when compared to the competition. In addition, CVS

- 4 -

was not competitive in pricing its contracts and was providing poor service to its clients. Furthermore, CVS, as admitted by defendant Ryan, "never had a good relationship" with benefits consultants who are key players in the PBM business. Defendants knew, as a result of these operating problems, that the PBM business was underperforming its peers. Since the beginning of 2009 through November 4, 2009, in fact, CVS lost the renewals of 2010 contracts for major clients, including Horizon, the State of New Jersey' Blue Cross Blue Shield business (valued at $1 billion), the managed Medicare business of the State of Ohio (valued at $500 million), Chrysler retirees and Coventry. These contract losses have an aggregate value of approximately $4.5 billion. In addition, numerous smaller clients were not renewing their contracts with CVS for 2010, causing net losses on contract renewals to approximate $4.8 billion for 2010. CVS also lost the Med D business in 15 regions for 2010, causing CVS to incur additional losses for 2010 approximating $1.7 billion. These contractual losses will cause the operating profit of the PBM business in 2010 to decline by approximately 10% to 12%. These losses represent a stunning blow to CVS's PBM business. In addition, CVS hired a new Senior Vice President of Marketing and a new Vice President of Sales for the PBM business. The adverse impact on CVS's financial results for 2010 will be substantial.

19.     The undisclosed operating problems in the PBM business, the more than $6 billion in contractual losses for 2010 and the adverse impact on CVS 2010 financial results were not disclosed in CVS's third quarter earnings press release, dated November 5, 2009. To the contrary, defendants touted in the press release, PBM's increased revenues in the third quarter. Defendants did not disclose the operating problems, the contractual losses and the adverse impact on CVS's 2010 financial results until they held their third quarter earnings conference call with analysts at 8:30 a.m. on November 5, 2009. Even then, defendants sought to downplay the materiality of the adverse facts by discussing them only in an effort to explain why their previous indication for CVS's 2010 EPS

growth of "at least 13% to 15%", which defendants had provided to analysts during CVS's second quarter earnings call on August 4, 2009, had to now be significantly reduced. Defendant Ryan admitted on November 5, 2009, that the EPS growth he provided on August 4, 2009, was dependent upon the PBM business achieving low to mid single digit growth which, in light of the undisclosed material adverse facts concerning the PBM was "not going to happen." At the time defendant Ryan made his EPS growth statements to analysts on August 4, 2009, he knew of the adverse material facts concerning the PBM business and knew that those material adverse facts would preclude the PBM business from achieving any profit growth in 2010. In fact, defendant Ryan knew that the PBM business would experience a decline in operating profit in 2010.

20.     At the same time, defendants belatedly disclosed that the Federal Trade Commission ("FTC") had begun a "nonpublic investigation" in August 2009 into whether CVS's business practices and service offerings violated antitrust laws. Among the business practices of CVS that the FTC is reportedly investigating are improper use of pricing and patient data from its retail pharmacy operations to steer its PBM members to CVS stores. CVS stated in its SEC filing that it was "cooperating in the FTC's investigation and is voluntarily producing documents and other information on a rolling basis as requested by the FTC."

21.     When defendants, on November 5, 2009, made the belated disclosures of the adverse material facts concerning the PBM business and their adverse impact on CVS's financial results for 2010, as alleged in paragraph 16, hereof, and the FTC investigation, as alleged in paragraph 17, hereof, the market was stunned and the price of CVS common stock fell 20% to close at $28.87, its biggest drop in eight years. The media reported that "CVS Investors Pummel Stock on CEO's Caremark Surprise," (Bloomberg News, November 6, 2009), that "CVS stock plunges on lost PBM

contracts," (*Providence Business News*, online, November 5, 2009) and "New trouble for CVS as FTC starts probe." (*Providence Business News*, online, November 6, 2009).

22.     Although defendants knew of the undisclosed adverse material facts alleged in paragraphs 18 through 20, at the time they issued CVS's first quarter earnings press release and held CVS's first quarter earnings call with analysts, both on May 5, 2009, defendants failed to disclose material adverse facts and made misrepresentations of material fact at that time or at any subsequent time during the Class Period, as follows:

        (a)     Defendants failed to disclose that the PBM business was suffering from and would continue to suffer from serious operating problems, including, without limitation, failure to market the PBM business properly, failure to price PBM contracts properly, and failure to service clients properly, which problems were causing and would continue to cause CVS to lose billions of dollars of contract renewals in 2009 for 2010.

