UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

————————————————————x
RICHARD MEDOFF, Individually and On   :    Class Action
Behalf Of All Others Similarly Situated,   :
  :    Civil Action No. 1:09-cv-00554-S-DLM
                Plaintiff,   :
  :    CONSOLIDATED CLASS ACTION
       vs.   :    COMPLAINT
  :
CVS CAREMARK CORPORATION,   :
THOMAS M. RYAN, DAVID RICKARD,   :
and HOWARD McLURE,   :
  :
             Defendants.   :
————————————————————x

BOISSEAU & DEAN LLP
Barry J. Kusinitz
155 South Main Street, Suite 405
Providence, Rhode Island 02903
Telephone: 401/831-4200
401/831-7053 (fax)

*Liaison Counsel*

LABATON SUCHAROW LLP
Joseph A. Fonti
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)

ROBBINS GELLER
  RUDMAN & DOWD LLP
Robert M. Rothman
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Lead Counsel*

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ..................................................................... 2

II.     THE CLAIMS ASSERTED IN THIS COMPLAINT ......................................... 6

III.    JURISDICTION AND VENUE ................................................................. 6

IV.     CLASS ACTION ALLEGATIONS ............................................................. 7

V.      PARTIES ........................................................................................ 8

        A.      Lead Plaintiffs............................................................................ 8

        B.      Defendants ............................................................................... 9

VI.     SUBSTANTIVE ALLEGATIONS ............................................................. 10

        A.      Background Allegations................................................................ 14

        B.      The CVS Caremark Merger .......................................................... 21

        C.      Defendants Knew Pervasive Integration Issues Were Causing Service
                Issues And Client Terminations, But Fraudulently Stated They Were
                Maintaining And Increasing Their PBM Clients ................................... 25

        D.      Contrary To Their Public Statements, Defendants Knew Months Before
                Disclosure That Key Contracts Were Lost Due To Failed Integration And
                Service Issues.......................................................................... 28

        E.      Defendants Fraudulently Withheld From Investors That The Integration
                Was A Failure, Impacting Contract Renewals..................................... 36

        F.      While Knowing They Had Misled Investors, Defendants Made
                $40 Million Selling Their Shares Before Their Fraud Was Revealed ................. 39

        G.      Defendants Knew That The 2009 Regulation Eliminating Med-D PDP
                Spread Impaired SilverScript's Pricing Structure And Would Lead To
                Material Losses In 2010.............................................................. 42

        H.      Defendants Knew That The Maintenance Choice Offering Was Neither
                Driving Contract Renewals Nor Gaining New PBM Contracts ..................... 43

VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
        OMISSIONS ..................................................................................... 43

VIII.   THE TRUTH IS REVEALED.................................................................. 74

IX.     POST-CLASS PERIOD CONDUCT .......................................................... 80

X.      ADDITIONAL EVIDENCE OF SCIENTER .................................................................. 83

XI.     LOSS CAUSATION/ECONOMIC LOSS ....................................................................... 87

XII.    FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE .................................. 88

XIII.   NO SAFE HARBOR PROTECTION ............................................................................ 90

XIV.    CAUSES OF ACTION .................................................................................................... 91

COUNT I -- AGAINST DEFENDANTS  FOR VIOLATIONS OF SECTION 10(b) OF
        THE EXCHANGE ACT  AND RULE 10b-5 PROMULGATED THEREUNDER ....... 91

COUNT II -- AGAINST THE INDIVIDUAL DEFENDANTS  FOR VIOLATIONS OF
        SECTION 20(a) OF THE EXCHANGE ACT ............................................................... 95

XV.     PRAYER FOR RELIEF ................................................................................................. 96

XVI.    JURY TRIAL DEMANDED .......................................................................................... 97

The City of Brockton Retirement System, the Plymouth County Retirement System, and the Norfolk County Retirement System (collectively, "Lead Plaintiffs") bring this class action for violations of the anti-fraud provisions of the Securities Exchange Act of 1934 (the "Exchange Act") against defendants CVS Caremark Corporation ("CVS Caremark" or the "Company"); Thomas M. Ryan ("Ryan"), Executive Chairman, President, and Chief Executive Officer ("CEO"); David B. Rickard ("Rickard"), Executive Vice-President and Chief Financial Officer ("CFO"); and Howard A. McLure ("McLure"), President of Caremark Pharmacy Services (collectively, "Defendants").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and as to other matters upon the investigation of Lead Counsel, which included, among other things, (i) a review and analysis of public filings by CVS Caremark with the United States Securities and Exchange Commission (the "SEC"); (ii) a review and analysis of other publicly available information, including press releases, transcripts of the Company's conference calls with Wall Street analysts, and articles in the general and financial press; (iii) a review and analysis of documents obtained through freedom of information act requests under state acts and statutes; (iv) interviews with scores of former employees of CVS Caremark (and related legacy entities), customers, and industry experts; and (v) a review and analysis of other available materials relating to CVS Caremark. Lead Plaintiffs believe that substantial additional evidentiary support will exist for their allegations after a reasonable opportunity for discovery.[1]

---

[1] Attached is a Glossary of Terms defined herein.

I.     **NATURE OF THE ACTION**

1.     In March 2007, CVS Corp. ("CVS"), the nation's largest retail pharmacy chain, completed its much-anticipated merger with Caremark Rx Inc. ("Caremark"), the second largest prescription benefits  manager ("PBM"), forming CVS Caremark (the "Merger").  This case arises from Defendants' materially false and misleading statements relating to the Merger, and, in particular, the success and profitability of the PBM business, which administers drug benefit programs on behalf of entities (*e.g.*, employers) that provide prescription drug insurance to their enrollees or members (*e.g.*, employees and retirees).

2.     At its most basic, the Merger's purported goal was to deliver to PBM plan participants the "right drug at the right place at the right time," according to defendant Ryan, CVS Caremark's CEO.  Defendants were keenly aware that the Merger's success hinged on the Company's service to its clients.  Indeed, shortly before the Merger, CEO Ryan made a pledge to investors that: "[n]o one is going to be able to out-cost us in the market . . . .  So, then it's all about . . . service."  The emphasis of service over price was a critical component of the Company's business model.  As Defendants acknowledged, while they could always be competitive on price, if participants were not satisfied with how the Company was servicing their needs, existing business would be lost and new contracts would be illusive—costing the Company billions of dollars in annual earnings.

3.     From the inception of the Merger, customers and investors voiced their concerns regarding the Company's ability to execute the level of service that Ryan had promised.  As CEO Ryan explained, customers and investors "want to get calmed down that . . . we're still going to focus on execution and service and we're confident that we are."  As Ryan knew, however, this promise hinged on a successful integration of the Company's computer systems,

policies, procedures, and staff—a complex undertaking for two companies that each had

undergone numerous acquisitions and attempted integrations prior to the Merger.

4.     Within months, however, Defendants declared that the Merger was a success.  For

example, during a call with investors and analysts on November 1, 2007, defendant Ryan

claimed he was "pleased that we've completed the integration of both the organization and back

end systems quickly and successfully."  Thereafter, Defendants continued to insist in the face of

investor scrutiny that the Merger had gone smoothly, that the Company was fully integrated, and

that customers were eagerly pleased with the new Company's service.

5.     In reality, CVS Caremark's integration was a failure, causing the Company's plan

participants and plan sponsors to launch frequent, consistent, and repeated complaints

concerning the Company's sheer incapacity to provide benefits as promised.  Ultimately,

Defendants lost $4.5 billion in PBM revenue for 2010, with as much as $3 billion attributable to

three contracts—Coventry, New Jersey, and Chrysler.  Defendants had personal knowledge that

the clients would terminate all three of these contracts months before Defendants chose to reveal

it to the market.  And, significantly, Defendants knew that these contracts were lost due to poor

service resulting from the Company's failed integration.

6.     As detailed herein, Defendants' personal knowledge of these facts arose, in part,

from detailed reports and frequent meetings and conferences addressing the integration failure

and the impact thereof.  Each week, Defendants received Sales Pipeline Reports, which

specifically identified contracts at risk for termination.  At least monthly, they participated in

conferences dedicated to discussing customer issues and renewal efforts.  Some problem

accounts, like Coventry (with contracts worth in excess of $4 billion annually) and New Jersey (a

contract worth in excess of $1 billion annually), were featured no later than May 2008 in internal

Company documents as being at the highest risk for termination due to service issues, and were the subject of daily discussion by Defendants.  In fact, by Fall 2008, it was practically official within the Company that each of these three contracts was not going to be renewed—a material fact concealed from investors.

7.      Recognizing that the loss of these lucrative contracts was eviscerating CVS Caremark's ability to hit projected earnings—and would reveal that the Merger had failed—Defendants acted in desperation to retain their remaining clients.  In particular, at year-end 2008, Defendants announced that they unilaterally decided to cut prices on more than 50 percent of CVS Caremark's contracts, including 70 percent of the national contracts, which have higher profit margins.  When one securities analyst questioned whether poor service caused the re-pricing, Ryan directly and forcefully stated: "there was no hidden agenda here about giving a lower price because of lack of service."  In reality, however, that was precisely Defendants' agenda.

8.      On August 4, 2009, Defendants told investors they "would be very disappointed if [the Company] didn't have an EPS growth of at least 13 to 15% next year."  This projection was based on "low to mid single digit" growth in the PBM business.  Defendants fraudulently made this statement notwithstanding their actual knowledge that CVS Caremark's largest contracts were lost due to service issues and disruptions—the same issues and disruption that resulted in the wrong drugs being sent to the wrong people at the wrong price across numerous significant plan sponsor clients.

9.      The next day, August 5, 2009, Defendants received a letter confirming that the New Jersey contract was not being renewed, a fact that Defendants had known since 2008.  Rather than disclose this material fact to investors, let alone admit that their earnings projection

of 13-15 percent was false, Defendants decided, instead, to capitalize on their adverse, non-public information, and sell in excess of *$40 million* of their Company shares at artificially inflated prices before revealing the truth.  Specifically, on August 7, 2009, CEO Ryan and PBM head McLure sold nearly *$21 million* of their Company shares in a single day.  On August 17, 2009, CFO Rickard sold *$8.5 million* of his Company shares.  Between September and November, 2009, defendant McLure sold an additional *$11 million* in Company shares.  In total, defendant McLure sold more than 98 percent of his shares personally held during the Class Period, and over 60 percent of his holdings, including vested options.

       10.     At the end of the Class Period, investors learned the truth: the Merger integration was a failure, driving customers—and thus billions in revenue—away from the Company.  In particular, Defendants admitted that the Coventry contracts were lost due to service issues.  As defendant Ryan put it, "when we lost the [Medicare Part D contract with Coventry in May 2008], *we knew* we were going to lose the commercial business, there were some service issues." (Emphasis added.)  Defendants disclosed the loss of the Coventry commercial contract in May 2009, but concealed their knowledge that the loss was due to service until the end of the Class Period.  Under the guise of "retirement," Defendants also announced that McLure, the chief architect of the Merger's PBM model, was fired.

       11.     Upon learning these revelations, investors reacted severely, causing the share price of CVS Caremark stock to collapse 20 percent in a single day, on 13 times the average daily volume during the Class Period.  In view of the truth, analysts who had bought into Defendants' misrepresentations also reacted.  For instance, an analyst from HSBC pointed to the fact that the "[s]urprise nature of disclosure raises credibility issues" for management, and an analyst from Deutsche Bank concluded that the Company's PBM business had no value.

Perhaps most succinctly, notwithstanding Defendants' statements during the Class Period that the Merger was a success, as an analyst with Credit Suisse put it: "CVS provided ***undeniable evidence*** today that it has mismanaged the Caremark acquisition and ***destroyed shareholder value***."  (Emphasis added.)

## II.  <u>THE CLAIMS ASSERTED IN THIS COMPLAINT</u>

12.    This Complaint sets forth claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants, who were knowing or reckless participants in defrauding investors in connection with their material misrepresentations and omissions concerning the success of the Merger.

## III.  <u>JURISDICTION AND VENUE</u>

13.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78J(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

14.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and pursuant to 28 U.S.C. § 1331.

15.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and pursuant to 28 U.S.C. § 1391(c).  CVS Caremark resides and transacts business in this District, and maintains its corporate headquarters in this District at One CVS Drive, Woonsocket, Rhode Island 02895.  In addition, many of the acts and transactions that constitute the violations of law complained of herein, including the preparation and dissemination to the public of untrue statements of material facts, occurred in this District.

IV.    **CLASS ACTION ALLEGATIONS**

16.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of

Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased, or

otherwise acquired, CVS Caremark common stock between October 30, 2008 and November 4,

2009, inclusive, and were damaged thereby.  Excluded from the Class are Defendants; the other

officers and directors of CVS Caremark; members of the immediate families of any excluded

person; the legal representatives, heirs, successors, or assigns of any excluded person or entity;

and any entity in which Defendants have or had a controlling interest.

17.    While the exact number of Class members is unknown to Lead Plaintiffs at this

time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that

there are tens of thousands, if not hundreds of thousands, of members in the proposed Class.

Throughout the Class Period, CVS Caremark securities were traded on the New York Stock

Exchange, with an average daily volume of approximately 14 million shares.

18.    The members of the Class are so numerous that joinder of all members is

impracticable.  Record owners and other members of the Class may be identified from records

maintained by CVS Caremark and may be notified of the pendency of this action by mail, using

the form of notice similar to that customarily used in securities class actions.

19.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class,

as all members of the Class are similarly affected by Defendants' wrongful conduct in violation

of federal law that is complained of herein.

20.    Lead Plaintiffs will fairly and adequately protect the interests of the members of

the Class and Lead Counsel is competent and experienced in class actions and securities

litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether the SEC filings, press releases, reports, and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

(c)     whether and to what extent the market price of CVS Caremark's securities were artificially inflated during the Class Period due to the non-disclosures and/or misrepresentations complained of herein; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.     <u>PARTIES</u>

### A.     <u>Lead Plaintiffs</u>

23.     The City of Brockton Retirement System represents over 3,000 active and retired employees of the City of Brockton, Massachusetts, and manages more than $390 million in assets.

24.     Plymouth County Retirement System represents more than 9,700 active and retired public employees of Plymouth County, Massachusetts, and manages approximately $636 million in assets.

25.     Norfolk County Retirement System has over 9,500 active and retired members from 40 governmental units throughout the County of Norfolk, Massachusetts, and has approximately $500 million in assets.

26.     Brockton, Plymouth, and Norfolk enjoy a long-standing, pre-existing working relationship and share joint membership in Massachusetts-based retirement system organizations. As set forth in their certifications previously filed with the Court, Lead Plaintiffs purchased shares of CVS Caremark common stock during the Class Period and suffered damages proximately caused by the violations of the securities laws alleged herein.

**B.     Defendants**

27.     Defendant CVS Caremark was created through the Merger.   CVS Caremark is incorporated in Delaware and maintains its principal place of business and chief executive offices at One CVS Drive, Woonsocket, RI 02895.  The Company's Class A shares of common stock are publicly traded on the New York Stock Exchange, under the symbol "CVS."

28.     Defendant Ryan was, at all relevant times, the Company's Executive Chairman, President and CEO.  Ryan has served as Chairman of the Board of CVS Caremark since November 2007 and President and CEO of CVS, and later CVS Caremark, since May 1998. Ryan is also a director of Bank of America Corporation and Yum! Brands, Inc., and previously served as a director of Reebok International Ltd. until January 2006.  Ryan has been with CVS Caremark for 35 years, rising in the ranks from in-store pharmacist to CEO.  Ryan holds a Bachelor of Science degree from the University of Rhode Island.

29.     Defendant Rickard was, at all relevant times, the Company's CFO and Executive Vice-President.  He held both positions from September 1999 to December 2009.  Prior to joining CVS, Rickard was Senior Vice-President and CFO of RJR Nabisco Holdings Corporation from March 1997 to August 1999, and also served as Executive Vice-President of International Distillers and Vintners Americas.  Rickard currently serves as a director and audit committee chairman of numerous companies, including Jones Lang LaSalle Inc. and Dollar General Corp.  Rickard received a Bachelor of Science degree in Social Psychology in 1969 from Cornell University and an M.B.A. in Finance in 1971 from Harvard Business School.

30.     Defendant McLure was, at all relevant times, President of Caremark Pharmacy Services, the division of CVS Caremark which includes its PBM business.  Prior to obtaining this position,  McLure was the Chief Operating Officer and Senior Executive Vice-President of Caremark from June 21, 2005 to March 2007.  He also served as an Executive Vice-President, CFO, and Principal Accounting Officer of Caremark from May 2000 to June 21, 2005.  McLure is a Certified Public Accountant and a member of the American Institute of Certified Public Accountants.

31.     Defendants Ryan, Rickard, and McLure are hereinafter collectively referred to as the "Individual Defendants."

## VI.    **SUBSTANTIVE ALLEGATIONS**

32.     Lead Plaintiffs' allegations are based on the investigation conducted by Lead Counsel, which included, among other things, a review of public filings by CVS Caremark with the SEC, press releases, transcripts of the Company's conference calls with Wall Street analysts, publicly available trading information, articles in the general and financial press, documents obtained through freedom of information act requests under state acts and statutes, other

available materials relating to CVS Caremark, interviews with CVS Caremark customers, and

consultation with industry experts.

33.     Lead Plaintiffs' allegations are also based upon information provided by former

employees of CVS Caremark or their predecessor entities, with knowledge of the facts alleged

herein, including but not limited to, the following confidential witnesses:

- Confidential Witness No. 1 ("CW1") is a former employee of PharmaCare, CVS's pre-Merger PBM, who worked as a Project Manager on the Company's Chrysler contract from 2006 through mid-2007. During CW1's tenure at PharmaCare, one of CW1's primary responsibilities was to upload Chrysler's plan participant data into the Company's computer systems. As a result, CW1 was in a position to know, and does know, about service issues related to CVS Caremark's failure to integrate Caremark's plan participant structure with PhamaCare's plan participant structure, as alleged herein.

- Confidential Witness No. 2 ("CW2") is a former employee of PharmaCare and CVS Caremark, who worked as a PBM Account Executive from 2007 to February 2008. CW2's primary responsibility was to manage PBM contracts through plan benefit design. Throughout CW2's tenure at CVS Caremark, CW2 managed several large contracts. As a result, CW2 was in a position to know, and does know, how CVS Caremark created its Sales Pipeline Reports (defined below) and what information the reports conveyed to Senior Executive leadership, including the Individual Defendants, as alleged herein.

- Confidential Witness No. 3 ("CW3") was an employee of Caremark and CVS Caremark, from 1999 to January 2009, during which CW3 worked as a Senior Account Advisor on the New Jersey account. CW3 was responsible for and did provide periodic reports, including Sales Pipeline Reports (defined below), to senior executives, including the Individual Defendants, concerning the New Jersey account. Based on CW3's communication with the New Jersey account administrators and CVS Caremark's management, CW3 was in a position to know, and does know, that the Company's pervasive post-Merger service issues impacted CVS Caremark's ability to properly service, among others, the New Jersey account, that attrition among the ranks of upper management was in large part responsible for the service issues, and that the New Jersey account was at high risk of termination as early as the fourth quarter of 2007, as alleged herein.

