UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RICHARD MEDOFF, Individually and On Behalf Of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> CVS CAREMARK CORPORATION, THOMAS M. RYAN, DAVID RICKARD, and HOWARD McLURE, <br><br> Defendants. | Civil Action No. 1:09-cv-00554-S-DLM |

<u>DEFENDANTS' MOTION TO DISMISS</u>

Defendants CVS Caremark Corporation ("CVS Caremark" or the "Company"), Thomas M. Ryan, David Rickard, and Howard McLure (collectively the "Individual Defendants" and, together with CVS Caremark, the "Defendants") hereby move to dismiss the Corrected Consolidated Class Action Complaint, filed June 1, 2010 (the "Complaint"), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and section 78u-4(b) of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). In support of this motion, Defendants rely upon and incorporate by reference the accompanying memorandum of law and the Declaration of Lawrence Portnoy, including the exhibits attached thereto. For the reasons set forth in the memorandum of law, Defendants respectfully request that the Court dismiss the Complaint.

/s/ William R. Grimm
William R. Grimm #1938
HINCKLEY, ALLEN & SNYDER LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island  02903
Tel. (401) 274-2000
Fax. (401) 277-9600
wgrimm@haslaw.com

DAVIS POLK & WARDWELL LLP
Lawrence Portnoy *(pro hac vice)*
Edmund Polubinski III *(pro hac vice)*
Jessica K. Foschi *(pro hac vice)*
450 Lexington Avenue
New York, New York  10017
Tel. (212) 450-4000
Fax. (212) 701-5800
Email.  Lawrence.Portnoy@davispolk.com
          Edmund.Polubinski@davispolk.com
          Jessica.Foschi@davispolk.com

*Attorneys for Defendants*

CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2010, a copy of foregoing Motion to Dismiss was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

/s/ Mitchell R. Edwards
Mitchell R. Edwards #6942
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI  02903
401-274-2000
401-277-9600 (fax)
medwards@haslaw.com

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

---

|  |  |  |
|---|---|---|
| RICHARD MEDOFF, Individually and On Behalf Of All Others Similarly Situated, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 1:09-cv-00554-S-DLM |
| vs. | : | |
| | : | |
| CVS CAREMARK CORPORATION, THOMAS M. RYAN, DAVID RICKARD, and HOWARD McLURE, | : | |
| | : | |
| Defendants. | : | |

---

MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS

HINCKLEY, ALLEN & SNYDER LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island  02903
Telephone:  (401) 274-2000
Facsimile:  (401) 277-9600

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800

*Attorneys for Defendants*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ......................................................................1

FACTUAL BACKGROUND ..........................................................................5

 The Preliminary Earnings Prediction..............................................................6

 The November 5, 2009 Call............................................................................7

 The Filing of the Original Complaint ..............................................................9

 The Amended Complaint and the Other Alleged Misstatements and Omissions................9

 Scienter Allegations......................................................................................11

ARGUMENT ..........................................................................................12

I. PLAINTIFFS FAIL TO STATE A CLAIM AS TO THE PRELIMINARY EARNINGS PREDICTION ...............................................................................13

 A. The Preliminary Earnings Prediction Is Entitled to the Protection of the Safe Harbor Because It Was Accompanied by Meaningful, Narrowly Tailored Cautionary Statements. .........................................................................15

 B. The Preliminary Earnings Prediction Is Entitled to the Protection of the Safe Harbor Because Plaintiffs Do Not Plead Facts Supporting a Strong Inference That Defendants Knew That It Was False or Misleading When Made. ..................19

II. PLAINTIFFS FAIL TO STATE A CLAIM WITH RESPECT TO ALL OF THE REMAINING PURPORTEDLY ACTIONABLE STATEMENTS ALLEGED IN THE COMPLAINT ........................................................................22

 A. Plaintiffs' Remaining Allegations Fail To Allege Loss Causation. ................22

 B. Even If Plaintiffs Had Alleged Loss Causation as to the Remaining Allegations, the Vast Majority of the Supposedly False or Misleading Statements They Identify Are Not Actionable. .........................................................................27

  1. Plaintiffs' theory that Defendants failed to disclose *potential* contract losses fails as a matter of law. ...............................................................27

2.  Generalized statements regarding the Company's strategic business model, sales outlook, and "success" of the merger are inactionable corporate puffery.  ................29

III. THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER AS TO ANY OF PLAINTIFFS' CLAIMS .........................................................................................33

A.  Plaintiffs Allegations Regarding Insider Stock Sales Fail To Give Rise to a Strong Inference of Scienter.  ......................................................................................................34

1.  Messrs. Rickard and McLure traded pursuant to 10b5-1 plans, which negate the inference of scienter.  ......................................................................................................34

2.  Mr. Ryan's single stock sale was not suspicious.  ......................................................37

B.  The Complaint's Remaining Allegations Fail to Allege That Defendants Acted with a High Degree of Recklessness.  .........................................................................................38

1.  The statements in the Complaint attributed to confidential witnesses do not create a strong inference of scienter.  ......................................................................................38

2.  Plaintiffs fail to identify any specific contract-related information that would have put Defendants on notice that their statements were false or misleading.  ................40

3.  Plaintiffs fail to plead facts supporting their assertion that Defendants knew that customer service problems were causing contract losses.  .........................................42

4.  Plaintiffs' allegations regarding the CMS Spread Regulation fail to plead a strong inference of scienter.  ......................................................................................................43

5.  Plaintiffs' allegations regarding Maintenance Choice fail to plead a strong inference of scienter.  ......................................................................................................44

IV. PLAINTIFFS DO NOT STATE A CLAIM FOR CONTROL PERSON LIABILITY.................................................................................................................................44

CONCLUSION......................................................................................................................46

# TABLE OF AUTHORITIES

### CASES

PAGE

ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46 (1st Cir. 2008)....................................13, 33, 38

Acito v. Imcera Group, Inc., 47 F.3d 47 (2d Cir. 1995) ...............................................................37

Albert Fadem Trust v. Citigroup, Inc., 165 F. App'x 928, 2006 WL 276611 (2d Cir. 2006).......28

In re Allaire Corp. Secs. Litig., 224 F. Supp. 2d 319 (D. Mass. 2002) ........................................33

Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.,
    Civ. A. No. 3:02-CV-1152-M, 2008 WL 4791492 (N.D. Tex. Nov. 4, 2008),
    aff'd, 597 F.3d 330 (5th Cir. 2010)..........................................................................................25

Atl. Gypsum Co. v. Lloyds Int'l Corp., 753 F. Supp. 505 (S.D.N.Y. 1990) .................................42

In re Avon Prods., Inc. Sec. Litig.,
    No. 05 Civ. 6803(LAK)(MHD), 2009 WL 848017 (S.D.N.Y. Feb. 23, 2009) ......................21

Baron v. Smith, 380 F.3d 49 (1st Cir. 2004) ................................................................................13

In re Biogen IDEC, Inc. Sec. Litig.,
    Civ. A. No. 05-10400-WGY, 2008 WL 4810045 (D. Mass. Oct. 25, 2009)..........................33

In re Boston Scientific Corp. Sec. Litig.,
    Civ. A. No. 05-11934-DPW, 2010 WL 1704043 (D. Mass. Apr. 27, 2010)...........................28

In re Cabletron Sys., Inc., 311 F.3d 11 (1st Cir. 2002)...............................................33, 36, 38, 42

Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126 (3d Cir. 2004)......................39, 40

Catogas v. Cyberonics, Inc.,
    292 F. App'x 311, No. 07-20787, 2008 WL 4158923 (5th Cir. 2008).............................24, 25

Chien v. Skystar Bio Pharm. Co., 566 F. Supp. 2d 108 (D. Conn. 2008) ....................................28

In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367 (S.D.N.Y. 2004),
    aff'd sub nom. Albert Fadem Trust v. Citigroup, Inc., 165 F. App'x 928, 2006 WL 276611
    (2d Cir. 2006)...........................................................................................................................28

City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.,
    CA No. 1:08-11889-JTL, 2010 WL 1221402 (D. Mass. Mar. 25, 2010)...............................36

City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc., 686 F. Supp. 2d 404
    (D. Del. 2009) ...........................................................................................34

In re Cytyc Corp. Sec. Litig.,
    No. Civ. A. 02-12399-NMG, 2005 WL 3801468 (D. Mass. Mar. 2, 2005) .....................14, 17

In re Dell Inc., Sec. Litig., 591 F. Supp. 2d 877 (W.D. Tex. 2008)..............................................23

In re Discovery Labs. Sec. Litig., No. 06-1820, 2006 WL 3227767
    (E.D. Pa. Nov. 1, 2006)...........................................................................25, 26

In re Donald Trump Casino Sec. Litig., 7 F.3d 357 (3d Cir. 1993)..............................................16

Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005).....................................................3, 12, 22, 23

ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,
    553 F.3d 187 (2d Cir. 2009).........................................................................41

In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187 (S.D.N.Y. 2008) .......................................40, 41

In re First Marblehead Corp. Sec. Litig., 639 F. Supp. 2d 145 (D. Mass. 2009)..........................43

In re Focus Enhancements, Inc. Sec. Litig., 309 F. Supp. 2d 134 (D. Mass. 2001) .....................14

In re Ford Motor Co. Sec. Litig.,
    184 F. Supp. 2d 626 (E.D. Mich. 2001), aff'd, 381 F.3d 563 (6th Cir. 2004).......................28

In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261 (S.D.N.Y. 2009) ........................37

Glazer v. Formica Corp., 964 F.2d 149 (2d Cir. 1992)..................................................28

In re Glenayre Techs. Inc. Sec. Litig.,
    No. 96 CIV. 8252(HB), 1998 WL 915907 (S.D.N.Y. Dec. 30, 1998) ...................................37

Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999)..................................... passim

Greenberg v. Crossroads Sys., 364 F.3d 657 (5th Cir. 2004).......................................23

Haft v. Eastland Fin. Corp., 755 F. Supp. 1123 (D.R.I. 1991) ....................................32

In re Ibis Tech. Sec. Litig., 422 F. Supp. 2d 294 (D. Mass. 2006) ...................................17, 18, 19

In re Initial Pub. Offering Sec. Litig., 399 F. Supp. 2d 261 (S.D.N.Y. 2005) ........................15, 23

In re Int'l Rectifier Corp. Sec. Litig.,
    No. CV 07-02544-JFW (VBKx), 2008 WL 4555794 (C.D. Cal. May 23, 2008) ..................35

Isham v. Perini Corp., 665 F. Supp. 2d 28 (D. Mass. 2009)....................................................14, 40

Kafenbaum v. GTECH Holdings Corp., 217 F. Supp. 2d 238 (D.R.I. 2002)..............................32

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) ............................................................................42

Kenney v. State St. Corp.,
    Civ. A. No. 09-CV-10750-PBS, 2010 WL 938333 (D. Mass. Mar. 15, 2010) ......................32

Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55 (2d Cir. 1996) ...................................31

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005)................................................22, 23

Magruder v. Halliburton Co.,
    Civ. A. No. 3:05-CV-1156-M, 2009 WL 854656 (N.D. Tex. Mar. 31, 2009) ......................23

Malin v. XL Capital Ltd.,
    499 F. Supp. 2d 117 (D. Conn. 2007), aff'd, 312 F. App'x 400, 2009 WL 481897
    (2d Cir. 2009).........................................................................................................................39

In re Medimmune, Inc., Sec. Litig., 873 F. Supp. 953 (D. Md. 1995) .........................................28

Miss. Pub. Employees Ret. Sys. v. Boston Sci. Corp., 523 F.3d 75 (1st Cir. 2008) ....................34

N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.,
    537 F.3d 35 (1st Cir. 2008)..........................................................................................36, 37, 40

NPS, LLC v. Ambac Assurance Corp.,
    Civ. A. No. 08-11281-DPW, 2010 WL 723786 (D. Mass. Feb. 25, 2010) ......................32, 33

In re Newell Rubbermaid Sec. Litig.,
    No. 99 C 6853, 2000 WL 1705279 (N.D. Ill. Nov. 14, 2000).................................................31

In re Number Nine Visual Tech. Corp. Sec. Litig., 51 F. Supp. 2d 1 (D. Mass. 1999)...........30, 31

In re Parametric Tech. Corp. Sec. Litig., 300 F. Supp. 2d 206 (D. Mass. 2001).....................18, 21

In re Peritus Software Services, Inc. Sec. Litig., 52 F. Supp. 2d 211 (D. Mass. 1999)...........31, 32

Polin v. Conductron Corp., 552 F.2d 797 (8th Cir.) ....................................................................16

In re Rackable Sys., Inc. Sec. Litig.,
    No. C 09-0222 CW, 2010 WL 199703 (N.D. Cal. Jan. 13, 2010)..........................................39

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004)..........................................................................30

Rosen v. Textron, Inc., 321 F. Supp. 2d 308 (D.R.I. 2004)....................................................*passim*

Santa Fe Indus. Inc. v. Green, 430 U.S. 462 (1977) ...................................................................32