        (b)     In the press release, for example, defendants stated that "[r]evenues in the pharmacy services segment increased 7.2%..." Defendant Ryan also stated in the press release that "I'm very pleased with our results for the first quarter, which were at the top of our expectations. Our performance reflects healthy underlying growth in our business, with solid revenue increases and share gains across the enterprise." These statements were materially false and misleading because defendants knew but failed to disclose that the first quarter's revenue growth was not an indicator of the "healthy underlying growth" of the PBM business because, as of that date, defendants knew that the current and continuing operating problems of the PBM business and the losses already sustained and to be sustained on contracts and the Med D business would cause the PBM business to sustain reduced profit growth when the impact of the material adverse facts were accounted for in CVS's financial results in 2010.  It was materially misleading for defendants to

portray the 2009 results in the first quarter, which were based entirely on the contracts signed in 2008, as the basis for profit growth in 2010 when defendants knew that the 2010 financial results would be based entirely on the contracts signed in 2009 (not the old 2008 contracts).  There was nothing about the first quarter's performance by the PBM business which portended well for 2010 or served as the basis for "healthy growth" in 2010.

        (c)        In the earnings call with analysts on May 5, 2009, defendant Ryan discussed the PBM business, stating that "[a]s far as selling season goes, in 2009 we reached a new record level of $8.9 billion in annualized new name sales...On a 2009 impact basis, our gross new revenues are $7.6 billion. . .  The primary driver here is an increase in Med D revenues due to higher enrollment. . .  While we won't talk about specifics this early in the current selling season, we see plenty of new business opportunities for 2010 and we're very pleased with the early results of the season.  In addition, clients are more open than ever to changes in plan design and other cost containment tools to save money.  As you probably heard, last week we lost the Coventry Commercial contract, which is about $1 billion in revenues and a relatively low mail penetration account.  This was not unexpected.  In fact, as we began to set our goals for 2010, the loss of this account was considered.  We have a lot of irons in the fire."  It was materially false and misleading for defendants to portray the 2009 contract renewal season as a positive situation for CVS when defendants knew that the continuing operating problems at the PBM business, which defendants failed to disclose, were causing other clients not to renew their contracts for 2010 and that billions of dollars in additional contract losses were seriously at risk.

       23.       Defendants continued their common course of conduct during the Class period by continuing to misrepresent the facts and by failing to disclose adverse material facts, as alleged in paragraphs 18 through 20, at the time they issued CVS's second quarter earnings press release and

held CVS's second quarter earnings call with analysts, both on August 4, 2009. Defendants failed to disclose material adverse facts and made misrepresentations of material fact at that time or at any subsequent time during the Class Period, as follows:

(a)     Defendants failed to disclose that the PBM business was suffering from and would continue to suffer from serious operating problems, including, without limitation, failure to market the PBM business properly, failure to price PBM contracts properly, and failure to service clients properly, which problems were causing and would continue to cause CVS to lose billions of dollars of contract renewals in 2009 for 2010.

(b)     In the press release, for example, defendants stated that "[r]evenues in the pharmacy services segment increased 22.1%. . ." CVS's Chief Financial Officer further stated that "[g]iven our strong performance year to date as well as our optimism for the rest of the year, we're raising our earnings guidance and narrowing the range. We now expect to deliver Adjusted EPS from continuing operations of $2.59 - $2.64 for the year…" Defendant Ryan also stated in the press release that "I'm very pleased with our second quarter results, which were at the high end of our expectations. We saw solid revenue growth and cost control across our businesses, which led to 8% operating profit growth after one-time costs for the Longs integration. This is shaping up to be a very good year and we expect an even better 2010." These statements were materially false and misleading because defendants knew but failed to disclose that the current quarter's revenue growth was not an indicator of the current financial health of the PBM business because, as of that date, defendants knew that the current and continuing operating problems of the PBM business and the losses already sustained and to be sustained on contracts and the Med D business would cause the PBM business to sustain reduced profit growth when the impact of the material adverse facts were accounted for in CVS's financial results in 2010. It was misleading for defendants to portray the

- 9 -

2009 results, which were based entirely on the contracts signed in 2008, as the basis for profit growth in 2010 when defendants knew that the 2010 financial results would be based entirely on the contracts signed in 2009 (not the old 2008 contracts) and that, to date, CVS had already lost approximately $3 billion in contract renewals and would continue to lose billions of dollars more in failed contract renewals as the result of the ongoing operating problems in the PBM business.