- Confidential Witness No. 4 ("CW4") is a former employee of PharmaCare and CVS Caremark, who worked as a PBM Account Executive from 2004 through July 2009. CW4's primary responsibility was to manage PBM contracts through plan benefit design. Throughout CW4's tenure at CVS Caremark, CW4 managed several large contracts, amounting to a book of

11

business valued at $91 million.  As a result, CW4 was in a position to know, and does know, that the status of PBM contracts were well documented through Sales Pipeline Reports (defined below) that were regularly distributed to Senior Executive leadership, including the Individual Defendants, as alleged herein.

- Confidential Witness No. 5 ("CW5") is a former employee of Caremark and CVS Caremark who worked as a Director of the PBM department from 2006 through November 2008.  CW5's primary responsibility consisted of managing over 100 employees who designed plan benefit programs.  CW5 additionally oversaw the management of PBM accounts, including customer satisfaction, inventory, and budgets.  Throughout CW5's tenure at CVS Caremark, CW5 attended quarterly Senior Executive meetings, which were attended by the Individual Defendants, to discuss the status of PBM contract negotiations and service-related issues.  Accordingly, CW5 was in a position to know, and does know, that billions of dollars of PBM contracts were terminated due to CVS Caremark's poor systems integration, service, and insufficient resources, as alleged herein.

- Confidential Witness No. 6 ("CW6") is a former employee of Caremark and CVS Caremark, who worked as a Client Liaison Coordinator in the Nashville, Tennessee office from 2005 to just after the Merger in March 2007.  CW6 was primarily responsible for monitoring the Merger transition process among plan sponsor clients and resolving issues of service interruptions.  For instance, CW6 worked directly with CVS Caremark's Customer Care Representatives so that they could effectively service calls from plan participants of recently transitioned plan sponsors.  CW6 was in a position to know, and does know, that throughout CW6's tenure with the Company, CVS Caremark was plagued by service-related and integration problems that prevented it from properly servicing existing clients and new clients, as alleged herein.

- Confidential Witness No. 7 ("CW7") is a former employee of Caremark and CVS Caremark, who worked as an Audit Department Team Leader from 1994 to March 2009.  CW7's primary responsibility was to ensure that the prices charged to plan participant claims were consistent with the plan sponsor's contract.  Moreover, following an audit of a client's contract, CW7 granted plan sponsor reimbursements where necessary.  Based on CW7's experience with "Reflections," CVS Caremark's audit software, CW7 was in a position to know, and does know, that the Company suffered from severe computer integration problems that eventually led to the termination of the Coventry, and other, contracts.  Further, CW7 was in a position to know, and does know, that members of Senior Management, including defendant Ryan, received monthly audit reports identifying contracts at high-risk of termination, as alleged herein.

12

- Confidential Witness No. 8 ("CW8") is a former employee of Caremark and CVS Caremark, who served as a Specialty Admissions Coordinator from 2006 to October 2007. CW8's primary responsibility was to investigate and verify benefits for plan participants under the Coventry contract. Further, CW8's employment with the Company placed CW8 in a position to regularly interact with other employees who dealt with Coventry. As a result, CW8 was in a position to know, and does know, about the high level of staff turnover among those CVS Caremark employees who worked on the Coventry contract. Moreover, CW8 worked directly with the PeopleSafe software program, allowing CW8 to experience the poor level of computer systems integration following the Merger, as alleged herein.

- Confidential Witness No. 9 ("CW9") is a former employee of Caremark and CVS Caremark, who worked in the Company's Nashville, Tennessee call center from 2005 to August 2009. CW9 primarily assisted plan participants with issues pertaining to insurance, mail-order prescriptions, billing, prescription order status, and claims. As a result, CW9 was in a position to know, and does know, about problems that arose at call centers related to CVS Caremark's computer systems following the Merger, as alleged herein.

- Confidential Witness No. 10 ("CW10") is a former employee of CVS Caremark who worked as a Client Audit Analyst in the Scottsdale, Arizona office from 2007 to April 2009. More specifically, CW10 audited CVS Caremark's PBM contracts for errors related to billing and processing. CW10 therefore was in a position to know, and does know, that during his/her tenure at CVS Caremark, PBM customers experienced problems related to the Company's billing processes, as alleged herein.

- Confidential Witness No. 11 ("CW11") is a former employee of PharmaCare and CVS Caremark, who worked as a Project Coordinator on the Chrysler contract from 2007 through May 2008. Throughout CW11's tenure, CW11 was largely responsible for creating and editing Chrysler's drug formulary (*i.e.*, the negotiated list of drugs available to Chrysler's plan participants). As part of CVS Caremark's team dedicated to Chrysler, CW11 attended meetings three to four times a week related to the Company's issues regarding contract compliance. Accordingly, CW11 was in a position to know, and does know, that members of Senior Management, including defendant Ryan, knew that the Chrysler contract was at high risk of termination throughout CW11's tenure, primarily due to CVS Caremark's integration-related service problems, as alleged herein.

- Confidential Witness No. 12 ("CW12") is a former employee of Caremark and CVS Caremark, who worked as a Prior Authorization Representative at the Company's Richardson, Texas call center from 2005 through March 2007. CW12 was specifically responsible for processing prescription authorizations for participants from doctors, pharmacists, and nurses. CW12 was in a position to know, and does know, that high staff turnover rates at these call

13

centers became a persistent customer service issue due to less experienced personnel fielding such calls, as alleged herein.

- Confidential Witness No. 13 ("CW13") is a former employee of CVS Caremark who worked as an analyst from November 2009 through February 2010. CW13 attended CVS Caremark's National Sales Meeting on February 1-3, 2010 in Orlando, Florida, during which defendant Ryan made several admissions regarding the Company's management of its PBM business since the Merger. As a result, CW13 was in a position to know, and does know, the substance of defendant Ryan's statements during the 2010 National Sales Meeting, as alleged herein.

A.     **Background Allegations**

1.     **Overview Of The Company And Its Business**

34.     Defendant CVS Caremark describes itself as the "largest provider of prescriptions and related healthcare services in the United States." The Company was formed as the result of the Merger. The combined company is both the largest retail pharmacy chain and the largest PBM in the United States, with approximately 100 million "covered lives"[2] as of the first quarter of 2010. The Company's main PBM competitors include Medco Health Solutions, Inc. ("Medco") and Express Scripts, Inc. ("Express Scripts").

35.     CVS Caremark operates in two business segments: Pharmacy Services and Retail Pharmacy. The Pharmacy Services segment provides a range of PBM services, including mail-order pharmacy services, specialty pharmacy services, plan design and administration, formulary management, and claims processing. CVS Caremark's Retail Pharmacy segment sells prescription drugs and a wide assortment of general merchandise, including over-the-counter drugs, beauty products and cosmetics, photo finishing, seasonal merchandise, greeting cards, and convenience foods through its pharmacy retail stores and over the Internet. As of December 31,

---

[2] The term "covered lives" refers to the number of individuals covered by a pharmacy benefit health plan.

2009, the Retail Pharmacy segment included 7,025 retail drugstores, located in 41 states and the District of Columbia.

36.     The Company's Pharmacy Services segment primarily serves employers, insurance companies, labor unions, government employee groups, managed care organizations, and other sponsors of health benefit plans and individuals.  As of December 31, 2009, the Pharmacy Services segment operated 49 retail specialty pharmacy stores, 18 specialty mail-order pharmacies and six mail service pharmacies located in 25 states, Puerto Rico, and the District of Columbia.

37.     Under the Pharmacy Services segment, CVS Caremark also serves, or served, as PBM to eligible insurance carrier clients (*e.g.*, Coventry, discussed below) that have qualified as Medicare Part D ("Med-D") prescription drug plans ("PDP") under Part D of the federal government's Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA").[3]  In addition to servicing PDP clients under Med-D, CVS Caremark operates its own PDP called SilverScript Insurance Company ("SilverScript"), for which CVS Caremark serves as the PBM.

## 2.     Overview Of The Pharmacy Benefit Management Business

38.     PBMs are companies that administer drug benefit programs on behalf of entities that provide prescription drug insurance to their enrollees or members.  These entities (herein referred to as "plan sponsors") include employers, government agencies, labor unions, retirement systems, and health maintenance organizations.  Plan sponsors contract with PBMs to handle drug purchasing and distribution, through retail and mail-order pharmacies.

---

[3] Medicare Part D is a federal program that subsidizes the cost of prescription drugs for Medicare beneficiaries in the United States.

39.     The PBM business in the United States initially began as a means for plan sponsors to control rising prescription drug costs.  PBMs, such as CVS Caremark, are hired to manage prescription drug programs in a manner that is cost-effective for their plan sponsor clients.  The PBMs essentially act as middlemen to negotiate prescription drug prices between pharmaceutical manufacturers, retail pharmacies (*i.e.*, CVS), and plan sponsors.

40.     Approximately 95 percent of all patients with drug coverage receive benefits through a PBM.  The three leading PBMs include CVS Caremark, Medco, and Express Scripts.  These companies dominate the PBM market and, collectively, manage drug benefits for over 230 million Americans.

41.     In managing their clients' prescription drug insurance coverage, PBMs perform a number of functions and services, including:

(a)     *Establishing pharmacy networks*:  PBMs contract with retail and mail-order pharmacies to establish where plan participants[4] can fill their prescriptions.

(b)     *Formulary management*:  Plan Sponsors may determine broad categories of drugs that are covered by their benefit plans.  PBMs, however, determine which specific drugs fall within each category.  In addition, PBMs are solely responsible for creating and managing the list of preferred prescription drugs (the "formulary") for all of its plan sponsor clients.

(c)     *Claims administration*:  PBMs maintain an electronic adjudication system that processes claims submitted by a pharmacist.  PBMs pay claims on behalf of plan sponsors and inform pharmacies how much cost sharing or "co-payments" to collect from plan participant.

---

[4] A "plan participants" refers to a third-party employee or plan sponsor member to whom the PBM's services flow as part of an employment agreement or other form of contract.

(d)     *Plan Participant Call Centers*:  As part of its service agreements with plan sponsors, PBMs maintain call centers in order to provide benefit information to, and assist in the resolution of any service issues for, plan participants.

(e)     *Mail-order service*:  Many PBMs offer mail-order service for maintenance prescriptions that do not need to be filled instantaneously.

(f)     *Manufacturer price negotiation*:  PBMs negotiate with drug manufacturers for the prices of the drugs they manage.

(g)     *Utilization review*:  PBMs review patients' prescription drug use to prevent drug interactions or over/under use of prescriptions.  If a problem is found, the PBM may alert the pharmacist or prescribing physician.

(h)     *Medication therapy management*:  Some PBMs provide certain programs to improve the quality or cost of pharmaceutical care—such as, consumer and physician education, and compliance programs to ensure that patients take their medication and disease management programs.

42.     The pharmaceutical industry involves a complex group of entities.  In a typical arrangement, a plan sponsor (*e.g.*, an employer) contracts with a PBM to manage the plan participants' prescription drug benefits.  The PBM, in turn, contracts with a network of retail pharmacies to fill prescriptions.  The pharmacies purchase prescription drugs from wholesalers and receive a dispensing fee for filling prescriptions, in addition to reimbursement of drug costs from the PBM.  PBMs also buy drugs directly from the manufacturers and sell them to plan beneficiaries through proprietary mail-order pharmacies.  The following chart illustrates the relationship among those entities:

17

**Exhibit 1.  Flow of Goods and Financial Transactions Among Players in the U.S.
Commercial Pharmaceutical Supply Chain**



Source:  The Health Strategies Consultancy LLC

43.     By way of example, when a plan participant walks into a retail pharmacy with a

prescription (or uses a mail-order pharmacy), the pharmacy inputs the participant's information

which is then transmitted to the participant's PBM.  The PBM's claims processing system

analyzes the claim against its participant database and determines whether to approve or reject

the claim.  Claims may be rejected for many reasons including, *inter alia*, the participants

18

eligibility, whether or not the drug requested is on the PBM's approved list, or formulary, whether or not a deductible has been met, or whether a participant has exceeded their prescription drug benefit cap.  If a prescription drug claim is approved, the PBM's claim processing system (i) informs the pharmacy of any co-payment to be collected at the pharmacy, (ii) credits the pharmacy the agreed-upon amount for that particular drug (minus the co-payment), (iii) charges the plan sponsor the agreed-upon amount for that particular drug (which is usually an amount greater than that credited to the pharmacy, *see* "drug pricing spread" below), and (iv) informs the drug manufacturer of the transaction in order to collect any rebate the PBM is due.

44.     Plan sponsors typically procure PBM services through a bidding process.  They issue requests for proposals ("RFPs") to several PBMs and then evaluate the proposals based on a variety of factors, including cost and services offered by each bidder.  The winning PBM bidder enters into a contractual agreement to provide services to the plan sponsor.  The contracts between plan sponsors and PBMs are subject to audits.  The audits generally focus on, among other things, compliance with the terms of the contracts and applicable legal requirements.

### 3.     Overview Of How PBMs Make Money

45.     There are three main ways in which PBMs earn revenue, including: (i) administrative fees; (ii) manufacturer rebates; and (iii) drug pricing spread.

46.     PBMs profit, in part, through administrative fees paid to them by plan sponsors for managing prescriptions.  These are typically flat fees that a PBM charges for specific services or each prescription processed.

47.     Although PBMs are supposed to be servicing plan sponsors in exchange for administrative fees, a substantial portion of PBM profits arise from rebates paid by pharmaceutical manufacturers to obtain formulary status or to encourage PBMs to dispense their

drugs.  Given their ability to affect a drug's market share, PBMs have considerable leverage in this "pay for play" arrangement to negotiate such rebates.  The amount of a rebate that a PBM receives depends upon the particular drug, with more expensive drugs resulting in higher rebates.  The drugs that earn the highest rebates for PBMs are usually not the least expensive for plan sponsors, nor are they necessarily the most effective for patients.  Accordingly, PBMs often have significant profit incentives that conflict with the interests of plan sponsors and plan beneficiaries.  Typically, PBMs agree to share some of these rebates with plan sponsors.  PBMs, however, often refuse to disclose the specific rebate amounts they receive.  This prevents plan sponsors from learning the actual amount of rebates the PBM has received for administering drug benefits.  Due to the PBM's failure to disclose rebate amounts, the PBM is able to retain most or all of the rebates.

48.     Another way in which PBMs make money is by paying pharmacies a lower price than the PBM charges the plan sponsors for each prescription filled, and pocketing the difference.  For example, a PBM may charge a plan sponsor $100 for a particular drug, but pay the pharmacy only $75, generating a $25 spread for the PBM.  A PBM's profit from spread is in addition, of course, to the administrative fee it charges plan sponsors for executing the transaction, as well as the kickback or rebate it receives from the manufacturer.  The reimbursement amount PBMs pay to the pharmacies, and the resulting spread-profit, is almost always undisclosed—even if PBM customers request such information.  Moreover, the spread gives PBMs a financial incentive to encourage the use of higher-priced drugs, and higher corresponding spreads, on their formularies.

49.     A PBM's willingness to disclose, or permit audits of, drug pricing spreads and rebates reflects the level of a PBM's "transparency."

B.     **The CVS Caremark Merger**

50.     On November 1, 2006, CVS and Caremark jointly issued a press release

("November 1 Press Release") announcing that they had entered into a "definitive merger

agreement to create the nation's premier integrated pharmacy services provider."  Under the

terms of the Merger (as defined above), which was valued at over $25 billion, Caremark

shareholders were to receive 1.67 shares of CVS for each share of Caremark.  In addition, as a

result of the Merger, CVS shareholders would own 54.5 percent of the combined company,

while Caremark shareholders would own the remaining 45.5 percent.

51.     The November 1 Press Release described the beneficial effect of the transaction

for both health plans sponsors and participants, stating, *inter alia*:

> This merger creates a significant platform to address the needs of
> both payors and consumers by providing high-quality, cost-
> effective services in a manner that is convenient, flexible and easy
> for the consumer to navigate and understand.

52.     Indeed, the stated purpose behind the Merger was quite simple:  Leverage the

purchasing power of the largest prescription drug retailer along with one of the largest PBMs to

(i) create the lowest PBM price structure in the industry, and (ii) provide unique, integrated

service offerings that only a retail-PBM could offer.  The proposed CVS Caremark combined

entity would be the largest prescription drug purchaser, able to drive drug selection through

formulary control and exert enormous pricing-leverage over drug manufacturers.  In addition, as

a retail-PBM, the combined CVS Caremark offered unique services to the prescription drug

industry, like Maintenance Choice, a program the Company initiated to allow participants to get

a 90-day prescription directly from the retail pharmacy at the same cost, to the participant, as

mail-order.

53. Following the Merger announcement, CEO Ryan and Mac Crawford (Caremark's CEO at the time) held a conference call with analysts on November 1, 2006 ("November 1 call"). During the call, Ryan continued to lay out the logic behind the Merger and the reason why it would be successful, stating, in pertinent part:

> So combining Caremark's expertise in serving employer's with our expertise in serving consumers, will help employers and health plans better manage costs, and the complexities of the U.S. healthcare system, driving superior outcome and enhancing value for overall constituencies. Once again, this, is all about giving the consumers unparalleled access and choice.
>
> There's also the benefit on the other side of the [aisle], the payor community. At its most basic level, the combined company will help employers and plan providers deliver the **_right drug at the right place at the right time_**.
>
> At the end of the day, this is about providing a low net cost on a per plan, per member, per month with the lowest cost, and the best outcomes for healthcare. This is a whole new model.

(Emphasis added.)

## 1. CVS Caremark Knew It Had To Distinguish Itself On Service

54. By virtue of the size of the merged Company, Defendants knew they could always be competitive on price. Thus, as Defendants acknowledged prior to the Merger, service would be the key distinguishing factor for CVS Caremark. During the March 13, 2007 Bank of America Conference, Defendant Ryan put it simply:

> Think about this. No one is going to have a lower cost structure than this combined company. No one is going to be able to out-cost us in the market when we go.
>
> So, then it's all about, okay, what about service, what about product? **_And we think we can out-service and out-sell our competition here_**.

(Emphasis added.) What defendant Ryan refers to as "service" includes both servicing the plan sponsors and the plan participants. The plan sponsors want transparency in their dealings with

the PBM, meaning they want to be able to determine that the PBM is adhering to the contract terms, and, in particular, pricing.  At the same time, plan participants want to be able to obtain their medicines when needed at the correct price under the contract.

55.    Clients raised their concerns about possible service issues directly with Ryan.  As he put it during the May 8, 2007 earnings call with analysts ("May 8 call"):

> Yes, they're, I guess the two things that [plan sponsors are] most concerned about, one is that there's no degradation of service. That's the first thing.  ***And they want to get calmed down that, as I said earlier, that we're still going to focus on execution and service*** and we're confident that we are.
>
> The second is they want to find ways to help lower their healthcare costs.  I mean that's long-term.

(Emphasis added.)

## 2.    Post-Merger Integration Was Essential To Profit From The Merger

56.    The predicate for the combined-company to provide effective customer service was the integration of the computer systems used by CVS's proprietary PBM, PharmaCare, with the computer systems used by Caremark.  This was no small task.  As illustrated in Exhibit 1 (*supra* at ¶42), each PBM had contractual relationships with plan sponsors, and each PBM has a unique pricing relationship with its retail pharmacy network and with the individual drug manufacturers.  Failures to integrate the PBMs' computer systems, policies, and procedures would result in plan participants getting the wrong drugs, at the wrong price, at the wrong time.  And, that is if they were able to get their drugs at all.  Absent effective systems integration, plan sponsors would suffer from breaches of the contract terms due to formulary mismanagement (*e.g.*, getting more expensive brand drugs in place of cheaper generics) and improper pricing, as well as complaints flowing from their participants.  More specifically, a successful integration was necessary to avoid payment errors, enable call center representatives to respond to questions,

and prevent system outages that would make it impossible for plan participants to fill prescriptions.