Scritchfield v. Paolo, 274 F. Supp. 2d 163 (D.R.I. 2003)......................................................*passim*

Sekuk Global Enters. v. KVH Indus.,
    No. Civ. A. 04-306ML, 2005 WL 1924202 (D.R.I. Aug. 11, 2005) .......................................14

Shaw v. Digital Equip. Corp., 82 F.3d 1194 (1st Cir. 1996),
    superseded on other grounds by statute, 15 U.S.C. § 78u-4(b)(1)-(2)............................*passim*

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) ...................................................42

Simon v. Am. Power Conversion Corp., 945 F. Supp. 416 (D.R.I. 1996) .....................................31

Slayton v. Am. Express Co., 604 F.3d 758 (2d Cir. 2010) ...........................................................19

In re Smith & Wesson Holding Corp. Sec. Litig.,
    604 F. Supp. 2d 332 (D. Mass. 2009) ....................................................................14, 15, 16

Spiegel v. Tenfold Corp., 192 F. Supp. 2d 1261 (D. Utah 2002) ..................................................25

Stiegele ex. rel. Viisage Tech. v. Bailey,
    No. 05-10677-MLW, 2007 WL 4197496 (D. Mass. Aug. 23, 2007) .....................................35

In re Stone & Webster, Inc. Sec. Litig., 253 F. Supp. 2d 102 (D. Mass. 2003) ...........................42

In re Stone & Webster, Inc. Sec. Litig., 414 F.3d 187 (1st Cir. 2005) ..........................................14

In re Sun Healthcare Group, Inc. Sec. Litig., 181 F. Supp. 2d 1283 (D.N.M. 2002) ..............19, 20

Suna v. Bailey Corp., 107 F.3d 64 (1st Cir. 1997) ......................................................................45

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.,
    531 F.3d 190 (2d Cir. 2008)...............................................................................................42

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) .........................................4, 33

Watterson v. Page, 987 F.2d 1 (1st Cir. 1993).............................................................................5

Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102 (N.D. Cal. 2003) ...............................35

### STATUTES & RULES

15 U.S.C. § 77z-2(c)(1)(A)(i) ..................................................................13

15 U.S.C. § 78j(b) ...........................................................................9, 44

15 U.S.C. § 78t ..............................................................................9, 44

15 U.S.C. § 78u-4(b) ....................................................................... *passim*

15 U.S.C. § 78u-4(b)(1) ..........................................................16, 2, 13, 32

15 U.S.C. § 78u-4(b)(2) ...........................................................6, 12, 13, 32

15 U.S.C. § 78u-4(b)(3)(A) .....................................................................13

15 U.S.C. § 78u-5(c)(1)(A)(i) ..................................................................13

15 U.S.C. § 78u-5(d) ...........................................................................15

15 U.S.C. § 78u-5(i)(1) ........................................................................14

17 C.F.R. § 240.10b5 ..........................................................................9, 44

17 C.F.R. § 240.10b5-1(c)(1)(i)(A) ..........................................................11, 34

Fed. R. Civ. P. 9(b) ..............................................................................12

Defendants CVS Caremark Corporation ("CVS Caremark" or the "Company"), Thomas M. Ryan, David Rickard, and Howard McLure (collectively the "Individual Defendants" and, together with CVS Caremark, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Corrected Consolidated Class Action Complaint, filed June 1, 2010 (the "Complaint"),[1] pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and section 78u-4(b) of the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## PRELIMINARY STATEMENT

As this Court has noted, Congress enacted the PSLRA in 1995 to put an end to the abusive practice of filing securities fraud claims against public companies whenever their stock prices decline. Rosen v. Textron, Inc., 321 F. Supp. 2d 308, 316-17 (D.R.I. 2004) (Smith, J.). One of the chief abuses that Congress sought to stop was suits claiming fraud whenever a company lowers its financial forecasts. To achieve this aim, Congress enacted a heightened pleading standard for all securities fraud claims and, in particular, a safe harbor at the pleading stage for forward-looking statements like earnings projections.

This action is precisely the sort of case at which the PSLRA is aimed. Plaintiffs seek to recover for the alleged loss in value of CVS Caremark stock following the Company's November 5, 2009 third-quarter earnings call (the "November Call"). Three months earlier, on the Company's August 4, 2009 second-quarter earnings call, the Company's Chief Executive Officer, Thomas M. Ryan, had expressed his preliminary view on the Company's earnings outlook for 2010 (the "Preliminary Earnings Prediction"). On the November Call, Mr. Ryan

---

[1] Plaintiff Medoff filed an initial complaint on November 17, 2009. Nearly six months later, on May 3, 2010, plaintiffs filed a consolidated amended class action complaint. The Complaint is a corrected version of the May 3, 2010 complaint.

provided more formal guidance, lowering the expectation for 2010 earnings expressed in his

Preliminary Earnings Prediction.  The reason for the adjustment in expectations, Mr. Ryan

explained, was substantial and unexpected losses since August 2009 in the Company's pharmacy

benefit management ("PBM") business.

Plaintiffs do not allege that any of CVS Caremark's actual financial results were

misstated.  Nor do plaintiffs dispute that the PBM business losses described in the November

Call do, in fact, explain the difference between the Preliminary Earnings Prediction and the

earnings guidance provided by Mr. Ryan on the November Call.  Instead, they now claim, with

the benefit of hindsight, that the Preliminary Earnings Prediction must have been fraudulent

because the Company should have foreseen those business losses and therefore *knew* that the

Preliminary Earnings Prediction was false at the time it was given.  The lengthy Complaint also

includes a profusion of other generalized allegations of misstatements or omissions about CVS

Caremark's PBM business and about other specific contract losses that were publicly known

well before the November Call.  Each of plaintiffs' allegations fails to meet the heightened

pleading burdens under the PSLRA.

*First*, Mr. Ryan's Preliminary Earnings Prediction of the Company's future economic

performance is protected by the PSLRA's statutory safe harbor for forward-looking statements

for two independent reasons.  The Preliminary Earnings Prediction was accompanied by

meaningful cautionary language and, under the PSLRA and well-established First Circuit law, is

protected for that reason alone.  Greebel v. FTP Software, Inc., 194 F.3d 185, 201 (1st Cir. 1999);

Scritchfield v. Paolo, 274 F. Supp. 2d 163, 177 (D.R.I. 2003) (Smith, J.).  In addition, plaintiffs

do not plead facts sufficient to allege that Mr. Ryan had *actual knowledge* that the Preliminary

Earnings Prediction was false or misleading when made, as they must under the PSLRA's safe

harbor.  In <u>Scritchfield</u>, this Court applied the PSLRA's safe harbor to dismiss claims based on several forward-looking statements, including a similar earnings prediction.  274 F. Supp. 2d at 187.  As this Court explained: "That [the Company] ultimately may have been unable to realize its dreams cannot transmogrify hopeful predictions into fraudulent dictions. " <u>Id.</u> at 181.

*Second*, plaintiffs have not pled loss causation—a causal link between the alleged misstatement and plaintiffs' alleged losses—for the remainder of the alleged misstatements and omissions in the Complaint.  Plaintiffs do not and cannot contend that any of these statements was addressed, much less "corrected," on the November Call; as a result, the stock price drop following the November Call cannot—as a matter of law—have been caused by any of these alleged misstatements or omissions.  For example, each and every one of the other alleged PBM contract losses that are collectively the focus of dozens of paragraphs in the Complaint was publicly known *before* the call, in fact often months before.  Because the market was fully aware of these losses before November 5, none of these alleged misstatements or omissions could therefore have caused the loss in stock price value *on that day* for which the Complaint now seeks to recover.  Under a straightforward application of the United States Supreme Court's holding in <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336 (2005), the Court must reject as irrelevant and inactionable the vast majority of the allegations in the Complaint.

*Third*, even if the Complaint could adequately allege loss causation for the alleged misstatements or omissions other than the Preliminary Earnings Prediction, the vast majority should be rejected because they are inactionable.  Because it is well settled that a company need not disclose an outcome that is merely likely, as opposed to substantially certain, plaintiffs cannot recover based on allegations that the Company did not disclose contracts that it was allegedly "likely" to lose.  And statements like "our model is working," "we are seeing new

business opportunities in 2010," and "our sales team is very optimistic about the opportunities that lie ahead" are classic examples of the sort of allegations that this and other Courts routinely and properly reject as inactionable puffery.  See, e.g., Scritchfield, 274 F. Supp. 2d at 174.

*Finally*, plaintiffs' Complaint must be dismissed in its entirety for the separate and independent reason that plaintiffs have failed to meet their heightened burden under the PSLRA of pleading a strong inference of scienter—i.e., pleading that defendants engaged in conscious wrongdoing or acted with a high degree of recklessness—with respect to any of the alleged misstatements or omissions.  The Supreme Court has instructed that, for plaintiffs to meet this burden at the pleading stage, the inference of scienter must be "cogent and at least as compelling as any opposing inferences one could draw."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).  Plaintiffs seek to meet this burden by reference to stock trades by Messrs. Ryan, Rickard, and McLure and supposed statements by confidential witnesses.  Defendants' overall pattern of trading—including their use of "10b5-1 plans," pursuant to which their stock was sold automatically during certain trading windows—does not, however, support any inference of scienter.  Nor do the allegations attributed to the confidential witnesses.  This is not surprising given that more than half of these witnesses had concededly left CVS Caremark prior to the alleged class period (and well before the Preliminary Earnings Prediction); most are not alleged to have met, let alone worked with, any of the Individual Defendants; and none is alleged to have any knowledge whatsoever of the forecasting process.

Plaintiffs have had six-and-a-half months since the filing of their initial complaint to meet their steep pleading burden.  During that time, they purportedly interviewed scores of witnesses and generated a lengthy complaint.  But that length is largely a result of their inclusion of irrelevant facts, inactionable purported misstatements, and unsupported assertions of scienter.  At

4

its core, this remains a typical fraud-by-hindsight claim in which plaintiffs seek to recover

because the Company was unsuccessful in perfectly predicting its future earnings. This is

precisely the type of claim that Congress intended to eliminate with the PSLRA, and the Court

here should dismiss it with prejudice.

## FACTUAL BACKGROUND[2]

CVS Caremark is an integrated provider of prescriptions and related health services

headquartered in Woonsocket, Rhode Island. (Compl. ¶ 15, 34.)   The Individual Defendants

were executives of CVS Caremark during the relevant time.  Mr. Ryan was the Company's

Executive Chairman, President, and Chief Executive Officer ("CEO") (Compl. ¶ 28); Mr.

Rickard was its Chief Financial Officer ("CFO") and Executive Vice President (Compl. ¶ 29);

and Mr. McLure was the President of Caremark Pharmacy Services, the PBM division of CVS

Caremark (Compl. ¶ 30).

CVS Corp. merged with Caremark Rx Inc. in 2007 to form the combined Company.

(Compl ¶ 1.)  Broadly speaking, CVS Caremark operates two business divisions:  its retail

pharmacy business and its PBM business.  (Compl. ¶ 35.)  The retail pharmacy business operates

retail drugstores which sell prescription drugs and other general merchandise.  (Compl. ¶ 35.)

The PBM business administers drug benefit programs on behalf of employers, government

agencies, health maintenance organizations, and other entities that provide prescription drug

insurance to their members.  (Compl. ¶ 38.)  The PBM business does so by entering into

contracts with these entities to provide PBM services to them.  (Compl. ¶ 38.)  This business is

highly competitive, and the revenue stream of the PBM division and, correspondingly, of the

---

[2] For purposes of this motion to dismiss only, the non-conclusory factual allegations in the Complaint are taken as true.  The facts described herein are taken from the Complaint, as well as from publicly available documents and other sources central to plaintiffs' claim or sufficiently referred to in the Complaint.  See Watterson v. Page, 987 F.2d 1, 4 (1st Cir. 1993).

Company as a whole can be impacted in substantial ways by wins or losses of large PBM contracts.  (Compl. ¶ 34.)

**The Preliminary Earnings Prediction**

On August 4, 2009, the Company announced its earnings for the second quarter of 2009. On a conference call that day to discuss those earnings (the "August Call"), Mr. Ryan provided preliminary views of the Company's earnings expectations for 2010—the Preliminary Earnings Prediction.  After explaining that he was "not giving guidance for 2010," Mr. Ryan said:

> I would be very disappointed if we didn't have an EPS growth of at least 13 to 15% next year.  As I said, we haven't completed our plan for 2010, and it is too early to give specific guidance, but I did want to give you some visibility on the Med D impact.

(Compl. ¶ 160; Ex. 3, transcript of the CVS Caremark second-quarter 2009 earnings conference call (the "Aug. 4 Tr.") at 2.)[3]  In addition to Mr. Ryan's own cautionary statements about the earliness and imprecision of the Preliminary Earnings Prediction, the Company also identified it as a forward-looking statement at the time it was made.  At the outset of the August Call, Nancy R. Christal, CVS Caremark's Senior Vice President of Investor Relations, announced that the presentation would include "certain forward-looking statements" and that the Company claimed "the protection of the Safe Harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995."  (Ex. 6, Aug. 4 Tr. at 2.)