(c)     On the earnings call with analysts on August 4, 2009, defendant Ryan repeated the 2009 increased earnings guidance that was included in the press release.  In addition defendant Ryan stated, "[w]hile we are not giving guidance for 2010, I know there are some questions with respect to Med D regulatory changes and its impact on our 2010 earnings and we received a lot of those questions at our analysts meeting.  Well, we've finalized our Med D bids and have really had a chance to do some early handicapping on the various regions and what we think we'd keep and get.  So now we think the net impact of the elimination of Med D, the Med D network differential next year will be in the range of $0.05 to $0.07 a share. . . .  Now even with this, I'd be very disappointed if we didn't have an EPS growth of at least 13% to 15% next year.  As I said, we haven't completed our plan for 2010 and it's too early to give specific guidance but I did want to give you some visibility on the Med D impact next year.  So we expect a great '09 and we look forward to even a better '10."  It was misleading for defendants to portray the 2009 results to date, which were based entirely on the contracts signed in 2008, as the basis for profit growth in 2010 when defendants knew that the 2010 financial results would be based entirely on the contracts signed in 2009 (not the old 2008 contracts) and that, to date, CVS had already lost approximately $3 billion in contract renewals and would continue to lose billions of dollars more in failed contract renewals in 2009 as the result of the ongoing operating problems in the PBM business.

(d)     In the earnings call with analysts on August 4, 2009, defendant Ryan told analysts that "[w]e are still in the middle of the 2010 selling season so we'll have more on the third quarter call but we've had some good successes and we've had some disappointments. We now have over 3,000 clients under contract and our retention rate for 2010 is 96%, which is slightly higher than 2009. As previously reported, we lost the Coventry commercial contract, which was worth $1.4 billion, which was widely expected, and recently the newly formed UAW Viva group decided to consolidate all the autos under one contract. As a result, we lost the Chrysler UAW retirees to Blue Cross Blue Shield of Michigan. Given the fact that the Chrysler contract was $400 million and was the smallest of the big three autos, we really weren't surprised that it consolidated into the other two (sic). It's important to note that the renewed Chrysler actives, as well as their non-union employees, will stay with us. Now on the flip side, we won new contracts, gross new contracts worth $1.1 billion…So with this…we've actually added $400 million of new business since the last analyst meeting. We're optimistic about additional wins this season but the remaining opportunities are probably not sizable enough to offset the losses since the term contracts I reviewed totaled about $2 billion." It was false and misleading for defendants to portray the 2009 contract renewal season as a "net win" when defendants knew that the continuing operating problems at the PBM business, which defendants failed to disclose, were causing other clients not to renew their contracts for 2010 and that billions of dollars in additional contract losses were seriously at risk. It was further misleading to represent that the contract losses incurred to date, $2 billion, net of additional "wins" was the maximum amount of losses CVS would incur on contract renewals in 2009 for 2010 when defendants knew that, based on the undisclosed ongoing operating problems in the PBM business, as well as CVS's questionable anti-competitive practices, would, in all probability, lead to additional large clients opting not to renew their contracts with CVS for 2010 and

that as a result, the $2 billion in disclosed losses was, in reality, the tip of the iceberg of losses. Because, based on information and belief, negotiations for contract renewals continue over a prolonged period, defendants, by August 4, 2009, knew that additional contract losses, based on ongoing negotiations, were a substantial probability.

(e)      Defendants failed to disclose that they were in jeopardy of losing additional contract renewals in 2009 for 2010, beyond the Chrysler retirees and Coventry losses defendant Ryan mentioned on the August 4, 2009 earnings call with analysts, which losses would surpass the losses on those two contracts and which, collectively, would cause the PBM business, and CVS, to suffer reduced profitability in 2010.

(f)      Defendants failed to disclose that the FTC had opened a "nonpublic investigation" into CVS's business and sales practices and that CVS was producing documents on a rolling basis to the FTC.

(g)      Defendants made false and misleading statements to the market when they told analysts that they expected CVS to achieve EPS growth of at least 13% to 15% in 2010 when defendants knew, but did not disclose, that EPS growth was dependent upon the PBM business achieving operating profit growth in the low to mid single digit range and that because of the known operating problems, contract losses and loss of the Med D business, defendants knew that it was impossible for the PBM business to achieve any profit growth in 2010 and, in fact, defendants knew that those problems and losses would cause the PBM business operating profit to decline in 2010.

24.      The market for CVS common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, CVS common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired CVS common stock relying upon

the integrity of the market price of CVS's common stock and market information relating to CVS, and have been damaged thereby.