57.     Ultimately, a successful integration was the only way the Company could maintain and attract new clients, and the billions of dollars in earnings they generated. While analysts saw some benefits in a merged company, they expressed concern that the integration of CVS and Caremark would be possible. For example, an analyst for William Blair & Company expressed "serious concerns about the 'merger of equals' structure of the transaction and the heightened integration risk, given that both companies themselves have been active industry consolidators in the recent past."

58.     On March 13, 2007, during the 2007 Bank of America Consumer Conference ("March 13 Conference"), just days prior to the CVS and Caremark shareholder votes on the fate of the Merger, defendant Ryan attempted to quell any dissent over whether CVS and Caremark could be successfully integrated:

> People always question this because, you know, you hear people talk about vertical mergers and they don't really work. This is not really a vertical merger because we own the PBM. We understand this business. It's not like we're getting in, buying a hospital or nursing home. This is a business that we understand. We have a history with PBMs.
>
> *     *     *
>
> Integration planning is on the way . . . . Caremark has done a lot of these. PharmaCare [CVS's pre-merger PBM business] is relatively small. ***I don't mean to diminish any integration because there's always risk, but it's relatively straight-forward*** . . . .

(Emphasis added.)

59.     During the March 13 Conference, defendant Ryan continued to tout the Merger, asserting that the Company would be a leader in both price structure and customer service, and noted clients were already praising the potential benefits of a combined CVS-Caremark:

24

> I can tell you this, that since we've announced this, and it seems
> like a long time ago, I have not had one client, either a PharmaCare
> or Caremark, and I've been to a number of their clients, that has
> questioned this merger.  They get it.  It's going to make it easier
> for their clients, it's going to make it easier for their customers, and
> it's going to lower their cost . . . .

### 3.   **Analysts And Investors Had Good Cause For Concern**

60.     Caremark was still suffering from integration woes from its own prior mergers.

In April 2004, Caremark merged with AdvancePCS, creating the then-largest PBM.

AdvancePCS, itself, was the result of a merger.  Issues related to the 2004 merger were still

unresolved in 2007.  As CW1 explained, prior to the Merger, Caremark had a "myriad of

systems, they basically let them be autonomous, and had tons of different systems so they didn't

all talk to one another."

61.     Indeed, the integration/customer service issues that spawned from Caremark's

earlier mergers resulted in litigation brought by plan sponsors against Caremark, including,

among others, a 2006 action by the New York State Teamsters Council Health and Hospital

Fund, and a January 2008 action by Kindred Healthcare.

62.     Caremark also faced lawsuits and contract terminations by several plan sponsor

clients over its lack of pricing/rebate transparency, including, among others, actions brought in

2005 by the University of Michigan and the State of Illinois.  In 2007, the State of Maryland left

Caremark for another PBM, even though Caremark made a lower bid, because Caremark refused

to allow the State of Maryland to audit its pricing and rebates for compliance with their contract.

### C.   **Defendants Knew Pervasive Integration Issues Were Causing Service Issues And Client Terminations, But Fraudulently Stated They Were Maintaining And Increasing Their PBM Clients**

63.     The ultimate success of the CVS Caremark PBM model was judged based on

Defendants' retention of existing clients and the Company's ability to obtain new business,

necessary to meet earnings targets.  In every interaction with analysts and investors, Defendants

consistently stated throughout the Class Period that the PBM business was meeting or exceeding

expectations.  For instance, during the May 5, 2009 earnings conference call, defendant Ryan

reaffirmed that the 2010 selling season was "on plan, in good shape:"

> As far as the 2010 ***pipeline***, overall it's kind of reasonable from
> last year, $8 billion plus, maybe $10 billion out there.  We're
> obviously aggressively going after the appropriate—the
> appropriate business, but we think—when you think about
> renewals, where we are right now at this point in the season, ***we're
> essentially on plan, in good shape***, and obviously we feel
> comfortable where we are with some of the new business going on.

(Emphasis added.)

64.     Days later, on May 15, 2009, at CVS Caremark's 2009 Annual Analyst/Investor

Meeting, defendant Ryan claimed the Company was "exactly where we need to be" for the 2010

selling season:

> We are ***exactly where we need to be*** from a re-upping contract
> standpoint.  So from the PBM side of our business, we're in good
> shape.

(Emphasis added.)

### 1.     Weekly Sales Pipeline Reports Contradicted Defendants' Public Statements, Indicating Contracts At The Highest Risk For Termination

65.     Defendants' primary tool for monitoring incumbent contracts was called the

"Sales Pipeline Report."  According to CW2, "the pipeline reports were created from a database

of information concerning each renewable contract and any obstacles potentially hindering their

renewal."  Next to each incumbent contract on the Sales Pipeline Reports was a color code.

According to CW3, red meant the contract was not only "at risk," but that there was a substantial

likelihood the contract would be lost during the next selling season, yellow meant the contract

was "up for renewal, and that there were customer problems associated with the contract," and white signified "contracts up for renewal with no problems."

66.     Sales Pipeline Reports were updated every week by the various sales teams. Every Friday by 2 P.M. (MT), a Sales Pipeline Report was distributed to senior sales leadership, including three Senior Vice-Presidents of sales and account services Bill Spehr, Bruce Lyons, and James Margiotta.  Every Monday, after the sales leadership had an opportunity to comment, weekly sales pipeline report were distributed to Senior Executive leadership, including defendants Ryan and McLure, and Mac Crawford when he was still with CVS Caremark, according to CW3 and CW4, a CVS PharmaCare Account Executive from 2004 through July 2009.

67.     By the end of May 2008, the weekly Sales Pipeline Reports detailed that CVS Caremark had billions of dollars of incumbent contracts "at risk" of termination during the current upcoming selling season.  For example, according to the May 27, 2008 Sales Pipeline Report, CVS Caremark had over $6.25 billion in annual PBM contract revenue deemed "at risk," with nearly $3.5 billion of that amount identified at the highest risk of termination.

> **2.     Defendants Held Monthly Conference Calls To Discuss Specific Client Risks And Contract Negotiations**

68.     Defendants were also kept apprised of contract developments and service issues during monthly teleconferences with Account Executives and Senior Account advisors, according to CW3 and CW4.  CW3 noted that these calls typically took place on the third Friday of every month.  CW4 explained that up until the beginning of 2009, defendant McLure hosted the conference calls, during which "individual VPs would report on their segments."  Beginning in 2009, defendant Ryan replaced defendant McLure on the monthly calls, according to CW4.

69.     In addition, the Individual Defendants participated in quarterly conferences with senior executive to discuss the progress of PBM contract negotiations, according to CW5, a CVS Caremark PBM Director from 2006 through November 2008.  CW5 noted that the quarterly senior executive meetings were attended by Directors, Vice-Presidents, and Division-Presidents, in addition to Ryan and Rickard.  CW5 explained that "service issues were commonly the subject of discussion" during these meetings, which focused on the "good, the bad, and the ugly."

70.     As detailed herein, the Sales Pipeline Reports and frequent meetings and conversations revealed that far from being able to meet expectations, the Company's model was a failure and billions of dollars of annual earnings were lost.

**D.      Contrary To Their Public Statements, Defendants
          Knew Months Before Disclosure That Key Contracts
          <u>Were Lost Due To Failed Integration And Service Issues</u>**

71.     Soon after the Merger, on November 1, 2007, defendant Ryan told investors "we are operating as one company," and concluded that he was "pleased that ***we've <u>completed</u> the integration of both the organization and back end systems quickly and successfully***." (Emphasis added.)  Following defendant Ryan's pronouncement, CVS Caremark's purported accomplishments were frequently addressed with customers and investors.  During the Company's May 1, 2008 earnings call ("May 1 call"), defendant Ryan reiterated that "[o]ur clients are telling us that we've kept our focus on service, which was their primary concern following our merger."  And, again, during the January 9, 2009 conference call with analysts and investors, Ryan assured listeners that "***[a]ll the systems are able to talk to each other*** . . . . ***We have got no issue with our systems***."  (Emphasis added.)

72.     In reality, the various systems were not integrated, causing clients and plan sponsors to launch frequent, consistent, and repeated complaints concerning the Company's sheer incapacity to provide benefits as promised.  All told, Defendants lost $4.5 billion in PBM

revenue for 2010, as much as $3 billion of which was attributable to three contracts—Coventry, New Jersey, and Chrysler—which were the subject of Defendants' personal knowledge.

1. **Defendants Fraudulently Withheld That
   The $4 Billion Coventry Contract Was Lost Due To Service**

**Overview of $4 Billion Coventry Contracts**

73.     Coventry provides group and individual health insurance, Medicare and Medicaid programs, and coverage for specialty services such as workers' compensation and behavioral health care.  Until being terminated, CVS Caremark provided PBM services to Coventry's commercial group health plans and Med-D clients.

74.     Defendants disclosed for the first time at the end of the Class Period that the Company lost all of its business with Coventry, valued at nearly $4 billion (annually), due to service issues.  This revelation came only after Defendants concealed the true cause for the lost business.  During an earnings call on July 31, 2008 ("July 31 call"), defendant Rickard disclosed that CVS Caremark lost the Med-D portion of its contract with Coventry, purportedly, "due in large part to price," concealing any issue related to service.

75.     During CVS Caremark's May 5, 2009 earnings call ("May 5 call"), defendant Ryan announced they had lost the Coventry commercial contract, but claimed the loss "was not unexpected," following on defendant Rickard's statement in May 2008 that Coventry Med-D loss was "due in large part to price."  Defendants' deception was necessary to conceal that the Merger had failed.  If service was known to be the reason, investors would learn that the Company could not generate the promised earnings because current and future clients would flee from dealings with the Company—all before Defendants could unload tens of millions of dollars of their personally held stock at artificially inflated prices.

**Defendants Admit Coventry Was Lost Due To Service**

76.     The truth was concealed from investors until the Company's November 5, 2009

earnings call.  Not only did defendant Ryan finally admit that both the Coventry Med-D and

commercial contract losses were due to "service issues," he admitted that Defendants knew they

were going to lose the $1 billion (annual) commercial contract no later than July 2008, at the

time they lost the Coventry Med-D contract:

> [W]hen we lost Med D, *we knew* we were going to lose the
> commercial business, there were some *service issues* on that.

77.     Corroborating defendant Ryan's admission, CW6, a Caremark Client Liaison

Coordinator and a point-of-contact for Coventry, stated that by mid-2008—nearly a year before

it was disclosed to investors—it was clear within the Company that Coventry had decided to

abandon CVS Caremark because of severe service issues.  Specifically, CW6 pointed to "basic

service problems, lack of audit transparency, and misrepresentations concerning CVS

Caremark's ability to serve Coventry as a client."  Indeed, "service levels were low" because

problems with the integration of computer systems often resulted in CVS Caremark

representatives being unable to access participants' information, according to CW6.  Participants

also complained of pricing issues, because they were told that they would receive a prescription

at a certain price, but without consent, they would be provided with a more expensive substitute,

according to CW6.  Essentially, Coventry believed it was given "a fluffed-up pamphlet of what

[CVS Caremark was] going to provide for them as a company, and we didn't deliver on what we

promised," CW6 conceded.

78.     CW7, who was an Audit Department Team Leader, responsible for verifying that

price terms were consistent with the contracts, explained that the failed computer integration and

high employee turnover resulted in a "nightmare" with Coventry.  The Audit Department created

Monthly Audit Reports from a computer system called "Reflections," detailing the amounts that needed to be refunded due to client overpayment caused by processing errors.  These Monthly Audit Reports were provided to Brenda Fiorito, Audit Division Director, and George Pavlakis, Vice-President of Finance, who then provided them to senior management, including defendant Ryan, according to CW7.

**Internally, The Loss Of Coventry Was Known At Least Ten Months Before Disclosure**

79.     The loss of Coventry was maintained as an internal secret for at least ten months after Defendants knew that Coventry would terminate its contracts.  In and around August and September 2008, CW6, who was under the reporting chain of Rosemary Danzanz, Vice-President of Customer Care, was "given information that we were going to be losing them, but not to say anything," and was placed under a "gag order not to say anything within the center" in Nashville, Tennessee.

80.     The loss of Coventry came as no surprise to Defendants.  Indeed, internal Sales Pipeline Reports, as early as June 10, 2008, reveal that Coventry was at the highest risk for loss. Nearly $1.1 billion in annual revenue was attributed to the Coventry commercial contract, and nearly 90 percent of that revenue was deemed at risk on the Sales Pipeline Reports.  Consistent with the Report, CW6 was told that, in sum and substance, Coventry "was the bread and butter of the business" and that once Coventry left, the Company did not "know what's going to happen with our business because they were the biggest part of what [CVS Caremark was] doing on the PBM side."

81.     The impact of the service and integration problems on Coventry was known well before the announcement on July 30, 2008 of the Med D contract termination.  According to CW8, a member of the Coventry service team who left the Company in October 2007, it was well known before CW8's departure that the contract was going to be lost.  CW8 explained that

the merger of information systems, including the PeopleSafe system, did not function properly, especially in providing correct patient and co-pay information.

82.     Similarly, CW5 also explained that the Coventry contract was lost due to poor implementation and service issues.  These problems were exacerbated by the fact that Coventry had many different contracts with CVS Caremark, each calling for different pricing and custom benefits that the Company's systems could not support.  As CW5 explained, "[t]here were a lot of IT development that needed to be done in order to meet their needs, and if you don't have enough resources to meet the timing on that, then obviously you have an unhappy client."  CW5 also noted that the State of South Carolina account was terminated for service related reasons.

**Coventry Loss Is Discussed At October 2008 Meeting**

83.     While investors did not learn of the loss until May 5, 2009, the termination was "officially learned" within the Nashville center at an October 2008 meeting held by General Manager Gia Jernigan.  All of the center's managers and supervisors were present, and Coventry management took part via teleconference to officially announce that they were not renewing their contract with CVS Caremark.  In view of the loss of the Coventry contracts, in February 2009, the staff at CW6's office was cut in half.

### 2.     Defendants Fraudulently Withheld For Nearly A Year That The New Jersey Contract Was Going To Be Terminated

84.     CVS Caremark provided PBM benefits to the New Jersey State employees through a contract with Horizon Blue Cross Blue Shield of New Jersey ("Horizon"), worth between $1 billion to $1.3 billion annually (the "New Jersey" account).

**New Jersey Account Was Deemed Lost One Year Before Disclosure**

85.     No later than May 6, 2008, Defendants deemed the New Jersey account at highest risk for termination in the weekly Sales Pipeline Report.  The May 6, 2008 version of the report

was finalized on Friday, May 9, 2008, and delivered to defendants Ryan and McLure on

Monday, May 12, 2008, according to CW3.  In November 2008—a year before Defendants

disclosure of the contract loss—it was practically "official" within the Company that the New

Jersey account was going to be lost, according to CW6.

86.     The loss of New Jersey was no revelation to Defendants.  They knew that

beginning in late-2007, immediately after the Merger, CVS Caremark had no way of adequately

servicing the client.  Due to the failed integration, the Company had "no information on their

formularies, no information on their drug costs," resulting in the denial of participant benefits,

according to CW6, a Caremark Client Liaison Coordinator from 2005 through February 2009.

Even as late as November 2008, CW6's center continued to lack the required information despite

assigning extra staff to the client.

**Failed Integration Caused Denial Of Benefits To Tens Of Thousands Of Participants**

87.     By early-May 2008, the impact of the computer issues on the New Jersey account

became a frequent topic of contention between New Jersey and CVS Caremark.  For example, on

or about May 6, 2008, Christa Fadem, a Senior Account Manager assigned to the New Jersey

account, provided an "Error Report" from the plan participant database, PeopleSafe, to Judy

Jimenez, a pharmacy benefit consultant with Horizon.  The report contained 221 pages, totaling

approximately 11,000 error records, of New Jersey account pharmacy benefit participants

improperly rejected by CVS Caremark's PeopleSafe system.  Ms. Fadem, along with at least one

other CVS Caremark account representative, met with Ms. Jimenez on May 8, 2008, in an

attempt to address the long-running issues with PeopleSafe.

88.     One month later, on Wednesday, June 4, 2008, Ms. Jimenez sent an email to

Ms. Fadem about the continuing PeopleSafe errors impacting New Jersey account plan

participants' ability to obtain pharmacy benefit entitlements.  Specifically, Ms. Jimenez noted

that while the approximately 11,000 errors previously addressed in May had been substantially resolved, approximately 10,000 more errors had occurred in the interim with "many of the [] errors requir[ing] manual review of each file." Ms. Jimenez implored CVS Caremark to develop a better and more efficient way to address these massive amounts of PeopleSafe errors.

89.     The service problems persisted through New Jersey's termination of the contract. CW3 reported that in one such incident, the over-billing amounted to approximately $40 million before it was eventually discovered.   This was nothing new, CW3 explained, as the New Jersey account was identified to Defendants in Sales Pipeline Reports, as "at risk," as early as fourth quarter 2007.

90.     Ultimately, the New Jersey account was lost to Medco, as confirmed by letter dated August 5, 2009.  Defendants, however, did not disclose this loss until *three months later*, on November 5, 2009, after they had made approximately $40 million in illicit insider stock sales.

91.     The PeopleSafe errors impacted customers across all of CVS Caremark, not just the New Jersey account, according to CW9.  CW9 explained that during the busy season (January through March each year), groups of as many as "40,000" plan participants would go "months" without getting their appropriate medication.  The PeopleSafe errors continued to impact CVS Caremark's ability to service its customers through at least August 2009, when CW9 left the Company.

92.     This type of over billing was not the exception at CVS Caremark.  CW10, a Client Audit Analyst, who audited accounts for compliance for errors in billing and processing, explained that audits routinely found overcharges of as much as $10 million.

### 3.     Defendants Fraudulently Withheld Termination Of The Chrysler Contract

93.     By the end of 2007, CVS's PharmaCare legacy-client, Chrysler, began expressing frustration over customer service and integration problems at the newly merged CVS Caremark PBM.  CW11, a PharmaCare Project Coordinator, specifically assigned to the Chrysler contract from 2007 through May 2008, described frequent meetings with Chrysler that often became "quite contentious" over service failures relating to the Merger.  The CVS Caremark team dedicated to Chrysler met three to four times a week to address the problems during CW11's tenure.  CW11 and other members of the Chrysler Team had to resort to manual data entry at times in order to get the correct participants information into the systems.  Indeed, the "friction" between CVS Caremark and Chrysler became so bad, that defendant Ryan "felt compelled" to "actively participate" in one teleconference with Chrysler following the August 2007 integration of the PBMs, according to CW11.  "[I]t was no secret . . . where it was very in the open, very much in the open that there were issues . . . .  There was nothing that was not said," CW11 added.

94.     These problems were concealed through the end of the Class Period.  For instance, during the May 15, 2009 meeting with analysts, defendant Ryan commented on the status of negotiations with Chrysler:

> That's proceeding along.  I think they had a few other things on their plate besides the prescription benefit program.  So they're trying to figure out how to fund this program and then I think we should hear shortly, I would think a relatively short time.  But it's still going on.

In reality, Defendants had known from at least mid-2008, that Chrysler was at risk for loss, if not a foregone conclusion it would be terminated.