---

[3] Citations to "Ex. __" refer to exhibits to the Declaration of Lawrence Portnoy, dated July 2, 2010.

The Court may consider the entirety of documents cited and quoted in plaintiffs' Complaint on a motion to dismiss: "This prevents a party from 'excising an isolated statement from a document and importing it into the complaint, even though the surrounding context imparts a plainly non-fraudulent meaning to the allegedly wrongful statement.'"  Rosen v. Textron, Inc., 321 F. Supp. 2d 308, 312 (D.R.I. 2004) (Smith, J.) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996), superseded on other grounds by statute, 15 U.S.C. § 78u-4(b)(1)-(2)).

Ms. Christal also warned investors that forward-looking statements made on the call "are subject to risks and uncertainties that could cause actual results to differ materially" and directed investors to the Cautionary Statement Concerning Forward-Looking Statements of the Company's most recently filed Form 10-Q and the Risk Factors section of the Company's most recently filed Annual Report on Form 10-K. (Id. at 2.)  The 10-Q for the fiscal second quarter of 2009 (the "Second-Quarter 2009 10-Q") included cautionary statements warning investors that "all forward-looking statements involve risks and uncertainties" and emphasizing that "[a]ctual results may differ materially from those contemplated by the forward-looking statements for a number of reasons."[4]  (Ex. 3, Second-Quarter 2009 10-Q at 32.)  The 10-K for the period ended December 31, 2008 (the "2008 10-K") warned investors of specific risks associated with the Company's business, including its PBM business.  (Ex. 1, 2008 10-K at 12, 20.)

**The November 5, 2009 Call**

On November 5, 2009, CVS Caremark reported results for its fiscal third quarter ending September 30, 2009 and held a conference call to discuss those results.  On that call, Mr. Ryan provided guidance on the Company's 2010 earnings outlook,[5] which fell short of the Preliminary Earnings Prediction.  Mr. Ryan explained that "operating profit in the PBM will decline in 2010, perhaps as much as 10 to 12%" and he further explained that, as a result, he no longer expected that the Company would achieve the 13 to 15% growth rate in 2010 he had preliminarily

---

[4] In particular, the 10-Q contained warnings of specific risk factors that could lead to differences between results predicted in Mr. Ryan's statement and actual results, including:  "[o]ur ability to realize fully the incremental revenues and other benefits from the Caremark merger"; "[t]he possibility of client loss and/or the failure to win new client business"; "[t]he effect on our Pharmacy Services business of a declining margin environment attributable to increased competition in the pharmacy benefit management industry and increased client demands for lower prices, enhanced service offerings and/or higher service levels"; "[r]isks regarding the impact of the Medicare prescription drug benefit on our business"; and "[l]itigation, legislative and regulatory risks associated with our business or the . . . pharmacy benefit management industry generally."  (Ex. 3, Second Quarter 2009 10-Q at 32-33.)

[5] The Company customarily first provides formal guidance on the earnings outlook for a prospective year no earlier than the third-quarter earnings call of the prior year.

predicted in August.  (Compl. ¶ 182.)  Mr. Ryan also announced that Mr. McLure "will be

retiring effective November 27."  (Ex. 7, transcript of the CVS Caremark third-quarter 2009

earnings conference call (the "Nov. 5 Tr.") at 5.)  CVS Caremark shares declined following the

November Call.  (Compl. ¶ 212.)

On the November Call, Mr. Ryan explained the unforeseen developments in the PBM

business that had made the Preliminary Earnings Prediction unattainable:  namely, the loss of a

contract with the State of New Jersey, the loss of Medicare low-income subsidy ("LIS") business

in 15 regions (accounting for the overwhelming majority of the 10-12% loss he projected for the

PBM business), the loss of the managed Medicare business for the State of Ohio, the early

renegotiation—at the request of the client—of a contract with the Blue Cross Blue Shield Federal

Employees Plan ("FEP"), and $600 million in other, smaller contract losses:

> We had $1.4 billion in wins in 2010.  Approximately, 600 million of those gross
> wins came since the last quarterly call.  We had 4.5 billion in losses and
> approximately two plus billion of those came from the last call—since the last call,
> and those would be Horizon, I think you know about obviously the State of New
> Jersey.  This was a bid that the state wanted on a stand-alone basis, so it was a
> kind of price and carve-out issue.  We lost the State of Ohio and the managed
> Medicare business.  It was carved in, which is about 500 plus million.  And then
> we had another 600 million miscellaneous.  These were basically smaller clients
> around RxAmerica or PharmaCare that just really wanted essentially smaller
> PBMs.  So in total, that was about $2 plus billion since the last call.
>
> And then, lastly, we had $1.7 billion that we lost in Med-D business.  This was
> the 500,000 lives that we lost in the duals, and once again, this was since the last
> call.  So net-net, it's about $4.8 billion in loss—in net loss for 2010 and
> approximately almost 3.7 billion since the last call.
>
> . . .
>
> To get to that 13 to 15% growth rate, I expected strong double-digit growth in our
> retail business, which I still do, and I expected low-to-mid single digit in our PBM
> business, which is not going to happen.  What's changed?  Well, as I just said, we
> lost more PBM business than we expected since the call, $2 billion in contracts.
> We lost the Med-D duals in 15 regions, which was 1.7 billion, which I just
> referred to.  And we extended the $4 billion FEP contract through 2011 at the

client's request.  This was an early renegotiation, not at our request, but at the client's request.  So we're going to have obviously some margin implications in 2010.

(See Ex. 7, Nov. 5 Tr. at 4-5.)  Plaintiffs do not and cannot deny that these contract losses would account for the difference between the Preliminary Earnings Prediction and the 2010 earnings guidance provided by Mr. Ryan on the November Call; nor can they contend that any of these contract losses occurred prior to the Preliminary Earnings Prediction.  Instead, they contend that the Company somehow knew that these losses were going to occur before they did.  (Compl. ¶¶ 85, 110.)

**The Filing of the Original Complaint**

Seeking to recover based on the decline in CVS Caremark's stock price, plaintiffs filed a complaint on November 17, 2009, alleging that the Company and the Individual Defendants violated section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 and that the Individual Defendants are liable as controlling persons under section 20(a) of the Exchange Act.  The original complaint alleged only that the Preliminary Earnings Prediction was somehow fraudulent; it did not identify any other alleged misstatements or omissions that were purportedly revealed either in the November Call or at any other prior point in time.

**The Amended Complaint and the Other Alleged Misstatements and Omissions**

The Consolidated Class Action Complaint was filed almost six months later—on May 3, 2010—followed by the Corrected Consolidated Class Action Complaint on June 1, 2010.  The

Complaint includes an array of other allegations of alleged misstatements and omissions,[6] none of which is alleged to have been disclosed for the first time or corrected on the November Call.

Most of these alleged misstatements are inactionable corporate puffery regarding the Company's business prospects or the success of the 2007 merger.  (See, e.g., Compl. ¶ 113 ("I would say our model is working"); Compl. ¶ 135 ("[a]s we head into the 2010 selling season, our sales team is very optimistic about the opportunities that lie ahead"); Compl. ¶ 150 ("this model really is going to make a difference going forward").)  And the Complaint does not allege that any of these statements was disclosed on the November Call—the only alleged "corrective disclosure" date in the Complaint.  (Compl. ¶ 179.)

In fact, plaintiffs concede that the vast majority of the alleged misstatements and omissions described in the Complaint had been disclosed weeks or even months earlier. Although the Complaint alleges that the November Call somehow revealed "the magnitude of the lost business, including the loss of the New Jersey account, and the true impact on the Company's earnings" (Compl. ¶ 183), each of the major PBM contract losses and events that plaintiffs describe in the Complaint had previously been disclosed:

- The Company confirmed the loss of the Coventry Health Care commercial business ("Coventry") on May 5, 2009.  (Compl. ¶ 141.)

- The Company confirmed the loss of the Chrysler unionized retirees business ("Chrysler") on the August Call.  (Compl. ¶ 163.)

- On the August Call, the Company also disclosed the impact on revenues of a Centers for Medicare & Medicaid Services ("CMS") regulatory amendment requiring PBMs to report as an administrative cost the difference, or spread, between the price a PBM pays for a drug and the amount it is reimbursed for purchasing that drug (the "CMS Spread Regulation").  (Compl. ¶ 152.)

---

[6] The Complaint attributes these statements to Mr. Ryan or Mr. Rickard.  The Complaint does not allege that Mr. McLure made any false or misleading statements.

- The Company's loss of the State of New Jersey ("New Jersey")[7] business was known to the market as early as August 11, 2009.  (See Ex. 12, August 11, 2009 NorthJersey.com article.)

- The Company announced, in a mid-quarter press release on October 2, 2009, the loss of LIS members enrolled in its SilverScript and Accendo Medicare Part D plans as well as the earnings per share impact of that loss.  (Compl. ¶ 174.)

## Scienter Allegations

In support of their claim that Defendants acted with the requisite scienter, plaintiffs rely primarily on allegations of insider trading on behalf of the Individual Defendants.  (Compl. ¶ 204.)  But plaintiffs acknowledge that Messrs. Rickard and McLure traded pursuant to "pre arranged 10b-5 trading plans."[8]  (Compl. ¶ 205.)  Plaintiffs also concede that Mr. Ryan made only one trade during the alleged class period, which amounted to only a small percentage of his total holdings of stock.  (Compl. ¶ 109.)

The Complaint's remaining scienter allegations, purportedly based on information from confidential witnesses, include a variety of conflicting, irrelevant, and conclusory allegations about the Defendants' purported knowledge of contract losses, customer service and integration issues, regulatory changes, and the success of the Company's Maintenance Choice program. (See, e.g., Compl. ¶¶ 65, 68, 69, 98, 110, 111.)  None of these, however, is a particularized allegation concerning any Defendant's state of mind.  None describes a single conversation or meeting with any of the Individual Defendants; none describes how the specific contract losses and other issues that the Individual Defendants purportedly knew about affected the Company's

---

[7] CVS Caremark provided PBM benefits to the State of New Jersey through a contract with Horizon Blue Cross Blue Shield of New Jersey.  (Compl. ¶ 84.)

[8] A 10b5-1 trading plan is a contract between a company executive and a broker that contains detailed instructions to sell specified amounts of securities on particular dates or at specified prices.  See 17 C.F.R. § 240.10b5-1(c)(1)(i)(A).

forecasts; and, in any event, none describes in any way the process the Company used to reach its Preliminary Earnings Prediction.

In fact, most of the confidential witnesses included in the Complaint did not work at the Company during the alleged class period; the remainder only worked at the Company for small portions of the alleged class period; only one confidential witness was employed by the Company in August of 2009 when Mr. Ryan made his 2010 Earnings Projection.  (See Compl. ¶ 33.)  And most of the confidential witnesses are not alleged to have ever even met any of the Individual Defendants, much less have particularized evidence of what those Individual Defendants were thinking.

## ARGUMENT

The elements of a securities fraud claim are (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); Rosen v. Textron, Inc., 321 F. Supp. 2d 308, 316 (D.R.I. 2004) (Smith, J.).

To survive a motion to dismiss a securities fraud suit, plaintiffs must satisfy the heightened pleading standards of both Federal Rule of Civil Procedure 9(b) and the PSLRA.  See Rosen, 321 F. Supp. 2d at 316; Scritchfield v. Paolo, 274 F. Supp. 2d 163, 170 (D.R.I. 2003) (Smith, J.).  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  FED. R. CIV. P. 9(b).  The PSLRA "augments Rule 9(b)'s particularity requirement."  Rosen, 321 F. Supp. 2d at 317.  It further requires that a complaint alleging a Rule 10b-5 violation shall (i) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and (ii) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(1), (2).

12

The First Circuit has explained that these pleading requirements are "notably strict and rigorous." ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 n.7 (1st Cir. 2008) (quoting Greebel v. FTP Software Inc., 194 F.3d 185, 193 (1st Cir. 1999)).  Because plaintiffs fail to meet them, the Complaint must be dismissed.  See 15 U.S.C. § 78u-4(b)(3)(A) (where pleading requirements are not met, "the court shall . . . dismiss the complaint").

## I.     PLAINTIFFS FAIL TO STATE A CLAIM AS TO THE PRELIMINARY EARNINGS PREDICTION

In their nearly one hundred-page Complaint, plaintiffs point to only a single alleged misstatement that was actually addressed for the first time on the November Call:  Mr. Ryan's Preliminary Earnings Prediction, made on the August Call, that he "would be very disappointed if [CVS] didn't have an EPS growth of at least 13 to 15% next year."[9]  (Compl. ¶ 160.)  But plaintiffs cannot state a claim with respect to Mr. Ryan's Preliminary Earnings Prediction because, as a quintessentially forward-looking statement, it falls squarely within the safe harbor of the PSLRA.