25.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of CVS common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

26.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about CVS's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of CVS and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein when the truth about the Company was revealed and the inflation in the price of CVS's stock was removed.

27.     While in possession of the material facts alleged herein, Defendants sold their personally-held CVS shares to the unsuspecting public. The following chart sets forth the suspicious and unusual insider trading:

| Last Name | First Name | Position | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| FERDINANDI | VINCENT | O,SVP | 8/19/2009 | 5,657 | $34.51 | $195,223 |
| | | | | 5,657 | | $195,223 |
| | | | | | | |
| MCLURE | HOWARD | O,OX | 8/7/2009 | 136,258 | $34.18 | $4,657,298 |
| | | | 8/7/2009 | 63,742 | $34.42 | $2,194,000 |
| | | | 9/1/2009 | 100,000 | $37.45 | $3,745,000 |
| | | | 10/1/2009 | 96,717 | $35.63 | $3,446,027 |
| | | | 10/1/2009 | 3,283 | $35.88 | $117,794 |
| | | | 11/2/2009 | 100,000 | $35.71 | $3,571,000 |
| | | | | 500,000 | | $17,731,119 |
| | | | | | | |
| RICKARD | DAVID | CFO,O | 8/17/2009 | 251,520 | $33.96 | $8,541,619 |
| | | | | 251,520 | | $8,541,619 |
| | | | | | | |
| RYAN | THOMAS | CEO,P,OD | 8/7/2009 | 400,000 | $34.41 | $13,764,000 |
| | | | | 400,000 | | $13,764,000 |
| | | | | | | |
| SGARRO | DOUGLAS | O,EVP | 8/18/2009 | 112,336 | $34.50 | $3,875,592 |
| | | | 8/19/2009 | 244,149 | $34.51 | $8,425,582 |
| | | | 8/20/2009 | 24,741 | $34.50 | $853,565 |
| | | | | 381,226 | | $13,154,738 |
| | | | | | | |
| | | | | 1,538,403 | | $53,386,700 |

## FIRST CLAIM

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

28.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

29.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 14 -

30.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

31.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CVS common stock.  Plaintiff and the Class would not have purchased CVS common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

32.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of CVS common stock during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

33.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

34.     The Individual Defendants acted as controlling persons of CVS within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of CVS, and their ownership of CVS stock, the Individual Defendants had the power and authority to cause CVS to engage in the wrongful conduct complained of herein.

35.     By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment:

A.     Determining that the action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and that Plaintiff be appointed Lead Plaintiff under the Private Securities Litigation Act of 1995 and as the representative of the Class and his counsel be appointed Lead and Liaison Counsel for the Class;

B.     Awarding compensatory damages and/or rescission as appropriate against Defendants, in favor of Plaintiff and all members of the Class for damages sustained as a result of Defendants' wrongdoing;

C.     Awarding Plaintiff and members of the Class the costs and disbursements of this suit, including reasonable attorneys', accountants' and experts' fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 17, 2009

BARRY J. KUSINITZ #1404

155 South Main Street, Suite 405
Providence, Rhode Island  02903
Telephone:  401/831-4200
401/831-7053 (fax)
bkusinitz@bdglawyers.com (email)

- 16 -

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES BERNARD M. GROSS, P.C.
DEBORAH R. GROSS
ROBERT P. FRUTKIN
Suite 450, John Wanamaker Building
100 Penn Square East
Philadelphia, PA 19107
Telephone: 215/561-3600
215/561-3000 (fax)

Attorneys for Plaintiffs

LAW OFFICES BERNARD M. GROSS, P.C.

## CERTIFICATION OF RICHARD MEDOFF

1.      I, Richard Medoff, have reviewed the Complaint and have authorized the filing of same.

2.      I did not purchase the securities of the CVS Caremark at the direction of counsel or in order to participate in any private action arising under this title.

3.      I am willing to serve as a class representative and provide testimony at deposition and trial if necessary.

4.      My transactions in the common stock of CVS Caremark during the time period from May 5, 2009 to November 4, 2009, inclusive are set forth on Exhibit A attached hereto.

5.      During the previous three years, I have not been a lead plaintiff in any securities fraud class action.

6.      I will not accept any payment for serving as a class representative beyond my pro rata share of any recovery, except as ordered or approved by the Court with respect to an award for reasonable costs and expenses (including lost wages).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16 day of November, 2009, at Clifton Hts  PA.     .(city\state)

RICHARD MEDOFF