      **E.**      **Defendants Fraudulently Withheld From Investors That
              The Integration Was A Failure, Impacting Contract Renewals**

95.     Throughout the Class Period, Defendants fraudulently withheld from investors, as well as their customers, that the Merger was a failure.  Knowing that they could not remedy their integration problems, Defendants resorted to desperate measures, including unilaterally lowering prices on over 50 percent of their contracts—including many that were years from renewal and ordering employees not to disclose problems to participants.  They did this knowing that if the truth about the failed Merger was revealed, investors and clients would know Defendants' earnings projections were false, and punish the Company's share price—precisely what happened at the end of the Class Period.

**Defendants Lower Prices To Conceal Service Issues**

96.     In the face of the integration and customer service crisis, Defendants decided to slash contract prices not only on contracts that were up for renewal, but, surprisingly, also on some that were years from renegotiation.  Investor and analyst concerns were raised, but met with Defendants' fraudulent denials.  Styling these renegotiations as "2009 wins," during the January 9, 2009 earnings call ("January 9 call"), defendant Ryan quelled questions about service issues, firmly responding the price cuts were not a "trade-offs because of [] service."  Specifically, an analyst with William Blair & Company, concerned that poor service may be the reason behind the re-pricing, asked:

> You said you repriced some of the accounts for all the reasons that you might imagine, but what are the things that would cause you to reprice?  Is there a concern about the service for the systems and how can you get people past that also for 2010?

97.     Defendant Ryan fraudulently responded that service issues had nothing at all to do with CVS Caremark's decision to reprice its contracts during the 2009 selling season:

> No, there is no—we didn't—let me be clear on that because I think you are making the assumption that we repriced because we had an inferior service.  We repriced because we decided that these key accounts were accounts that we could impact, we could help lower their costs, we could help their participants and we could grow our business.  So these are accounts that we kind of wanted to lock down.  ***No trade-offs because of our service***.
>
> *     *     *
>
> ***So there was no hidden agenda here about giving a lower price because of lack of service if that is what you are asking***.

(Emphasis added.)

98.     In reality, Defendants cut their prices—and thereby profits—simply to lock in clients who would have fled the Company once their contracts were up.

## Merger Leads To High Employee Turnover And Low Morale, Impacting Service Capacity

99.     In addition to the computer and technical impact of the failed integration, the Merger resulted in low employee morale and high turnover of employees, directly impacting the Company's capacity to service clients.  According to CW8 and CW12, the high turnover rates resulted in inexperienced personnel providing incorrect information, with a high degree of difficulty in retrieving the right information.  Turnover also infected the high ranks.  For instance, Greg Madsen (Senior Vice-President, Retail Services), Russell Annunziata (Vice-President, Retail Services), and Jan Berger (Senior Vice-President and Chief Medical Officer) left the Company, according to CW3.  By March 2008, nearly half of the account team servicing the New Jersey account had left the Company, according to internal documents.

**Capacity Issues Were Concealed From Customers And Investors**

100.    The loss of capacity was concealed from customers, as well as investors.  For

instance, in an April 2, 2008 email, Christa Fadem, a CVS Caremark Senior Account Manager,

reported to several of her colleagues that the New Jersey account was "getting complaints from

their group that Horizon and Caremark are not ready for the groups implementation."  In the

same email, Fadem admonished Robby Wallace and Melani Boyd:

> Per our discussions, last week, Customer care should NOT be
> telling [New Jersey account] callers that participants are not in
> PeopleSafe.

(Emphasis in original.)  Defendants had been concealing information from clients about the

success of systems integration since the Merger.

101.    In fact, even before the Merger was complete, employees were told to never tell a

client—especially New Jersey—that a resource issue was the cause for problems, according to a

July 2007 email.  Supervisors at call centers told employees never to tell plan participants that

they were experiencing system problems, according to CW9.  A culture of deception pervaded

interactions with sponsors and participants.  "[Y]ou were told not to bring it up or just basically

talk around it," explained CW2.  "There were some kind of things that were shuffled under the

rug to the clients," added CW2, and explained that CW2 "didn't feel we were completely on the

up and up with complying with our contracts."  Like many others, CW2 left the Company

because it wasn't "my kind of environment."

102.    In a May 6, 2008 email regarding "Eligibility Issues" from Judith Jimenez of

Horizon, the administrator of the New Jersey account, Ms. Jimenez complained to Coletta

Harper and Carolyn Rudinsky of CVS Caremark that New Jersey account "members []were told

that they were not in the system and could not fill drug [prescriptions]."  Jimenez admonished

38

that CVS Caremark's failures were causing serious concerns at Horizon's highest levels and was

simply "unacceptable:"

> [I] am writing to inform you of an ***increasingly common trend regarding enrollment issues***. This trend is causing higher call volumes to both our customer service divisions and is ***directly impacting our client satisfaction***. By extension, this is causing Pharmacy Department staff to address Sales, Account Management, and Executives concerns/questions. ***All this is unacceptable***.

(Emphasis added.)

103.     Other clients lodged similar complaints, and were frustrated by CVS Caremark's

unresponsiveness. In March 2008, Taylor Carrie emailed her colleagues that "SC [Blue Cross

Blue Shield of South Carolina] is very dissatisfied" that participants were not loaded into the

PeopleSafe system for up to 48 hours later after enrollment. Carolyn Rudinsky responded that

this was the same "huge problem" facing the New Jersey account.

104.     In July 2008, representatives of UFC Local 1262 health plan complained about

errors in the routine reenrollment of participants. In an email to Lloyd Burlew, Kim Persley, and

Paul Romano at CVS Caremark, among others, Richard Termine of UFC Local 1262 wrote:

> I can only assume that Caremark does not have our re-enrollment procedures properly documented so they can be easily followed by whoever they assign to our group. The account rep should have been given better trained and procedures to follow.

105.     Little did plan sponsors or investors know that these errors were due to high

turnover and incapacity resulting from the Merger.

**F.     While Knowing They Had Misled Investors, Defendants Made $40 Million Selling Their Shares Before Their Fraud Was Revealed**

106.     On August 4, 2009, Defendants told investors they "would be very disappointed if

we didn't have an EPS growth of at least 13 to 15% next year." As revealed at the end of the

Class Period, their projection was based on "low to mid single digit" growth in the PBM business.  As detailed herein, Defendants knew, or were at least reckless, that their August 4 statements were fraudulent when made in view of the known contract losses, the number of contracts that were at highest risk, and every indication that the integration was a failure.

107.   Defendants' actions following these false statement further supports a strong inference that they acted with the requisite scienter—if not premeditated deliberation—reaping over $40 million in illicit proceeds from their sale of artificially inflated shares:

- On August 5, 2009, Defendants received, but did not disclose to investors, a letter confirming the loss of the New Jersey account, valued at $1 billion to $1.3 billion per year.

- On August 7, 2009, defendant Ryan sold 400,000 shares for *$13.7 million*; and defendant McLure sold 200,000 shares for *$6.8 million*, for a total of nearly $21 million worth of stock after converting options on the same day.

- On August 17, 2009, defendant Rickard sold 251,529 shares for over *$8.5 million*.

- Between September 1, 2009 and November 2, 2009, defendant McLure sold 300,000 shares for proceeds totaling nearly *$11 million*.

108.   On November 5, 2009, after completing their selling spree, Defendants revealed that achieving 13 percent to 15 percent EPS growth in 2010 was "not going to happen" because pervasive service and integration issues drove away more customers than were retained.  The Company's share price collapsed 20 percent.  Also that day, under the guise of "retirement," defendants McLure was fired.

40



## CVS Caremark
### July 31, 2009 - November 5, 2009

8/7/09 Defendant McLure sells 200,000 shares for $6.8 million.

8/7/09 Defendant Ryan sells 400,000 shares for $13.7 million.

8/17/09 Defendant Rickard sells 251,529 shares for $8.5 million.

9/1/09 Defendant McLure sells 100,000 shares for $3.7 million.

10/1/09 Defendant McLure sells 100,000 shares for $3.6 million.

11/2/09 Defendant McLure sells 100,000 shares for $3.6 million.

8/5/09 Defendants fail to disclose that the State of New Jersey cancelled its contract .

8/4/09 Defendants announce that they lost the Chrysler contract but project "EPS growth of at least 13 to 15%" in 2010 and express their confidence in the Company's ability to retain current clients and win new business.

10/2/09 Defendants claim that the decrease in enrollees and certain regulatory changes would have a de minimus effect on the Company's Medicare Part D business.

11/5/09 Defendants shock the market by revealing that operating profit in the PBM will decline as much as 10-12% in 2010 because of lost business.

11/5/09 Defendants admit that CVS Caremark lost $4.5 billion in its PBM business, including the loss of its contract with the State of New Jersey (Horizon), as a result of service issues at the Company. Defendants also announced the loss of $1.7 billion in its Medicare Part D business.

11/5/09 Defendants announce that CVS Caremark is being investigated by the FTC.

8/09 Defendants fail to disclose that the FTC begins investigating CVS Caremark.

109.    Each of the Individual Defendants' trades were suspicious in timing or amount. For example, all of defendants McLure's and Rickard's sales during the Class Period occurred *after* August 4, 2009.  Save a sale of 1,700 shares, all of defendant Ryan's sales during the Class Period—or 99.6 percent—took place after August 4, 2009.  Between September and November, 2009, defendant McLure sold more than 98 percent of his shares personally held during the Class Period, and over 60 percent of his total holdings, including vested options.  Defendant Rickard sold 52 percent of his shares personally held during the Class Period, and almost 20 percent of

his total holdings, including vested options. Defendant Ryan sold 22 percent of his shares

personally held during the Class Period, and over 7 percent of his total holdings, including vested

options. In contrast to his $13.7 million sale in August 2009, however, defendant Ryan has not

sold a single share since the fraudulent artificial inflation in the share price was removed at the

end of the Class Period. The following chart sets forth the insider trading during the Class

Period:

| CVS Caremark Corporation (CVS) Insider Sales: 8/1/09 - 11/4/09 | | | | | |
|---|---|---|---|---|---|
| **Last Name** | **First Name** | **Date** | **Shares** | **Price** | **Proceeds** |
| MCLURE | HOWARD | 08/07/09 | 136,258 | $34.18 | $4,657,298 |
| | | 08/07/09 | 63,742 | $34.42 | $2,194,000 |
| | | 09/01/09 | 100,000 | $37.45 | $3,745,000 |
| | | 10/01/09 | 96,717 | $35.63 | $3,446,027 |
| | | 10/01/09 | 3,283 | $35.88 | $117,794 |
| | | 11/02/09 | 100,000 | $35.71 | $3,571,000 |
| | | | 500,000 | | $17,731,119 |
| RICKARD | DAVID | 08/17/09 | 251,520 | $33.96 | $8,541,619 |
| | | | 251,520 | | $8,541,619 |
| RYAN | THOMAS | 08/07/09 | 400,000 | $34.41 | $13,764,000 |
| | | | 400,000 | | $13,764,000 |

**G.     Defendants Knew That The 2009 Regulation Eliminating
Med-D PDP Spread Impaired SilverScript's Pricing Structure
And Would Lead To Material Losses In 2010**

110.     By early 2009, a regulation imposing significant changes to the Med-D program

was enacted. The Centers for Medicare & Medicaid Services ("CMS")[5] amended certain

regulatory definitions controlling the day-to-day management of Med-D benefit plans. Effective

January 1, 2010, PDP (defined below) providers, such as CVS Caremark's SilverScript, were

required to report as "administrative costs" all costs incurred by any Med-D plan that amounted

---

[5]CMS is the agency charged with approving which PDPs administer the drug benefit plans
of Med-D participants during a given year.

to spread for the PDP.  In effect, the new regulation eliminated all PDP providers' ability to earn spread on prescriptions for Med-D participants, therefore causing SilverScript's pricing structure to become materially impaired and decreasing revenue earned by CVS Caremark from PDP Med-D business in 2010.  Despite Defendants' understanding of the material impact that this legislation would have on its Med-D revenue in 2010, they failed to warn the investors, but instead falsely classified the change as a mere "headwind."

> **H.** **Defendants Knew That The Maintenance Choice Offering Was Neither Driving Contract Renewals Nor Gaining New PBM Contracts**

111.    PBM clients also expressed frustration with Maintenance Choice, the Company's marquee product, which could only be offered by a retail-PBM like CVS Caremark. Maintenance Choice allowed plan participants to fill 90-day mail-order prescriptions, purportedly at mail-order prices, at CVS Caremark retail stores.  Defendants repeatedly asserted that PBM customers were enamored with Maintenance Choice because it combined the convenience of retail for participants, with the benefit of low-cost mail-order pricing for plan sponsors.  According to numerous client's, however, CVS Caremark did not, in fact, apply mail-order pricing to Maintenance Choice transactions.  Instead, the Company instituted a higher, retail/mail-order hybrid pricing structure to bilk additional money out of plan sponsors, while at the same time driving more foot-traffic to its stores.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

112.    The Class Period begins on October 30, 2008.  On that day, CVS Caremark held a conference call with analysts ("October 30 call") to discuss the Company's 3Q08 earnings results and recent industry developments.  During the call, defendant Ryan recognized the significant impact the worldwide financial crisis was having on the pharmaceutical industry, but

reassured investors that CVS Caremark's PBM business would continue to grow because of its

superior "execution" and "service."  Specifically, Ryan stated, in part, that:

> Even in these difficult and uncertain times . . . our PBM continues
> to retain existing clients and attract new ones.
>
> We will continue to gain share because . . . .  We have ***excellent
> service***.

(Emphasis added.)

113.    On the October 30 call, defendant Ryan also recapped the progress of the current

2009 selling season and the non-renewals of several major contracts.  Specifically, he

highlighted the losses of the "$2.5 billion Coventry Med D" contract, and the "WellPoint and

Humana" accounts, which were "lost due to acquisitions by managed care companies."

Defendant Ryan noted, however, that the non-renewals from the 2009 selling season would be

"offset" by new PBM business:

> We've had a very successful selling season . . . .  I would say ***our
> model is working***.
>
> Unfortunately, we also saw some significant losses, including the
> $2.5 billion Coventry Med D business that was discussed on the
> last call.  We also had a couple of large accounts that were lost due
> to acquisitions by managed care companies; obviously, the
> WellPoint and Humana acquisitions.
>
> But let me summarize where we are at this point in time.  The
> $5.2 billion in the first 12 months revenue will have an impact on
> 2009 revenues of about $4.5 billion.  The $4.5 billion in '09
> incremental revenues is nearly offset by the known terminations.
> For 2009 revenue impact perspective, ***the wins and losses are in
> fair balance***.

(Emphasis added.)

114.    The statements in ¶¶112-13 omitted to state the truth and were materially false

and misleading when made.  These statements failed to disclose that CVS Caremark was

suffering from poor execution and service, the Company's model was not working, and that

44

contract losses were outpacing contract wins.  Defendants also knew, but failed to disclose, with fraudulent scienter, that (i) CVS Caremark's service-related problems were due to its failure to properly integrate CVS PharmaCare's plan participant structure with Caremark's plan participant structure; (ii) based on Sales Pipeline Reports and monthly/quarterly meetings with CVS Caremark Executives, CVS Caremark's contracts with New Jersey and Chrysler were at the highest risk of non-renewal since May 2008; (iii)  by October 2008, Company employees were told that the Coventry commercial contract would not be renewed; (iv) by the fall of 2008, Company employees knew that the New Jersey contract would not be renewed due to substantial, unresolved service-related and transparency issues; (v) Defendants knew that they would lose the Coventry commercial contract after losing the Med-D contract due to service issues; and (vi) the new Med-D regulations, which eliminated a PDP provider's ability to earn spread on prescriptions for Med-D participants, materially impaired SilverScript's pricing structure and could lead to heavy losses of PDP Med-D business in 2010.

115.    The materially false and misleading statements made on the October 30 call were designed to maintain the illusion that the CVS Caremark merger, and resulting retail-PBM model, was a success, and that the Company would continue to retain current PBM clients (and compete for new business) and meet future revenue and earnings expectations and guidance.

116.    In reliance upon Defendants' materially false and misleading statements, analysts reacted positively towards the current and future prospects of CVS Caremark's PBM business. For example, on October 31, 2008, an analyst with J.P. Morgan, in a report entitled "CVS Caremark Corp. 3Q08 Follow-Up: Reiterate [Overweight] on Solid 3Q Report," praised the Company's recent PBM contract wins and expected more of the same in the 2010 selling season:

> On the PBM side, we believe things are shaping up nicely in terms
> of 2009 wins and that the benefit of the integrated model should

become more evident as the company builds on the strong wins it
saw for 2009.

117.    On November 4, 2008, an analyst with Morgan Stanley, in a report entitled

"CVS/Caremark Corp. 3Q08: Making It Look Easy Even Though It Isn't," concluded that "[t]he

company's Caremark subsidiary is the ***most competitive PBM***, and stands to remain a ***share***

***gainer*** in this highly profitable industry."  (Emphasis added.)

118.    On CVS Caremark's January 9, 2009 earnings guidance call ("January 9 call"),

however, the reason for the Company's somewhat "successful" 2009 selling season was partially

revealed.  On the call, defendant Ryan stated that many of the "2009 wins" were secured because

CVS Caremark "repriced a significant amount of business" in order to take certain "key

accounts…off the table and reprice early for all the reasons that you can imagine."  Ryan noted

that the re-pricing included not only contracts that were up for renewal, but also contacts that

were set to expire in 2010 and beyond, explaining that Defendants decided to sacrifice some

PBM "profitability" in order to lock-up additional contracts in the 2009 selling season:

> Let me take a few minutes to just talk a little bit about the margin
> pressures in '09.  First, *a larger than ever portion of our client*
> *book repriced* for '09.  That was comprised of renewals that we
> bid aggressively plus improved pricing on other contracts that were
> not up for renewal.  In fact, *over half of our PBM business*
> *received improved pricing* and close to 70% of our national
> accounts were repriced.

(Emphasis added.)

119.    An analyst with William Blair & Co., concerned that poor service may be the

reason behind the re-pricing, asked:

> Could you talk about what some of those client discussions a little
> bit further?  You said you repriced some of the accounts for all the
> reasons that you might imagine, but what are the things that would
> cause you to reprice?  Is there a concern about the service for the
> systems and how can you get people past that also for 2010?

120.    Defendant Ryan responded, stating that service issues had nothing at all to do

with CVS Caremark's decision to re-price its contracts during the 2009 selling season:

> No, there is no—we didn't—let me be clear on that because I think
> you are making the assumption that we repriced because we had an
> inferior service.  We repriced because we decided that these key
> accounts were accounts that we could impact, we could help lower
> their costs, we could help their participants and we could grow our
> business.  So these are accounts that we kind of wanted to lock
> down.  ***No trade-offs because of our service***.  We just got the JD
> Power Associates Health Plan PBM of the Year for our service and
> our call centers.  So the notion that we had to reprice because the
> service was poor, our service in our PBM business is the best it has
> been.
>
> And as I mentioned it earlier, if you look at the metrics and we stay
> close to the metrics on customer service, as you know in our stores
> and in our PBM, it's at the top of the game.  And in fact, when you
> think about the service—and it is actually putting a little more
> pressure on the PBM business because now they have to think
> about how they integrate with the retail side and communicate with
> the retail pharmacies and they have done really a great job.  So
> ***there was no hidden agenda here about giving a lower price
> because of lack of service*** if that is what you are asking.