The PSLRA exempts forward-looking statements from securities fraud causes of action if "the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . ."  15 U.S.C. §§ 77z-2(c)(1)(A)(i),78u-5(c)(1)(A)(i); accord Baron v. Smith, 380 F.3d 49, 54 (1st Cir. 2004); Rosen v. Textron, 321 F. Supp. 2d 308, 321 (D.R.I. 2004) (Smith, J.); Scritchfield v. Paolo, 274 F. Supp. 2d 163, 177 (D.R.I. 2003) (Smith, J.).  The PSLRA codified the bespeaks caution doctrine.  See, e.g., Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1213 n.23 (1st Cir. 1996), superseded on other

---

[9] The Preliminary Earnings Prediction represented Ryan's preliminary estimate, in August 2009, of the Company's earnings "next year" (i.e., in the fiscal year beginning January 1, 2010).  It reflects not only the PBM business, but all other business segments of the Company.

grounds by statute, 15 U.S.C. § 78u-4(b)(1)-(2).  "Under this doctrine, [a] forward looking

statement is not materially misleading if 'accompanied by adequate cautionary disclosures.'"  In

re Cytyc Corp. Sec. Litig., No. Civ. A. 02-12399-NMG, 2005 WL 3801468, at *21 (D. Mass

Mar. 2, 2005) (quoting In re Focus Enhancements, Inc. Sec. Litig., 309 F. Supp. 2d 134, 162 (D.

Mass. 2001)).  As the First Circuit has recognized, "when statements of 'soft' information such

as forecasts, estimates, opinions or projections are accompanied by cautionary disclosures that

adequately warn of the possibility that actual results or events may turn out differently, the 'soft'

statements may not be materially misleading."  Shaw, 82 F.3d at 1213.

The Preliminary Earnings Prediction is, self-evidently, a textbook example of a forward-

looking statement.  "Forward-looking statements are, generally speaking, statements that speak

predictively of the future."  In re Stone & Webster, Inc. Sec. Litig., 414 F.3d 187, 195 (1st Cir.

2005) (citing 15 U.S.C. § 78u-5(i)(1)) (internal quotation marks omitted); see also 15 U.S.C.

§ 78u-5(i)(1) (defining "forward-looking statement" to include predictive statements of "future

economic performance," including projections of revenues, income, and earnings per share).

Courts have consistently invoked this straightforward, commonsense definition when assessing

motions to dismiss securities fraud claims.  See, e.g., Isham v. Perini Corp., 665 F. Supp. 2d 28,

39-40 (D. Mass. 2009) (deeming "statements about anticipated revenue and earnings per share"

protected by PSLRA safe harbor); In re Smith & Wesson Holding Corp. Sec. Litig., 604 F. Supp.

2d 332, 341 (D. Mass. 2009) (deeming statement regarding projected "income per share"

protected by PSLRA safe harbor); Sekuk Global Enters. v. KVH Indus., No. Civ.A. 04-306ML,

2005 WL 1924202, at *11 (D.R.I. Aug. 11, 2005) (deeming statement predicting "revenue

growth in the range of 30-50%" protected by PSLRA safe harbor); Scritchfield, 274 F. Supp. 2d

at 187 (holding that CEO's prediction of "$15 million in revenues by the end of 2000" is a non-

actionable forward-looking statement).

Interpreting the PSLRA, the First Circuit has held that the safe harbor for forward-

looking statements like the Preliminary Earnings Prediction has "two alternative inlets":

> [T]he first shelters forward-looking statements that are accompanied by meaningful cautionary statements. See 15 U.S.C. § 78u-5(c)(1)(A)(i). The second inlet focuses on the state of mind of the defendant and precludes liability for a forward-looking statement unless the maker of the statement had actual knowledge it was false or misleading.

Greebel v. FTP Software, Inc., 194 F.3d 185, 201 (1st Cir. 1999); see also Smith & Wesson, 604

F. Supp. 2d at 340 ("A forward-looking statement is protected if it . . . includes a disclaimer

regarding risks and the possibility that results will differ from projections . . . or . . . the

executives of the company had no actual knowledge the statement was false or misleading.").[10]

Thus the Preliminary Earnings Prediction is inactionable if *either* of these "two alternative

inlets" applies.  As explained below, both do.

### A.   The Preliminary Earnings Prediction Is Entitled to the Protection of the Safe Harbor Because It Was Accompanied by Meaningful, Narrowly Tailored Cautionary Statements.

The PSLRA's safe harbor applies because the Preliminary Earnings Prediction was

accompanied by cautionary language that was "substantive and tailored to the specific future

projections, estimates or opinions . . . which the plaintiffs challenge."  Smith & Wesson, 604 F.

---

[10] In addition, because the Preliminary Earnings Prediction is forward-looking, the PSLRA provides that Defendants had no duty to update or correct it. See 15 U.S.C. § 78u-5(d).  The Complaint therefore alleges no more than "the unfortunate but commonplace event of a publicly traded company failing to meet its revenue forecast, coupled with a concomitant and predictable drop in share prices."  In re Initial Pub. Offering Sec. Litig., 399 F. Supp. 2d 261, 266 n.30 (S.D.N.Y. 2005); id. at 266-67 ("If downturns in stock prices based on such mundane events as failures to meet forecasts and downward revisions of forecasts were legally sufficient to constitute disclosures of securities fraud, then any investor who loses money in the stock market could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed and that the disclosure caused their losses.").

Supp. 2d at 341 (quoting <u>In re Donald Trump Casino Sec. Litig.</u>, 7 F.3d 357, 371-72 (3d Cir. 1993)).

As an initial matter, the Preliminary Earnings Prediction contains all the indicia of uncertainty that are the hallmarks of the doctrine. For instance, Mr. Ryan did not identify a specific growth target, instead saying only that he "would be very disappointed if" earnings per share were less than 13 to 15%. (Compl. ¶ 160.) Moreover, he specifically warned that "it is too early to give specific guidance." (<u>Id.</u>) Where similar caveats and cautionary language have accompanied challenged statements, courts have found the statements so indefinite that they bespeak caution. <u>See, e.g.</u>, <u>Shaw</u>, 82 F.3d at 1220-21; <u>Polin v. Conductron Corp.</u>, 552 F.2d 797, 807 n.28 (8th Cir. 1977) (finding statements to bespeak caution when results were "'expected' to show improvement" and the Company saw a "'possibility' of a break-even soon"). The equivocal nature of the Preliminary Earnings Prediction confirms that the statement reflected Mr. Ryan's view of the future—a view that was subject to unforeseen intervening events.

More fundamentally, the Preliminary Earnings Prediction was also accompanied by precisely the sort of "clearly demarcated cautionary statement" that courts routinely hold satisfy the safe harbor. <u>Scritchfield</u>, 274 F. Supp. 2d at 187 (deeming a CFO's projection of future revenues made in a newspaper article a forward-looking statement where the cautionary language was included in an earlier-issued press release); <u>see also</u> Ex. 11, Exhibits 30 and 31 to the Appendix to Defendants' Motion to Dismiss in <u>Scritchfield</u>. At the outset of the August Call, the Company warned investors that forward-looking statements made on the call "are subject to risks and uncertainties that could cause actual results to differ materially" and recommended that investors

> become familiar with the specific risks and uncertainties that are described in the
> Risk Factors section of our most recently filed Annual Report on Form 10-K

and . . . review the section entitled, 'Cautionary Statement Concerning Forward-Looking Statements,' in our most recently filed quarterly report on Form 10-Q.

(Ex. 6, Aug. 4 Tr. at 2.)  The Company's Second-Quarter 2009 10-Q and 2008 10-K contain detailed cautionary statements warning investors that "all forward-looking statements involve risks and uncertainties" and emphasizing that "[a]ctual results may differ materially from those contemplated by the forward-looking statements for a number of reasons."[11]  (Ex. 3, Second-Quarter 2009 10-Q at 32.)

In fact, the list of risks identified in the Second-Quarter 2009 10-Q squarely addresses plaintiffs' allegations that the Preliminary Earnings Prediction was false or misleading because potential client loss, systemic integration and service issues, and new government regulation would prevent the Company from realizing 13 to 15% earnings growth.  (See Compl. ¶ 165.) The Company's cautionary statements cover each of these risks:

- "Our ability to realize fully the *incremental revenues* and other benefits from the *Caremark merger*";
- "*The possibility of client loss* and/or the failure to win new client business";
- "The effect on our Pharmacy Services business of a declining margin environment attributable to increased competition in the pharmacy benefit management industry and increased client demands for lower prices, *enhanced service offerings and/or higher service levels*";
- "Risks regarding *the impact of the Medicare prescription drug benefit* on our business"; and
- "Litigation, legislative and *regulatory risks associated with our business* or the . . . pharmacy benefit management industry generally."

---

[11] It is well established that a company may "rely on this safe harbor when making an oral statement simply by referring to the written document containing the cautionary language."  Cytyc, 2005 WL 3801468, at *21 & n.55; see also In re Ibis Tech. Sec. Litig., 422 F. Supp. 2d 294, 311-12 & n.15 (D. Mass. 2006) ("[D]irect incorporation by reference of cautionary statements in SEC filings is permissible and supports the application of the safe harbor provisions.").

(Ex. 3, Second-Quarter 2009 10-Q at 32-33 (emphasis added).)  Moreover, detailed language in

the 2008 10-K warned investors of the specific risks associated with the particular regulation

identified in the Complaint—the CMS Spread Regulation—and the possibility of customer loss:

- "[I]n January 2009, CMS issued a regulation with comment period . . . [requiring] that, beginning in 2010, any difference between the drug price charged to Part D sponsors by a PBM and the drug price paid by the PBM to the dispensing provider be treated as an administrative cost, rather than a drug cost, to the Part D sponsor for purposes of calculating both the subsidy payments by the government and the drug price to be charged to enrollees. . . . The Medicare Drug Benefit continues to attract a high degree of legislative and regulatory scrutiny, and the applicable government rules and regulations continue to evolve. *Accordingly, it is possible that legislative and regulatory developments could materially affect our Medicare Part D business or profitability.*"

- "Our PBM business generates net revenues primarily by contract with clients to provide prescription drugs and related health care services to plan participants.  PBM client contracts generally have terms approximating 3 years in duration.  Accordingly, approximately one third of a PBM's customer base typically is subject to renewal each year, and therefore we face challenges in competing for new business and retaining or renewing business. . . . There can be no assurance that we will be able to win new business on terms as favorable to the Company as the present terms. *Accordingly, our failure to renew or win PBM business could adversely affect our business, financial position and results of operations.*"

(Ex. 1, 2008 10-K at 12, 20 (emphasis added).)

In In re Parametric Technology Corp. Securities Litigation, 300 F. Supp. 2d 206 (D. Mass.

2001), the court held that similar cautionary language "comported with the requirement of the

statute."  Id. at 218.  Specifically, the Parametric court found that language in a press release

warning that revenues would be impacted by "the level of future orders, market acceptance for

the company's new [product] . . . ,weakness in the Asian economies, as well as the company's

ability to continue to penetrate [a market segment]" was sufficient to invoke the shelter of the

safe harbor provision.  Id. at 218-19.  Similarly, in In re Ibis Technology Securities Litigation,

422 F. Supp. 2d 294 (D. Mass. 2006), the court found that cautionary language "warning that

product demand and market acceptance risks . . . could cause actual results to differ from the anticipated results" sufficed to trigger the protection of the safe harbor.  Id. at 311.

Like the cautionary language in those cases, the specifically tailored cautionary language accompanying the Preliminary Earnings Prediction warned investors of the particular risks that might impact CVS Caremark's future earnings.  Plaintiffs' boilerplate allegation that the statutory safe harbor for forward-looking statements does not apply because "the statements were not specifically identified as 'forward-looking statements' when made" (Compl. ¶ 217) is both demonstrably false and inconsistent with the law.  The PSLRA's safe harbor therefore insulates forward-looking earnings forecasts, including the Preliminary Earnings Prediction, from claims of securities fraud.

**B.      The Preliminary Earnings Prediction Is Entitled to the Protection of the Safe Harbor Because Plaintiffs Do Not Plead Facts Supporting a Strong Inference That Defendants Knew That It Was False or Misleading When Made.**

Although satisfying the first inlet is sufficient by itself to gain the protection of the safe harbor,[12] the Preliminary Earnings Prediction merits protection for the additional reason that plaintiffs do not even attempt to plead facts demonstrating that Mr. Ryan had actual knowledge that the statement was false or misleading when made.

"[D]ismissal of securities fraud claims based on forward-looking statements is warranted if . . . the plaintiff fails to plead with particularity facts giving rise to a strong inference that the defendant made the statements with actual knowledge that they were false or misleading."  Ibis Tech., 422 F. Supp. 2d at 311 (emphasis on original).  "'Actual knowledge' is a higher level of scienter than the 'recklessness' required by the pleading standards of the PSLRA."  In re Sun

_____

[12] See Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010) ("The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language . . . or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading.") (emphasis in original) (citations omitted).