(Emphasis added.)

121.    During the January 9 call, an analyst with UBS questioned defendant Ryan on the

integration of CVS Caremark's three plan participant platforms (*i.e.*, PharmaCare, Caremark, and

AdvancePCS), asking whether the systems are "able to talk to each other?"  Defendant Ryan

responded, explaining that there is "no issue" with CVS Caremark's systems:

> Oh, yes, yes, yes.  ***All the systems are able to talk to each other*** . .
> . .  We have got no issue with our systems.  Obviously, opportunity
> we have with our systems, they are just more costly to run for us
> and so that is an opportunity for us.  But from a client standpoint,
> with the systems that we use, depending on the health plan or its
> employer or DPA, they are appropriate for those systems.  So we
> are okay.

(Emphasis added.)

122.    The statements in ¶¶118-21 omitted to state the truth and were materially false and misleading when made.  These statements failed to disclose that during the 2009 selling season, CVS Caremark unilaterally reduced prices on over 50 percent of its existing PBM contracts in order to retain customers that were dissatisfied with the Company's inferior service, integration-related issues, and lack of transparency.  The statements were also false because Defendants knew that since March 2007, the Company's computer systems were not integrated, resulting in severe service disruptions, overpriced prescriptions, incorrect prescriptions, delayed prescriptions or no prescriptions at all.  Defendants also failed to disclose, with fraudulent scienter, that (i) CVS Caremark's service-related problems were due to its failure to properly integrate CVS PharmaCare's plan participant structure with Caremark's plan participant structure; (ii) based on "Sales Pipeline Reports" and monthly/quarterly meetings with CVS Caremark Executives, CVS Caremark's contracts with New Jersey and Chrysler were at the highest risk of non-renewal since May 2008; (iii) by October 2008, Company employees were told that the Coventry commercial contract would not be renewed; (iv) by the fall of 2008, Company employees knew that the New Jersey contract would not be renewed due to substantial, unresolved service-related and transparency issues; (v) Defendants knew that they would lose the Coventry commercial contract after losing the Med-D contract due to service issues; and (vi) the new Med-D regulations, which eliminated a PDP provider's ability to earn spread on prescriptions for Med-D participants, materially impaired SilverScript's pricing structure and could lead to heavy losses of PDP Med-D business in 2010.

123.    In reliance upon Defendants' materially false and misleading statements, analysts reacted positively towards the current and future prospects of CVS Caremark's PBM business.

For example, shortly after the January 9 call, an analyst with SunTrust Robinson Humphrey, noting that CVS Caremark's "[l]ower than anticipated PBM margin is primarily the result of [its] efforts to renew and reprice a number of [] contracts," emphasized that:

> [T]his is the ***result of strategic decisions that improve visibility*** on important contracts; the PBM profit adjustment is probably unique to CVS and the impact should be temporary; and CVS seems to be accomplishing its goal of driving the topline, given expected Caremark revenue growth of 10% to 12%.

(Emphasis added.)

124.    On January 12, 2009, in a report concluding that CVS Caremark stock was "undervalued" and "reiterating [its] Buy rating," an analyst with Jeffries & Company declared that CVS Caremark's "vision" of an "integrated PBM and retail model, is the right one."  Jeffries further opined that CVS Caremark's re-pricing of contracts would give the Company an added advantage going into the 2010 selling season:

> While we are not thrilled that the company took down its pricing structure, ***it will allow the PBM side of the business to be aggressive in the 2010 selling season*** which is already under way. Indeed, we would think most, if not all, Medco and Express Scripts customers have pushed or will push for better terms on their contracts, potentially opening the door for Caremark.

(Emphasis added.)

125.    During CVS Caremark's February 19, 2009 earnings conference call ("February 19 call"), defendant Ryan projected a "good" 2010 selling season, following the Company's prior success at retaining old and gaining new clients based, in part, on its "outstanding customer service:"

> [In 2008,] [o]ur PBM had an ***excellent client retention*** and achieved all time industry sales and new business growth with 90 clients and $8.2 billion in 12-month revenues, that's $8.2 billion. ***So for anyone wondering if our offerings are resonating they certainly are***. And for the third time our PBM call centers were

certified by JD Power & Associates for providing **outstanding customer service** . . . .

First I'll touch on the PBM.  Following on the heels of the most successful selling season in the company's—in our company's history, our sales force again is **looking forward to another good year**.  While I won't talk about specifics this early in the season, **we see significant new business opportunities in 2010**.  With proactive pharmacy care, we have the ability to provide our clients and their planned participants with beneficial services that really no other competitor can.  We are hearing from our clients that in these tough economic times, they are more open than ever to changes in plan design and other cost containment tools that save money and improve outcomes.  Our proactive pharmacy care offering includes medication management tools like innovative plan designs, clinical programs, ExtraCare health along with integrated specialty Rx solutions and maintenance choice . . . .

We have some new wins already early in '10—early in '09 for 2010 . . . .  And I can tell you from finalists meetings and what we're seeing early and what our sales team is pointing out, **we feel pretty optimistic about the season**.  Some of the ones that were presently carved out where people are starting to look to—are apparently pulled in are starting to look to carve those out.  And we have some small opportunities for mid-year sign-ups.

(Emphasis added.)

126.    With respect to CVS Caremark's expectations concerning the Med-D business,

defendant Ryan declared:

Med D came in exactly where we thought it would be in the fourth quarter and **it's starting out basically right on plan early this year**.  So there were kind of no surprises when we readjusted and made the—little bit of a course correction there . . . .

**We absolutely won new Part D members**.

(Emphasis added.)

127.    During the February 19 call, an analyst with Cleveland Research posed the

question, "[c]an you give us any sense as a baseline to consider as we look out to 2010 for PBM

50

profit growth." Maintaining a positive outlook, Defendant Ryan concluded, "[w]e're not ready to give that.  We just said it would be ***significantly better than '09***."  (Emphasis added.)

128.    The statements in ¶¶125-27 omitted to state the truth and were materially false and misleading when made.  These statements failed to disclose that CVS Caremark's 2010 business opportunities were to be offset by a number of substantial contract non-renewals, including Coventry, Chrysler, and New Jersey, primarily resulting from service-related and transparency issues.  Thus, the Company failed to have "excellent client retention."  The statements were also false because Defendants knew that based on the aforesaid customer attrition, the Company would not achieve "significantly better" PBM profit growth in 2010 than it did in 2009.  Defendants also knew, but failed to disclose, with fraudulent scienter, that (i) the new Med-D regulations, which eliminated a PDP provider's ability to earn spread on prescriptions for Med-D participants, materially impaired SilverScript's pricing structure and could lead to heavy losses of PDP Med-D business in 2010; (ii) based on "Sales Pipeline Reports" and monthly/quarterly meetings with CVS Caremark Executives, CVS Caremark's contracts with New Jersey and Chrysler were at the highest risk of non-renewal since May 2008; (iii) by October 2008, Company employees were told that the Coventry commercial contract would not be renewed; (iv) Defendants knew that they would lose the Coventry commercial contract after losing the Med-D contract due to service issues; (v) by the fall of 2008, Company employees knew that the New Jersey contract would not be renewed due to substantial, unresolved service-related and transparency issues; and (vi) CVS Caremark's service-related problems were due to its failure to properly integrate CVS PharmaCare's plan participant structure with Caremark's plan participant structure.

129.     In reliance upon Defendants' materially false and misleading statements, analysts

reacted positively towards the current and future prospects of CVS Caremark's PBM business.

For instance, on the same day as the February 19 call, an analyst with Deutsche Bank concluded

that "CVS continues to win new PBM business."  Specifically, in reiterating its Buy rating, the

Deutsche Bank analyst noted that:

> On the call management highlighted that CVS' PBM had an
> *excellent client retention and achieved all time industry sales and
> new business growth* with 90 clients and $8.2 billion in 12-month
> revenues during the period . . . .
>
> CVS completed a very successful 2008 and has started 2009 with a
> strong foundation.  *We expect the company to continue to execute
> on its unique vertically-integrated drug retail/PBM model.*

(Emphasis added.)

130.     An analyst with Deutsche Bank further opined that CVS Caremark's new

customer service "offerings" were "resonating in the marketplace" and permitting the Company

to build upon its success:

> Recent success in winning new PBM business is encouraging, and
> demonstrates that the company's *differentiated Maintenance
> Choice and Proactive Pharmacy offerings are resonating* in the
> marketplace—particularly as payers become ever more cost-
> conscious on healthcare spend.  From a financial standpoint, CVS
> is also delivering.  Though FY09 is expected to be a very
> challenging year in the economy, *management still anticipates
> modest EPS growth*, even with headwinds that include start-up
> costs of new PBM clients and the one-time Longs' integration
> costs . . . .  We reiterate our Buy on CVS.

(Emphasis added.)

131.     Similarly, on the same day, an analyst with Wachovia reported:

> Great Franchise, Attractive Valuation—Reiterate Outperform.
>
> *CVS is winning new PBM business and we expect this business
> to make a much more meaningful contribution to EPS in 2010*.

> Thus, we suggest that investors take advantage of the recession and
> CVS' attractive valuation to build long-term positions.

(Emphasis added.)

132.    On February 20, 2009, an analyst with J.P. Morgan positively opined that CVS

Caremark's PBM business was in fact "strong:"

> We remain positive on the long-term outlook for both segments of
> the company's business . . . .
>
> The outlook for the **PBM business remains strong**.  The company
> noted that it continues to see *significant opportunities for new
> business* and that it has already had some wins for 2010 starts.

(Emphasis added.)

133.    In CVS Caremark's Form 10-K for the fiscal year ended December 31, 2008,

filed February 27, 2009 and signed by defendants Ryan and Rickard, Defendants declared that

the merger had been a material contributor to the Company's success to date:

> We believe ***the breadth of capabilities resulting from the
> Caremark Merger are resonating with our clients and
> contributed to our success*** at renewing existing clients and
> obtaining a significant number of new clients in the 2008 selling
> season.

(Emphasis added.)

134.    The statements in ¶133 omitted to state the truth and were materially false and

misleading when made.  These statements failed to disclose that the purported benefits of the

CVS Caremark merger were not "resonating" with existing clients, including Coventry, Chrysler

and New Jersey, primarily due to integration-related service issues and lack of transparency.  The

statements were also false because Defendants knew that the Company's 2010 business

opportunities would be offset by contract terminations of existing PBM plan sponsors Coventry,

Chrysler, and New Jersey.  Defendants also knew, but failed to disclose, with fraudulent scienter,

that (i) the new Med-D regulations, which eliminated a PDP provider's ability to earn spread on

prescriptions for Med-D participants, materially impaired SilverScript's pricing structure and could lead to heavy losses of PDP Med-D business in 2010; (ii) based on "Sales Pipeline Reports" and monthly/quarterly meetings with CVS Caremark Executives, CVS Caremark's contracts with New Jersey and Chrysler were at the highest risk of non-renewal since May 2008; (iii) by October 2008, Company employees were told that the Coventry commercial contract would not be renewed; (iv) Defendants knew that they would lose the Coventry commercial contract after losing the Med-D contract due to service issues; (v) by the fall of 2008, Company employees knew that the New Jersey contract would not be renewed due to substantial, unresolved service-related and transparency issues; and (vi) CVS Caremark's service-related problems were due to its failure to properly integrate CVS PharmaCare's plan participant structure with Caremark's plan participant structure.

135.    On March 10, 2009, at the Raymond James Institutional Investor Conference ("March 10 meeting"), defendant Rickard once again proclaimed that CVS Caremark's model was "resonating" within the "PBM marketplace," compelling him to foresee a positive 2010 selling season:

> A major focus of the investment community over the past few months has been whether ***our model is resonating in the PBM marketplace***.  I think if you look at this slide, ***the answer has to be a resounding yes***.  We have just come off, by far, the best PBM selling season in our company's history, with $8.2 billion in first-year revenues and $2.5 billion of net new revenues, including the impact of two large account terminations.
>
> ***As we head into the 2010 selling season, our sales team is very optimistic about the opportunities that lie ahead***.  We already have several wins chalked up.

(Emphasis added.)

136.    At the March 10 call, defendant Rickard also described why "Maintenance Choice should help [CVS Caremark] win new PBM contracts" in 2009:

[W]e developed Maintenance Choice. **It's an industry breakthrough**, and it's unmatched by any of our competitors.

\*     \*     \*

Through Maintenance Choice, we're giving clients and their participants a leading combination of access, quality, and cost savings that no other competitor can offer.

\*     \*     \*

**Maintenance Choice should help us win new PBM contracts, drive higher client satisfaction and retention**, shift non-CVS scripts to our CVS Caremark 90-day scripts, and increase our share of acute scripts at retail.

(Emphasis added.)

137.     With respect to CVS Caremark's re-pricing of certain contracts for 2009, defendant Rickard reaffirmed that Defendants would generate beneficial results for the Company and investors:

[W]e gained a significant amount of share in last year's selling season for implementation in '09.  And we plan to do the same this year toward 2010.

**We did have some price compression**.  A couple of major contracts became extremely competitive and **we did have some pull-forward of contracts to lock up business going forward**.  So we have the result that you get from that.

But at this point, we're very, very well positioned going forward . . .

So I think that you can complain about not making as much financial progress this year as some competitors.  That's certainly true.  I think, however, **that we have done the things strategically that needed to be done to make this merger successful**.

(Emphasis added.)

138.     The statements in ¶¶135-37 omitted to state the truth and were materially false and misleading when made.  These statements failed to disclose that CVS Caremark's model was not "resonating" with existing clients due to the Company's poor execution and service, and

55

therefore contract losses were outpacing contract wins.  The statements were also false because

Defendants knew that the Maintenance Choice offering was neither driving contract renewals nor

gaining new PBM contracts.  Defendants also knew, but failed to disclose, with fraudulent

scienter, that (i) CVS Caremark unilaterally reduced prices on over 50 percent of its existing

PBM contracts in order to retain customers that were dissatisfied with the Company's inferior

service, integration-related issues, and lack of transparency; (ii) the new Med-D regulations,

which eliminated a PDP provider's ability to earn spread on prescriptions for Med-D

participants, materially impaired SilverScript's pricing structure and could lead to heavy losses

of PDP Med-D business in 2010; (iii) based on "Sales Pipeline Reports" and monthly/quarterly

meetings with CVS Caremark Executives, CVS Caremark's contracts with New Jersey and

Chrysler were at the highest risk of non-renewal since May 2008; (iv) by October 2008,

Company employees were told that the Coventry commercial contract would not be renewed; (v)

Defendants knew that they would lose the Coventry commercial contract after losing the Med-D

contract due to service issues; (vi) by the fall of 2008, Company employees knew that the New

Jersey contract would not be renewed due to substantial, unresolved service-related and

transparency issues; and (vii) CVS Caremark's service-related problems were due to its failure to

properly integrate CVS PharmaCare's plan participant structure with Caremark's plan participant

structure.

139.    In CVS Caremark's Form 10-Q for the quarterly period ended March 31, 2009,

filed May 5, 2009 and signed by defendants Ryan and Rickard, Defendants outlined several

factors, including efforts to "retain existing customers," that were impacting the Company's

profit margin entering the 2009 selling season:

> Our gross profit dollars and gross profit rates continued to be
> impacted by our efforts to (i) ***retain existing customers***, (ii) obtain

> new business, (iii) migrate customers and participants to our Maintenance Choice program and (iv) maintain or improve the purchase discounts we received from manufacturers, wholesalers and retail pharmacies.  During the 2008 selling season, the Company renewed a number of existing clients and obtained new clients at lower rates, which resulted in **gross profit compression** in the first quarter of 2009.

(Emphasis added.)

140.   Similarly, on CVS Caremark's May 5, 2009 earnings conference call ("May 5 call"), defendant Ryan continued his positive outlook for the 2010 selling season, noting that with respect to renewals, the Company was "essentially on plan, in good shape:"

> As far as the 2010 **pipeline**, overall it's kind of reasonable from last year, $8 billion plus, maybe $10 billion out there.  We're obviously aggressively going after the appropriate—the appropriate business, but we think—when you think about renewals, where we are right now at this point in the season, **we're essentially on plan, in good shape**, and obviously we feel comfortable where we are with some of the new business going on.

(Emphasis added.)

141.   Prefaced with news concerning the purported new business opportunities for 2010, defendant Ryan also informed the market for the first time on the May 5 call that, **as expected**, Coventry would not be renewing its PBM contract with CVS Caremark:

> **We see plenty of new business opportunities for 2010 and we're very pleased with the early results of the season**.  In addition, clients are more open to—than ever to changes in plan design and other cost containment tools to save money.  As you probably heard last week, we lost the Coventry commercial contract, which is about $1 billion in revenues and a relatively low mail penetration account.  **This was not unexpected**.  In fact, as we began to set our goals for 2010, the loss of this account was considered.

(Emphasis added.)

142.    On the May 5 call, with respect to customers' acceptance of CVS Caremark's additional customer service offerings, Rickard expressed that "[w]e're really pleased with the strong adoption of our groundbreaking Maintenance Choice offering."

143.    Similarly, on the May 5 call, an analyst from Goldman Sachs asked whether CVS Caremark's Maintenance Choice "service" offering was ultimately winning new contracts:

> Tom, in the past you've talked about you win new contracts on price and you keep them on service.  Is the dialogue now, because of Maintenance Choice the new model, where does it stand where you can win on service or the new model, as opposed to price?

144.    In response, defendant Ryan confirmed that new and existing customers consider additional service offerings, such as Maintenance Choice, important in choosing a PBM:

> [T]he discussion comes around how can we help them–how can we help them lower their overall healthcare costs? And one of the ways is ***Maintenance Choice is why it's so big*** . . . .
>
> [O]verall, the issue, ***the real tenor and tone of the discussion is around the services that one can provide*** and how it can lower overall healthcare costs, not just pharmacy.

(Emphasis added.)

145.    With respect to the Med-D business, on the May 5 call, an analyst from Raymond James asked, "could you help us frame the part D improvement this year versus last year?  Does it–what's kind of the ballpark EPS impact from doing better in that line of business this year versus last year."  Defendant Ryan responded, "***year to year profitability improvement is high single digits***.  It's related to both the way we bid the business for this year.  ***It's related to the enrollment, which is up versus prior year***.  A number of things are going in the direction there."

(Emphasis added.)

146.    The statements in ¶¶139-45 omitted to state the truth and were materially false and misleading when made.  These statements failed to disclose that based on the announced termination of the Coventry commercial contract and the anticipated termination of the Chrysler and New Jersey contracts, CVS Caremark would not have sufficient PBM contract renewals entering the 2010 selling season.  Moreover, Defendants knew, but failed to disclose, that CVS Caremark's "profit compression" was not due to its efforts to retain the aforementioned lost or soon to be lost contracts.  Defendants also knew, but failed to disclose, with fraudulent scienter, that (i) the Maintenance Choice offering was neither driving contract renewals nor gaining new PBM customers; (ii) the loss of the Coventry commercial contract was "not unexpected" because Defendants knew that they would lose it after losing the Med-D contract as a result of service issues; (iii) based on "Sales Pipeline Reports" and monthly/quarterly meetings with CVS Caremark Executives, CVS Caremark's contracts with New Jersey and Chrysler were at the highest risk of non-renewal since May 2008; (iv) by the fall of 2008, Company employees knew that the New Jersey contract would not be renewed due to substantial, unresolved service-related and transparency issues; (v) CVS Caremark's service-related problems were due to its failure to properly integrate CVS PharmaCare's plan participant structure with Caremark's plan participant structure; and (vi) the new Med-D regulations, which eliminated a PDP provider's ability to earn spread on prescriptions for Med-D participants, materially impaired SilverScript's pricing structure and could lead to heavy losses of PDP Med-D business in 2010.