Healthcare Group, Inc. Sec. Litig., 181 F. Supp. 2d 1283, 1289 (D.N.M. 2002) (citations omitted).

The Complaint does not contain a single particularized factual allegation supporting an inference that Mr. Ryan or the Company knew the Preliminary Earnings Prediction was false when made.  In fact, the allegations in the Complaint support the contrary inference—that Mr. Ryan had a reasonable basis for his August 4 statements.  First, on the August Call, Mr. Ryan explained in detail the basis for his prediction.  (See Compl. ¶ 159 (Mr. Ryan discussed new contract wins and noted that the Company's 2010 retention rate was 96%, slightly higher than in 2009); Compl. ¶¶ 159, 163 (Mr. Ryan acknowledged the Coventry and Chrysler contract losses); Compl. ¶ 164 (Mr. Ryan discussed the impact of the CMS Spread Regulation).)  Second, on the November Call, Mr. Ryan provided an even more detailed explanation of why the predicted growth had not transpired.  (See Compl. ¶ 182 (Mr. Ryan noted that, "*since the [August 4] call*," the Company lost more contracts than expected (including the State of New Jersey contract) and lost the Med-D LIS lives in 15 regions.") (emphasis added).)

These facts do not support any inference—let alone a strong inference—that Mr. Ryan knew the Preliminary Earnings Prediction to be false when made.  Plaintiffs do not allege relevant, non-conclusory facts suggesting that Mr. Ryan knew, on August 4, that the Company would lose the New Jersey contract or the Med-D LIS lives.  Nor do any of plaintiffs' confidential witnesses address Mr. Ryan's state of mind in August 2009.  The only confidential witness allegedly employed by the Company at the time of the Preliminary Earnings Prediction was an employee at the Company's Nashville, Tennessee call center, whose knowledge appears to be limited to alleged problems with the computer system at that call center.  (Compl. ¶ 33.)

At best, plaintiffs offer conclusory allegations, made with the benefit of hindsight, that Mr. Ryan *should have known* that contracts were in jeopardy and that 13 to 15% earnings growth was therefore unlikely.  Such allegations, however, even if credited, are insufficient to ascribe actual knowledge of falsity to Mr. Ryan or the Company.  See Parametric, 300 F. Supp. 2d at 219 (finding forward-looking statement merited protection of safe harbor where "[t]he facts pleaded about what [defendant] or other insiders knew are too general to permit an inference— even a merely reasonable one—that [defendant] had actual knowledge that his statement . . . was either false or misleading"); see also In re Avon Prods., Inc. Sec. Litig., No. 05 Civ. 6803(LAK)(MHD), 2009 WL 848017, at *19 (S.D.N.Y. Feb. 23, 2009).

Avon Products is instructive.  Plaintiffs there challenged several forward-looking statements on the basis that the makers of the statements had actual knowledge of their falsity. Specifically, plaintiffs claimed that defendants' public statements failed to refer to the alleged unhappiness of Chinese retailers and the impact that unhappiness would have on the defendant company's performance.  Id. at *3.  Those allegations of unhappiness were similar in nature to plaintiffs' vague and unsupported allegations concerning purported service issues at CVS Caremark.  The Avon Products court granted defendants' motion to dismiss and noted "the absence of specifics in the complaint regarding the scope of retailer 'unhappiness.'"  Id. at *19. The court also listed plausible reasons supporting an inference that defendants' did *not* have actual knowledge of falsity.  Id.  That straightforward logic compels the same outcome here. Plaintiffs have not alleged facts sufficient to establish that Mr. Ryan knew the Preliminary Earnings Prediction was false or misleading when made.  Indeed, the facts in the Complaint support precisely the opposite inference.

In Scritchfield, this Court itself held that a substantially similar earnings projection to the Preliminary Earnings Prediction was a forward-looking statement protected by the PSLRA's safe harbor.  274 F. Supp. 2d at 187.  There, the defendant (who was the CFO of the company in question) predicted "$15 million in revenues by the end of 2000."  Scritchfield, 274 F. Supp. 2d at 187.  This Court deemed that prediction a forward-looking statement and, accordingly, held that it was inactionable.  Id.  The fact that the Preliminary Earnings Prediction is, in all material respects, indistinguishable from the statement at issue in Scritchfield compels the same conclusion here.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM WITH RESPECT TO ALL OF THE REMAINING PURPORTEDLY ACTIONABLE STATEMENTS ALLEGED IN THE COMPLAINT

The Complaint's remaining alleged misstatements are equally inactionable.  In particular, the Complaint fails to state a claim because (i) plaintiffs have not adequately pled loss causation and (ii) the vast majority of these supposed false or misleading statements are inactionable.[13]

### A.   Plaintiffs' Remaining Allegations Fail To Allege Loss Causation.

Because none of the remaining alleged misstatements or omissions was disclosed for the first time on the November Call, plaintiffs have not adequately pled loss causation as to those statements.

Loss causation is the "causal connection between the material misrepresentation and the loss."  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005).  In order to plead this connection, plaintiffs must allege that a "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  Lentell v. Merrill Lynch & Co.,

---

[13] And as explained below (infra Point III), all of the alleged misstatements—including the Preliminary Earnings Prediction—must be dismissed for the additional, independent reason that they do not allege facts raising a strong inference of scienter.

396 F.3d 161, 173 (2d Cir. 2005); <u>see also</u> <u>In re Dell Inc., Sec. Litig.</u>, 591 F. Supp. 2d 877, 907

(W.D. Tex. 2008) (plaintiffs must allege that market reacted negatively to a corrective disclosure,

"which revealed the falsity of [defendant company's] previous representations").  This

requirement ensures that securities fraud actions are not used "to provide investors with broad

insurance against market losses," but rather "to protect against those economic losses that

misrepresentations actually cause."  <u>Dura</u>, 544 U.S. at 345.

Mere confirmatory disclosures cannot, as a matter of law, cause a change in stock price;

the disclosure must be corrective in nature.  <u>See</u> <u>Greenberg v. Crossroads Sys.</u>, 364 F.3d 657,

670 (5th Cir. 2004);  <u>Magruder v. Halliburton Co.</u>, Civil Action No. 3:05-CV-1156-M, 2009 WL

854656, at *11 (N.D. Tex. Mar. 31, 2009) ("[T]he revelation of confirmatory information, or

information already known to the market, cannot constitute a corrective disclosure."); <u>In re</u>

<u>Initial Pub. Offering Sec. Litig.</u>, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (loss causation does

not arise out of disclosures that had "a negative effect on stock prices, but not a corrective

effect").

The Complaint alleges only one purported corrective disclosure event:  the November

Call.[14]  (Compl. ¶ 179 ("On November 5, 2009, the truth about CVS Caremark's PBM business

was finally revealed during a conference call with investors and analysts.").)  Likewise, plaintiffs

seek to recover for only a single purported injury:  the stock decline on November 5, 2009.

(Compl. ¶ 212 ("As a direct result of Defendants' November 5, 2009 disclosures, CVS

Caremark's stock price dropped 20 percent.").)  The only alleged misstatement or omission

during the alleged class period that was addressed on the November Call—and thus the only

---

[14] And, as emphasized above in Point I, Defendants did not actually correct anything on the November Call
for the simple reason that there was nothing to correct.  Rather, Mr. Ryan explained that, due to unforeseen
intervening events, the 2010 consolidated earnings growth rate he anticipated in August would not materialize.

statement for which plaintiffs could plausibly have alleged loss causation—is the Preliminary

Earnings Prediction, which is a forward-looking statement protected by the PSLRA's safe harbor.

See supra Point I.

The remaining alleged misstatements and omissions were either not addressed on the

November Call, were already known to the market, or both.  The Complaint alleges that

Defendants first disclosed to the market on November 5 "the magnitude of the lost business,

including the loss of the New Jersey account, and the true impact on the Company's earnings."

(Compl. ¶ 183.)  The Complaint itself, however, reflects that all of this information was public

weeks or even months earlier:

- The Company confirmed the loss of the Coventry business on May 5, 2009.  (Compl. ¶ 141.)

- The Company confirmed the loss of the Chrysler business on the August Call. (Compl. ¶ 163.)

- On the August Call, the Company also disclosed the impact on earnings of the CMS Spread Regulation.  (Compl. ¶ 152.)

- The Company's loss of the New Jersey business was known to the market as early as August 11, 2009.[15]  (See Ex. 12, August 11, 2009 NorthJersey.com article.)

- The Company announced, in a mid-quarter press release on October 2, 2009, the loss of the Med-D LIS lives and its impact on earnings.  (Compl. ¶ 174.)

---

[15] In view of the fact that the loss of the New Jersey business after the Preliminary Earnings Prediction was reported in the public press, plaintiffs do not contend that the market first learned about the loss of that business in the November Call.  Instead, they allege that CVS Caremark did not *itself* disclose the loss of the New Jersey contract until November 5.  (See Compl. ¶¶ 90, 203.)  However, Company policy regarding contract disclosures was not to "provide information regarding contractual wins and losses between [quarterly earnings] calls."  (Ex. 4, Q1.08 Earnings Call Tr. at 2.)  Indeed, and as plaintiffs' allegations show, at the end of each quarter, the Company disclosed certain of the major contracts that it had lost during that quarter and the aggregate impact of those losses. (See Compl. ¶ 75 (Coventry loss discussed on May 5, 2009); ¶ 163 (Chrysler loss discussed on August 4, 2009); ¶ 183 (New Jersey loss discussed on November 5, 2009).)  The fact that CVS Caremark did not confirm the loss of the New Jersey contract until its November 5 call is entirely consistent with its stated policy.  In any event, as explained in the text, *how* the market learned is irrelevant to the loss causation analysis—which is focused on the state of the market's awareness of relevant facts at points in time, not the precise means by which the market came to know those facts.

Insofar as statements on the November Call addressed these issues, they merely confirmed information that was previously known to the market and cannot provide the requisite connection between a prior alleged misstatement and the decline in value of plaintiffs' stock.

The Fifth Circuit's opinion in Catogas v. Cyberonics, Inc. is right on point.  No. 07-20787, 2008 WL 4158923 (5th Cir. Sept. 8, 2008).  Plaintiffs there claimed that an August 2006 press release was "the first time that the market learned the full ramifications of the [stock options] backdating and repricing scheme."  Id. at 315, 2008 WL 4158923 at *4.  However, a July 2006 investment-analyst report along with Cyberonics' June 2006 8-K had previously revealed the very same potential problems with the company's stock option accounting as well as the existence of an SEC investigation, subpoenas from the United States Attorney, and the company's own internal investigation.  Id.  Accordingly, the Fifth Circuit affirmed the district court's dismissal of the complaint on loss causation grounds, holding that, although plaintiffs had alleged that the August 2006 announcement negatively impacted Cyberonics' stock price, "such news did not reveal anything regarding the accounting of options that had not already been disclosed to the investing public."[16]  Id.; see also Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co., Civil Action No. 3:02-CV-1152-M, 2008 WL 4791492, at *2 (N.D. Tex. Nov. 4, 2008) ("[M]isrepresentations cannot be actionable unless they are non-confirmatory, and complete corrective disclosures will only affect the stock price when they are first made."), aff'd, 597 F.3d 330 (5th Cir. 2010); In re Discovery Labs. Sec. Litig., No. 06-1820, 2006 WL 3227767, at *10 (E.D. Pa. Nov. 1, 2006) (granting defendant's motion to dismiss where, among other

---

[16] Faced with the fact that investors knew all of this information before November 5, plaintiffs contend that Defendants had not yet disclosed the "magnitude of the lost business."  (Compl. ¶ 183.)  Such a theory, however, amounts to nothing more than a failure to aggregate previously disclosed information, which cannot constitute securities fraud.  Cf. Spiegel v. Tenfold Corp., 192 F. Supp. 2d 1261, 1265-1266 (D. Utah 2002) ("The inference from . . . a pattern of disclosure is not that the individual Defendants knowingly misled investors, but rather that Defendants attempted to inform investors of the problems as they arose.").

things, the information allegedly withheld from plaintiffs was "already available in the marketplace").

Plaintiffs fare no better with their allegations that pervasive customer service issues in the PBM business were driving clients away from CVS Caremark and that Defendants had concealed this until the November Call.[17]   (See e.g., Compl. ¶¶ 10, 98, 184, 210.)  In seeking to describe this as a corrective disclosure event, they rely on a single statement from Mr. Ryan made on November 5—that "some service issues" impacted the loss of the Coventry contract. (Compl. ¶ 184.)  As explained above, however, the Company had disclosed the loss of the Coventry contract six months before and had discussed the financial impact of that loss in more than one conference call before November.  (Compl. ¶¶ 141, 150, 159.)  Moreover, plaintiffs, in an effort to imply that Mr. Ryan's comment about Coventry service issues was a corrective disclosure of some earlier fraud, attempt to manufacture a link between Mr. Ryan's statement about service issues with Coventry and other aspects of the Company's PBM business.  But the Company did *not* suggest on the November Call that service issues had anything to do with the New Jersey contract loss or any of the other events since August that led to the revision of the Preliminary Earnings Prediction.  Mr. Ryan's limited statement with respect to the Coventry contract cannot be said to have provided investors with enough information to conclude that *systemic* service issues existed, let alone that they caused the Company to lose PBM business generally or the Chrysler and New Jersey contracts specifically.  Indeed, as Mr. Ryan explained on the November 5 Call, the majority of major clients who terminated did so for reasons *other than* service.  (Ex. 7, Nov. 5 Tr. at 18.)