147.    In reliance upon Defendants' materially false and misleading statements, analysts reacted positively towards the current and future prospects of CVS Caremark's PBM business. For example, On May 6, 2009, an analyst with William Blair & Company highlighted Ryan's upbeat outlook for the 2010 selling season:

> Regarding the 2010 selling season, CVS Caremark indicates that it is "essentially on plan, in good shape" with renewals—despite the loss of the $1 billion Coventry contract to Medco (MHS $44.90)—and "we feel comfortable with where we are with some of the new business going on."

Similarly, on the same day, Jeffries & Company reported:

> Management announced the addition to the program of more Caremark members and accounts on July 1 and seemed *optimistic about the 2010 selling season* . . . .

> [P]atients seem to be taking to the program and CVS.

(Emphasis added.)

148.     On May 15, 2009, at CVS Caremark's 2009 Annual Analyst/Investor Meeting

("May 15 meeting"), defendant Ryan further emphasized his purported excitement about how the

Company was situated for the 2010 selling season:

> We are *exactly where we need to be* from a re-upping contract standpoint.  So from the PBM side of our business, we're in good shape.  And obviously we have *growth in the Med D side* of our business.

(Emphasis added.)

149.     In addition, David Joyner, CVS Caremark's Executive VP for Sales & Account

Services, concluded that the Company's differentiated model would lead to success on the

contract front:

> I would say we're still right smack in the middle of the selling season.  As you know, we really don't get clarity until we get closer to Q3.  And I would say that—*score our chances as very good about closing more than our fair share of the business, with a lot of the opportunities really being around the new products that we're promoting*, whether it be Maintenance Choice or the other types of programs that really differentiate our model.

(Emphasis added.)

150.    In connection with the non-renewal of the Coventry contract, defendant Ryan

reiterated during the May 15 meeting that the loss "was expected," though he did not clarify

why:

> We did have, and I'm sure there'll probably be a comment on the
> Q&A around Coventry, again, ***this was expected***.  This was a two-
> year process of moving them over.  But I do have confidence at
> least within the organization here that we have enough activity and
> enough excitement and, again, enough talk in the marketplace that
> ***this model really is going to make a difference going forward***.

(Emphasis added.)

151.    During the May 15 meeting, defendant Ryan also commented on the status of

negotiations with Chrysler:

> That's proceeding along.  I think they had a few other things on
> their plate besides the prescription benefit program.  So they're
> trying to figure out how to fund this program and then I think we
> should hear shortly, I would think a relatively short time.  But it's
> still going on.

152.    With respect to the recent Med-D regulatory changes, eliminating a PDP

provider's ability to earn spread on prescriptions for Med-D participants, defendant Rickard

explained that the new regulation was a mere "headwind" for CVS Caremark's SilverScript

subsidiary.  Specifically, after discussing the Company's recent retail success and the PBM client

renewals during the 2009 selling season, defendant Rickard stated:

> Offsetting these tailwinds will be the impact of the elimination of
> the network differential in the Medicare Part D business.  Some of
> you may be unfamiliar with the term network differential.  It is
> simply the difference between the drug price charged by the PBM
> to the Part D sponsors and the drug price paid by the PBM to the
> drugstores.  You might refer to it more commonly as spread.
> While the full details of this change are still unknown, the net
> impact will be a headwind.

153.   During the May 15 meeting, an unidentified analyst posed the following question as to whether the merger presented any FTC issues:

> [I]f you could comment for all of us around the FTC issue.  So you have the incentive pharmacists are now trying to come and break up CVS Caremark.  That tells me that obviously you're doing something that's disrupting their business.  But what do you think the chances are that the FTC will come back and look at the CVS Caremark transaction?

Denying that the FTC posed any threat, defendant Ryan declared:

> It's hard to talk about the FTC issues because ***we don't think there are FTC issues*** . . . .  We're going to deal with it and I don't expect it.  We feel confident they won't.  That's the best I can say to you.  I just don't think it's a—***I think it's a competitor that's saying we're losing business to a better model***.

(Emphasis added.)

154.   The statements in ¶¶148-53 omitted to state the truth and were materially false and misleading when made.  These statements failed to disclose that based on the announced termination of the Coventry commercial contract and the anticipated termination of the Chrysler and New Jersey contracts, CVS Caremark would have minimal PBM contract renewals entering the 2010 selling season.  The statements were also false because Defendants had known since May 2008 that the Chrysler contract was at the highest risk of non-renewal and that negotiations with the Company were not proceeding successfully.  Defendants also knew, but failed to disclose, with fraudulent scienter, that (i) the loss of the Coventry commercial contract was "not unexpected" because Defendants knew that they would lose it after losing the Med-D contract as a result of service issues; (ii) based on the number of antitrust allegations levied against CVS Caremark by private parties, there was a material risk of an FTC probe/investigation of the Company; (iii) the Maintenance Choice offering was neither driving contract renewals nor gaining new PBM customers; (iv) the new Med-D regulations, which eliminated a PDP

provider's ability to earn spread on prescriptions for Med-D participants, materially impaired

SilverScript's pricing structure and could lead to heavy losses of PDP Med-D business in 2010;

(v) based on "Sales Pipeline Reports" and monthly/quarterly meetings with CVS Caremark

Executives, CVS Caremark's contracts with New Jersey and Chrysler were at the highest risk of

non-renewal since May 2008; (vi) by the fall of 2008, Company employees knew that the New

Jersey contract would not be renewed due to substantial, unresolved service-related and

transparency issues; (vii) Defendants knew that they would lose the Coventry commercial

contract after losing the Med-D contract due to service issues; and (viii) CVS Caremark's

service-related problems were due to its failure to properly integrate CVS PharmaCare's plan

participant structure with Caremark's plan participant structure.

155.   In reliance upon Defendants' materially false and misleading statements, analysts

reacted positively towards the current and future prospects of CVS Caremark's PBM business.

For example, on May 17, 2009, an analyst with Deutsche Bank reaffirmed that "Friday's annual

Analyst/Investor Day provided incremental color of CVS' uniquely strong prospects."  In

maintaining a Buy rating for CVS Caremark, Deutsche Bank proclaimed, "management outlined

the recent successes of CVS' unique drug retail/PBM model and cleared up lingering

misinformation about how the model works and delivers value to payers, patients, and

shareholders."

156.   With respect to Maintenance Choice and CVS Caremark's other customer service

offerings, Deutsche Bank extensively outlined how they positively differentiated the Company's

combined model and resonated with new and existing customers:

> [M]anagement outlined the recent successes of CVS' unique drug
> retail/PBM model and cleared up lingering misinformation about
> how the model works and delivers value to payers, patients, and
> shareholders . . . .

Maintenance Choice has added clients, & CVS has already won
close to $1B in revenues in the '10 selling season, with 26% of its
PBM revenues up for renewal in '10 . . . .

Progress of the new retail/PBM model is evident, with the unique
Proactive Care and Maintenance Choice programs clearly
differentiating CVS in the marketplace and driving business to its
retail pharmacies.  CVS' fundamentals and competitive positioning
are very strong . . . .

CVS's scale is a key competitive advantage, as the company is
able to leverage its size to bring down the cost of medications, the
savings can be shared with payers and consumers.  Furthermore,
CVS Caremark can deliver overall healthcare cost savings through
initiatives like Maintenance Choice and Proactive Pharmacy Care
that are unmatched in the marketplace today.

CVS can reach out to patients through multiple channels—via
phone, email, text, or face-to-face with a pharmacist.  The face-to-
face interaction with a CVS pharmacist can be particularly
powerful in ensuring better overall adherence to prescription drug
regimens, in switching patients to more cost-effective generics, or
in recognizing when a drug therapy may have lapsed . . . .  In
essence, CVS's proactive approach to pharmacy care saves payers
money not only on drug spending, but on overall healthcare
spending.  This is a key principle underlying CVS Caremark's go-
to-market strategy.

157.    On May 18, 2009, an analyst with J.P. Morgan stated that "we continue to believe

the company is gaining traction in the marketplace with its integrated model and innovative

offerings, which serves to reinforce our positive view on CVS Caremark shares."  On the same

day, an analyst with Morgan Stanley maintained an Overweight rating for CVS Caremark in a

report entitled "CVS/Caremark Corp. Analyst Meeting: Early Progress from New PBM/Retail

Model."  Harping on its belief that the 2010 selling season had been successful thus far, Morgan

Stanley opined, "CVS expects profitability to improve driven by new contract wins . . . .  The

company reported $1B of new business wins so far for the 2010 selling season."

158.    Following the May 15 meeting, an analyst with Morgan Stanley also reported that

the National Pharmacist Association had alleged that CVS Caremark was engaging in

anticompetitive business practices through its Maintenance Choice offering.  Nonetheless,

essentially turning a negative into a positive, Morgan Stanley reported the following:

> In what is perhaps *a sign that CVS is shaking up the marketplace*, independent pharmacists have charged that the new Maintenance Choice product is anticompetitive; the National Community Pharmacists Association has asked the FTC to investigate the CVS Caremark merger and its business practices.  CVS underscored that the Maintenance Choice product is an employer-elected option and it is conceptually no different than the mandatory mail programs and other plan designs with differential co-pays which are currently broadly in use across the PBM industry.

(Emphasis added.)

159.    On CVS Caremark's August 4, 2009 earnings conference call ("August 4 call"),

defendant Ryan once again expressed "great confidence" in the ability of CVS Caremark's PBM

to retain current clients and win new business through its superior service:

> [W]e have had some good successes, and we have had some disappointments.  We now have over 3,000 clients under contract, and *our retention rate for 2010 is 96%, which is slightly higher than 2009*.  As previously reported, we lost the Coventry commercial contract, which was worth $1.4 billion, which was widely expected . . . .
>
> Our new clients are very excited about what we bring to the table, and our existing clients are giving us *high customer satisfaction scores*.  *The fact that both clients and their members love our integrated proactive pharmacy care offerings, gives me great confidence going forward*.

(Emphasis added.)

160.    On the August 4 call, defendant Ryan provided explicit projections for 2010:

> *I would be very disappointed if we didn't have an EPS growth of at least 13 to 15% next year*.  As I said, we haven't completed our plan for 2010, and it is too early to give specific guidance, but I did want to give you some visibility on the Med D impact.  So we expect a great '09, and we look forward to an even better '10.

(Emphasis added.)

161.    Also on the August 4 call, defendant Ryan explained that the Company was

withdrawing its prior guidance concerning the amount of business gained during the 2009 selling

season because one of its potential customers verbally committed, but then subsequently pulled

out of its agreement:

> At the Analyst Meeting, we announced $1 billion of new business.
> So some of you may be asking, why just a small increase.  Well at
> that meeting, *when we announced $1 billion of new business, that
> included an oral commitment from a large insurer*.  This insurer
> focused on individual markets, and this was worth about $300
> million.  Since then, the insurer pulled it's commitment, and this is
> rarely done, and it is a first for us, which is why sometimes we
> don't announce until the contract is signed, but we had a verbal
> commitment, and were convinced they were coming with us . . . .
> So with this if you back out that insurer, we have actually added
> $400 million of new business since the Analyst Meeting.  We are
> optimistic about additional wins this season, but the remaining
> opportunities are probably not sizable enough to offset the losses,
> since the term contracts I reviewed totaled about $2 billion.

(Emphasis added.)

162.    In view of the prior statement, a Goldman Sach's analyst posed the following

question related to the customer that withdrew its commitment from CVS Caremark: "have they

told you why they picked you originally?"  Defendant Ryan responded, attributing the eventual

loss to pricing:

> [W]ell, one, they had been with the incumbent for a while.  There
> were some service issues.  *They liked the model*.  They liked the
> fact this is an independent, or an insurer that really focuses on
> individuals. There are a lot of stories there.  We got apologies from
> the consultants.  We have never seen it, but *I guess the pricing
> was so good, it was hard to pass up*, and we obviously looked at it
> and passed.  So a lesson learned.

(Emphasis added.)

163.    During the August 4 call, defendant Ryan also discussed the recent loss of other

major contracts, including Chrysler:

> And recently the newly formed UAW VEBA group decided to
> consolidate all of the autos under one contract.  As a result, we lost
> the Chrysler UAW retirees to Blue Cross/Blue Shield of Michigan.

164.    With respect to the previously disclosed Med-D regulatory changes regarding a

plan sponsors ability to retain spread pricing revenues, defendant Ryan stated that CVS

Caremark had completed its analysis of the impact on earnings and concluded that it would be

minimal.  Specifically, he explained that:

> Well, we have now finalized our Med D bids, and have really had
> a chance to do some early handicapping on the various regions,
> and what we think we would keep and get, so now we think the net
> impact of the elimination of the Med D network differential next
> year, will be in the range of $0.05 to $0.07 a share.  So once again
> the elimination of Med D network differential, net/net in total be in
> the range of $0.05 to 0.07 a share in 2010.

165.    The statements in ¶¶159-64 omitted to state the truth and were materially false

and misleading when made.  These statements failed to disclose that CVS Caremark could not

achieve 13%-15% EPS growth in 2010 because existing customers, including New Jersey, were

leaving the Company or not renewing contracts and potential customers were choosing

competitors due to undisclosed severe integration and service issues.  The statements were also

false because CVS Caremark lost the Chrysler contract due to long-running service-related and

transparency issues.  Defendants also knew, but failed to disclose, with fraudulent scienter, that

(i) the Company lost a verbal commitment from a potential customer due to service-related and

transparency issues; (ii) based on "Sales Pipeline Reports" and monthly/quarterly meetings with

CVS Caremark Executives, CVS Caremark's contract with New Jersey was at the highest risk of

non-renewal since May 2008; (iii) by late 2008, Company employees knew that the New Jersey

contract would not be renewed due to substantial, unresolved service-related and transparency issues; (iv) Defendants knew that they would lose the Coventry commercial contract after losing the Med-D contract due to service issues; (v) CVS Caremark's service-related problems were due to its failure to properly integrate CVS PharmaCare's plan participant structure with Caremark's plan participant structure; and (vi) the new Med-D regulations, which eliminated a PDP provider's ability to earn spread on prescriptions for Med-D participants, materially impaired SilverScript's pricing structure and could lead to heavy losses of PDP Med-D business in 2010.

166.    In reliance upon Defendants' materially false and misleading statements, analysts reacted positively towards the current and future prospects of CVS Caremark's PBM business, conveying particular confidence in CVS Caremark's ability to consistently meet or exceed its earnings projections.  For example, shortly after the August 4 call, an analyst with Wells Fargo noted that CVS Caremark's "*management expects to generate at least 13-15% EPS growth in 2010 even after absorbing $0.05-0.07 in EPS dilution* from a change in Medicare drug plan regulations.  This positive outlook reflects secular trends such as increased generics as well as continued *benefits* from the merger with Caremark, in our view."  (Emphasis added.)

167.    One day after the call, an analyst with J.P. Morgan expressed its confidence that based on CVS Caremark's historical performance, the Company's projected 13-15% EPS growth was a "conservative" outlook:

> The biggest positive surprise on the conference call was the company's initial commentary around the 2010 outlook.  While it hasn't completed its 2010 plan, management indicated that it would be *very disappointed if it didn't see at least 13-15% EPS growth next year*, inclusive of a $0.05-0.07 headwind from the elimination of the Medicare Part D network differential.  In our view, *this initial outlook is likely to prove conservative given the*

> *company's recent history of coming in at or above the quarterly EPS guidance range*.
>
> We continue to be believers in the strategic rationale of the CVS-Caremark merger.
>
> We continue to believe the company's differentiated model should drive new business wins in the future.

(Emphasis added.)

168.    Also in response to the August 4 call, an analyst with Morgan Stanley maintained a positive outlook about CVS Caremark based on the Company's projected earnings growth in 2010:

> CVS Caremark posted a solid 2Q earnings with better than expected PBM results and stronger Rx trends.  PBM earnings growth could remain constrained again in 2010 as it appears Caremark will suffer net contract losses and Medicare Part D regulatory changes will pose a margin drag.  However, *management provided indications that EPS growth for 2010 should still be 13-15%*.

(Emphasis added.)

169.    On the same day as the call, an analyst with Credit Suisse expressed optimism regarding CVS Caremark's near-term earnings potential:

> We continue to rate CVS Outperform.  While the company still has work to do in proving the longer-term merits of the Caremark deal, *we like the near-term earnings momentum (we see further upside to guidance this year)* and relative valuation is compelling.

(Emphasis added.)

170.    Also on August 4, 2009, an analyst with Deutsche Bank was "encouraged" by CVS Caremark's ability to gain new customers based on its Maintenance Choice offering:

> While the 2010 PBM selling season is still underway, *we are encouraged that the company continues to sign-up new clients for the company's unique Maintenance Choice offering.*

(Emphasis added.)

171.     An analyst at Wells Fargo additionally noted that the 2009 selling season was

going well and attributed the loss of CVS Caremark's recent contracts to "unfavorable economic

terms:"

> While still in the middle of the 2010 selling season, the company
> has commented that they have over *3,000 clients under contract
> with the retention rate for 2010 of 96%, which is slightly higher
> than 2009*.  As previously reported, CVS lost the Coventry
> commercial contract, which was worth $1.4 billion.  CVS also lost
> the Chrysler UAW retirees contract to Blue Cross/Blue Shield of
> Michigan, but retained Chrysler's active employees' and their non-
> union employees' contracts.  In an unusual move a large insurer
> that had previously orally committed to a new $300 million
> contract with CVS pulled out and decided to go with incumbent
> provider.  *CVS stated that after reviewing the new terms of the
> contract they had decided not to proceed with the contract due to
> unfavorable economic terms*.

(Emphasis added.)

172.     On September 11, 2009, at the Thomas Weisel Partners Healthcare Conference

("September 11 meeting"), defendant Rickard stated that the "$10 billion of gross new business"

CVS Caremark added from 2008 to date was due to "the products and services that we now can

deliver:"

> In 2008, we added about $9 billion worth of gross new business,
> $3 billion of net new business.  This year, we have added a little
> over $1 billion of gross new business. So for the two years, *$10
> billion of gross new business*.  Now that came to us for a variety
> of reasons, but one of those reasons is *what we offer employers
> and other payors in terms of the products and services that we
> now can deliver*.

(Emphasis added.)

173.     The statements in ¶172 omitted to state the truth and were materially false and

misleading when made.  These statements failed to disclose that CVS Caremark had been unable

to retain existing PBM clients and gain new PBM plan sponsors due to its poor service,

integration related issues and lack of transparency.  Defendants also knew, but failed to disclose, with fraudulent scienter, that (i) CVS Caremark lost the Chrysler contract due to long-running service-related and transparency issues; (ii) based on "Sales Pipeline Reports" and monthly/quarterly meetings with CVS Caremark Executives, CVS Caremark's contract with New Jersey was at the highest risk of non-renewal since May 2008; (iii) by late-2008, Defendants knew that the New Jersey contract would not be renewed due to substantial, unresolved service-related and transparency issues and the Company already received a letter from the State of New Jersey expressly confirming that the contract was terminated; (iv) Defendants knew that they would lose the Coventry commercial contract after losing the Med-D contract due to service issues; (v) CVS Caremark's service-related problems were due to its failure to properly integrate CVS PharmaCare's plan participant structure with Caremark's plan participant structure; and (vi) the new Med-D regulations, which eliminated a PDP provider's ability to earn spread on prescriptions for Med-D participants, materially impaired SilverScript's pricing structure and could lead to heavy losses of PDP Med-D business in 2010.