---

[17] Plaintiffs similarly allege in an entirely conclusory fashion that Mr. McLure's retirement was a "guise" for his firing.  (Compl. ¶ 10, 90, 108, 190.)  Plaintiffs cannot, however, contend that the announcement of Mr. McLure's departure constitutes a disclosure of some actionable misstatement or omission.  Plaintiffs do not contend, for example, that the announcement of Mr. McLure's retirement had not been disclosed sufficiently promptly.

**B.      Even If Plaintiffs Had Alleged Loss Causation as to the Remaining Allegations, the Vast Majority of the Supposedly False or Misleading Statements They Identify Are Not Actionable.**

Even if plaintiffs had sufficiently alleged loss causation as to the statements in the Complaint other than the Preliminary Earnings Prediction (which is protected under the PSLRA's safe harbor), the vast majority of these allegedly false or misleading statements are not actionable under the securities laws.  In particular, the law is clear that plaintiffs cannot survive a motion to dismiss by alleging that defendants needed to disclose contract losses before they happened or by characterizing generalized optimistic statements about its business—classic inactionable puffery—as alleged misstatements.

**1.      Plaintiffs' theory that Defendants failed to disclose *potential* contract losses fails as a matter of law.**

The Complaint is replete with allegations that Defendants failed to disclose contract losses that had not yet occurred.  For instance, plaintiffs allege that Mr. Ryan's statements on a February 19, 2009 conference call "were materially false or misleading" because they "failed to disclose that CVS Caremark's 2010 business opportunities *were to be* offset by a number of substantial contract non-renewals, including Coventry, Chrysler, and New Jersey."  (Compl. ¶ 128 (emphasis added).)  Elsewhere in the Complaint, plaintiffs admit that CVS Caremark lost the Coventry contract in April 2009 (Compl. ¶ 141), the Chrysler contract in July 2009 (Compl. ¶ 163), and the New Jersey contract in August 2009 (Compl. ¶ 99).  *A fortiori*, it cannot be true that any Defendant, including Mr. Ryan, knew in February 2009 that these contracts were lost. At most, therefore, plaintiffs allege that Defendants *should have known* that contract losses were *likely* to occur.

27

There is no duty to disclose an outcome that is merely "likely," as opposed to "substantially certain."[18]   See, e.g., In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (no obligation to disclose potential litigation arising from purportedly improper activities that was not "substantially certain to occur"), aff'd sub nom. Albert Fadem Trust v. Citigroup, Inc., 165 F. App'x 928, 2006 WL 276611 (2d Cir. 2006); In re Ford Motor Co. Sec. Litig., 184 F. Supp. 2d 626, 633 (E.D. Mich. 2001) (nondisclosure of mass recall not actionable because "[c]ompanies are under no duty to disclose predictions that are not substantially certain to hold"), aff'd, 381 F.3d 563 (6th Cir. 2004); see also In re Boston Scientific Corp. Sec. Litig., Civil Action No. 05-11934-DPW, 2010 WL 1704043, at *15 (D. Mass. Apr. 27, 2010) ("[A] company need not reveal every piece of information.") (citation omitted).

The logic of this rule is clear.  If companies were required to disclose to investors the vicissitudes of contract negotiations, the market would be flooded with contingent, hypothetical information.  The ensuing information overload "could easily result in misleading the public more than not reporting."  In re Medimmune, Inc., Sec. Litig., 873 F. Supp. 953, 966 (D. Md. 1995).  Moreover, disclosure of ongoing contract negotiations would imperil the negotiations and diminish any competitive advantage the company may have had, which would redound directly to the detriment of shareholders.

---

[18] This rule holds true even when a potential outcome is fundamental to a company's existence.  See, e.g., Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992) (upholding dismissal of securities fraud suit because there was no duty to disclose a potential merger before the agreement was finalized); Chien v. Skystar Bio Pharm. Co., 566 F. Supp. 2d 108, 116 (D. Conn. 2008) (granting motion to dismiss because defendant "was under no duty to disclose the pendency of merger talks . . . until . . . an agreement was finally reached").

2.    **Generalized statements regarding the Company's strategic business model, sales outlook, and "success" of the merger are inactionable corporate puffery.**

Although the Complaint is vague as to precisely which of Defendants' statements are alleged to be fraudulent,[19] plaintiffs appear to focus on optimistic statements regarding CVS Caremark's (i) post-merger business model and strategy,[20] (ii) Maintenance Choice product,[21] and (iii) 2010 PBM sales outlook.[22]  It is well settled that such "vague, or loosely optimistic

---

[19] Plaintiffs make virtually no effort to identify which allegations in the Complaint are responsive to which supposed misstatements or omissions.  Instead, plaintiffs merely reproduce lengthy block quotes and repeat the same generalized allegations.

[20] See, e.g.:

- Compl. ¶ 113 ("I would say our model is working.")
- Compl. ¶ 125 ("So for anyone wondering if our offerings are resonating they certainly are.")
- Compl. ¶ 133 ("We believe the breadth of capabilities resulting from the Caremark Merger are resonating with our clients and contributed to our success at renewing existing clients and obtaining a significant number of new clients in the 2008 selling season.")
- Compl. ¶ 135 ("A major focus of the investment community over the past few months has been whether our model is resonating in the PBM marketplace. I think if you look at this slide, the answer has to be a resounding yes.")
- Compl. ¶ 150 ("But I do have confidence at least within the organization here that we have enough activity and enough excitement and, again, enough talk in the marketplace that this model really is going to make a difference going forward.")
- Compl. ¶ 159 ("The fact that both clients and their members love our integrated proactive pharmacy care offerings, gives me great confidence going forward.").

[21] See, e.g.:

- Compl. ¶ 136 ("Maintenance Choice should help us win new PBM contracts, drive higher client satisfaction and retention, shift non-CVS scripts to our CVS Caremark 90-day scripts, and increase our share of acute scripts at retail.")
- Compl. ¶ 142 ("[W]e're really pleased with the strong adoption of our groundbreaking Maintenance Choice offering.")

[22] See, e.g.:

- Compl. ¶ 112 ("Even in these difficult and uncertain times . . . our PBM continues to retain existing clients and attract new ones.")
- Compl. ¶ 125 ("Following on the heels of the most successful selling season in the company's—in our company's history, our sales force again is looking forward to another good year.  While I won't talk about specifics this early in the season, we see significant new business opportunities in 2010. . . . And I can tell you from finalists meetings and what we're seeing early and what our sales team is pointing out, we feel pretty optimistic about the season.")
- Compl. ¶ 135 ("As we head into the 2010 selling season, our sales team is very optimistic about the opportunities that lie ahead.")

(…continued)

29

statements about a company" are inactionable "puffery" because, given their generalized and unverifiable nature, a reasonable investor would not rely on them.  Scritchfield v. Paolo, 274 F. Supp. 2d 163, 172 (D.R.I. 2003) (Smith, J.); cf. Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("[C]ompanies must be permitted to operate with a hopeful outlook" and are "not required to take a gloomy, fearful or defeatist view of the future.").

This Court has endorsed a "contextual approach to assessing the applicability of the puffery defense."  Scritchfield, 274 F. Supp. 2d at 175.  Applying the components of this Court's approach to the optimistic statements plaintiffs allege form the basis of Defendants' fraud, it is clear that the puffery defense applies in this case.

*First*, Defendants' allegedly fraudulent statements concerning the Company's business model and sales potential were "so vague, so general, [and] so loosely optimistic that a reasonable investor would find [them] unimportant to the total mix of information."  In re Number Nine Visual Tech. Corp. Sec. Litig., 51 F. Supp. 2d 1, 17 (D. Mass. 1999) (Young, J.). Judge Young's description in Number Nine of the defendant's puffing statement as a "subjective characterization that any reasonable investor would perceive as harmless and standard corporate

---

(continued…)

- Compl. ¶ 137 ("[W]e gained a significant amount of share in last year's selling season for implementation in '09.  And we plan to do the same this year toward 2010.")
- Compl. ¶ 140 ("[W]hen you think about renewals, where we are right now at this point in the season, we're essentially on plan, in good shape, and obviously we feel comfortable where we are with some of the new business going on.")
- Compl. ¶ 141 ("We see plenty of new business opportunities for 2010 and we're very pleased with the early results of the season.")
- Compl. ¶ 148 ("We are exactly where we need to be from a re-upping contract standpoint. So from the PBM side of our business, we're in good shape.")
- Compl. ¶ 149 ("And I would . . . score our chances as very good about closing more than our fair share of the business, with a lot of the opportunities really being around the new products that we're promoting, whether it be Maintenance Choice or the other types of programs that really differentiate our model.").

hyperbole" applies with equal force to the statements plaintiffs allege to be fraudulent here.[23]  51

F. Supp. 2d at 20.  For instance, plaintiffs claim that Defendants' positive statements about the

Company's post-Merger business strategy were actionable false or misleading statements.  (See,

e.g., Compl. ¶¶ 134, 154.)  Courts have repeatedly held that similar generalized statements are

not actionable.  See Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996)

(defendant's statement that "business strategies [would] lead to continued prosperity" constituted

puffery); In re Newell Rubbermaid Sec. Litig., No. 99 C 6853, 2000 WL 1705279 at *7 (N.D. Ill.

Nov. 14, 2000) (statements that merger "would create synergies, a 'stronger combined presence,'

'broader acquisition opportunities,' and a better ability to serve Europe" deemed puffery).

Evaluating statements analogous to the allegedly false or misleading statements listed

above, courts in the First Circuit have upheld the use of the puffery defense.  For instance, in

Simon v. Am. Power Conversion Corp., 945 F. Supp. 416, 428 (D.R.I. 1996), the court assessed

the defense against statements including "we are gaining market share, we are gaining

momentum, and our revenues are strong" and "1995 [is going] to be a busy year."  The court not

only held that such statements are not actionable; it noted that "the market could have expected

nothing less from a CEO, i.e. predictions of . . . improvements and a busy year."  Id. at 429.

*Second*, plaintiffs point to statements that do no more than "evince subjective beliefs or

opinions."  Scritchfield, 274 F. Supp. 2d at 174 (discussing In re Peritus Software Services, Inc.

Sec. Litig., 52 F. Supp. 2d 211 (D. Mass. 1999) (Young, J.)).  In granting motions to dismiss a

---

[23] The statement at issue in Number Nine was:

> The Company's product line addresses both mainstream and high-end segments of the PC video/graphics accelerator subsystem market. A broad product line not only allows the Company to serve as a single-source supplier for OEMs seeking to streamline the procurement of video/graphics solutions, but also facilitates the penetration of the retail channel by spanning a range of prices, beginning at $150 and extending to $2,000.

securities fraud suit, Judge Young determined that the phrases "unprecedented market demand" and "we . . . are extremely proud of our success and our focus on near and long term opportunities" were "mere corporate puffery." Peritus, 52 F. Supp. 2d at 220 (citing Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996) ("Courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace."), superseded on other grounds by statute, 15 U.S.C. § 78u-4(b)(1)-(2)).  Other courts have reached the same outcome with respect to similarly subjective statements.  Just months ago, the District of Massachusetts upheld a puffery defense with respect to the statement "I am extremely pleased with this record revenue performance, particularly in today's challenging environment." Kenney v. State St. Corp., Civil Action No. 09-CV-10750-PBS, 2010 WL 938333, at *9 (D. Mass. Mar. 15, 2010).

Many of Defendants' statements similarly expressed general, subjective pleasure at an element of the Company's performance.  (See, e.g., Compl. ¶ 141 ("We see plenty of new business opportunities for 2010 and we're very pleased with the early results of the season."); Compl. ¶ 142 ("[W]e're really pleased with the strong adoption of our groundbreaking Maintenance Choice offering.").)  Relatedly, Defendants' statements touting the success of the merger and the ability of the integrated model to generate business are no more than subjective, optimistic views on the Company's strategic position.[24]  See NPS, LLC v. Ambac Assurance

---

[24] Plaintiffs make a number of blanket allegations about the Company's integrated business model that amount to nothing more than hindsight critiques of the merger and of management decisions made after the merger.  (See, e.g., Compl. ¶ 5 ("In reality, CVS Caremark's integration was a failure.").)  "It is well-established in federal case law that a securities fraud complaint that . . . states nothing more than a claim of corporate mismanagement . . . is not actionable under federal securities law." Kafenbaum v. GTECH Holdings Corp., 217 F. Supp. 2d 238, 246 (D.R.I. 2002) (citing Haft v. Eastland Fin. Corp., 755 F. Supp. 1123, 1131 (D.R.I. 1991) ("failing to disclose possible mismanagement . . . does not state a federal securities law claim")); see also Santa Fe Indus. Inc. v. Green, 430 U.S. (…continued)

Corp., Civil Action No. 08-11281-DPW, 2010 WL 723786, at *7 (D. Mass. Feb. 25, 2010)

(holding that "general statements of opinion about the quality of services that [defendant] would

provide . . . are representations of opinion").