174.   On October 2, 2009, CVS Caremark issued a materially false and misleading press release (the "October 2 Press Release"), entitled "CVS Caremark Statement Regarding Results of 2010 Medicare Part D Bidding Process," in which the Company projected slightly lower earnings with respect to its Med-D business, following the government's response to CVS Caremark's bid for Med-D participants in 2010:

> [T]he number of low income subsidy ("LIS") members enrolled in its SilverScript and Accendo Medicare Part D plans will likely decline by approximately 30 to 35% in 2010.  The Company based its conclusions on a preliminary review of the results of the 2010 Medicare Part D competitive bidding process recently released by the Centers for Medicare and Medicare ("CMS").
>
> Based on these results, the Company estimates that the decrease in LIS members enrolled in SilverScript and Accendo plans during

> 2010 could negatively impact 2010 earnings by $0.03 to $0.04.  In
> addition, the Company previously noted in its second quarter 2009
> earnings call that the effect of a regulatory change that effectively
> eliminated Medicare Part D network differential is expected to
> negatively impact 2010 earnings by $0.05 to $0.07.  Consequently,
> the aggregate impact on 2010 earnings is expected to be $0.08 to
> $0.11.

175.    Nonetheless, in the October 2 Press Release, defendant Rickard positively

declared that the decrease in enrollees and regulatory changes would have a de minimis effect on

the profitability of CVS Caremark's Med-D business:

> While we are disappointed that we will serve fewer auto enrollees
> in 2010, the Medicare Part D business will still provide **good
> returns** and remain **solidly profitable**.

(Emphasis added.)

176.    The statements in ¶¶174-75 omitted to state the truth and were materially false

and misleading when made.  These statements failed to disclose that the decrease in LIS

members enrolled in SilverScript and Accendo plans would prevent CVS Caremark from

achieving its previously projected "EPS growth of at least 13 to 15%" in 2010.  Defendants also

knew, but failed to disclose, with fraudulent scienter, that (i) the new Med-D regulations, which

eliminated a PDP provider's ability to earn spread on prescriptions for Med-D participants, was

devastating to SilverScript's pricing structure and would likely lead to heavy losses of PDP Med-

D business in 2010; (ii) CVS Caremark lost the Chrysler contract due to long-running service-

related and transparency issues; (iii) based on "Sales Pipeline Reports" and monthly/quarterly

meetings with CVS Caremark Executives, CVS Caremark's contract with New Jersey was at the

highest risk of non-renewal since May 2008; (iv)  by late-2008, Defendants knew that the New

Jersey contract would not be renewed due to substantial, unresolved service-related and

transparency issues and the Company already received a letter from the State of New Jersey

expressly confirming that the contract was terminated; (v) Defendants knew that they would lose

the Coventry commercial contract after losing the Med-D contract due to service issues; and

(vi) CVS Caremark's service-related problems were due to its failure to properly integrate CVS

PharmaCare's plan participant structure with Caremark's plan participant structure.

177.    In reliance upon Defendants' materially false and misleading statements, analysts

maintained their outlook concerning CVS Caremark's ability to achieve its previously

announced earnings target for 2010.  For example, on the same day as the October 2 Press

release, Deutsche Bank "continue[d] to expect CVS to show solid sales and EPS growth going

forward:"

> Today, CVS announced that they expect the number of low income subsidy members enrolled in its SilverScript and Accendo Medicare Part D plan to decline by 30-35% in FY10.  The estimate was determined from preliminary results released by the Centers for Medicare and Medicaid of the 2010 Medicare Part D competitive bidding process.  . . .  Based on the expected decrease in members enrolled in SilverScript and Accendo plans, CVS management believes that FY10 EPS could be negatively impacted by -$0.03 to  -$0.04.
>
> Additionally, today's press release reminded investors that the effect of a regulatory change that effectively eliminates the Medicare Part D network differential is expected to negatively impact FY10 EPS by -$0.05 to -$0.07.
>
> *        *        *
>
> **We continue to expect CVS to show solid sales and EPS growth going forward** driven by unique offerings like Maintenance Choice, and as the company continues to gain share within both the Retail and PBM businesses.  Reiterate Buy rating.

(Emphasis added.)

178.    Similarly, on October 2, 2009, Thomas Weisel Partners "continue[d] to believe

that CVS shares offer an attractive risk/reward scenario:"

> This afternoon, October 2, CVS Caremark announced that the number of low income subsidy members enrolled in its SilverScript and Accendo Medicare Part D plans will likely decline

> by 30-35% in 2010. This estimate was based on a preliminary
> review conducted by the Centers for Medicare and Medicaid
> Services (CMS) on the results of the 2010 Medicare Part D
> competitive bidding process. . . .  While we are reducing our
> estimates slightly, at current levels ***we continue to believe that
> CVS shares offer an attractive risk/reward scenario and we
> maintain an Overweight rating***.

(Emphasis added.)

## VIII.   **THE TRUTH IS REVEALED**

179.    On November 5, 2009, the truth about CVS Caremark's PBM business was finally revealed during a conference call with investors and analysts.  This revelation was not due to Defendants' candor, but the result of probing questions from analysts.  Before the market opened on November 5, 2009, CVS issued a press release entitled CVS Caremark Reports Record Third Quarter 2009 Results ("November 5 Press Release"), which gave no indication of any troubles.  To the contrary, defendant Ryan was quoted in the November 5 Press Release as stating:

> I'm very pleased with our performance across the enterprise this
> quarter.  The quarter was characterized by continued industry-
> leading performance in our retail business, solid performance in
> our PBM, and record results from MinuteClinic.  Our integrated
> pharmacy care offerings are contributing to results across the
> company at a growing pace. We achieved solid revenue growth,
> healthy earnings growth and significant free cash flow.

180.    Similarly, Defendant Rickard gave upbeat projections, stating:

> Given our continued strong performance year to date, we are
> narrowing our earnings guidance range for 2009.  We expect to
> deliver adjusted earnings per share from continuing operations,
> excluding the effect of the tax benefit, of $2.61 to $2.64, up from
> our previous guidance of $2.59 to $2.64.

181.    Later that morning, Defendants held a conference call with analysts and investors to report third quarter results ("November 5 Analyst call").  Defendants began the call with the same positive tone as the November 5 Press Release, claiming the PBM business had a "very

good quarter," touting the number of clients who had adopted Maintenance Choice.  While throughout the Class Period, Defendants repeatedly stated that the PBM business was fully-integrated, successfully retaining clients, and generating new business, Defendants for the first time revealed the truth about CVS Caremark's PBM business.  Defendant Ryan bluntly stated that what they had told investors was "not going to happen."

182.    Acknowledging the growth he projected during the August 4 Analyst call, Ryan instead disclosed double digit losses.  In particular, defendant Ryan stated:

> [During the August 4 Analyst call] I also said I would be disappointed if we didn't have an EPS growth of at least 13% to 15% next year for the enterprise.  To get to that 13% to 15% growth rate, I expected strong double digit growth in our retail business, which I still do, and *I expected low to mid single digits in our PBM business, which is not going to happen*.
>
> What has changed?  Well, as I just said, we lost more PBM business than we expected, since the call—$2 billion in contracts.  We lost the Med D duals in 15 regions which was $1.7 billion, which I just referred to.  And we extended the $4 billion FEP contract through 2011, at the client's request.  This was an early renegotiation, not at our request but at the client's request, so we are going to have obviously some margin implications in 2010.
>
> Given all of that, it now looks like operating profit in the *PBM will decline in 2010.  Perhaps as much as 10% to 12%*.  I want to point out that approximately 10 basis points of that—10 percentage basis points of that change is Med D alone.

(Emphasis added.)

183.    Defendants also for the first time disclosed the magnitude of the lost business, including the loss of the New Jersey account, and the true impact on the Company's earnings.  As Ryan stated:

> [W]e had some big client losses.  And let me recap those for you so everybody is on the same page.
>
> We had $1.4 billion in wins in 2010.  Approximately $600 million of those gross wins came since the last quarterly call.  We had *$4.5*

75

*billion in losses and approximately $2-plus billion of those came
from the last call*—since the last call.  And those would be
Horizon, I think about the—obviously the State of New Jersey—
this was a bid that the state wanted on a stand-alone basis, so it was
a price and carve-out issue.  We lost the State of Ohio, the
managed  [Medicaid]  (corrected by company after the call)
business, it was carved in, which is about $500-plus million.  And
then we had another $600 million miscellaneous.  These were
basically smaller clients around RXAmerica, or PharmaCare that
just really wanted essentially smaller PBMs.  So in total, that was
about $2-plus billion since the last call.

And then lastly, we had $1.7 billion that we lost in Med D
business.  This was the 500,000 lives that we lost in the duals, and
once again, this was the—since the last call.  So net-net, it is about
$4.8 billion in loss—net loss for 2010, and approximately almost
$3.7 billion since the last call.  If you look at the losses, total the
losses with Med D and the $4.5 billion contract losses, they really
come from four contracts, plus the Med D lives.  The two really
that I mentioned, and then Chrysler, and Coventry.

(Emphasis added.)

184.    During the call, analysts were stunned by the news.  For example, Scott Mushkin,

an analyst with Jeffries & Co. asked:  "you look at the PBM numbers and it gives everyone heart

palpitations…why are people shying away from Caremark's PBM?"  Ryan candidly responded

that it is "[e]xecution and performance," admitting for the first time that CVS lost the Coventry

business, worth $4 billion annually, due to service issues—issues that impacted other customers.

Specifically, defendant Ryan disclosed, for the first time, that the Coventry contracts were lost

due to "service issues."

"[W]hen [CVS Caremark] lost Med D, *we knew* we were going to
lose the commercial business, there were some service issues on
that.

(Emphasis added.)

185.    He further stated that CVS Caremark's lost PBM business during the 2010 selling season "was not lost on price," explaining that "price gets you in," but "it is service" that drives renewals.

186.    Another analyst confronted Ryan on the guidance he provided during the August 4 Analyst call:

> I want to go back to this guidance you're giving.  I'm not exactly sure why you gave us earnings per share guidance for 2010 earlier that was for the entire Company, 13% to 15%.

187.    In response, Ryan attempted to re-label what he had told investors in August, saying it was not "guidance:"

> We didn't give—let me be clear on that.  I did not give guidance then.  I said I would be disappointed if we weren't in that range.  And I said it was too early to give guidance from a budgeting standpoint.
>
> But now, I'm just giving you full disclosure.  I'm telling you what we were thinking about on the 13% to 15% and how one could get there, and one could get there very easily with a PBM growth rate in the 2% to 4% range.  When you look at where the retail side was growing, what interest rates, and share buyback, et cetera, and all of the pieces, it was pretty straightforward.  Obviously, when we lose significant business that we lost, almost $4 billion of business since the call, that 2% to 4% changes on the PBM side.
>
> So I want to be clear, we were not giving guidance.  We never— really haven't.  What I am doing now is telling you is that I wanted to make it clear in the marketplace that I am not comfortable with that 13% to 15%.  I'm telling you one of the pieces is the PBM side of the business is going to be down 10-plus and for the reasons I cited.

188.    Other analysts also reacted to Ryan's change in guidance.  For instance, William, Blair & Company issued a report on November 5, 2009 contrasting Defendants prior false statements:

> Following the second-quarter earnings release [the August 4 Analyst call], we saw it as a positive step that management

acknowledged modest market share losses in the 2010 PBM selling
season (versus earlier denials after the May analyst meeting).  CEO
***Tom Ryan's conviction that the company should achieve at least
13% to 15% EPS growth in 2010 appeared to represent a turning
point for the company***, and valuation was low versus peers.

(Emphasis added.)

189.    Similarly, in a report dated November 6, 2009, analysts with Argus concluded

"this news created a bit of a ***credibility problem***."  The Argus report continued:

We also believe that Mr. Ryan will have to deal with a credibility
problem as a result of the weakness in the PBM.  In the past he has
told investors what he expected the company to do an it has
happened.

190.    In addition to the lost business, investors were surprised to learn that defendant

McLure was fired.  McLure, as the President of CVS Caremark's Pharmacy Services Segment,

had overseen the integration of the PBM into the merged Company and, according to Ryan, was

a "chief architect of [the] integrated model."  This abrupt end of McLure's 30-year career, styled

a "retirement," confirmed the fundamental failure of the PBM integration.  None other than Ryan

seized control of the PBM business.  Defendants also appointed Len Greer to Senior Vice-

President of PBM marketing.

191.    HSBC analyst R. Scott Frost in a credit research note, dated November 6, 2009,

reacted to concerns over volatility in the PBM business, McLure's termination, and the surprise

nature of the disclosure during the November 5 Analyst call versus the November 5 Press

Release.

CVS stuns with news of additional PBM non-renewals:

Yesterday, after reporting record earnings and raising fiscal 2009
guidance, CVS informed market participants in its quarterly
conference call that it had lost a total of USD4.5bn in PBM
contracts during the most recent renewal season, USD3.7bn of
which had taken place since last quarter's conference call.  CVS
also announced the sudden retirement of Caremark's President,

that the current CEO would act in the interim to manage the business, and that a search was currently underway for a new business head.  . . .  There is cause for concern from a credit perspective for the following reasons:

**Loss of contracts demonstrates volatility of PBM business**: this business appears chunky and volatile, and the question remains as to how much of the rest of the PBM contracts are vulnerable to nonrenewal, especially now that CVS' loss has been made public. For the record, CVS did note that it had a 92% retention rate, and that announced losses were associated with four large contracts as well as Medicare Part D business.

**Turnover in the executive suite**: the suddenness of the retirement of Howard McLure, Caremark's President, leads us to believe that his departure was *not exactly voluntary*; a new search is underway for a new leader of the PBM business, and in the meantime, CVS's current Chairman/CEO will preside over the business.  What this means for future business retention is uncertain.

**Surprise nature of disclosure raises credibility issues**: CVS's disclosure was alluded to in the call, but clearly the *magnitude of the loss was discovered on the call and not in the release*. Surprising market participants with bad news on an earning call tends to lead to questions about credibility with respect to everything from earnings guidance to the business model itself. Market participants were asking that very question post-news on the call and in subsequent news headlines on the company, namely the wisdom of the combined drug retailer/PBM model, and whether CVS should consider a spin off the PBM business. Uncertainty about the direction of the business can quickly be followed by higher volatility, lower equity prices, and credit spread widening.

(Emphasis added.)

192.    In a November 5, 2009 report, an analyst with from SunTrust Robinson

Humphrey viewed the disclosures as evidencing a breakdown in the Caremark model, especially

in comparison to the Company's key competitors:

[T]oday's announcement shows a *breakdown in the Caremark model*.  Not that a 10% decline in operating profits seen for next year would be a disaster but, juxtapositioned next to the strong numbers being posted by Medco and Express Scripts over the past week, it would certainly indicate a loss of share.  Caremark won

some $1.4 billion in new wins, but lost $4.5 billion with a retention rate of only 92%.  It seems that ***Caremark's new model is being met with some indifference in the marketplace***.

193.    Similarly, Credit Suisse reported in a November 6, 2009 report entitled

"Caremark Officially Broken, What Now?"  The report put it bluntly:  "CVS provided

***undeniable evidence*** today that it has mismanaged the Caremark acquisition and ***destroyed***

***shareholder value***."  (Emphasis added.)  And, Gabelli & Company, Inc. also issued a report that

day, concluding the "Caremark merger clearly is not working and will take substantial effort to

fix."

194.    Indeed, following the November 5 Analyst call, an analyst with at Deutsche Bank

concluded that the PBM business added no value to the Company.  In reaching their valuation of

the Company, Deutsche Bank's November 6, 2009 report stated:

> We do not consider the value of the PBM segment in arriving at
> our price target.  We view the PBM as essentially a free option.

195.    In reaction to this news, the price of CVS Caremark shares plummeted over

20 percent that day.  According to Morgan Stanley, the 20 percent "stock decline today is fully

pricing in today's bad news."

## IX.    POST-CLASS PERIOD CONDUCT

196.    On November 12, 2009, CVS Caremark participated in a conference call at the

Credit Suisse Healthcare Conference (the "November 12 call").  On the conference call,

Defendant Ryan admitted that the Company had "some isolated service issues . . . on some of the

health plans side, some health plans and some employers" which are "focused around people and

. . . around some Med D issues."  Defendant Ryan noted his "deep involvement" in PBM sales,

and further admitted that that "there are obviously areas we need to work on" and that the

Company has had "honest, open discussion[s] of the areas that need to be fixed" but has been

"hesitant to do it with the investor community." With regard to the Company's unusually high employee attrition rate, defendant Ryan stated, "I think we have some churn in our account management teams, where we move people around . . . you establish customer [intimacy] . . . with the account team which with your client and I believe we had some churn in there that we shouldn't have had and we had some people that didn't take care of business."

197.    During the November 12 call, when specifically asked "the reasons why [the Company] lost some of the business," defendant Ryan responded, in part, as follows:

> ***Coventry, Coventry was a service issue.  Coventry was an issue
> we had two years ago.  We lost the Med D business because in my
> mind, because of service.  And we have made changes in that
> group since then.***
>
> ***But once the Med D went over, kind of knew we were going to
> lose the commercial business the following year because it kind
> of just flows together.*** [New Jersey], I explained.  And then there
> were some price—listen, at the end of the day PBMs pick some
> targets that they're going to go after.
>
> We do the same thing.  You know what I said we did last year.  We
> made some investments.  ***So price is not the issue.  We don't want
> to—if we don't want to lose it for price, we're not going to lose it
> because we buy them better than anybody else.  But there were
> some messaging issues and then some service issues.***

(Emphasis added.)

198.    On November 17, 2009, CVS Caremark participated in the Lazard Capital Healthcare Conference.  During the conference, defendant Ryan repeated many of the same admissions regarding service issues that he made during the November 12 call, stating, in relevant part, as follows:

> So it's not a—I will show you a number of employers, unions,
> health plans, TPAs, that love our client service.  There were some
> that hey, it's a big company and ***we dropped the ball in some
> client service issues that we shouldn't have.  And we're owning
> up to it and we're fixing it.  So, that's what happened, and it
> obviously was a big one with Coventry because the natural falloff***

81

> *is we know we're going to lose the commercial business*
> *following it.*

(Emphasis added.)

199.    At a February 2010 National Sales meeting attended by CW13, defendant Ryan was even more candid, explaining that soon after the Merger, Defendants realized that they were devoting all of their energies and money toward the retail pharmacy business, and not the PBM.

200.    On February 19, 2010, Bloomberg Businessweek published an article entitled, "CVS to Invest 'Substantial' Amount in Caremark Units," which announced the Company's plan to provide a major investment in integrating CVS Caremark's PBM units.  According to the article, Per Lofberg, President of Caremark Pharmacy Services since January 2010, admitted that CVS Caremark's PBM business "*has five segments that haven't been fully integrated*." (Emphasis added.)  These include Caremark Rx Inc., PCS Health Systems Inc., AdvancePCS Inc., PharmaCare and RX America LLC.  In stark contrast to Defendants post-merger declarations that the integration was complete, Lofberg admitted, "we are just in the first inning of an important initiative for us."