Third, none of the statements identified above purports to convey a "comparative

connotation." Scritchfield, 274 F. Supp. 2d at 175 (discussing In re Allaire Corp. Secs. Litig.,

224 F. Supp. 2d 319, 332 (D. Mass. 2002)).

Like plaintiffs' myriad allegations concerning contracts that had not yet been lost,

plaintiffs' repeated reproduction in the Complaint of Defendants' generally optimistic statements

about the PBM business cannot form the basis for a cognizable securities fraud cause of action.

## III. THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER AS TO ANY OF PLAINTIFFS' CLAIMS

Even if the Complaint could articulate an actionable misstatement or omission, it still

must be dismissed in its entirety because it does not allege with particularity facts that give rise

to a strong inference of scienter that is "cogent and at least as compelling as any opposing

inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd.,

551 U.S. 308, 314 (2007). In assessing claims of scienter, a court must weigh "not only

inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the

facts alleged." Id.; In re Biogen IDEC, Inc. Sec. Litig., Civil Action No. 05-10400-WGY, 2008

WL 4810045, at *5 (D. Mass. Oct. 25, 2009).

While the First Circuit has rejected any "rigid formula" for pleading scienter, In re

Cabletron Sys., Inc., 311 F.3d 11, 38 (1st Cir. 2002), plaintiffs must show that defendants acted

---

(continued…)

462, 479 (1977) ("By enacting § 10(b), Congress "did not seek to regulate transactions which constitute no more than internal corporate mismanagement.").

with "either conscious intent to defraud or 'a high degree of recklessness.'" ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008). The definition of recklessness is decidedly strict and "comes closer to being a lesser form of intent than merely a greater degree of ordinary negligence." Greebel v. FTP Software, Inc., 194 F.3d 185, 199 (1st Cir. 1999); see id. at 198 (adopting a definition of recklessness "involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care"). The Complaint's indirect, circumstantial allegations—taken either separately or together—fail to raise the strong inference of scienter necessary to support a claim for securities fraud.

A.     **Plaintiffs' Allegations Regarding Insider Stock Sales Fail To Give Rise to a Strong Inference of Scienter.**

The Complaint alleges that Messrs. Rickard, McLure, and Ryan made stock sales during the alleged class period that were "suspicious." (Compl. ¶ 109.) Even if the Individual Defendants' trades were suspicious—which they are not—allegations of insider trading do not, in and of themselves, establish scienter. Miss. Pub. Employees Ret. Sys. v. Boston Sci. Corp., 523 F.3d 75, 92 (1st Cir. 2008); Greebel, 194 F.3d at 197. In any event, plaintiffs fail to show that Defendants' trades were unusual and made in either suspicious amounts or at suspicious times; in fact, the circumstances of Defendants' trades preclude any inference of scienter at all.

1.     **Messrs. Rickard and McLure traded pursuant to 10b5-1 plans, which negate the inference of scienter.**

As plaintiffs acknowledge, Mr. Rickard's and Mr. McLure's trades during the alleged class period were all made pursuant to 10b5-1 trading plans. (Compl. ¶ 205.) A 10b5-1 trading plan is a contract between a company executive and a broker that contains detailed instructions to sell specified amounts of securities on particular dates or at specified prices. See 17 C.F.R. § 240.10b5-1(c)(1)(i)(A); see also City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc., 686 F. Supp. 2d 404, 425 (D. Del. 2009) ("Defendants made sales at regular monthly intervals as

specified by their Rule 10b5-1 plans.  Accordingly, the sales do not marginally increase the

likelihood that defendants make knowingly false or misleading statements out of a desire for

personal financial gain.") (internal quotations omitted).  Mr. Rickard's 10b5-1 trading plan,

entered into on March 19, 2009, contemplated two trades:  the exercise of 251,250 stock options

on August 17, 2009, followed by the exercise of 80,000 stock options on December 14, 2009.

(Ex. 9, Rickard 10b5-1 Trading Plan at 2.)  As the plan lays out, these options were "[s]ubject to

[t]rading [w]indows" and the first possible trade date under the Plan was August 17, 2009.  (Id.

at 1.)  Mr. McLure's trading plan, entered into on June 19, 2009, set up the exercise of 600,000

stock options in increments of 100,000 per month to be exercised on the first available trading

day of each month.  (Ex. 10, McLure 10b5-1 Trading Plan at Exhibit B.)  The fact of a 10b5-1

plan alone "rebuts an inference of scienter and supports the reasonable inference that stock sales

were pre-scheduled and not suspicious."[25]  Stiegele ex. rel. Viisage Tech. v. Bailey, No. 05-

10677-MLW, 2007 WL 4197496, at *13 (D. Mass. Aug. 23, 2007).  Moreover, additional

contextual information further undermines any inference of scienter based on the stock sales.

    **Rickard.**  Mr. Rickard announced in February 2009 that he would be retiring from CVS

Caremark at the end of the year.  (See Ex. 5, transcript of the CVS Caremark fourth-quarter 2008

earnings conference call at 6.)  Under well-established law, this fact negates plaintiffs' allegation

that his stock sales were suspicious.  It "is not unusual for individuals leaving a company . . . to

sell shares."  Greebel, 194 F.3d at 206 (pointing out that retiring individuals often have a limited

period of time to exercise stock options); Wietschner v. Monterey Pasta Co. 294 F. Supp. 2d

1102, 1116 (N.D. Cal. 2003) (finding stock sales failed to establish scienter given defendant's

---

[25] Contrary to plaintiffs' conclusory assertions, the fact that Mr. Rickard and Mr. McLure entered into these trading plans during the alleged class period is not, in and of itself, suspicious.  In re Int'l Rectifier Corp. Sec. Litig., No. CV 07-02544-JFW (VBKx), 2008 WL 4555794, at *19 (C.D. Cal. May 23, 2008).

pending retirement).  Moreover, Mr. Rickard's 10b5-1 plan included two trades, one of which took place *after* plaintiffs' alleged November 5 disclosure date and, therefore, after the alleged class period.  It defies common sense that Mr. Rickard would have waited until *after* the alleged fraud was disclosed to sell Company shares.  In any event, Mr. Rickard's sales constituted only 22% of his holdings (with only 17% sold during the alleged class period), further negating any inference of scienter.  See Wietschner, 294 F. Supp. 2d at 1116-17 (trading not suspicious where defendant sold 37% of his holdings, including sales outside of the class period, in connection with planned retirement).

*McLure*.  Allegations pertaining to Mr. McLure's trading are wholly irrelevant because plaintiffs have not alleged that McLure made a single false or misleading statement.[26]  New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 56 (1st Cir. 2008) (finding allegations of insider trading insufficient to establish scienter where the insider "made none of the statements alleged to be misleading, and there is no specific allegation that [he] was any more knowledgeable than any of the other individual defendants"); City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., CA No. 1:08-11889-JTL, 2010 WL 1221402, at *11 (D. Mass. Mar. 25, 2010) (disregarding allegations with respect to seven alleged insiders

---

[26] The First Circuit recognizes "a very limited version of the group pleading doctrine for securities fraud."  Cabletron, 311 F.3d at 40 (acknowledging "great debate" as to whether the doctrine survives the enactment of the PSLRA, but declining to decide either way).  Even if the doctrine survives, only "group-published documents such as annual reports filed with the … SEC" fall under its scope.  See Rosen v. Textron, Inc., 321 F. Supp. 2d 308, 328 n. 14 (D.R.I. 2004).  All but two of the alleged misstatements were made during earnings calls, or other, similar presentations where the speaker is readily apparent; such statements are not "group-published" and therefore cannot be attributed to the other Defendants.  See Cabletron, 311 F.3d at 41 n. 16.  With respect to Mr. McLure, plaintiffs do not allege that he made a single misleading or omissive statement; as a result, the securities fraud claim against him cannot stand.  See Rosen, 321 F. Supp. 2d at 328 (dismissing claim against defendant where defendant never signed any SEC filings and plaintiffs did not attribute any actionable misstatements to him).

accused of selling stock because none were responsible for making any alleged misstatements to investors).[27]

### 2.   Mr. Ryan's single stock sale was not suspicious.

Plaintiffs have similarly failed to plead facts establishing that Mr. Ryan's single trade supports an inference of scienter.

*First*, while plaintiffs emphasize the absolute dollar value size of Mr. Ryan's sale (Compl. ¶¶ 107, 206), they ignore that Mr. Ryan sold only 5.4% of his total holdings[28]—an amount that, as a matter of law, does not support a strong inference of scienter.  See Acito v. Imcera Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) (noting that a sale of only 11% of holdings, absent other allegations, suggested that the trading was not unusual); In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (finding that "total sales amounting to a relatively low percentage of an insider's percentage of stock holdings militate against an inference of scienter" where defendants sold 22.5% and 4.9% of holdings); In re Glenayre Tech. Inc. Sec. Litig., No. 96 CIV. 8252(HB), 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998) (finding that a sale of only 5% of holdings did not raise an inference of scienter).

*Second*, plaintiffs fail to plead that Mr. Ryan's sale was inconsistent with his prior trading history, let alone "well beyond [his] normal patterns of trading."  Greebel, 194 F.3d at 198; see

---

[27] Even considering Mr. McLure's sales *arguendo*, plaintiffs do not plead facts that give rise to a strong inference of scienter.  Mr. McLure entered into his trading plan on June 19, 2009, and scheduled the sale of 600,000 shares (in increments of 100,000 on the first eligible trading day of each month beginning on July 19, 2009).  (See Ex. 10, McLure 10b5-1 Trading Plan at Exhibit B.)  Had Mr. McLure known of the contract losses plaintiffs allege Defendants concealed, it would have defied logic to schedule future sales at times he knew would likely follow the disclosure of those losses.

[28] Plaintiffs allege that Mr. Ryan sold "22% of his shares personally held during the Class Period, and over 7 percent of his total holdings, including vested options."  (Compl. ¶ 109.)  However, the Company's 2009 Definitive Proxy Statement, filed March 24, 2009 on SEC Schedule 14A, reflects that Mr. Ryan owned 7,398,279 shares.  The 400,000 shares that Mr. Ryan sold on August 7, 2009 constitute 5.4% of that total ownership.  (See Ex. 2, CVS Caremark 2009 Definitive Proxy Statement at 12.)

also id. at 198 n.11 (requiring that plaintiffs allege this information as it is "readily available" to them through public filings).[29]

### B. The Complaint's Remaining Allegations Fail To Allege That Defendants Acted with a High Degree of Recklessness.

Plaintiffs rely on a confusing and contradictory set of irrelevant allegations from confidential witnesses in an attempt to establish that the Defendants were reckless in not knowing that (1) certain contracts were lost before the Company disclosed these losses; (2) contracts were being lost due to pervasive service and integration issues; (3) the CMS Spread Regulation would lead to material losses in 2010; and (4) the Maintenance Choice offering was not driving renewals or gaining new contracts.  As explained in Sections II.A and II.B, supra, each of these allegations fails because plaintiffs have not pled loss causation or that the allegations are anything more than inactionable puffery.  In addition, none of these allegations adequately pleads scienter.[30]

#### 1. The statements in the Complaint attributed to confidential witnesses do not create a strong inference of scienter.

In evaluating statements by confidential sources, the court will consider the "level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia."  Cabletron, 311 F.3d at 29-30.

---

[29] In any event, even if Mr. Ryan's trade is deemed to be unusual—which it should not be—the unusual sales of only one defendant cannot give rise to a strong inference of scienter.  See N.J. Carpenters, 537 F.3d at 56.

[30] For the same reasons that plaintiffs fail to allege that Mr. Ryan gave his Preliminary Earnings Prediction with actual knowledge that it was false (see supra Section I.B), plaintiffs similarly fail to adequately allege that Mr. Ryan did so with the "high degree of recklessness" required to plead a strong inference of scienter.  See ACA Fin., 512 F.3d at 58.