201.    Then, on April 22, 2010, the CtW Investment Group ("CtW"), a CVS Caremark shareholder, sent a letter to the SEC asking them to investigate a series of insider stock sales at CVS Caremark between August and November 2009.  According to CtW, defendant Ryan and other senior executives at the Company made millions of dollars selling CVS Caremark stock while in possession of significant non-public information regarding the Company's problems with its PBM segment.  The problems with CVS Caremark's PBM segment were eventually disclosed on November 5, 2009, after Defendants had already sold over 1.1 million shares of Company stock for a combined profit of $11.7 million, between August 5 and September 2, 2009.  In the letter, CtW Executive Director William Patterson stated that CVS Caremark

"executives, including Chairman and CEO Tom Ryan, may have traded their shares at the same time that the Company had not fully disclosed what it knew about how its PBM segment was faring, news that caused CVS share price to plummet when it was finally disclosed to shareholders on November 5" and that "[t]he delays by the company in fully disclosing bad news about the PBM segment throughout 2009 appear designed to falsely bolster the investment community's verdict on the merger – as well as the company's stock price."

## X.    ADDITIONAL EVIDENCE OF SCIENTER

202.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding CVS Caremark, their control over, and/or receipt and/or modification of CVS Caremark's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

203.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or, at least, the reckless disregard by the personnel at the highest levels of the Company, including the Individual Defendants.  At the time the statements alleged herein were made, each of the Individual Defendants was aware of the true financial condition and prospects of the Company, including the problems with the Company's

PBM segment and the loss of several large PBM clients.  As detailed herein, many of CVS Caremark's PBM clients, including Chrysler and the State of New Jersey, had begun to voice their complaints about the Company's service issues and integration problems.  During this time, and throughout the first half of 2008, Defendants attended meetings in which these service-related issues and customer complaints were discussed.  By mid-2008, Defendants had regular access to internal CVS Caremark documents that listed the Chrysler and New Jersey contracts at the highest risk for termination.  Then in late July 2008, CVS Caremark lost its Med-D contract with Coventry, but failed to disclose that the commercial contract with Coventry would be lost as well.  Defendants subsequently admitted that once they lost the Med-D part of the Coventry contract they "knew [they] were going to lose the commercial business the following year because it kind of just flows together."  By August 2009, Defendants also knew that they lost their contract with the State of New Jersey.  They had been advised of this fact by letter, dated August 5, 2009, but did not disclose the lost contract until three months later.

**Individual Defendants' Insider Sales Reveal Motive And Opportunity**

204.    Defendants' scienter is further evidenced by their unusual and suspicious insider trading.  The Individual Defendants took advantage of the inflation in the price of CVS Caremark's stock resulting from Defendants' false statements and sold over 1 million shares of their personally-held CVS Caremark common stock for gross proceeds in excess of $40 million, during the Class Period.

205.    The size of the Individual Defendants' insider selling was highly unusual in nature.  Defendant McLure sold over 60 percent of his CVS Caremark common stock owned during the Class Period, nearly twice the percentage he sold in the year preceding the Class Period.  Defendant Rickard sold 19.6 percent of his CVS Caremark common stock owned during the Class Period.  Defendant Rickard sold no shares of CVS Caremark stock during the year

prior to the Class Period.  Although the Class Period sales by defendants McLure and Rickard appear to be a part of pre-arranged 10b-5 trading plans, neither McLure nor Rickard sold stock under such a plan in the past, which suggests that the plans were created around the time they were used.  In addition, defendants McLure, Rickard, and Ryan together sold more than 1.1 million shares between August 7, 2009 and November 2, 2009.  These sales followed CVS Caremark's second quarter earnings announcement in which defendant Ryan expressed his "great confidence" in the Company's ability to retain current clients and projected "an EPS growth of at least 13 to 15% next year."

206.    The timing of the Individual Defendants' insider sales was also highly suspicious. The majority of insider trading took place between August 7, 2009 and November 2, 2009, ending just 3 days before the Company announced that the operating profit in its PBM would decline by 10-12 percent as a result of over $6 billion in lost business.  Moreover, by August 5, 2009, it was confirmed that Defendants had lost a very large client (*i.e.,* the State of New Jersey) and would be unable to meet their projected EPS growth of 13-15 percent.  During this time, the Defendants also knew that the FTC had initiated an investigation into the Company's practices. Accordingly, the Individual Defendants tried to dispose of their CVS Caremark shares before the truth about the Company's PBM business came out to the market.  Just three days after the bullish August projections, defendant Ryan sold 400,000 shares of CVS Caremark stock for gross proceeds of almost $14 million and defendant McLure sold 200,000 shares for gross proceeds of almost $7 million.

207.    The suspicious nature of these insider sales prompted the CtW Investment Group, a CVS Caremark shareholder, to ask the SEC to investigate the Company's 2009 insider stock sales.  In a letter to the SEC's enforcement division, CtW Investment Group asserted that senior

executives at CVS Caremark made millions of dollars selling Company stock between August to November 2009 when they knew, but failed to fully and promptly disclose that the Company's PBM business was experiencing problems.

208.    The following table illustrates that the Individual Defendants' insider sales were made during a period of appreciation fueled by the inflation in CVS Caremark common stock prices caused by Defendants' false and misleading statements:



**Related Government Investigations Of CVS Caremark**

209.    Since at least August 2009, the FTC has been investigating the business dealings of CVS Caremark after receiving numerous letters from several congressmen, plan sponsors, pharmacists and patients expressing concern about the Company's practices and asking the agency to investigate.  In a letter to the FTC, dated September 14, 2009, eight lawmakers complained that "CVS Caremark is engaging in unfair and deceptive business practices that are causing harm to consumers, patients and local community pharmacies."  The government's ongoing investigation concerns the Merger, which many complain has resulted in a conflict of interest and service issues.

## XI.    LOSS CAUSATION/ECONOMIC LOSS

210.    During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated CVS Caremark's stock price and operated as a fraud or deceit on the Class Period purchasers of CVS Caremark stock by misrepresenting or omitting facts concerning CVS Caremark's business, operations, and prospects.  Specifically, Defendants' materially false and misleading statements either misrepresented or failed to disclose, *inter alia*, that (i) pervasive customer service issues plagued CVS Caremark's ability to service its PBM clients, (ii) the service issues were caused by CVS Caremark's failure to properly integrate the merged-entity, (iii) the post-Merger losses of CVS Caremark's most lucrative customers were a direct result of its service issues, (iv) the new Government regulations limiting a PBM's ability to profit on drug-pricing spreads would cause devastating losses in Medicare Part D participant retention, and (v) CVS Caremark's new, highly-touted retail-PBM model had been a failure.

211.    During the Class Period, Lead Plaintiffs and the Class purchased CVS Caremark stock at artificially inflated prices and suffered an economic loss when the artificial inflation was removed from CVS Caremark's stock price on November 5, 2009.  On that day, CVS Caremark

investors learned the truth about the Company's failure to integrate the merged-entity, which resulted in the loss of billions of dollars in PBM contracts, and that the CVS Caremark retail-PBM model had failed to gain acceptance by customers in the pharmaceutical benefit market.

212.    As a direct result of Defendants' November 5, 2009 disclosures, CVS Caremark's stock price dropped 20 percent from a closing price of $36.15 per share on Wednesday, November 4, 2009, to a closing price of 28.87 per share on Thursday, November 5, 2009, on trading volume of 185,123,476 shares, or more than 13 times the Class Period average.  As alleged in detail at ¶¶179-95, analysts reacted critically to the revelation of the truth.  For instance, an analyst from HSBC pointed to the fact that the "[s]urprise nature of disclosure raises credibility issues" for management, and an analyst from Deutsche Bank concluded that the Company's PBM business had no value.  An analyst with Credit Suisse concluded: "CVS provided *undeniable evidence* today that it has mismanaged the Caremark acquisition and *destroyed shareholder value*."  (Emphasis added.)

213.    In sum, when the truth about the Defendants' fraud was revealed on November 5, 2009, CVS Caremark's stock price declined as the artificial inflation came out of the stock, and Lead Plaintiffs and other members of the Class were damaged thereby.    Had Lead Plaintiffs and the Class known of the material adverse information alleged herein, they would not have purchased or otherwise acquired CVS Caremark stock at artificially inflated prices.

## XII.    FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE

214.    The market for CVS Caremark's stock was open, well-developed and efficient at all relevant times.  As a result of Defendants' materially false and misleading statements and failures to disclose, as detailed herein, CVS Caremark's common stock traded at artificially inflated prices during the Class Period.  The artificial inflation continued until at least the end of the Class Period.  Lead Plaintiffs and other members of the Class purchased or otherwise

acquired CVS Caremark stock relying upon the integrity of the market price of CVS Caremark's stock and market information relating to CVS Caremark, and have been damaged thereby.

215.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of CVS Caremark's stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  The statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CVS Caremark, its business, and operations.  Specifically, Defendants' materially false and misleading statements either misrepresented or failed to disclose, *inter alia*, that (i) pervasive customer service issues plagued CVS Caremark's ability to service its PBM clients, (ii) the service issues were caused by CVS Caremark's failure to properly integrate the merged-entity, (iii) the post-Merger losses of CVS Caremark's most lucrative customers were a direct result of its service issues, (iv) the new Government regulations limiting a PBM's ability to profit on drug-pricing spreads would cause devastating losses in Medicare Part D participant retention, and (v) CVS Caremark's new, highly-touted retail-PBM model had been a failure.

216.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about, *inter alia*, the Company's utter failure to integrate the merged-entity, which resulted in the loss of billions of dollars in PBM contracts, and that the CVS Caremark retail-PBM model had failed to gain acceptance by customers in the pharmaceutical benefit market.  These material misstatements and omissions had the cause and effect of creating

in the market an unrealistically positive assessment of CVS Caremark, thus causing CVS

Caremark's stock to be overvalued and artificially inflated at all relevant times.  Defendants'

materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and

other members of the Class purchasing CVS Caremark's stock at artificially inflated prices, thus

causing the damages complained of herein.

## XIII.   NO SAFE HARBOR PROTECTION

217.    The statutory safe harbor for certain forward-looking statements does not apply to

the misrepresentations and omissions alleged in this Complaint.  Many of the statements were

not specifically identified as "forward-looking statements" when made.  To the extent that there

were any properly identified forward-looking statements, there were no meaningful cautionary

statements identifying the important then-present factors that could and did cause actual results

to differ materially from those in the purportedly forward-looking statements.  Alternatively, to

the extent that the statutory safe harbor does apply to any forward-looking statement pleaded

herein, Defendants are liable nonetheless because at the time each of the misrepresentations was

made, the particular speaker(s) knew that the statement was materially false or misleading,

and/or the forward-looking statement was authorized and/or approved by an executive officer or

director of CVS Caremark who knew that the statement was materially false and misleading

when made.

218.    Any warnings or other cautionary language contained in the press releases and

other public statements described herein were generic, "boilerplate" statements of risk that would

affect any similar company, and misleadingly contained no factual disclosure of any of the

problems affecting the Company which placed the ability of the Company to accurately depict its

own financial situation into serious question.  As such, any forward-looking statements

complained of herein were not accompanied by meaningful cautionary language.

219.     Any relevant purported risk disclosures were, in fact, false and misleading in and of themselves, by virtue of the fact that the events which the risk disclosures purported to warn against as contingencies had frequently already become a reality or a certainty.

## XIV.   CAUSES OF ACTION

### COUNT  I

### AGAINST DEFENDANTS
### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
### AND RULE 10b-5 PROMULGATED THEREUNDER

220.     Lead Plaintiffs incorporate by reference and realleges each and every allegation contained above as if fully set forth herein.

221.     This claim is brought pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against defendants CVS Caremark, Ryan, Rickard, and McLure.

222.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CVS Caremark's stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase CVS Caremark's stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

223.     Defendants, individually and in concert, directly and indirectly by the use of means and instrumentalities of interstate commerce, the mails, the facilities of national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of CVS Caremark's stock in an effort to maintain artificially

inflated market prices for CVS Caremark's stock in violation of Section 10(b) of the Exchange

Act, and Rule 10b-5 promulgated thereunder.  Defendants are each sued as primary participants

in the wrongful and illegal conduct charged herein.  Defendants Ryan, Rickard, and McLure (the

"Individual Defendants") are also sued as controlling persons of CVS Caremark as alleged

below.

224.    In addition to the duties of full disclosure imposed on Defendants as a result of

their making of affirmative statements and reports, or participation in the making of affirmative

statements and reports to the investing public, Defendants had a duty to promptly disseminate

truthful information that would be material to investors in compliance with the integrated

disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §§ 210.01 *et

seq.*) and Regulation S-K (17 C.F.R. §§ 229.10 *et seq.*) and other SEC regulations, including, but

not limited to, accurate and truthful information with respect to CVS Caremark's business,

operations, and prospects so that the market price of CVS Caremark's stock would be based on

truthful, complete, and accurate information.

225.    Defendants employed devices, schemes, and artifices to defraud, while in

possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of CVS Caremark's value and

performance and continued substantial growth, which included the making of, or the

participation in the making of, untrue statements of material facts and omitting to state material

facts necessary in order to make the statements made about CVS Caremark and its business

operations and future prospects in the light of the circumstances under which they were made,

not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a

course of business that operated as a fraud and deceit upon the purchasers of CVS Caremark's stock during the Class Period.

226.    The Individual Defendants' primary liability, and controlling person liability, also arises from the following facts: (i) the Individual Defendants were high-level executives at CVS Caremark during the Class Period and members of CVS Caremark's management team or had control thereof; (ii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of and had access to other members of CVS Caremark's management team, internal reports, and other data and information about CVS Caremark's business, operations, and projections at all relevant times; and (iii) each of the Individual Defendants was aware of CVS Caremark's dissemination of information to the investing public that he knew or recklessly disregarded was materially false and misleading.

227.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CVS Caremark's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by Defendants' overstatements and misstatements of CVS Caremark's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

228.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CVS Caremark's stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of CVS Caremark's publicly-traded stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by the Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired CVS Caremark stock during the Class Period at artificially high prices and were damaged when that artificial inflation was removed from the price of CVS Caremark's stock once the true condition of the Company was revealed.

229.     At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known of the truth concerning CVS Caremark's business operations and future prospects, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their CVS Caremark stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

230.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

231.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of CVS Caremark stock during the Class Period.

## COUNT  II

## AGAINST THE INDIVIDUAL DEFENDANTS
## FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT

232.     Lead Plaintiffs incorporate by reference and realleges each and every allegation contained above as if fully set forth herein.

233.     This claim is asserted against defendants Ryan, Rickard, and McLure. Throughout the Class Period, the Individual Defendants by virtue of their positions, stock ownership, and/or specific acts described above, were controlling persons of CVS Caremark within the meaning of Section 20(a) of the Exchange Act.

234.     The Individual Defendants had the power to, and did, directly and indirectly, exercise control over CVS Caremark, including the content and dissemination of statements which Lead Plaintiffs allege are false and misleading.  The Individual Defendants were each provided with and/or had access to reports, filings, press releases, and other statements alleged to be misleading prior to and/or shortly after they were issued and had the ability to prevent the issuance or correct the statements.  The Individual Defendants had direct and supervisory involvement in the day to day operations of CVS Caremark and engaged in the acts constituting violations of the federal securities laws, as set forth in Count One above.

235.     The Individual Defendants acted as controlling persons of CVS Caremark within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of CVS Caremark's operations and/or intimate knowledge of the false statements issued by CVS Caremark and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of CVS Caremark, including the content and dissemination of the various statements that Lead

Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of CVS Caremark's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

## XV.   **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs, on behalf of itself and the other members of the Class, prays for judgment as follows:

a.    declaring this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.    awarding Lead Plaintiffs and the other members of the Class compensatory damages as a result of the wrongs alleged herein;

c.    awarding Lead Plaintiffs and the other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

d.    awarding Lead Plaintiffs and the other members of the Class such other and further relief as the Court may deem just and proper.

## XVI.   <u>JURY TRIAL DEMANDED</u>

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.


DATED:  May 3, 2010

BOISSEAU & DEAN LLP
BARRY J. KUSINITZ (NO. 1404)

_____/s/ Barry J. Kusinitz_____
BARRY J. KUSINITZ

155 South Main Street, Suite 405
Providence, Rhode Island 02903
Telephone: 401/831-4200
401/831-7053 (fax)

*Liaison Counsel*

LABATON SUCHAROW LLP
Joseph A. Fonti
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)

ROBBINS GELLER
  RUDMAN & DOWD LLP
Robert M. Rothman
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Lead Counsel*

738742 v3

## GLOSSARY OF TERMS

1.      **"Covered lives"** – the number of members that a PBM serves.  The term "covered lives" does not refer strictly to insured members, but rather, the number of potential members that may possibly be served by a PBM's existing contracts.

2.      **"Formulary" –** a list of prescription drugs approved for use by a hospital, health plan or other health care organization and that will be dispensed to participating pharmacies to an insured person.  PBMs create and manage formularies, which they use to negotiate deeper price discounts with manufacturers.

3.      **"Maintenance Choice"** – a program offered by CVS Caremark in which participants may receive a 90-day supply of prescription drugs from CVS retail pharmacies at the same cost as mail-order.

4.      **"Medicare Part D" or "Med-D" –** a federal program that subsidizes the cost of prescription drugs for Medicare beneficiaries in the United States that are over 65 years old.  It was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and went into effect on January 1, 2006.

5.      **"Merger" –** the merger between CVS and Caremark was completed on March 22, 2007.  The $26.5 billion Merger created a unique retail pharmacy/PBM that became the largest provider of prescription drugs in the United States, filling more than 1.2 billion prescriptions annually.

6.      **"Pharmacy benefit manager" or "PBM"** – a third party administrator of prescription drug benefit programs.  PBMs perform a variety of services including,

among other things, processing and paying prescription drug claims, negotiating prices with drug manufacturers and managing a list of preferred prescription drugs.

7.      **"Plan participant"** – a third party employee or plan sponsor member to whom the PBM's services flow as part of an employment agreement or other form of contract.

8.      **"Plan sponsor" –** an entity that provides prescription drug insurance to its enrollees or members (*e.g.*, employers, government agencies, labor unions, retirement systems and health maintenance organizations).  Plan sponsors hire PBMs to handle drug purchasing and distribution.

9.      **"Rebates"** – a sum of money pharmaceutical manufacturers give to PBMs in order to obtain formulary status or to encourage PBMs to dispense the manufacturer's drugs.

10.     **"Request for Proposal" or "RFP"** – an invitation issued by plan sponsors for PBMs to submit a proposal for services.  PBMs are typically procured through a bidding process.

11.     **"Spread"** – the difference between the price PBMs charge their clients for prescription drugs and the price they pay to retail pharmacies for the drugs.  One of the ways in which PBMs earn revenue is by paying pharmacies a lower price than they charge plan sponsors for prescription drugs and retaining the spread.

12.     **"Transparency"** – full disclosure of profits, including rebate revenue and drug pricing spreads, made by PBMs through a specific client's business.

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that the a true and correct copy of the foregoing

**Consolidated Class Action Complaint** was filed electronically with the Clerk of Courts using

the CM/ECF system, which will send notification of such filing to all counsel of record on the

3rd day of May, 2009.


<u>/s/ Joseph A. Fonti</u>
Joseph A. Fonti