Six of plaintiffs' thirteen confidential witnesses—CW1, CW2, CW8, CW11, CW12 and CW13—did not even work for the Company during the alleged class period.  (See Compl. ¶ 33.) And CW5 is alleged to have been employed at the Company only during the first month of the alleged class period (November 2008).  Id.  As both a practical matter and as a matter of law, none of these confidential witnesses could provide information, based on personal knowledge, that is probative of the Defendants' state of mind at the time of any of the allegedly false or misleading statements.  Plaintiffs in California Public Employees' Retirement System v. Chubb Corp. alleged, based on information provided by a former vice president of the company, that quarterly meetings were usually held two weeks after the close of each quarter during which certain executives were present and quarterly earnings were discussed.  394 F.3d 126, 154 (3d Cir. 2004).  The Third Circuit rejected plaintiffs' claims that there *must have been* a meeting two weeks after the end of the quarter in question and that defendants *must have known* about the quarterly earnings for that quarter, because the former vice president was not alleged to be employed at the time of these alleged events.  See id.; In re Rackable Sys., Inc. Sec. Litig., No. C 09-0222 CW, 2010 WL 199703, at *8 (N.D. Cal. Jan. 13, 2010) (finding it unlikely that four of the confidential witnesses had personal knowledge of defendants' relevant state of mind when none was employed at company during class period); Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 141 (D. Conn. 2007) (finding information collected from confidential witnesses—"although substantial in amount"—inadequate to support inference of scienter where "the bulk of the information relayed by the [confidential witnesses] relates to the time prior to the start of the Class Period"), aff'd, 312 F. App'x 400, 2009 WL 481897 (2d Cir. 2009).

Even those confidential witnesses alleged to be employed by the Company during the alleged class period do not offer any information probative of plaintiffs' claims.  For example,

CW10—allegedly employed as a Client Audit Analyst in the Scottsdale, Arizona office from 2007 to April 2009—offers irrelevant assertions regarding problems with the Company's billing process, yet does not appear to have worked on any of the contracts discussed in the Complaint and alleges nothing with respect to how any Defendant knew about such problems.  (Compl. ¶¶ 33, 92.)  Likewise, CW7—an Audit Department Team Leader from 1994 to March 2009—offers purported information about a computer system called "Reflections," yet fails to link anything produced through Reflections with contract losses or the knowledge of any Defendant. (Compl. ¶¶ 33, 78.)

No confidential witness relied on in the Complaint is alleged to have ever met any of the Individual Defendants.  They are also not alleged to have any knowledge of the forecasting process or how the Company put together its projected earnings for the quarterly earnings announcements and conference calls.  Moreover, only one of the confidential witnesses offers any specific dates on which a report was issued or a meeting took place (Compl.¶ 85), and this date falls *outside* of the alleged class period; the remainder of the confidential witnesses fail to offer any particular details regarding *when* information allegedly became known.  See N.J. Carpenters, 537 F.3d at 52-53 (dismissing information from confidential witnesses where several of the witnesses did not allege when certain facts became known).  Such defects render ineffective the allegations purportedly supported by confidential witness statements.  See Chubb Corp., 394 F.3d at 155 (noting that the "sheer volume of confidential sources cited cannot compensate for . . . inadequacies" including the lack of factual particularity).

2.      **Plaintiffs fail to identify any specific contract-related information that would have put Defendants on notice that their statements were false or misleading.**

Plaintiffs' generalized claims that Defendants should have known about contract losses from weekly Sales Pipeline Reports and monthly and quarterly meetings and phone calls (see,

40

e.g., Compl. ¶¶ 65, 68, 69) fail because the Complaint does not identify the specific information

that Defendants purportedly learned that would have put them on notice that their disclosures

were false or misleading.  See Isham v. Perini Corp., 665 F. Supp. 2d 28, 35-36 (D. Mass. 2009)

(identifying as too vague and "routinely" dismissed allegations that defendants had access to

corporate documents and that they attended regular management meetings); In re Elan Corp. Sec.

Litig., 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (allegations "far too vague with respect to what

information was actually communicated and what conclusions any defendant actually reached").

Moreover, plaintiffs offer no statistical or other factual support for their conclusory allegation

that contracts designated "at risk" in Sales Pipeline Reports were substantially likely to be lost

during the next selling season.  (Compl. ¶ 65.)

Plaintiffs' allegations with respect to specific contracts fare no better.  Plaintiffs make

contradictory allegations regarding when the Defendants purportedly became aware that the

Company was going to lose the Coventry contract.  (See Compl. ¶ 76 (July 2008); Compl. ¶ 79

(August or September of 2008); Compl. ¶ 83 (October 2008).)  Rather than supporting an

inference of scienter, these competing allegations support the inference that the Company did *not*

know that it would lose the Coventry contract prior to Coventry's decision.  With respect to the

New Jersey contract, plaintiffs concede that Defendants did not know that it had been lost until

August 5, 2009—a day *after* Mr. Ryan's August statement regarding 2010 Earnings.  (Compl.

¶¶ 90, 203.)  Finally, with respect to the Chrysler contract, plaintiffs offer only the conclusory

and legally irrelevant allegation that, by mid-2008, Defendants knew that Chrysler was *at risk for*

*loss*.[31]  (See Compl. ¶ 94.)

---

[31] Plaintiffs' allegations with respect to Chrysler are further undermined by the fact that the Company actually *retained* the Chrysler business with respect to the lives that Chrysler continued to control.  See infra, Section III.B.2.

Moreover, plaintiffs' theory of scienter as to the contract losses defies economic reason. It is illogical that the Company, knowing it had already lost certain contracts, would devote time and money to winning those contracts.  See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 203 (2d Cir. 2009) (holding that, where "[p]laintiffs' view of the facts defied economic reason," the facts do "not yield a reasonable inference of fraudulent intent") (quoting Atl. Gypsum Co. v. Lloyds Int'l Corp., 753 F. Supp. 505, 514 (S.D.N.Y. 1990)).  But plaintiffs allege that, despite knowing that the New Jersey contract was as good as lost, CVS Caremark added additional staffing to its customer service base for New Jersey.  (See Compl. ¶ 86.)  Similarly, plaintiffs' scienter allegations are undermined because the Complaint contains no explanation of why Defendants would conceal information about contract losses that they knew would soon be revealed to the market.  See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994) (defendants are assumed to be acting in their own informed economic interest and it is "hard to see what benefits accrue from a short respite from an inevitable day of reckoning").  Rather than raising a strong inference that Defendants knew these contracts were lost, such facts indicate that the Company believed just the opposite.

> **3.     Plaintiffs fail to plead facts supporting their assertion that Defendants knew that customer service problems were causing contract losses.**

Plaintiffs fail to plead facts that support their assertion that Defendants knew that pervasive customer service problems were causing contract losses.[32]  First, as explained above,

---

[32] Plaintiffs also attempt, but fail, to plead scienter based on allegations that Defendants perpetrated a fraudulent scheme in order to conceal that the merger had failed.  Such "catch-all" allegations of motive and opportunity alone are not sufficient to establish a strong inference of scienter.  Rosen, 321 F. Supp. 2d at 322. Indeed, the desire to sustain an appearance of profitability has been "consistently rejected" as an insufficient motive. Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 196-97 (2d Cir. 2008); cf. Cabletron, 311 F.3d at 39 (finding that scienter had been adequately pled where the plaintiffs alleged "more than the usual concern by executives to improve financial results").  Rather, plaintiffs must allege that Defendants sought to (…continued)

on the November Call on which plaintiffs allege "the truth was finally revealed" Defendant Ryan mentioned service only in connection with the Coventry contract.  (See Ex. 7, Nov. 5 Tr. at 9.) Second, plaintiffs plead facts directly contradicting an inference that defendants were aware of pervasive service issues, including (1) that, in 2009, J.D. Power and Associates recognized the Company for excellence in customer service for the *third* time (Compl. ¶¶ 120, 125) and (2) that the Company's retention rate for the 2010 selling season was 92%.  (Compl. ¶ 191; see also Ex. 7, Nov. 5 Tr. at 4 (stating that Company also gained 125 *new* clients during 2009).)  Third, plaintiffs conspicuously fail to acknowledge that the Company retained its Chrysler business with respect to active employees and non-union retirees.  (Ex. 6, Aug. 4 Tr. at 3.)  The Company lost only the Chrysler unionized retirees whose coverage was spun off into a voluntary employee benefit association ("VEBA") operated independently by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW").  (See Compl. ¶ 163.)  Therefore, plaintiffs' claim that the Company "lost the Chrysler contract due to long-running service-related and transparency issues" (Compl. ¶ 173) does not hold water; Chrysler would not have renewed its contract for the lives it controlled if it had been dissatisfied with the Company's customer service.  Plaintiffs' efforts to create the appearance that pervasive service problems at the Company were driving customers away are unavailing and fail to plead any facts sufficient to raise a strong inference of scienter.

---

(continued…)

obtain a specific benefit from the alleged fraud that would not be "either generalized to all corporate directors or beneficial to all shareholders."  Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001); In re Stone & Webster, Inc. Sec. Litig., 253 F. Supp. 2d 102, 129 (D. Mass. 2003) (defendants must have "benefitted in some concrete personal way from the purported fraud").

### 4.     Plaintiffs' allegations regarding the CMS Spread Regulation fail to plead a strong inference of scienter.

Plaintiffs' scienter allegations in connection with the CMS Spread Regulation fail "because [CVS Caremark] disclosed that which the Complaint alleges it concealed." In re First Marblehead Corp. Sec. Litig., 639 F. Supp. 2d 145, 163 (D. Mass. 2009) (finding that, because defendants had disclosed the facts and underlying risks that plaintiffs complain were concealed, such disclosures "negate any inference of scienter"). First, Defendants did *not* conceal the impact of the CMS Spread Regulation. In the Second-Quarter 2009 10-Q, which the Company filed *three months before* the alleged corrective disclosure, the Company announced that the CMS Spread Regulation would "reduce the profitability of our Medicare Part D business beginning in 2010." (Ex. 3, Second-Quarter 2009 10-Q at 24.) Moreover, Plaintiffs' claim that Defendants knew the CMS Spread Regulation would lead to material losses in 2010 but "failed to warn investors, [and] instead falsely classified the change as a mere 'headwind'" (Compl. ¶ 110) takes the "headwind" statement entirely out of context. At the May 15, 2009 investor meeting at which the Company disclosed the regulatory change, Mr. Rickard expressly stated that the full impact was still "unknown." (Ex. 8, transcript of CVS Caremark's May 15, 2009 annual analyst/investor meeting at 38 ("*[w]hile the full details of this change are still unknown, the net impact will be a headwind*") (emphasis added).)[33] In no way does Mr. Rickard's statement—or any other statements by Defendants—support a strong inference that they knew of, but concealed, the precise impact that the CMS Spread Regulation would have on the Company's bottom line.

---

[33] Mr. Rickard's use of the word "headwind" was not meant to describe the *degree* of impact that this change would have, but merely to denote, among other disclosures, whether this would be a positive impact ("tailwind") or a negative impact ("headwind").

5.      **Plaintiffs' allegations regarding Maintenance Choice fail to plead a strong inference of scienter.**

Plaintiffs allege that the Maintenance Choice offering was not driving renewals or gaining new contracts.  (Compl. ¶ 111.)  However, the Complaint fails to provide a single factual allegation in support of that claim, let alone facts showing that Defendants had any knowledge of the alleged issues with Maintenance Choice.

## IV.   PLAINTIFFS DO NOT STATE A CLAIM FOR CONTROL PERSON LIABILITY

Plaintiffs have failed to allege a primary violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Accordingly, as a matter of law, plaintiffs cannot recover from the Individual Defendants under Section 20(a) of the Exchange Act.  See, e.g., Greebel v. FTP Software, Inc., 194 F.3d 185, 207 (1st Cir. 1999) ("Because plaintiffs' complaint does not adequately allege an underlying violation of the securities laws, the district court was correct to dismiss the Section 20(a) claim.") (citing Suna v. Bailey Corp., 107 F.3d 64, 72 (1st Cir. 1997)).  Therefore, plaintiffs' Section 20(a) "control person" claim must be dismissed as to each of the Individual Defendants.[34]

---

[34] Because plaintiffs do not allege that Mr. McLure made a single false or misleading statement, Mr. McLure could only be found liable under a control person theory.  However, the Complaint contains no individualized allegations as to Mr. McLure's purported control of the Company.  The § 20(a) claims against him must therefore be dismissed for this additional reason.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Complaint be

dismissed for failure to state a claim.

Dated:   Providence, Rhode Island
         July 2, 2010

By:   /s/ William R. Grimm
      William R. Grimm #1938
      HINCKLEY, ALLEN & SNYDER LLP
      50 Kennedy Plaza, Suite 1500
      Providence, Rhode Island  02903
      Tel.    (401) 274-2000
      Fax.    (401) 277-9600
      Email.  wgrimm@haslaw.com

      DAVIS POLK & WARDWELL LLP
      Lawrence Portnoy *(pro hac vice)*
      Edmund Polubinski III *(pro hac vice)*
      Jessica K. Foschi *(pro hac vice)*
      450 Lexington Avenue
      New York, New York  10017
      Tel.    (212) 450-4000
      Fax.    (212) 701-5800
      Email.  Lawrence.Portnoy@davispolk.com
              Edmund.Polubinski@davispolk.com
              Jessica.Foschi@davispolk.com

      *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2010, a copy of the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

 /s/ Mitchell R. Edwards
Mitchell R. Edwards #6942
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI  02903
401-274-2000
401-277-9600 (fax)
medwards@haslaw.com