UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RICHARD MEDOFF, Individually and On Behalf Of All Others Similarly Situated, | ) ) ) | No. 1:09-cv-00554-S-DLM |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS THE CORRECTED |
| CVS CAREMARK CORPORATION, et al., | ) ) | CONSOLIDATED CLASS ACTION COMPLAINT |
| Defendants. | ) ) ) | |

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................................1

II.  STATEMENT OF FACTS ....................................................................................3

    A.   Background ................................................................................................3

    B.   Concerns Over Integration and Service ....................................................4

    C.   Post-Merger, Defendants Assure Investors Regarding Integration .........4

    D.   In Reality, Defendants Knew the Integration Was a Failure ...................5

        1.   Coventry................................................................................................8

        2.   New Jersey ............................................................................................9

        3.   Chrysler................................................................................................10

    E.   While Continuing to Conceal the Truth Concerning the Contract Losses, Defendants Reaped a Substantial Reward Through Insider Sales .........11

    F.   The Truth Is Revealed..............................................................................12

    G.   Defendants' Post-Class Period Affirmations ..........................................13

III. ARGUMENT ......................................................................................................14

    A.   Standards on a Motion to Dismiss ..........................................................14

    B.   The Complaint Alleges Actionable Misrepresentations and Omissions...............15

        1.   Defendants' Statements are Not Puffery.....................................................16

        2.   Defendants Violated Their Duty to Disclose Accurate and Complete Information Regarding CVS Caremark's Service and Integration Issues that Resulted in Contract Losses ...................................20

        3.   Defendants' Statements Are Not Protected by the PSLRA's Safe Harbor ...................................................................................................24

    C.   The Complaint's Detailed Allegations Give Rise to a Strong Inference of Scienter ...................................................................................................29

        1.   Defendants Had Knowledge of Serious Service and Integration Problems Affecting CVS Caremark's PBM Business that Contradicted Their Public Statements .......................................................31

2.      Defendants Had Direct Knowledge of Contract Terminations
        Months Before They Were Disclosed ........................................................35

        a.      Coventry ........................................................................36

        b.      New Jersey ....................................................................38

        c.      Chrysler ........................................................................38

3.      Defendants' Positions at CVS Caremark and Their Intimate
        Involvement with the PBM Business Support a Showing of
        Scienter ...............................................................................................40

4.      Confidential Witnesses Corroborate Allegations Concerning
        Defendants' Scienter ..........................................................................43

5.      Defendants' Suspicious Insider Trading Creates a Strong Inference
        of Scienter ...........................................................................................46

D.      Plaintiffs Have Sufficiently Alleged Claims Against McLure .............................52

E.      Plaintiffs Have Sufficiently Pled Loss Causation ...................................................55

F.      The Complaint Alleges Control Person Liability Under Section 20(a) of
        the Exchange Act ...........................................................................................63

# TABLE OF AUTHORITIES

**Page**

CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46, 65 (1st Cir. 2008)....................................................................28, 29, 30

*Akerman v. Arotech Corp.*,
608 F. Supp. 2d 372 (E.D.N.Y. 2009) ...................................................................33

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72, 82 (1st Cir. 2002).........................................................................29, 31

*Ark. Pub. Emp. Ret. Sys. v. GT Solar Int'l, Inc.*,
No. 08-CV-312-JL, 2009 U.S. Dist. LEXIS 93820
(D.N.H. Oct. 7, 2009) ...........................................................................................18

*Ashcroft v. Iqbal*,
__ U.S. __, 129 S. Ct. 1937 (2009).......................................................................15

*Beach v. Healthways, Inc.*,
No. 3:08-0569, 2009 U.S. Dist. LEXIS 17809
(M.D. Tenn. Mar. 9, 2009).....................................................................................18

*Bean v. Gen. Elec. Co.*,
593 F. Supp. 2d 306, 309 (D. Mass. 2009) ...........................................................15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 555 (2007)..........................................................................14, 15, 40

*Brumbaugh v. Wave Systems*,
416 F. Supp. 2d 239, 250 (D. Mass. 2006) .................................................. *passim*

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004).................................................................................45

*Callahan v. Harvest Bd. Int'l, Inc.*,
138 F. Supp. 2d 147 (D. Mass. 2001) ...................................................................60

*Catogas v. Cyberonics, Inc.*,
292 Fed. Appx. 311 (5th Cir. 2008)......................................................................61

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*,
497 F.3d 546 (5th Cir. 2007) ................................................................................51

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
686 F. Supp. 2d 404 (D. Del. 2009)......................................................................51

**Page**

*Cornwell v. Credit Suisse Group,*
No. 08 Civ. 3758 (VM), slip op. (S.D.N.Y. Feb. 11, 2010) ...................................................45

*Crowell v. Ionics, Inc.,*
343 F. Supp. 2d 1, 19 (D. Mass. 2004) ...................................................................................40

*Dura Pharms. Inc. v. Broudo,*
544 U.S. 336 (2005) ........................................................................................................ *passim*

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,*
551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) .............................................................................27

*Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*
343 F.3d 189 (2d Cir. 2003) .............................................................................................56, 59

*Ernst & Ernst v. Hochfelder,*
425 U.S. 185, 193 n.12 (1976) ................................................................................................29

*Fitzer v. Sec. Dynamics,*
119 F. Supp. 2d 12, 25 (D. Mass. 2000) .................................................................................48

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.,*
270 F.3d 645 (8th Cir. 2001) ..................................................................................................31

*Freeland v. Iridium World Commc'ns, Ltd.,*
545 F. Supp. 2d 59 (D.D.C. 2008) ..........................................................................................55

*Freudenberg v. E*Trade Fin. Corp.,*
No. 07 Civ. 8538, 2010 U.S. Dist. LEXIS 46053
(S.D.N.Y. May 11, 2010) ..................................................................................50, 56, 59, 62

*Ganino v. Citizens Utils. Co.,*
228 F.3d 154 (2d Cir. 2000) ....................................................................................................60

*Geffon v. Micrion Corp.,*
249 F.3d 29, 37 (1st Cir. 2001) .........................................................................................29, 34

*Glassman v. Computervision Corp.,*
90 F.3d 617 (1st Cir. 1996) .....................................................................................................39

*Goldman v. Belden,*
754 F.2d 1059, 1071 (2d Cir. 1985) ........................................................................................49

*Greebel v. FTP Software, Inc.,*
194 F.3d 185, 198 (1st Cir. 1999) .................................................................................29, 34, 49

**Page**

*Hall v. The Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008)........................................................42

*Hunt v. Enzo Biochem Corp.*
530 F. Supp. 2d 580, 594 (S.D.N.Y. 2008)................................................56

*In re Able Labs. Sec. Litig.*,
No. 05-2681 (JAG), 2008 U.S. Dist. LEXIS 23538
(D.N.J. Mar. 24, 2008).................................................................51, 54

*In re Allaire Corp. Secs. Litig.*, 224 F. Supp. 2d 319, 337
(D. Mass. 2002)................................................................18, 22, 53

*In re Allied Prods. Corp., Inc. Sec. Litig.*,
No. 99 C 3597 (HDL), 2000 U.S. Dist. LEXIS 16781
(N.D. Ill. Nov. 15, 2000)..................................................................42

*In re Ames Dep't. Stores Inc. Stock Litig.*,
991 F.2d 953, 959 (2d Cir. 1993)........................................................19

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ............................................................60

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)....................................................32

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
No. 07-CV-61542, slip op. (S.D. Fla. Aug. 18, 2010) ............................62

*In re Biogen Idec, Inc. Sec. Litig.*,
No. 05-10400-WGY, 2007 U.S. Dist. LEXIS 98076
(D. Mass. Oct. 25, 2007)...............................................................28, 51

*In re Boston Scientific Corp. Sec. Litig.*,
604 F. Supp. 2d 275 (D. Mass. 2009) ......................................... *passim*

*In re Bristol-Meyers Squibb Sec. Litig.*,
No. 00-1990 (SRC), 2005 U.S. Dist. LEXIS 18448
(D.N.J. Aug. 17, 2005)....................................................................56

*In re Bristol-Myers Squibb Co. Securities Litigation*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008)................................................54, 55

*In re Brooks Automation Inc. Sec. Litig.*,
No. 06-11068-RWZ, 2007 U.S. Dist. LEXIS 88045
(D. Mass. Nov. 6, 2007)..................................................................55

**Page**

*In re Cabletron Sys.*,
 311 F.3d 11, 38 (1st Cir. 2002) .................................................................... *passim*

*In re Cardinal Health, Inc. Sec. Litig.*,
 426 F. Supp. 2d 688 (S.D. Ohio 2006) ................................................................52

*In re Countrywide Fin. Corp. Derivative Litig.*,
 554 F. Supp. 2d 1044 (C.D. Cal. 2008) ..............................................................46

*In re Credit Suisse-AOL Sec. Litig.*,
 465 F. Supp. 2d 34 (D. Mass. 2006) .......................................................56, 59, 62

*In re Donald J. Trump Casino Sec. Litig.*,
 7 F.3d 357 (3d Cir. 1993) ...................................................................................26

*In re Gilead Scis. Sec. Litig.*,
 536 F.3d 1049 (9th Cir. 2008) .............................................................................59

*In re Global Crossing, Ltd. Sec. Litig.*,
 313 F. Supp. 2d 189 (S.D.N.Y. 2003) .................................................................60

*In re Gtech Holdings Corp. Sec. Litig.*,
 No. 94-0294P, 1995 U.S. Dist. LEXIS 22078
 (D.R.I. Feb. 3, 1995) ..........................................................................................64

*In re Hi/fn, Inc. Sec. Litig.*,
 No. C 99-4531 SI, 2000 U.S. Dist. LEXIS 11631
 (N.D. Cal. Aug. 9, 2000) .....................................................................................19

*In re Ibis Technology Securities Litigation*,
 422 F. Supp. 2d 294 (D. Mass. 2006) ..................................................................28

*In re IBM Corp. Sec. Litig.*,
 163 F.3d 102, 107 (2d Cir. 1998) ........................................................................29

*In re Immucor Inc. Sec. Litig.*,
 No. 05-2276, 2006 U.S. Dist. LEXIS 72335
 (N.D. Ga. Oct. 4, 2006) .......................................................................................50

*In re Int'l Rectifier Corp. Sec. Litig.*,
 No. CV 07-02544-JFW (VBKx), 2008 U.S. Dist. LEXIS 44872
 (C.D. Cal. May 23, 2008) ....................................................................................51

*In re Micron Tech., Inc. Sec. Litig.*,
 No. 06-CV-85-S-BLW, 2009 U.S. Dist. LEXIS 13793
 (D. Idaho Feb. 23, 2009) .....................................................................................54

**Page**

*In re MobileMedia Sec. Litig.*,
  28 F. Supp. 2d 901, 924-928 (D.N.J. 1998)............................................................................18

*In re Motorola Sec. Litig.*,
  505 F. Supp. 2d 501 (N.D. Ill. 2007) ....................................................................................56

*In re Nash Finch Co. Secs. Litig.*,
  502 F. Supp. 2d 861, 880 (D. Minn. 2007)............................................................................18

*In re NetSolve, Inc.*,
  185 F. Supp. 2d 684, 694 (W.D. Tex. 2001)..........................................................................18

*In re Nortel Networks Corp. Sec. Litig.*,
  238 F. Supp. 2d 613, 627 (S.D.N.Y. 2003)............................................................................29

*In re Novagold Res. Inc. Sec. Litig.*,
  629 F. Supp. 2d 272 (S.D.N.Y. 2009)....................................................................................23

*In re Oxford Health Plans Sec. Litig.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ....................................................................................47, 48

*In re Parametric Technology Corp. Securities Litigation*,
  300 F. Supp. 2d 206 (D. Mass. 2001) ....................................................................................28

*In re Parmalat Sec. Litig.*,
  375 F. Supp. 2d 278 (S.D.N.Y. 2005)..............................................................................56, 62

*In re PerkinElmer, Inc. Sec. Litig.*,
  286 F. Supp. 2d 46, 54-55 (D. Mass. 2003)...........................................................................40

*In re Quintell Entm't Inc. Sec. Litig.*,
  72 F. Supp. 2d 283 (S.D.N.Y. 1999)......................................................................................23

*In re Rackable Sys.*,
  No. C 09-0222 CW, 2010 U.S. Dist. LEXIS 2663
  (N.D. Cal. Jan. 13, 2010) ......................................................................................................45

*In re Regeneron Pharms., Inc. Sec. Litig.*,
  No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350
  (S.D.N.Y. Feb. 3, 2005)........................................................................................................27

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001).....................................................................................................45

*In re Sepracor, Inc. Sec. Litig.*,
  308 F. Supp. 2d 20, 34 (D. Mass. 2004) .........................................................................25, 26

**Page**

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
  604 F. Supp. 2d 332, 342 (D. Mass. 2009) ....................................................... *passim*

*In re StockerYale Secs. Litig.*,
  453 F. Supp. 2d 345 (D.N.H. 2006)..................................................................................40

*In re Stone & Webster, Inc. Sec. Litig.*,
  414 F.3d 187, 213 (1st Cir. 2005)......................................................24, 25, 36, 63

*In re Sun Healthcare Group, Inc. Securities Litigation*,
  181 F. Supp. 2d 1283 (D.N.M. 2002) ..............................................................................28

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)..............................................................................56

*In re Xethanol Corp. Sec. Litig.*,
  No. 06 Civ. 10234 (HB), 2007 U.S. Dist. LEXIS 65935
  (S.D.N.Y. Sept. 7, 2007).............................................................................................46

*Inst. Investors Group v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)...........................................................................................45

*Isham v. Perini Corp.*,
  665 F. Supp. 2d 28, 40 (D. Mass. 2009) ..................................................................25

*Kafenbaum v. GTECH Holdings Corp.*,
  217 F. Supp. 2d 238 (D.R.I. 2002).......................................................21, 34, 40

*Kaplan v. Rose*,
  49 F.3d 1363, 1379-80 (9th Cir. 1994) ....................................................................49

*Lattanzio v. Deloitte & Touche LLP*,
  476 F. 3d 147 (2d Cir. 2007)........................................................................................23

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702, 709 (7th Cir. 2008) ............................................................................41

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007)....................................................................45

*Manavazian v. ATEC Group, Inc.*,
  160 F. Supp. 2d 468 (E.D.N.Y. 2001) ....................................................................22

*Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*,
  No. 08-6324 (PAM/AJB), 2010 U.S. Dist. LEXIS 10029
  (D. Minn. Feb. 3, 2010) ...............................................................................................44

**Page**

*Miss. Pub. Emps. Ret. Sys. v. Boston Scientific Corp.*,
  523 F.3d 75, 85 (1st Cir. 2008) ..................................................................... *passim*

*Morales-Tanon v. P.R. Elec. Power Auth.*,
  524 F.3d 15, 18 (1st Cir. 2008) ........................................................................... 14

*N.J. Carpenters Pension & Annuity Fund v. Biogen IDEC Inc.*,
  537 F.3d 35, 46 n.13 (1st Cir. 2008) ................................................................... 25

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
  *Am. West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ............................................................................... 22

*Novak v. Kasaks*,
  216 F.3d 300, 315 (2d Cir. 2000) ........................................................... 19, 31, 43

*Oscar Private Equity Inv. v. Allegiance Telecom, Inc.*,
  487 F.3d 261 (5th Cir. 2007) ......................................................................... 62, 63

*Roeder v. Alpha Indus., Inc.*,
  814 F.2d 22 (1st Cir. 1987) .................................................................................. 22

*Rombach v. Chang*,
  355 F.3d 164, 173 (2d Cir. 2004) ........................................................................ 27

*Rosen v. Textron, Inc.*,
  321 F. Supp. 2d 308, 318 n.7 (D.R.I. 2004) ........................................... 16, 29, 53

*Rosenbaum Capital LLC v. Boston Commc'ns Group, Inc.*,
  445 F. Supp. 2d 170, 176 (D. Mass. 2006) ......................................................... 20

*Schleicher v. Wendt*,
  No. 09-2154, 2010 U.S. App. LEXIS 17367
  (7th Cir. Aug. 20, 2010) ...................................................................................... 63

*Scritchfield v. Paolo*,
  274 F. Supp. 2d 163 (D.R.I. 2003) ............................................................. *passim*

*Sekuk Global Enters. v. KVH Indus.*,
  No. 04-306ML, 2005 U.S. Dist. LEXIS 16628
  (D.R.I. Aug. 11, 2005) ................................................................................... 20, 56

**Page**

*Serabian v. Amoskeag Bank Shares, Inc.*,
   24 F.3d 357 (1st Cir. 1994)......................................................................................39, 53

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194, 1225 (1st Cir. 1996)....................................................................................15

*Simon v. American Power Conversion Corp.*,
   945 F. Supp. 416 (D.R.I. 1996)..........................................................................................17

*Sloman v. Presstek, Inc.*,
   No. 06-cv-377-JD, 2007 U.S. Dist. LEXIS 69475
   (D.N.H. Sept. 18, 2007) ................................................................................25, 39, 55

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
   365 F.3d 353, 379-80 (5th Cir. 2004) .................................................................................48

*Stevelman v. Alias Research Inc.*,
   174 F.3d 79 (2d Cir. 1999)..................................................................................................48

*Stiegele ex. rel. Viisage Tech. v. Bailey*,
   No. 05-10677-MLW, 2007 U.S. Dist. LEXIS 86469
   (D. Mass. Aug. 23, 2007)....................................................................................................51

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008)...............................................................................40, 53, 54, 55

*Swack v. Credit Suisse First Boston*,
   383 F. Supp. 2d 223 (D. Mass. 2004) ................................................................................59

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 322-23 (2007) .......................................................................................30, 40

*Va. Bankshares v. Sandberg*,
   501 U.S. 1083 (1991)...........................................................................................................26

*Wool v. Tandem Computers Inc.*,
   818 F.2d 1433 (9th Cir. 1987) ............................................................................................53

**Page**

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §78u-5(c)(1)(A)(i)................................................................................................24
   §78u-5(c)(1)(B)..............................................................................................24, 28

Federal Rules of Civil Procedure
   Rule 8.................................................................................................55, 57, 58, 63
   Rule 8(a)(2)...........................................................................................................55
   Rule 10b5-1...............................................................................................50, 51, 52
   Rule 12(b)(6)....................................................................................................14, 59
   Rule 15(a)...............................................................................................................64

17 C.F.R.
   §§240.10b-5(a), (c) ...............................................................................................52

**LEGISLATIVE HISTORY**

H.R. Conf. Rep. No. 104-369,
   104th Cong. (1995) ...............................................................................................26

Lead Plaintiffs City of Brockton Retirement System, Plymouth County Retirement System and Norfolk County Retirement System ("Lead Plaintiffs" or "Plaintiffs"), respectfully submit this memorandum of law in opposition to the motion to dismiss the Corrected Consolidated Class Action Complaint (the "Complaint," cited herein as "¶__") filed by defendants CVS Caremark Corporation ("CVS Caremark" or the "Company"), Thomas M. Ryan ("Ryan"), David B. Rickard ("Rickard") and Howard A. McLure ("McLure")[1] (collectively, "Defendants").

## I.     PRELIMINARY STATEMENT

This litigation arises out of Defendants' fraudulent scheme to conceal severe problems that CVS Caremark faced with its prescription benefits manager ("PBM") business following the March 2007 merger between CVS Corp. ("CVS") and Caremark Rx Inc. ("Caremark").  The merger, which combined the largest retail pharmacy chain with the second largest PBM, was promoted as creating the "nation's premier integrated pharmacy services provider" and promised to provide "high-quality, cost-effective services" to the Company's customers.  ¶¶1, 50-51.  Investors and consumers were initially concerned that CVS Caremark would be unable to deliver on its promises, but several months following the merger, Defendants assured the public that they had "completed the integration of both the organization and back end systems quickly and successfully" and "kept [their] focus on service, which was the[] primary concern following [the] merger." ¶¶3-4, 71.  Defendants continued to publicize the purported success of the merger throughout the Class Period,[2] stating that clients "love[d] [CVS Caremark's] integrated proactive pharmacy care offerings" and that the PBM business had "excellent service," "excellent client retention" and was "resonating with [] clients." *See, e.g.,* ¶¶112, 125, 133, 159.  The truth, however, was that the CVS Caremark integration was a

---

[1]     Together, Ryan, Rickard and McLure are referred to herein as the "Individual Defendants."

[2]     The Class Period is October 30, 2008 to November 4, 2009.

complete failure and had caused a host of service-related problems which, in turn, resulted in the Company's loss of several multi-billion dollar PBM contracts.

Instead of admitting to the problems and the service-related loss of some of CVS Caremark's most profitable contracts, Defendants actively misrepresented and concealed the Company's integration and service failures.  By February 19, 2009, and continuing through the end of the Class Period, Defendants began making positive projections for the 2010 selling season, emphasizing that the merger resulted in "new business opportunities" that would drive "an EPS growth of at least 13 to 15%" for 2010.  *See, e.g.,* ¶¶8, 106, 125, 141, 160, 205.  Knowing that their outlook for 2010 could never be met because of CVS Caremark's service problems were resulting in contract losses, Defendants took the opportunity to trade on their inside information before the truth about the Company and its PBM business became known to the market.  As a result, in only three short months, Defendants Ryan, Rickard and McLure disposed of more than $40 million of their personally held Company shares.  Just days after Defendants finished unloading their shares at artificially inflated prices, Defendants finally revealed that the outlook for 2010 was "not going to happen" and that, instead, the "PBM w[ould] decline in 2010" as a result of $4.5 billion in contract losses.  ¶¶181-83.  The result of these disclosures was a dramatic collapse in CVS Caremark's stock price, which fell over 20% in just one day, on over 13 times the average daily volume during the Class Period.

Faced with the highly particularized allegations in the Complaint, Defendants respond by misrepresenting the majority of the facts and, instead, recasting the allegations into a strawman argument regarding CVS Caremark's failure to meet its 2010 earnings projections, all but ignoring the extensive allegations concerning fundamental service problems, internal CVS documents that support the allegations and Defendants' own wrongful conduct.  This litigation, however, cannot be reduced to a missed earnings case.  Rather, this case is about Defendants' repeated false statements

and omissions concerning the success of CVS Caremark's integration and customer satisfaction with the Company's PBM services.  Instead of responding to these allegations, Defendants simply discount their material statements about CVS Caremark's superior service and client retention as mere puffery and fail to even address their statements regarding the "completed" integration and the ability of the systems "to talk to each other."  As Defendants later admitted, those statements – which investors and analysts relied on to evaluate the Company and the success of the CVS Caremark merger – were false.  Indeed, when the truth was revealed, the price of CVS Caremark's stock dropped significantly on extraordinary trading volume.  Contrary to Defendants' contentions, the price of the stock dropped, not simply because the Company was not able to meet its earnings projections, but because the principal basis for CVS Caremark's value – *i.e.,* a fully integrated retail and PBM company – was a ruse.

As detailed below, the Complaint more than adequately alleges actionable misrepresentations.  *See infra* §III.B.  The Complaint also provides specific facts that, when viewed cumulatively, demonstrate Defendants' scienter in issuing materially false and misleading statements (*see infra* §III.C) and adequately pleads loss causation (*see infra* §III.E).  Defendants' efforts to strike down these particularized allegations are off the mark and unpersuasive.  Accordingly, Defendants' motion to dismiss should be denied in its entirety.

## II.   STATEMENT OF FACTS

### A.   Background

In March 2007, CVS, the nation's largest retail pharmacy chain, completed its much-anticipated merger with Caremark, the second largest PBM, forming CVS Caremark (the "Merger").  ¶¶1, 50.  At its most basic, the Merger's purported goal was to create the nation's only fully-integrated retail pharmacy/PBM that could deliver the appropriate level of "service;" meaning, as Defendant Ryan, CVS Caremark's CEO, put it, the merged company would have to deliver the "right drug at the right place at the right time."  ¶¶2, 50-55; *see also* ¶¶34-49 (providing an overview

- 3 -

of the PBM industry).  Without appropriate service, customers (*i.e.*, plan sponsors and plan participants) would flee in the hotly competitive PBM market.  ¶¶2, 56-59.

### B.    Concerns Over Integration and Service

While simple in concept, service depended on the complete integration of the two companies, their systems, policies, and procedures.  *See, e.g.*, ¶¶3, 56.  From the Merger's announcement, investors and analysts expressed concern that the integration would fail and customer service would suffer.  ¶¶3, 57.  For example, an analyst for William Blair & Company expressed "serious concerns about the 'merger of equals' structure of the transaction and the heightened integration risk, given that both companies themselves have been active industry consolidators in the recent past."  ¶57.

Defendants, and in particular Ryan, attempted to quell these concerns, telling investors, for example, at the March 13, 2007 Bank of America Consumer Conference, the Merger was "all about . . . service."  ¶¶2, 54-55.  Ryan further explained at the conference: "I don't mean to diminish any integration because there's always risk, but it's relatively straight-forward[.]"  ¶58; *see also* ¶59.  During the May 8, 2007 earnings call with analysts and investors, Defendant Ryan again acknowledged investors' and clients' concerns about integration and service, stating: "[T]hey want to get calmed down that . . . we're still going to focus on execution and service and we're confident that we are."  ¶¶3, 55.  As Defendants knew – and as they told investors – while they could always be competitive on price, if clients were not satisfied with how the Company was servicing their needs, existing business would be lost and new contracts would be illusive – costing the Company billions of dollars in annual revenue.  ¶¶2, 54-59; *see also* ¶¶60-62 (alleging customer concerns regarding Caremark's and CVS's failures to successfully integrate previously acquired companies).

### C.    Post-Merger, Defendants Assure Investors Regarding Integration

Following the Merger, Defendants continued to address investor concerns over integration and service.  Only eight months after the Merger closed, Ryan claimed he was "pleased that [CVS Caremark] **completed** the integration of both the organization and back end systems quickly and

successfully." ¶¶4, 71 (emphasis added).[3]  On a May 1, 2008 earnings call, Ryan claimed that the Company's "clients are telling us that *we've kept our focus on service, which was their primary concern following our merger*."  *Id.*  Similarly, on January 9, 2009, Ryan stressed that "*[a]ll the systems are able to talk to each other*. . . .  *We have got no issue with our systems.*"  *Id.*

On the October 30, 2008 earnings call, Defendants assured investors that, even in rough economic times, "our PBM continues to retain existing clients and attract new ones.  We will continue to gain share because. . . .  *We have excellent service.*"  ¶112.  Defendants touted the Merger, claiming, "We've had a very successful selling season. . . .  I would say our model is working."  ¶113.

Based on these statements, investors and analysts viewed the integration of the two companies and the Merger as a success.  For instance, an analyst with J.P. Morgan positively stated that "the benefit of the integrated model should become more evident as the company builds on the strong wins it saw for 2009."  ¶116.  On the February 19, 2009 earnings call, Defendants again assured investors that "for anyone wondering if our offerings are resonating they certainly are. . . . [W]e see significant new business opportunities in 2010."  ¶125.  In reaction to these statements, an analyst with Deutsche Bank concluded that CVS Caremark's "differentiated" PBM service offerings were "resonating in the marketplace" and expected "the company to continue to execute on its unique vertically-integrated drug retail/PBM model."  ¶¶129-30.

### D.    In Reality, Defendants Knew the Integration Was a Failure

From inception of the Merger and throughout the Class Period, Defendants knew the integration was a failure and that customers were abandoning the Company due to poor service.  *See generally* ¶¶5, 60-62, 65-94, 99-105.  Defendants, for instance, regularly monitored incumbent PBM

---

[3]    Emphasis is added, unless otherwise noted.

contracts through internal "Sales Pipeline Reports," monthly conference calls with CVS Caremark senior managers and vice presidents, and quarterly conferences with CVS Caremark senior executives.  ¶¶6, 65-70.  **Every Monday,** Defendants received Sales Pipeline Reports that indicated the level of termination "risk" associated with each incumbent contract.  ¶¶6, 65-66.  In particular, these Sales Pipeline Reports illustrated, via a color code, which CVS Caremark contracts were at risk, and, indeed, which were at highest risk of being lost.  ¶¶6, 65.  Unknown to investors, by May 2008, these internal reports highlighted over **$6.25 billion** in annual PBM contract revenue "at risk" for termination.  ¶67.

In addition to monthly conference calls, Defendants also monitored contracts through quarterly conferences, during which senior managers and executives informed Defendants of any issues that hampered negotiations with incumbent clients.  ¶¶68-69.  During these conferences, "service issues were commonly the subject of discussion."  ¶69.  Through the Sales Pipeline Reports, conferences, and frequent and consistent customer complaints, Defendants knew from the inception of the Class Period that customer service issues pervaded CVS Caremark's daily interactions with clients.  ¶¶76-94, 99-105.

The service issues resulted from the Company's failure to fully integrate its computer systems, staff, policies and procedures.  *See, e.g.*, ¶¶77-78, 86-89, 91-93, 99, 102-04.  Contrary to Defendants' statements at the time, computer software errors prevented CVS Caremark from delivering the right drugs, at the right price, at the right time.  *See, e.g.*, ¶¶77, 81, 87-88, 91-93.  For example, at least 40,000 plan participants endured months without vital medications because the Company's PeopleSafe computer system was not fully integrated.  ¶91.  Similarly, a March 2008 e-mail reflected that a major plan sponsor (Blue Cross Blue Shield of South Carolina) was "very dissatisfied" because their participants experienced up to 48 hours without access to benefits due to

integration-related computer problems.  ¶103.  Further, the computer problems routinely resulted in CVS Caremark over-billing clients in amounts exceeding $10 million.  *See, e.g.*, ¶¶89, 92.

In addition to the computer and technical impact of the Company's failed integration, excessive staff turnover adversely impacted CVS Caremark's capacity to service clients.  ¶99.  For example, by March 2008, nearly half of the account team servicing New Jersey, one of CVS Caremark's largest PBM clients, left the Company.  *Id*.  As a result of the high staff turnover rate, inexperienced and new personnel fielded customer calls without the proper skills to provide or retrieve plan participant information.  *Id*.  Reflecting this inadequacy, in a July 2008 e-mail to CVS Caremark, a client admonished that an "account rep should have been given better trained [sic] and procedures to follow."  ¶104.

By May 2008, Defendants knew that CVS Caremark had more than ***$6.25 billion*** of incumbent PBM contracts at risk of termination due to the failed integration and the resulting service-related issues.  ¶67.  In the face of these potential PBM revenue losses, Defendants unilaterally decreased prices on over 50% of CVS Caremark's PBM contracts – including many that were years from renegotiation.  ¶¶95-96.  Although investors and analysts raised concerns that this business move was the result of poor service, Defendant Ryan quelled any anxiety, stating on the January 9, 2009 earnings call, "[T]hese are accounts that we kind of wanted to lock down.  ***No trade-offs because of our service***."  ¶¶96-97, 120.  On the same call, Ryan further stated, "[T]here was no hidden agenda here about giving a lower price because of lack of service[.]"  ¶¶97, 120.

Despite Defendants' drastic price-slashing move, by the Fall of 2008, they "officially" knew that three of CVS Caremark's largest PBM clients – Coventry, Chrysler, and New Jersey Blue Cross Blue Shield – would not be renewing their PBM contracts primarily due to integration and service-related issues.  ¶¶6, 73-94.

### 1.     Coventry

CVS Caremark's largest losses due to the failed Merger were its two contracts with Coventry Health Care, Inc. ("Coventry"), valued at over $4 billion annually.  ¶¶73-74.  The first loss was the Medicare and Medicaid group contract (the "Med-D contract"), announced on July 31, 2008, followed by the commercial group (the "commercial contract"), announced May 5, 2009.  ¶¶74-75.

Until the end of the Class Period, Defendants concealed the true cause for Coventry's termination.  ¶¶73-75.  During an earnings call on July 31, 2008, Defendant Rickard, CVS Caremark's CFO, informed investors that CVS Caremark lost the Med-D contract "due in large part to price."  ¶74.  On May 5, 2009, CVS Caremark announced that it had lost the Coventry commercial contract.  ¶¶75, 141.  Following Rickard's statement that the Med-D contract was lost "due in large part to price," Ryan claimed that losing the commercial contract "was not unexpected." *Id*.

While throughout the Class Period, Defendants concealed the true reason why these contracts were lost, on November 5, 2009, Defendants admitted that "when we lost Med D, we knew we were going to lose the commercial business" as a result of "***service issues.***"  ¶¶10, 76, 184, 197-98, 203.  In fact, by no later than October 2007, Defendants knew that the loss of both Coventry contracts was inevitable, as the Company's information systems – including the participant database software – were not properly integrated, causing CVS Caremark to store incorrect patient and co-pay information concerning Coventry participants.  ¶81.  These problems were further exacerbated by CVS Caremark's inability to support Coventry's unique and varied pricing structure and customized contracts and benefits arrangement.  ¶¶81-82.  As a result of the Company's computer integration failures, "service levels [for Coventry] were low."  ¶¶77, 81-82.  Particularly, by mid-2008, CVS Caremark's computer systems failed to properly store Coventry drug formulary information, frequently replacing Coventry's contracted prescription drugs for more expensive substitutes.  *Id*.

While investors did not learn about the loss of the commercial contract until May 5, 2009, by mid-2008, Defendants knew that Coventry was experiencing poor service due to failed integration and that the plan sponsor had decided to terminate its contracts.  ¶¶77, 79-80.  Indeed, the Audit Department sent monthly reports to senior management and Defendants, detailing refunds owed to Coventry due to computer processing errors.  ¶78.  Further, as early as June 10, 2008, CVS Caremark's internal Sales Pipeline Reports defined Coventry's contracts at the highest risk for termination, accounting for nearly $1.1 billion in revenue.  ¶80.

Over a year before the true reason Coventry was lost was revealed to investors, in October 2008, Coventry "officially" informed CVS Caremark, via teleconference, that it would not be renewing its contract with the Company going into 2010.  ¶83.  Keeping with its corporate secrecy, Company employees were subject to a "gag order" concerning the Coventry loss.  ¶79.

### 2.    New Jersey

By no later than May 2008, Defendants rated the Horizon Blue Cross Blue Shield of New Jersey ("New Jersey") account – worth $1 billion to $1.3 billion annually – at the highest risk for termination.  ¶¶84-85.  Indeed, by late-2007, CVS Caremark's computer integration failures resulted in the denial of benefits to New Jersey participants because CVS had "no information on [New Jersey's] formularies, no information on their drug costs."  ¶86.  According to internal CVS Caremark documents, the integration failures resulted in at least 11,000 error records, totaling 221 pages of internal documents delivered to CVS Caremark's account representatives for resolution in May 2008.  ¶87.  By June 2008, an additional 10,000 errors had occurred, potentially "requir[ing] manual review of each file" to determine the appropriate benefits and billing.  ¶88.  By the time the errors were discovered, CVS Caremark had over-billed New Jersey by approximately *$40 million*.  ¶89.

CVS Caremark's failures were met with frequent, consistent complaints.  For instance, in a May 6, 2008 e-mail, an administrator for the New Jersey account wrote to inform CVS Caremark of "an increasingly common trend regarding enrollment issues.  This trend is . . . ***directly impacting our client satisfaction***. . . .  All this is ***unacceptable***."  ¶102.

In the face of these complaints, CVS Caremark employees were instructed to conceal the service issues from clients, particularly New Jersey.  ¶¶100-05.  CVS Caremark's employees were told to "talk around" system problems due to the failed integration.  ¶101.  For instance, in an internal April 2, 2008 e-mail, a Senior Account Manager admonished her subordinates to "NOT be telling [New Jersey account] callers" that the participants could not be entered into CVS Caremark's computer system – depriving them of their vital benefits.  ¶¶100-01.

In November 2008 – a year before Defendants' disclosure of the contract loss – Defendants and CVS Caremark employees knew that New Jersey planned to terminate its PBM contract.  ¶¶85-86.  New Jersey officially informed CVS Caremark via letter dated August 5, 2009 that, as of 2010, Medco would serve as its PBM.  ¶¶9, 90, 203.  Yet, Defendants delayed its disclosure concerning the contract termination for another three months to give themselves time to sell $40 million of their personally held Company stock.  ¶¶90, 203; *see also* ¶183.

### 3.   Chrysler

By the end of 2007, CVS Caremark had devoted a special team of executives to address service issues pertaining to its legacy client Chrysler.  ¶93.  Due to failed computer integration, Chrysler's account contained incorrect participant information, requiring CVS Caremark employees to manually enter data.  *Id*.  As a direct result, the relationship between Chrysler and the Company grew "quite contentious," compelling Defendant Ryan to participate in at least one meeting between the two companies.  *Id*.  Defendants, nonetheless, concealed from investors their problems with Chrysler through the end of the Class Period.  ¶94.  For instance, during a May 15, 2009 Annual

Analyst/Investor Meeting, Defendant Ryan portrayed contract negotiations with Chrysler as positively "proceeding along." ¶¶94, 151.

> **E.    While Continuing to Conceal the Truth Concerning the Contract Losses, Defendants Reaped a Substantial Reward Through Insider Sales**

On CVS Caremark's August 4, 2009 earnings call, Defendants continued to misrepresent and conceal from investors the truth concerning the Company's failed integration and resulting service issues. ¶¶159-64. Defendant Ryan, in fact, expressed "great confidence" in the Company's ability to retain existing clients and win new business during the 2010 selling season. ¶159. Ryan went as far as to state he "would be very disappointed if [CVS Caremark] didn't have an EPS growth of at least 13 to 15%" in 2010, given the "high customer satisfaction scores" the PBM business had received. ¶¶159-60. Coinciding with these false and misleading statements, on August 5, 2009, Defendants received a letter confirming that New Jersey officially terminated its contract. ¶¶9, 90, 203. The loss of New Jersey's business assured Defendants of two things: (i) CVS Caremark would not achieve "low to mid single digit" growth in its PBM business for 2010, wiping out any possibility of Defendants attaining their earnings projection; and (ii) Defendants would have to soon reveal the truth to the Company's investors – that the failed integration and related service issues resulted in the Company losing significant PBM business. ¶¶181-87.

Rather than disclose the Company's true troubles and recent developments, over the course of the next three months, Defendants sold more than 1 million shares of their CVS Caremark stock, reaping over $40 million. ¶¶9, 107, 109, 204. Specifically, between August 7, 2009 and November 2, 2009: (i) McLure sold 500,000 shares of CVS Caremark stock, representing 98% of the shares he held during the Class Period, for total proceeds of approximately $17.7 million; (ii) Ryan sold 400,000 shares, or approximately 22% of his Class Period holdings, for total proceeds of

approximately $13.7 million; and (iii) Rickard sold 251,520 shares, or 52% of his Class Period holdings, for total proceeds of approximately $8.5 million.  ¶109.

### F.    The Truth Is Revealed

On November 5, 2009 – just three days after Defendants completed their insider selling spree – Defendants revealed the truth concerning CVS Caremark's failed integration and resulting service issues during the Company's third quarter 2009 earnings call (the "November 5 Call").  ¶¶179-87. Particularly, Defendants informed investors for the first time that the Company's recent contract losses were primarily the result of the foregoing service and integration issues.  *Id.*  Despite claiming that the Company's PBM business had experienced a "very good quarter," Defendants disclosed that its previously projected EPS growth rate would not materialize in 2010.  ¶¶181-82.  Specifically, Defendant Ryan reasoned, "To get to that 13% to 15% growth rate, I expected . . . low to mid single digits in our PBM business, which is not going to happen."  ¶182.  Defendants had sustained $4.5 billion in PBM contract losses going into 2010.  ¶183.

When asked by analysts why people were "shying away" from CVS Caremark's PBM business, Defendant Ryan contradicted his earlier statements and candidly admitted for the first time, "***Execution and performance***."  ¶184.  Specifically, with respect to Coventry, Ryan acknowledged that when the Company lost the Med-D contract, "[W]e knew we were going to lose the commercial business, ***there were some service issues*** on that."  *Id.*  With respect to other recently lost contracts, particularly New Jersey, Ryan conceded that a majority of that business "***was not lost on price***." ¶185.  He explained, "[P]rice gets you in, but it is service, it is the relationships, it is the clinical offerings, it is lowering overall health care costs that keep you there."  *Id.*  Ryan also surprised investors by announcing that Defendant McLure, the "chief architect of [the] integrated model," had been fired.  ¶190.

Understandably, investors and the market were shocked by Defendants' revelations during the November 5 Call.   ¶¶184, 186, 188-89, 191-95.   Contrary to prior assertions, Defendants informed investors that CVS Caremark's PBM business suffered from "service issues" and an inability to properly execute and perform.   ¶¶181-87.   In response to these statements, an analyst with Credit Suisse bluntly concluded that "CVS provided ***undeniable evidence*** today that it has mismanaged the Caremark acquisition and destroyed shareholder value."   ¶193.   Similarly, an analyst with SunTrust Robinson Humphrey stated: "[T]oday's announcement shows a ***breakdown in the Caremark model***. . . .   It seems that Caremark's new model is being met with some indifference in the marketplace."   ¶192.   Taking into consideration the departure of Defendant McLure, analysts also questioned the credibility of CVS Caremark's leadership.   *See, e.g.*, ¶189 (an Argus analyst noted that "Mr. Ryan will have to deal with a ***credibility problem*** as a result of the weakness in the PBM").   Indeed, an analyst with Deutsche Bank refused to consider the PBM segment in arriving at his valuation of the Company.   ¶194.

Following the November 5 Call, CVS Caremark's share price plummeted from $36.15 to $28.87 – or over 20% – on trading volume that exceeded 13 times the Class Period average.   ¶¶11, 108, 195, 212.   According to an analyst with Morgan Stanley, the 20% "stock decline . . . fully pric[ed] in [the] bad news."   ¶195.

### G.   Defendants' Post-Class Period Affirmations

Shortly after the November 5 Call, Defendants affirmed that "service issues" caused the Company to lose the Coventry contract, as well as other PBM business.   ¶¶196-201.   Specifically, at the Credit Suisse Healthcare Conference on November 12, 2009, Defendant Ryan acknowledged that "there are obviously areas we need to work on."   ¶196.   In response to questions concerning lost PBM contracts, Ryan responded, "***Coventry was a service issue.***   Coventry was an issue we had two years ago.   We lost the Med D business because in my mind, because of service. . . .   [O]nce the Med

D went over, *[we] kind of knew we were going to lose the commercial business* the following year because it kind of just flows together." ¶197.  With respect to the Company's account management team, Ryan stated, "[W]e had some churn in there that we shouldn't have had and we had some *people that didn't take care of business*." ¶196.  Ryan further admitted that with respect to its PBM contracts generally, "price is not the issue. . . . [I]f we don't want to lose it for price, we're not going to lose it because we buy them better than anybody else.  *But there were . . . some service issues*." ¶197.

Similarly, during the Lazard Capital Healthcare conference on November 17, 2009, Defendant Ryan confessed that Defendants "*dropped the ball in some client service issues that we shouldn't have* . . . and it obviously was a big one with Coventry because the natural falloff is we know we're going to lose the commercial business following it." ¶198.  Additionally, in a February 19, 2010 *Bloomberg Businessweek* article, entitled "CVS to Invest 'Substantial' Amount in Caremark Units," CVS Caremark admitted that its PBM business "has five segments that haven't been fully integrated." ¶200.

## III.   ARGUMENT

### A.   Standards on a Motion to Dismiss

The standard for review on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is well established.  The Court must accept all well-pled facts as true and draw all reasonable inferences in favor of the plaintiff.  *See Miss. Pub. Emps. Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 85 (1st Cir. 2008) ("*Boston Scientific*").  A complaint "'attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations,'" but rather must simply provide the grounds of entitlement to relief and "'raise a right to relief above the speculative level.'"  *Morales-Tanon v. P.R. Elec. Power Auth.*, 524 F.3d 15, 18 (1st Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("*Twombly*")).  "If the facts in the complaint are sufficient to state a cause of action, a motion to

dismiss the complaint must be denied." *Bean v. Gen. Elec. Co.*, 593 F. Supp. 2d 306, 309 (D. Mass. 2009) (citation omitted).

Reaffirming the pleading standard set out in *Twombly*, the Supreme Court held that, to survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  *Twombly* cautioned, however, that "[a]sking for plausible grounds does not impose a probability requirement at the pleading stage;" it simply requires enough facts "to raise a reasonable expectation that discovery will reveal evidence" to prove the claim.  550 U.S. at 556; *see also Boston Scientific*, 523 F.3d at 90 ("'[I]n determining the adequacy of a complaint . . . we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence.'") (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996)).

## B.     The Complaint Alleges Actionable Misrepresentations and Omissions

Defendants contend that the Complaint should be dismissed because the majority of the alleged misrepresentations are not actionable.  Specifically, Defendants claim that their statements and omissions: (1) were immaterial "puffery"; (2) did not require disclosure; or (3) were forward-looking in nature and accompanied by cautionary language.  *See* Def. Mem. at 13-22, 27-33.[4]  As set forth below, the challenged statements and omissions were all materially false and misleading and do not fall within any of the purported exceptions on which Defendants rely.[5]

---

[4]     "Def. Mem. at __" refers to pages of Defendants' Motion to Dismiss, filed on July 2, 2010.

[5]     Notably, Defendants do not contest the materiality of all of the allegedly misleading statements and, thus, "[t]hose statements that have not been challenged [should] be presumed

### 1.   Defendants' Statements are Not Puffery

Defendants erroneously argue that the vast majority of their statements concerning the Merger, the integration of CVS and Caremark, the service levels provided by the Company, the 2010 sales outlook and the Maintenance Choice product are immaterial as a matter of law because they are mere puffery.  *See* Def. Mem. at 29-33.  Importantly, by "interposing the puffery defense," Defendants "conced[e] that the offending statements were technically inaccurate." *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 172 n.13 (D.R.I. 2003) (Smith, J.).

Statements may be deemed "puffery" only when they are '"so vague, so general, or so loosely optimistic that a reasonable investor would find [them] unimportant to the total mix of information.'" *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 342 (D. Mass. 2009) (quoting *Brumbaugh v. Wave Systems*, 416 F. Supp. 2d 239, 250 (D. Mass. 2006)).  "While courts continue 'to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace,' the recent trend is to consider expressions of corporate optimism carefully." *Brumbaugh*, 416 F. Supp. 2d at 250 (internal citation and footnote omitted).  In determining whether a statement is "mere puffery or [an] actionable misstatement," the Court should "look[] not only to the challenged language itself, but also the ***context in which the statement was made***." *Rosen*, 321 F. Supp. 2d at 320.  "[D]ismissals on this ground are increasingly rare." *Brumbaugh*, 416 F. Supp. 2d at 250 at 250 n.11.

Here, Defendants' concrete statements regarding the purported fact that the integration of CVS with Caremark was "completed" (*see, e.g.,* ¶71), the purported fact that "all of the systems were able to talk to each other" (*id.*), the success of the CVS Caremark Merger (¶¶63-64, 112-13, 121-25, 132-33, 135, 150, 159), as well as the PBM's "excellent client retention" and "outstanding

---

actionable for purposes of this Motion." *Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 318 n.7 (D.R.I. 2004) (Smith, J.).

customer service" (*see, e.g.,* ¶¶112, 125, 139, 172), are hardly so vague, general, or loosely optimistic that a reasonable investor would consider them unimportant.  A reasonable investor would consider statements regarding the success of a company's integration of two businesses as material, especially where, as here, successful integration was the only way the company could maintain and attract clients and continue to generate the billions of dollars in associated earnings.  *See* ¶57.  A reasonable investor would similarly consider statements that touted a company's "excellent service" as important where the company emphasized that its success was contingent on its service to clients.  *See* ¶¶2, 54-55.  In fact, not only did investors rely upon Defendants' statements, but the analysts that followed the Company were expressly interested in and relied upon the very statements Defendants now characterize as "puffery."  *See, e.g.,* ¶¶116-17, 123, 129-32, 147, 155-58.

Defendants' representations concerning the retail-PBM model, client satisfaction and the Company's ability to retain and attract customers, however, omitted the very significant problems that CVS Caremark was experiencing after the Merger, including integration and service-related problems, which did, in fact, cause several of the Company's largest clients to terminate their contracts with the Company.  *See, e.g.,* ¶¶76-94, 99-105.  Given the direct impact of the contracts on CVS Caremark's financials, these statements were not mere "puffery," as Defendants contend.[6]

_____

[6]      Citing to *Simon v. American Power Conversion Corp.*, 945 F. Supp. 416, 428 (D.R.I. 1996), Defendants argue that courts in the First Circuit have upheld the puffery defense when evaluating statements analogous to the ones at issue here.  *See* Def. Mem. at 31.  However, Defendants' argument is flawed because the *Simon* court emphasized the fact that the puffing statements were given at either the annual shareholder meeting or in a press release, and offered "little more than sales talk, an example of a CEO 'talking-up' his company," as he is expected to do in that context.  *Id*. at 428.  The *Simon* court continued to list a host of statements that were actionable "in light of the nature, context and substance of [the] statements."  *Id*. at 429.  The court did not hesitate in declaring that "a reasonable investor could certainly factor into his investment decision information provided in securities analyst reports or a company's 10-Q quarterly filing."  *Id*.  Here, every single statement Defendants claimed to be puffery was taken from either CVS Caremark's 10-Q or an analyst or earnings conference call or meeting.  Thus, Defendants' reference to *Simon* is readily distinguishable from the case at bar.

Instead, these false statements are precisely the type of information that courts have deemed material.  *See, e.g., Ark. Pub. Emp. Ret. Sys. v. GT Solar Int'l, Inc.*, No. 08-CV-312-JL, 2009 U.S. Dist. LEXIS 93820, at *32-*33 (D.N.H. Oct. 7, 2009) (statements about the present success of company's product, "just hours before the company's biggest customer for that product publicized its decision to switch to another supplier," were found to be material); *Brumbaugh,* 416 F. Supp. 2d at 250 (finding a reasonable investor would have viewed information regarding a strategic alliance important to the total mix of information); *In re Nash Finch Co. Secs. Litig.*, 502 F. Supp. 2d 861, 880 (D. Minn. 2007) (statements regarding the smooth integration process and the satisfaction/retention of customers were material).[7]

Moreover, at the time they were made, Defendants did not have a reasonable basis for their positive assessment of the success of the CVS Caremark Merger and the PBM business's service offerings, which takes the statements out of the realm of "puffery."  *See In re Allaire Corp. Secs. Litig.*, 224 F. Supp. 2d 319, 337 (D. Mass. 2002) (statements were actionable where it was alleged that defendants lacked any rational basis for their statements).  Specifically, while Defendants were making positive representations about the Company's "resonating" retail-PBM model (*see* ¶¶125, 133, 135) and touting that "clients and their members love our integrated proactive pharmacy care offerings" (¶159), Defendants knew that the purported benefits of the CVS Caremark Merger were not resonating with existing clients and that customers were, in fact, dissatisfied with the Company's

---

[7]     *See also Beach v. Healthways, Inc.*, No. 3:08-0569, 2009 U.S. Dist. LEXIS 17809, at *11 (M.D. Tenn. Mar. 9, 2009) (the fact that customers were canceling contracts was material information upon which a reasonable investor would rely); *In re NetSolve, Inc*., 185 F. Supp. 2d 684, 694 (W.D. Tex. 2001) (the loss of existing and potential customers due to service problems was found to be material); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 924-928 (D.N.J. 1998) (statement that company "believes" the "acquisition will enhance its competitive position" is "not the type of statement that has been found to be inactionable puffery," because it "specifically draws a link between future success and the acquisition" and could serve as basis for liability in light of company's post-class period admissions that it was experiencing problems integrating the acquisition).

PBM because of severe integration and service issues.   ¶¶76-94, 99-105.   Indeed, customers' disappointment and frustration with CVS Caremark's PBM services were plainly apparent to Defendants, who regularly received complaints regarding, among other things, the denial of participant benefits, overbilling and system errors.   *See, e.g.,* ¶¶72, 87-92, 100-04.

Similarly, Defendants' statements concerning the Company's future performance and earnings outlook were not merely amorphous, glowing and optimistic statements.   Rather, these were statements of substance about CVS Caremark's ***then-current*** business and the financial results the Company ***already*** realized and would realize in the near future.   For example, Defendants' statements about the 2010 selling season were based on the purported "significant new business opportunities" (¶¶125, 135, 141, 149) and "early results of the season" (¶141).   Defendants also drew a specific link between contract renewals and their statements about the 2010 selling season, assuring investors that "[w]e have some new wins already in early '10 . . . from finalists meetings and what we're seeing early . . . we feel pretty optimistic about the season" (¶125) and "when you think about renewals . . . we're essentially on plan, in good shape" (¶140).

At the time these statements were made, however, Defendants knew that their largest contracts were lost or at the highest risk for nonrenewal, due to service problems.   ¶¶76-94, 99-105. Accordingly, these statements are not immaterial puffery.   Defendants misrepresented existing facts – that the Company was unable to retain existing PBM clients and, in fact, had lost several of its most profitable contracts.   *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements were actionable where "complaint alleges that the defendants did more than just offer rosy predications; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true"); *In re Ames Dep't. Stores Inc. Stock Litig.*, 991 F.2d 953, 959 (2d Cir. 1993) (statement that "[w]e are looking forward to stronger sales for the remainder of the year" held actionable); *In re Hi/fn, Inc. Sec. Litig.*, No. C 99-4531 SI, 2000 U.S. Dist. LEXIS

11631, at *18 (N.D. Cal. Aug. 9, 2000) (stating that expressions of optimism and forecasts of increased business and revenues were not mere puffery where defendants allegedly knew of imminent reduction in orders).

In any event, "[o]nly purely forward-looking statements are entitled to protection as 'mere puffery.'" *Smith & Wesson*, 604 F. Supp. 2d at 342; *see also Rosenbaum Capital LLC v. Boston Commc'ns Group, Inc.*, 445 F. Supp. 2d 170, 176 (D. Mass. 2006). The statements Defendants claim to be "mere optimistic corporate puffery" are largely based upon concrete matters of current or historical fact – "we *have* excellent service," "our model *is* working," "our offerings *are* resonating," "our clients and their members love our integrated proactive pharmacy care offerings," "our PBM *continues to retain* existing clients and attract new ones" and "we're essentially *on plan, in good shape*" – are statements of present fact and, therefore, not puffery. *See Sekuk Global Enters. v. KVH Indus.*, No. 04-306ML, 2005 U.S. Dist. LEXIS 16628, at *30 (D.R.I. Aug. 11, 2005); *see also Scritchfield*, 274 F. Supp. 2d at 175 ("The representation that LOA was the '*premier* provider of high-speed DSL services in the Northeast corridor,' as it was described in a . . . press release . . . is much more than mere puffery: it is a statement of LOA's present status and capabilities. . . .") (emphasis in original).

### 2. Defendants Violated Their Duty to Disclose Accurate and Complete Information Regarding CVS Caremark's Service and Integration Issues that Resulted in Contract Losses

Defendants were obligated to disclose information concerning the service and integration problems that plagued the Company and the associated contract losses. As this Court has noted, "[a] duty to disclose arises when a corporation has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information." *Scritchfield*, 274 F. Supp. 2d at 170; *see also Boston Scientific*, 523 F.3d at 85 ("While a company need not reveal every piece of information that affects anything said before, it must disclose facts, 'if

any, that are needed so that what was revealed [before] would not be so incomplete as to mislead.'") (citation omitted). "The determination of whether a defendant had a duty to disclose certain information, therefore, focuses on two interrelated inquiries: (1) whether the omitted fact itself is material and (2) whether the [omission rendered a prior] public statement [] misleading." *Kafenbaum v. GTECH Holdings Corp.*, 217 F. Supp. 2d 238, 248 (D.R.I. 2002).

Defendants' argument that they were under no duty to disclose "contract losses that had not yet occurred" (Def. Mem. at 27), misrepresents the nature of Plaintiffs' allegations and inappropriately disputes the facts of the Complaint. The issue is not about Defendants' failure to disclose potential contract losses, but rather, Defendants' failure to disclose: (i) the true causes behind CVS Caremark's contract losses (*i.e.*, failed integration and poor service); and (ii) the magnitude and impact of the contract losses. These omitted facts were both material and rendered Defendants' previous positive statements regarding the PBM business and the 2010 sales season false and misleading. For instance, the fact that the Company lost contracts with several of its most profitable clients, which represented over $4 billion in lost earnings, was obviously important to investors. *See Brumbaugh*, 416 F. Supp. 2d at 249-50 ("To fulfill the materiality requirement there must be 'a reasonable likelihood that a reasonable investor would consider [the information omitted] important.'") (citation omitted). Similarly, the fact that the contracts were lost because the Company was incapable of providing appropriate services to these (and potentially other) clients was viewed by investors as material information.

Indeed, the contract losses, including their magnitude and the service-related cause of the losses, concerned the very integrity of Defendants' positive outlook for 2010 and other representations Defendants made throughout the Class Period regarding the success of the

Company's PBM business, as well as the assertions that the contracts were lost due to pricing.[8] "[H]aving elected to comment on [the 2010 earnings outlook, success of the Merger integration and the ability to retain PBM clients, CVS Caremark] was required to make full and accurate disclosures." *Allaire*, 224 F. Supp. 2d at 327; *see also Scritchfield*, 274 F. Supp. 2d at 170 (noting that "[w]hen a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate") (quoting *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987)).

As alleged in the Complaint, throughout the Class Period, Defendants made numerous public statements concerning CVS Caremark's successful integration (*see, e.g.*, ¶¶120-21, 159); the Company's ability to retain clients (*see, e.g.*, ¶¶125, 139-40, 159); the PBM's new business opportunities (*see, e.g.*, ¶125, 135, 141, 172); and the resulting EPS growth of 13-15% in 2010 (*see, e.g.*, ¶160). Defendants also asserted that the contracts were lost due to pricing rather than service. ¶¶74-75, 162. Once Defendants spoke with investors about the success of the Company's PBM business and made positive statements about the Company's 2010 selling season, Defendants had a duty to disclose that: (i) CVS Caremark was at imminent risk of losing some of its biggest clients because it was unable to provide adequate service; and (ii) that Defendants already knew that several multi-billion dollar PBM contracts would not be renewed in 2010 due to failed integration and service-related issues. *See, e.g.*, ¶¶76, 83, 85, 90, 93. This disclosure was necessary so as to not

---

[8]      The materiality of these omissions is further evidenced by the drastic drop in the Company's stock price when the omitted facts were disclosed. When CVS Caremark ultimately disclosed the Company's $4.5 billion in contract losses and the fact that the projected 13-15% EPS growth was "not going to happen" because the Company "lost more PBM business than . . . expected" as a result of the failed integration, the Company's stock price plummeted. ¶¶182, 195. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 949 (9th Cir. 2003) ("[T]he fact that a firm's stock price . . . significantly change[s] [upon the release of information] is strong evidence of materiality."); *Manavazian v. ATEC Group, Inc.*, 160 F. Supp. 2d 468, 483 (E.D.N.Y. 2001) ("A dramatic change in the value of a company's stock following a company announcement . . . supports the materiality of the announcement.").

mislead investors about the Company's true financial condition, because the loss of existing clients meant that CVS Caremark would not be able to achieve its projected EPS growth.  ¶¶181-82.

This Court's reasoning in *Scritchfield* is instructive.  Like Plaintiffs allege here, in *Scritchfield*, the Court considered a series of alleged misrepresentations regarding defendants' "great," "truly exceptional" and "world class" customer service, which, according to plaintiffs, were rendered false by the company's failure to "integrate the billing systems of the companies it acquired." 274 F. Supp. 2d at 184.  The Court found that these misstatements are actionable under Section 10(b), reasoning that they are "more than simply an allegation of undisclosed management [issues]: it charges that [defendant] misrepresented what [the company] could provide its customers in terms of service." *Id*.

Defendants also had a duty to disclose that the loss of the New Jersey contract had already occurred or was substantially certain to occur, based on information from the Sales Pipeline Reports indicating that New Jersey was at the highest risk for termination.  ¶85.  At the very least, once Defendants received the August 5, 2009 letter confirming that New Jersey refused to renew its contract with the Company (*see* ¶¶9, 90, 203), Defendants had a duty to correct their prior August 4, 2009 guidance of "at least 13 to 15%" EPS growth in 2010 (¶¶8, 106, 160).  *See In re Novagold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 301 (S.D.N.Y. 2009) ("The duty to correct applies to statements that are false at the time they are made, and it arises 'when [the defendant] learned that its prior statement . . . was untrue.'") (citing *Lattanzio v. Deloitte & Touche LLP*, 476 F. 3d 147, 154 (2d Cir. 2007)); *In re Quintell Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 292-93 (S.D.N.Y. 1999) (following defendants' public hype regarding its business success, "there was a duty to disclose when [defendants] received information that rendered that hype misleading").  Defendants knew that without the $1 billion in annual revenue from New Jersey, Defendants' guidance would be

impossible to achieve.  ¶182.  Rather than correct their prior statements, Defendants embarked on an unprecedented and undisclosed stock sale, reaping over $40 million in illicit profits.  ¶¶106-09.[9]

### 3.   Defendants' Statements Are Not Protected by the PSLRA's Safe Harbor

Out of the numerous false and misleading statements alleged in the Complaint, Defendants assert PSLRA safe harbor protection with respect to a single statement made about CVS Caremark's projected earnings for 2010.  Accordingly, Defendants concede that the remainder of their statements and omissions fall outside of the safe harbor.  Defendants' arguments with respect to even that single statement fail.

To qualify as a forward-looking statement entitled to safe harbor protection, a forward-looking statement must properly be "identified" as such and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. §78u-5(c)(1)(A)(i).  In addition, even where the safe harbor is triggered, it does not protect statements made with actual knowledge of falsity, as here. *See* 15 U.S.C. §78u-5(c)(1)(B).  Defendants' reliance on the safe harbor's narrow protection is, therefore, misplaced and does not shield them from liability for their 2010 projections.

*First*, the PSLRA safe harbor cannot apply to those aspects of Defendants' representations that relate to present or historical fact, "even though the statement might also contain a projection of future financial experience."  *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005).  As the First Circuit noted, "[t]he mere fact that a statement contains some reference to a

---

[9]      While Defendants submit that, based on Company policy, they did not need to disclose the impact of this material development on Defendants' guidance (*see* Def. Mem. at 24 n.15), Section 10(b) – not CVS Caremark's internal policies – governs the public disclosure of material adverse information and plainly required Defendants to correct their misstatements.

projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement." *Id.*

The safe harbor provision does not absolve Defendants from liability because their projection of "an EPS growth of at least 13 to 15% next year" was tied to ***currently available information*** – including integration failures that were driving away customers, the effect of recent Med-D regulations and the retention of key contracts including New Jersey. The alleged falsehood was not only the projection itself, but the omission of material information concerning the integration and customer service failures that resulted in CVS Caremark's loss of existing contracts with its clients that rendered the promised EPS growth in 2010 unachievable. Defendants' statements regarding earnings projections, therefore, were based on "present facts" relating to the subject matter underlying the projections – the PBM business – and "so do not fall under the statutory safe harbor for forward-looking statements."[10] *See N.J. Carpenters Pension & Annuity Fund v. Biogen IDEC Inc.*, 537 F.3d 35, 46 n.13 (1st Cir. 2008) (finding that financial projections based on present facts were not protected by the statutory safe harbor).[11]

_____

[10] Accordingly, the cases cited by Defendants are distinguishable because the financial projections in those cases were not based on current or historical facts that rendered the projections false. *See, e.g., Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 40 (D. Mass. 2009) (statements were forward-looking because "[t]o the extent that they refer to a current condition of fact, they are indisputably true"); *Smith & Wesson*, 604 F. Supp. 2d at 341 (noting that while "forward-looking statements fall within the statutory safe harbor . . . any statements of present or historical fact do not") (citation omitted); *Scritchfield*, 274 F. Supp. 2d at 187 (defendants' "naked and unsupported prediction" of $15 million in revenues was unactionable).

[11] *See also Sloman v. Presstek, Inc.*, No. 06-cv-377-JD, 2007 U.S. Dist. LEXIS 69475, at *16-*17 (D.N.H. Sept. 18, 2007) (statement that defendants expected "10% growth in revenues for the year" was not protected by the safe harbor provision because plaintiff's "claims of fraud [were] focused on the defendants' omissions concerning present facts rather than on their affirmative projections about the future"); *In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 34 (D. Mass. 2004) (holding that defendants' failure "to disclose known facts . . . that undermined their predictions" of future success subjected them to liability).

*Second*, even assuming Defendants' earnings projection was forward-looking, the cautionary language upon which Defendants rely is insufficient to invoke the protection of the safe harbor. Cautionary language accompanying forward-looking statements must be "meaningful" in nature, *i.e.*, "'substantive and tailored to the specific future projections, estimates or opinions'" alleged to be misleading. *Smith & Wesson*, 604 F. Supp. 2d at 341 (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993)).  "Vague or boilerplate disclaimers are insufficient to invoke safe harbor protection." *Sepracor*, 308 F. Supp. 2d at 34 (citation omitted); *see also Brumbaugh*, 416 F. Supp. 2d at 251 (defendants' "boilerplate" disclaimer insufficiently detailed for safe harbor protection).

Here, Defendants attempt to shield their statements from liability by pointing to a single boilerplate sentence made during an earnings call with analysts and investors on August 4, 2009 that generally warned listeners that the statements made "are subject to risks and uncertainties that could cause actual results to differ materially." Def. Mem. at 16.  However, to have effect, "cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement." H.R. Conf. Rep. No. 104-369, 104th Cong. at 43 (1995).  In other words, a cautionary statement must discredit the alleged misrepresentations to such an extent that "the risk of real deception drops to nil." *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1097 (1991).  Defendants' purported cautionary language lacked these qualities and provided no meaningful disclosure to the public, rendering the statement insufficient to invoke safe harbor protection.

Defendants also note that the August 4, 2009 earnings call referenced the Risk Factors sections of the Company's 2008 Form 10-K and the second quarter 2009 Form 10-Q, which listed certain hypothetical risks that CVS Caremark may face, including, *inter alia*, "[t]he possibility of client loss," "the impact of the Medicare prescription drug benefit" and potential "regulatory risks"

that *could* affect the Company's business.  Def. Mem. at 16-18.[12]  However, none of these purported

"cautionary statements" warned about the problems *already in existence* that would prevent CVS

Caremark from realizing a 13-15% earnings growth, namely, that, due to CVS Caremark's severe

integration and service issues: (i) existing customers were leaving the Company or failing to renew

their contracts; and (ii) potential customers were choosing competitors.  The risk factors also omitted

that the new Med-D regulations materially impaired SilverScript's pricing structure and were likely

to lead to heavy losses of the PDP Med-D business in 2010.  *See* ¶165; *see also In re Regeneron

Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350, at *54 (S.D.N.Y.

Feb. 3, 2005) (holding that "[a] warning that fails to disclose specific known facts is insufficiently

precise and will not insulate Defendants' statements from liability").

Indeed, by August 4, 2009, Defendants were well aware of frequent complaints from

customers about CVS Caremark's PBM services and received weekly Sales Pipeline Reports listing

the contracts that were at the highest risk of nonrenewal.  ¶¶76-94, 99-105.  As such, the purported

"cautionary statements" are inadequate because the dangers that CVS Caremark warned of had

already transpired, thereby excluding Defendants' earnings projection from the protection of the safe

harbor.  *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *see also Edison Fund v. Cogent

Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) ("The bespeaks caution

doctrine does not apply where the specific risk is apparent and not disclosed.  If a party is aware of

---

[12]    While Defendants assert that "the 2008 10-K warned investors of the specific risks associated
with the particular regulation identified in the Complaint – the CMS Spread Regulation" and cite a
paragraph from the "Business" section of the Form 10-K (Def. Mem. at 18; *see also* Declaration of
Lawrence Portnoy in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Class Action
Complaint, Exhibit 1 ("Portnoy Decl. Ex. __") at 12), the August 4, 2009 earnings call only referred
investors to the "Risk Factors section" of the Form 10-K, not the entire annual report.  Accordingly,
notwithstanding the fact that the paragraph that Defendants cite did not sufficiently warn investors
that the regulations impaired SilverScript's pricing structure, it also did not accompany the false and
misleading earnings projection.

an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability.").[13]

*Finally*, Defendants cannot claim safe harbor protection because Defendants had actual knowledge that the earnings projection was false and misleading at the time it was made. *See* 15 U.S.C. §78u-5(c)(1)(B); *see also ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 65 (1st Cir. 2008) ("The claim is that the makers of the statement about the 1998-1999 budget had actual knowledge that the statement was false or misleading, thus removing it from the safe harbor provisions of the PSLRA.").[14]   As detailed below, prior to the August 4, 2009 earnings call, Defendants already knew that the Company was experiencing customer service issues that resulted in the loss of some of CVS Caremark's most profitable clients and, thus, it would be impossible for the Company to realize a 13-15% earnings growth. *See infra* §III.C.2.   Accordingly, Defendants were fully aware that the "risks" identified in the 2008 Form 10-K and the second quarter 2009 Form 10-Q had actually materialized and, therefore, had no reasonable basis to predict an "EPS growth of at least 13 to 15% next year." *See In re Biogen Idec, Inc. Sec. Litig.*, No. 05-10400-WGY, 2007 U.S. Dist. LEXIS 98076, at *31 (D. Mass. Oct. 25, 2007) ("the statutory protection does not apply where

---

[13]     Defendants' reliance on *In re Parametric Technology Corp. Securities Litigation*, 300 F. Supp. 2d 206 (D. Mass. 2001) and *In re Ibis Technology Securities Litigation*, 422 F. Supp. 2d 294 (D. Mass. 2006) is misplaced because neither case involved statements or omissions of presently known facts. *See Parametric Technology*, 300 F. Supp. 2d at 219 (facts pled were "too general to permit an inference . . . that [defendant] had actual knowledge that his statement . . . was either false or misleading"); *Ibis Technology*, 422 F. Supp. 2d at 312 ("[n]othing in the Complaint suggest[ed] that [defendants] believed or had information" that contradicted their public statements).

[14]     Defendants cite *In re Sun Healthcare Group, Inc. Securities Litigation*, 181 F. Supp. 2d 1283, 1289 (D.N.M. 2002), a case that is not binding on this Court, for the proposition that "'[a]ctual knowledge' is a higher level of scienter than the 'recklessness' required by the pleading standards of the PSLRA." Def. Mem. at 19.   This very argument, however, was rejected by *Brumbaugh*, 416 F. Supp. 2d at 252 because "it fails to account for [] different procedural stages." *Id.* (concluding that plaintiffs' "allegations of 'actual knowledge' are sufficient to preclude safe harbor access" at the pleading stage).

the maker of the statement had actual knowledge that it was false and misleading"); *see also In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 627 (S.D.N.Y. 2003) ("[s]tatements regarding projections of future performance may be actionable . . . if the speaker does not genuinely or reasonably believe them'") (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)).

## C.     The Complaint's Detailed Allegations Give Rise to a Strong Inference of Scienter

Scienter is a "'mental state embracing intent to deceive, manipulate, or defraud.'"  *In re Cabletron Sys.*, 311 F.3d 11, 38 (1st Cir. 2002) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  In the First Circuit, scienter is demonstrated by showing that defendants acted with either a conscious intent to defraud or a high degree of recklessness.  *Boston Scientific*, 523 F.3d at 85 (citing *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002)).  Recklessness exists when a defendant's conduct constitutes "an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it."  *Geffon v. Micrion Corp.*, 249 F.3d 29, 37 (1st Cir. 2001) (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198 (1st Cir. 1999)).  In addition, allegations of "motive and opportunity" can strengthen the inference of scienter.  *Aldridge*, 284 F.3d at 82 (citing *Greebel*, 194 F.3d at 197); *see also ACA Fin.*, 512 F.3d at 67 (finding allegations of motive to be relevant to a showing of scienter).

The First Circuit has held that scienter may be established by indirect and circumstantial evidence and has "rejected any rigid formula for pleading scienter, preferring to rely on a 'fact-specific approach' that proceeds case by case."  *Cabletron*, 311 F.3d at 38 (citing *Aldridge*, 284 F.3d at 82).  Therefore, a "'plaintiff may combine various facts and circumstances indicating fraudulent intent . . . to satisfy the scienter requirement.'"  *Rosen*, 321 F. Supp. 2d at 322 (quoting *Aldridge*, 284 F.3d at 82); *see also Cabletron*, 311 F.3d at 40 ("Each individual fact about scienter

may provide only a brushstroke, but the resulting portrait satisfies the requirement of a strong inference of scienter under the PSLRA.").

In determining whether a strong inference of scienter has been alleged, the Supreme Court has held that "courts must consider the complaint in its entirety" and decide "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). For plaintiffs to prevail on a motion to dismiss, "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even the 'most plausible of competing inferences.'" *Id.* at 317 (citation omitted). It must merely be "*at least as likely as* any plausible opposing inference." *Id.* at 329 (emphasis in original). In other words, "where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff." *ACA Fin.*, 512 F.3d at 59; *see also Boston Scientific*, 523 F.3d at 86 (stating that *Tellabs* "held that a complaint survives [a motion to dismiss] when there are equally compelling inferences for and against scienter"); *Smith & Wesson*, 604 F. Supp. 2d at 244 ("*Boston Scientific* does not require absolute proof of scienter to survive a motion to dismiss but merely enough to raise an inference equal to that of innocent conduct.")

Here, the Complaint's allegations paint a picture of a strong and compelling inference of scienter that is *at least as likely as* any opposing inference of non-culpable intent. As alleged in the Complaint and set forth in detail below, Defendants publicly touted the excellent service and client retention of CVS Caremark's PBM business, while concealing and misrepresenting the fact that – due to known integration failures and resulting service issues – the Company had lost, and would continue to lose, some of its most profitable accounts, worth billions of dollars annually. *See, e.g.,* ¶¶112, 125, 139, 159. Although Defendants had personal knowledge that service related issues were causing clients to terminate their contracts with CVS Caremark months before they disclosed the

information to the public, Defendants concealed the truth from investors, enabling them to reap tens of millions of dollars in profits by selling their personally held shares of Company stock at artificially inflated prices.   ¶¶76-94, 99-109, 204-208.   Defendants have not offered a plausible competing inference of non-culpable conduct that is stronger than the compelling inference of scienter derived from these facts.   Instead, Defendants deny that the fraud ever occurred and urge the Court to act inconsistently with *Tellabs* by reviewing each allegation in isolation to determine whether, standing alone, it gives rise to a strong inference of scienter.

### 1.   Defendants Had Knowledge of Serious Service and Integration Problems Affecting CVS Caremark's PBM Business that Contradicted Their Public Statements

As alleged in the Complaint, throughout the Class Period, Defendants made numerous public statements about CVS Caremark's PBM business, despite knowing or recklessly disregarding facts suggesting that those statements were inaccurate or misleadingly incomplete.   *See, e.g.,* 112, 125, 139, 159.   Such allegations are "classic evidence of scienter."   *Aldridge*, 284 F.3d at 83 (citation omitted); *see also Boston Scientific*, 523 F.3d at 87 (holding that knowingly omitting material information is probative of scienter).[15]   Specifically, throughout the Class Period, Defendants made false statements that the Company's PBM had "excellent client retention," "excellent service" and "high customer satisfaction," and that the CVS Caremark "model [was] resonating in the PBM marketplace."   ¶¶112, 125, 133, 135-36, 159.   These statements were contradicted by facts known to Defendants concerning CVS Caremark's ongoing service issues and problems stemming from the unsuccessful integration of the Company's computer systems, giving rise to an inference that

---

[15]   *See also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate."); *Novak,* 216 F.3d at 311 (scienter was met where defendants "knew facts or had access to information suggesting that their public statements were not accurate . . . or [] failed to check information they had a duty to monitor").

Defendants "had intimate knowledge of those facts or should have known them."  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).

Beginning in 2007, soon after the completion of the CVS Caremark Merger, and continuing throughout the Class Period, Defendants received numerous complaints from customers, who expressed their frustration with CVS Caremark and its inability to provide promised services. ¶¶77, 82, 88, 93, 100-05; *see also Boston Scientific*, 523 F.3d at 87-88 (a strong inference of scienter was alleged where "defendants received numerous adverse reports" regarding problems with the company's product).  For example:

- On May 6, 2008, the administrator of the New Jersey account sent an e-mail to the Company complaining that "members []were told that they were not in the system and could not fill drug [prescriptions]" and that CVS Caremark's failures were causing concerns at Horizon, which was "unacceptable." ¶102.

- About a month later, the administrator sent another e-mail to the Company requesting that they develop a more efficient method of addressing the massive amounts – indeed, thousands – of PeopleSafe errors, resulting in the denial of benefits. ¶88.

- Chrysler also issued numerous complaints to CVS Caremark and the two companies met at least three to four times per week to discuss the service failures. ¶93.

- CVS Caremark received other complaints from customers, including Blue Cross Blue Shield of South Carolina and UFC Local 1262 health plan, who expressed similar dissatisfaction with the Company's inability to get participants loaded into the PeopleSafe system and errors in the reenrollment of participants. ¶¶103-04.

The service problems were so severe that CVS Caremark lost several of its most valuable contracts (a total of $4.5 billion in revenue during its 2010 selling season) – including the New Jersey account, the Coventry commercial contract and Chrysler. ¶¶77, 82, 87-90, 93.  As the Complaint alleges:

- CVS Caremark experienced problems with the integration of computer systems, which often resulted in the Company's inability to access participants' information, and the high turnover of employees. *See, e.g.,* ¶¶77, 99.

- As a result of the failed integration, the Company's plan participant database, PeopleSafe, did not function properly and continuously provided incorrect patient and co-payment information, thereby hindering plan participants' ability to obtain pharmacy benefit entitlements.  ¶¶81, 87-88, 91, 100, 103.

- PeopleSafe errors caused groups of as many as 40,000 plan participants to go months without receiving appropriate medication.  ¶91.  The problems were especially apparent with CVS Caremark's New Jersey account.  As early as May 2008, a Senior Account Manager at the Company reported approximately 11,000 error records, which involved improper denial of benefits to plan participants under the New Jersey account's pharmacy benefit program.  ¶¶87-92.

- Additional service problems arose from the high turnover of employees, including high-level executives, which had a direct impact on CVS Caremark's ability to properly service its clients.  ¶99.

Defendants knew that their public statements touting the Company's PBM services were false because they participated in monthly and quarterly meetings with senior executives during which CVS Caremark's PBM problems were discussed.  ¶¶68-69; *see also Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 387 (E.D.N.Y. 2009) (upholding scienter based on meetings with defendants "to discuss the difficulties").  The meetings revealed that, contrary to Defendants' public representations, the Company's retail-PBM model was a failure and the Company was experiencing severe service problems with its PBM business.  *See* ¶¶69-70.  Defendant Ryan even admitted that while the Company had "honest, open discussion[s] of the areas that need to be fixed" with regard to the PBM business, he had been "hesitant to do it with the investor community."  ¶196.

While Defendants knew that CVS Caremark was experiencing problems integrating their systems after the Merger, they failed to mention the Company's increasing struggles, and instead told investors that the "model is working" and "[a]ll the systems are able to talk to each other. . . . We have got no issue with our systems."  ¶¶113, 121.

Defendants had a compelling interest in maintaining the façade that the CVS Caremark Merger had gone smoothly and that the two companies were fully integrated – a critical concern in the PBM industry where service is everything.  ¶¶54-55.  Specifically, Defendants were concerned

that if investors and customers discovered the truth about the unsuccessful CVS Caremark Merger and the problems that it caused, they would terminate their contracts with the Company.  ¶95. Accordingly, Defendants were desperate to conceal the problems and reacted by slashing contract prices in an attempt to deflect attention away from the problems and lock in clients who would have fled the Company once their contracts ended.  ¶¶95-96, 98, 119-20.

As a result of the Company's inferior customer service, Defendants were forced to lower prices on over 50% of the Company's contracts, including those that were years from renegotiation. *Id.*  Although several analysts questioned whether the true reason behind the re-pricing was poor service, Defendants quickly dispelled these concerns by falsely stating that the price-cuts were not "trade-offs because of [] service" and that "there was no hidden agenda here about giving a lower price because of lack of service[.]"  ¶¶96-97.

At the very least, Defendants' failure to disclose CVS Caremark's service and integration issues amounted to extreme recklessness.  Recklessness is conduct which represents "an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." *Geffon*, 249 F.3d at 37 (quoting *Greebel*, 194 F.3d at 198).  Here, Defendants knew, or at least were reckless in not knowing, that CVS Caremark faced risks and actual contract losses as a result of service-related problems.  Defendants ***conceded*** their extreme recklessness at the end of the Class Period during a November 12, 2009 conference call, stating that CVS Caremark had "service issues . . . on some of the health plan side, some health plans and some employers" and the Company experienced a high employee turnover rate "that we shouldn't have had and we had some people that didn't take care of business."  ¶¶196-97; *see also Kafenbaum*, 217 F. Supp. 2d at 247 (defendants' admission that certain information should have been disclosed contributed to a strong inference of scienter).  During a November 17, 2009 conference call, Defendant Ryan again stated, "[w]e

- 34 -

dropped the ball in some client service issues that we shouldn't have." ¶198.  However, during the Class Period, they ordered employees never to tell plan participants that they were experiencing problems.  ¶¶95, 100-01.  According to a former PBM Account Executive at CVS Caremark, employees were "told not to bring it up or just basically talk around it," noting that the Company was not "completely on the up and up with complying with our contracts."  ¶101.

Other statements made by Defendants at the end of the Class Period expressly contradict representations that they made during the Class Period.  *Compare* ¶141 ("We see plenty of new business opportunities for 2010 and we're very pleased with the early results of the season") *with* ¶182 ("it now looks like operating profit in the PBM will decline in 2010"); ¶¶113, 140 ("the wins and losses are in fair balance" and "when you think about renewals . . . we're essentially on plan, in good shape") *with* ¶183 ("we had some big client losses"); and ¶¶113, 121 ("our model is working" and "[a]ll the systems are able to talk to each other") *with* ¶200 (the PBM business "has five segments that haven't been fully integrated").  These facts and admissions strongly suggest that Defendants knew or were extremely reckless in disregarding the severe service and integration problems that caused CVS Caremark to lose customers and, therefore, sufficiently establishes Defendants' scienter.

## 2. Defendants Had Direct Knowledge of Contract Terminations Months Before They Were Disclosed

Defendants also had direct knowledge that CVS Caremark had lost, or was at substantial risk of losing, several of its most profitable PBM client contracts when they made positive projections for the 2010 selling season.  As detailed in the Complaint, the Company's existing contracts were monitored by Defendants on a ***weekly*** basis through the use of Sales Pipeline Reports, which identified contracts that were substantially likely to be lost during the subsequent selling season.

¶65.[16]  These weekly reports outlined any obstacles potentially hindering each of CVS Caremark's renewable contracts and were distributed to senior executives, including Defendants Ryan and McLure.  ¶¶65-66.  Thus, Defendants were regularly provided with reports that disclosed that CVS Caremark had billions of dollars of incumbent contracts at extreme risk of termination.  ¶67; *see also Stone & Webster*, 414 F.3d at 211 (scienter was adequately pled where "comprehensive internal financial reports of the Company's current condition were regularly distributed to the Company's top executives").  In particular, months before they disclosed the information to the public, Defendants had actual knowledge that at least three CVS Caremark customers – Coventry, New Jersey and Chrysler – would not be renewing their PBM contracts with the Company.  ¶¶76-94, 99-105.

### a.      Coventry

As early as June 10, 2008, CVS Caremark's Sales Pipeline Reports revealed that the Company was at highest risk for termination of its Coventry commercial contract, which was valued at nearly $1.1 billion in annual revenue.  ¶80.  According to a former CVS Caremark employee, the loss of the Coventry commercial contract was known internally at least as early as August or September 2008, at which time the employee was informed that the Company was "going to be losing them, but [told] not to say anything" and was placed under a "gag order" to keep the information a secret.  ¶79.  Shortly thereafter, in October 2008, other employees discovered Coventry's termination of its contract with CVS Caremark during a meeting in which Coventry management officially announced that they would not be renewing with CVS Caremark.  ¶83.  Defendants, however, waited seven months to disclose the Company's loss of the Coventry commercial contract.  ¶¶75, 141.

---

[16]      Defendants fault Plaintiffs for failing to provide "statistical" support for the allegation that contracts designated "at risk" in the Sales Pipeline Reports were substantially likely to be lost (Def. Mem. at 41), however, Defendants seem to forget that this case is still at the pleading stage and, accordingly, Plaintiffs are not required to plead evidence.  *See Boston Scientific*, 523 F.3d at 90.

While Defendants now assert that "the Company did not know that it would lose the Coventry contract prior to Coventry's decision" (Def. Mem. at 41), Defendants have previously ***admitted*** that they knew they were going to lose the $1 billion commercial contract with Coventry as of July 2008, when CVS Caremark lost the Coventry Med-D business.  ¶¶10, 75-76, 184.[17]  For example, during CVS Caremark's May 5, 2009 earnings call, when the Company finally announced that it had lost the Coventry commercial contract, Defendant Ryan admitted that the loss "was not unexpected."  ¶¶75, 141.  Several months later, during a November 5, 2009 conference call, Defendant Ryan elaborated, "[W]hen [CVS Caremark] lost Med D, we ***knew*** we were going to lose the commercial business, there were some ***service issues*** on that."  ¶¶76, 184.  On November 12, 2009, Ryan again conceded, "[O]nce the Med D went over, [we] kind of ***knew*** we were going to lose the commercial business the following year because it kind of just flows together," and stated, "Coventry, Coventry was a service issue. . . .  [A]n issue we had ***two years ago***."  ¶197; *see also Boston Scientific*, 523 F.3d at 88 (noting that "[i]nferences supporting plaintiff's allegations about defendants' knowledge can be drawn from [post class period] statements").[18]

---

[17]     While Defendants were forced to reveal the Company's loss of the Med-D portion of its Coventry contract on July 31, 2008, Defendant Rickard misleadingly attributed the loss to price, as opposed to the true reason for the contract loss, which, as Defendant Ryan later admitted, was "because of service."  ¶¶74-75, 184, 197.

[18]     Defendants' contention that "Plaintiffs make contradictory allegations regarding when the Defendants purportedly became aware that the Company was going to lose the Coventry contract" (Def. Mem. at 41) results from their misreading the Complaint.  The paragraphs Defendants reference in the Complaint state that "*Defendants knew* they were going to lose the [Coventry contract] no later than July 2008" (¶76) and "around August and September 2008, "*CW6* . . . was 'given information that [the Company was] going to be losing them'" (¶79).  These allegations are entirely consistent.  Logically, Defendants, the most senior executives of the Company, would have knowledge about Coventry's non-renewal before a Company employee.

### b.     New Jersey

By no later than May 12, 2008, the Sales Pipeline Reports, submitted to Defendants Ryan and McLure, also revealed that the Company's New Jersey account was at highest risk of loss.  ¶85. A former Senior Account Advisor at CVS Caremark, who worked on the New Jersey account during the Class Period and provided periodic reports to the Individual Defendants, confirmed that Defendants knew that the New Jersey account was at risk of termination as early as the fourth quarter of 2007 (¶¶33, 89) and, by **November 2008**, nearly a year before it was disclosed, it was practically "official" within the Company that the New Jersey account would be terminated.  ¶¶33, 85.  When CVS Caremark received a letter dated August 5, 2009 confirming that the New Jersey account was lost to Medco, it came as no surprise to Defendants, who knew that, following the failed integration of CVS Caremark, the Company could not adequately service the client.  ¶90.[19]  Despite their actual knowledge that New Jersey would not be renewing its contract with the Company, Defendants did not disclose the loss or the impact of the loss on the Company's earnings until November 5, 2009.  ¶¶90, 183.

### c.     Chrysler

CVS Caremark was also experiencing problems with its Chrysler account and, by the end of 2007, Defendants knew that the Company was at risk of losing Chrysler because of integration problems and customer service.  ¶93.  A former CVS Caremark Project Coordinator who worked on the Chrysler contract confirmed that from 2007 through May 2008, the CVS Caremark employees who were assigned to the account met with representatives from Chrysler three to four times per

---

[19]     Defendants misrepresent Plaintiffs' allegations and state that "plaintiffs concede that Defendants did not know that [the New Jersey contract] had been lost until August 5, 2009" (Def. Mem. at 41), however, the Complaint clearly states that the August 5, 2009 letter merely *confirmed* that the New Jersey contract was not being renewed, "a fact that Defendants had known since 2008."  ¶9.

week to discuss service failures and integration issues, and that the meetings often became "quite contentious." *Id.* Defendant Ryan, in particular, knew about the problems with the Chrysler contract because the "friction" between the companies became so difficult that Ryan felt compelled to take part in a teleconference that took place after the Merger. *Id.* Indeed, Chrysler's disappointment with CVS Caremark's PBM "was no secret" and it was "very much in the open that there were issues. . . . There was nothing that was not said." *Id.*

Defendants cannot credibly deny that, at the time they made positive statements about the Company's PBM business and integration which resulted in deceptively upbeat projections for the 2010 selling season, Defendants had actual knowledge that CVS Caremark was certain to lose, or had already lost, contracts with some of its most significant clients. The weekly Sales Pipeline Reports and the direct notification from the PBM clients that they would not be renewing their contracts with the Company simply did not justify Defendants' statements that "we see significant new business opportunities in 2010" and "we feel pretty optimistic about the season." ¶125. Nor did this information support Defendant Ryan's financial projections of 13-15% EPS growth in 2010, based on growth in the PBM business. *See Glassman v. Computervision Corp.*, 90 F.3d 617, 627 (1st Cir. 1996) (recognizing that forecasts "may be actionable to the extent that they are not reasonably based on, or are inconsistent with, the facts at the time the forecast is made") (citation omitted); *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 368 (1st Cir. 1994) (finding that plaintiffs adequately pled scienter when they alleged that "reports and documents [were] presented to defendants at relevant times that were inconsistent with the defendants' public statements"); *Sloman*, 2007 U.S. Dist. LEXIS 69475, *30 ("Even if the defendants did not consciously intend to defraud, the allegation that they were aware of material issues that would likely affect [the company's]

revenues for the third quarter is sufficient to establish that they 'acted with a high degree of recklessness.'") (quoting *In re StockerYale Secs. Litig.*, 453 F. Supp. 2d 345, 357 (D.N.H. 2006)).[20]

### 3. Defendants' Positions at CVS Caremark and Their Intimate Involvement with the PBM Business Support a Showing of Scienter

The Individual Defendants' knowledge may be further inferred from their positions within the Company, which gave them unrestricted access to internal undisclosed adverse information. *See Boston Scientific*, 523 F.3d at 91 (noting that the defendant's position as chief operating officer would have put him in a position in which he would have known about the existence of an upcoming product recall); *see also In re PerkinElmer, Inc. Sec. Litig.*, 286 F. Supp. 2d 46, 54-55 (D. Mass. 2003) (the fact that individual defendants "held positions that would have given them not only access to, but close familiarity with, the details" of the company's affairs supported strong inference of scienter); *Brumbaugh*, 416 F. Supp. 2d at 259 (same). Officers are deemed to know facts reasonably available to them, particularly when the facts are critical to a company's core operations. *See, e.g., Boston Scientific*, 523 F.3d at 90-91 (knowledge imputed to key officials of problems with core business, supporting an inference of scienter); *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004) (inferring that "top executives at [the company] were aware of a scheme involving

---

[20] Ignoring Plaintiffs' allegations, Defendants respond by arguing that "the Complaint contains no explanation of why Defendants would conceal information about contract losses that they knew would soon be revealed to the market." Def. Mem. at 42. Other than the obvious fact that Defendants wanted to sell their CVS Caremark stock at an inflated price before the truth came out (*see* §III.C.5, *infra*), as the Complaint explains, Defendants feared that if existing and potential customers discovered that clients were receiving inferior customer service, they would have chosen another PBM to do business with, which, in turn would affect the Company's share price. ¶¶95, 98. *See Kafenbaum*, 217 F. Supp. 2d at 247 (finding a strong inference of scienter where it was alleged that defendants were motivated to conceal a software problem to preserve a $40 million contract). Even accepting Defendants' false argument that they lacked a motive, Plaintiffs' claims still survive. As the Supreme Court has held, the lack of a motive is not fatal to a claim of securities fraud. *See Tellabs*, 552 U.S. at 325. At a minimum, the desire to keep potential customers from learning of the service issues makes the allegations that Defendants knew of but failed to disclose contract losses "plausible." *See Twombly*, 550 U.S. at 570.

systemically fraudulent sales practices, given the importance of the [] sale to [the company's] business that year") (citation omitted); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (strong inference of scienter was sufficiently alleged where misrepresentations and omissions concerned company's "most important products" and were much more likely to result from an intent to deceive or recklessness on the part of management).

Here, there is no question that Defendants knew about the various service and integration problems at the Company, as well as information regarding contracts that were at the highest risk for loss or those that were already lost.  The ultimate success of the PBM model hinged upon the Company's ability to provide adequate service to its clients because, as Defendants acknowledged, if plan participants were not satisfied with CVS Caremark's service, existing contracts would be lost and new contracts would be difficult to obtain.  ¶¶2, 57, 63.  The retention of customer contracts, in turn, was critical to CVS Caremark because the loss of such contracts could cost the Company billions of dollars in annual earnings.  ¶¶2, 57.  For that very reason, Defendants monitored the Company's contracts on a weekly basis.  ¶65.  Given the importance of the PBM business, it is incredible to suggest that Defendants did not know of the continuing service and integration problems, as well as customers' dissatisfaction with the PBM services.  As high-level executives, each Individual Defendant was intimately involved with, and had direct responsibility for, important issues affecting the Company's business, including its PBM services.  ¶¶68-69, 93.  For example, Defendant Ryan, along with Defendant Rickard, regularly spoke about significant corporate matters, such as the CVS Caremark Merger, the Company's PBM business and its financial results, which suggests that they had a basis for those statements.  *See, e.g.,* ¶¶58-59, 112-13, 125-27, 135-37, 140-42, 152, 159-60, 172, 175, 180.

Defendant McLure was the President of the Company's Pharmacy Services and the chief architect of the PBM model.  ¶¶10, 30, 190.  McLure oversaw the integration of the PBM into the

merged Company (¶190); received weekly Sales Pipeline Reports outlining the contracts at the highest risk for termination (¶¶66, 85); and was terminated once the truth about CVS Caremark's contract losses and service issues were revealed.  ¶¶10, 108, 190.  McLure's forced resignation, announced on November 6, 2009, immediately following Defendants' disclosure that CVS Caremark would not be meeting its EPS growth, further contributes to an inference of scienter.  *See, e.g., Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (CEO's forced resignation "add[ed] to the overall pleading of circumstantial evidence of fraud").

In addition, all of the Individual Defendants participated in monthly or quarterly meetings during which service problems were discussed.  *See* ¶¶68-69; *see also In re Allied Prods. Corp., Inc. Sec. Litig.*, No. 99 C 3597 (HDL), 2000 U.S. Dist. LEXIS 16781, at *15 (N.D. Ill. Nov. 15, 2000) (finding an inference of scienter where products were "critical part" of company's business and defendants "were daily and month appraised" of production and cost accounting problems). Moreover, they each received the Sales Pipeline Reports on a weekly basis.  ¶66.  Accordingly, in the context of performing their responsibilities, Defendants had access to material non-public information regarding the Company's PBM business, customer contracts and integration issues.[21]

---

[21]    While Defendants offer little to dispute the Complaint's allegations that they deceived the public by concealing CVS Caremark's integration and service failures, they make earnest but futile attempts to counter some of the Complaints' other allegations.  For example, Defendants claim that they disclosed the impact of the CMS Spread Regulation.  *See* Def. Mem. at 44.  However, while Defendants told investors that the CMS Spread Regulation was expected to "reduce the profitability of our Medicare Part D business" (Def. Mem. at 44), they simultaneously downplayed the effect the regulation would have on the Company, stating that the "net impact will be a headwind."  ¶152. Defendants' argument that the Maintenance Choice allegations do not support an inference of scienter (*see* Def. Mem. at 45) also fails.  Contrary to Defendants' assertions, the Complaint alleges that while Defendants praised the Maintenance Choice offering as a great success, plan sponsors were disappointed with the offering because it failed to provide its promised mail-order pricing, but instead provided a higher retail/mail order hybrid pricing structure.  ¶111.

### 4.    Confidential Witnesses Corroborate Allegations Concerning Defendants' Scienter

Unable to withstand the compelling evidence of their scienter, Defendants resort to attacking Plaintiffs' reliable confidential witnesses and argue that the information that they provide is not sufficiently particularized.  *See* Def. Mem. at 38-40.  The Complaint, however, describes each confidential witness's exact job title and responsibilities, the timeframe during which he or she was employed by the Company, the information attributed to each confidential witness and why they were in a position to know the information alleged.  ¶33; *see also Cabletron*, 311 F.3d at 29 (noting that information from confidential witnesses can be relied upon "provided [the confidential witnesses] are described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged") (quoting *Novak*, 216 F.3d at 314).

The Complaint sets forth the detailed accounts of numerous former CVS Caremark employees with direct knowledge of the fraudulent nature of Defendants' statements during the Class Period.  As confirmed by the accounts of 13 confidential witnesses, CVS Caremark was experiencing pervasive service and integration problems both prior to and during the Class Period, which were widely known throughout the Company.  For example:

- CW5, a former CVS Caremark PBM Director, noted that "services issues were commonly the subject of discussion" during senior executive meetings. ¶69.

- CW6, a former Client Liaison Coordinator at the Company, explained that "service levels were low" because problems with integration of computer systems often resulted in representatives being unable to access participants' information.  ¶77.

- CW8, a former Specialty Admissions Coordinator at CVS Caremark, stated that even prior to the Class Period, the Company's merger of information systems did not function properly.  ¶81.

- CW9, a former employee at CVS Caremark's call center, noted that PBM plan participants would go "months" without getting appropriate medication

and employees were told to conceal system problems from plan participants. ¶¶91, 101.

- CW11, a former PharmaCare Project Coordinator, stated that there were service problems with the Chrysler account that were "very much in the open" even prior to the Class Period.  ¶93.

The confidential witnesses also confirmed that these problems caused CVS Caremark customers to discontinue their PBM contracts with the Company.  *See* ¶82 (CW5 explained that the Coventry contract was lost to poor implementation and service issues); ¶¶77, 85 (CW6 confirmed that by mid-2008 it was clear within the Company that Coventry decided to abandon CVS Caremark because of service issues and that around November 2008, it was practically "official" that the New Jersey account would be lost).  The confidential witnesses corroborate independent factual allegations of Defendants' knowledge, such as Sales Pipeline Reports (¶¶65-67, 80, 85), the August 5, 2009 letter confirming the loss of the New Jersey account (¶90) and Defendants' own admissions of service problems and knowledge that Coventry's commercial contract would be lost months before such information was disclosed (¶¶76, 184, 196-98).  *See Cabletron*, 311 F.3d at 29-30 (noting that the particularity of confidential witness allegations depends on the "level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia").

Defendants do not dispute these allegations.  Instead, they attempt to discredit some of the confidential witnesses because they left CVS Caremark before the start of the Class Period.  *See* Def. Mem. at 39.  However, contrary to Defendants' assertions, there is no requirement that all confidential witnesses must be at the Company at the start of the Class Period, as long as the information provided by the witnesses pertain to events that occurred during their tenure.  *See, e.g., Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc*., No. 08-6324 (PAM/AJB), 2010 U.S. Dist. LEXIS 10029, at *11 (D. Minn. Feb. 3, 2010) (rejecting defendants' argument that the court should

not credit the testimony of the confidential witnesses because 9 out of the 15 witnesses were not

employed at the company during the class period).  Here, the Complaint does not allege that the

confidential witnesses had knowledge of events after they left the Company.  Rather, the information

provided by the witnesses is relevant because it shows that CVS Caremark was experiencing

significant service and integration problems even before the Class Period began.  *See In re*

*Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (holding that pre-class period

information was relevant to establish defendants' knowledge of the true facts even before the start of

the class period); *Cornwell v. Credit Suisse Group*, No. 08 Civ. 3758 (VM), slip op., at 18 (S.D.N.Y.

Feb. 11, 2010) (finding that the existence of certain "reports and problems identified by Confidential

Witnesses before and during the Class Period . . . suggest that analogous information was available

to Defendants during the Class Period").[22]

Defendants also argue that Plaintiffs have not linked the information provided by the

confidential witnesses to the Individual Defendants.  *See* Def. Mem. at 40.  This argument, however,

overlooks the totality of the allegations, *i.e.*, that, among other things, Defendants were monitoring

incumbent contracts, received Sales Pipeline Reports informing them that certain contracts were at

the highest risk for termination, were notified by several CVS Caremark clients that they would not

be renewing their PBM contracts and held monthly meetings to discuss service issues.  ¶¶76-94, 99-

105; *see also Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242, 268-69 (3d Cir. 2009) (noting that

---

[22]     The cases cited by Defendants are inapposite because in those cases the facts were not
sufficiently alleged to suggest that the confidential sources would possess the information attributed
to them and the sources did not corroborate information from other sources in the complaint.  *See,*
*e.g., Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 148 (3d Cir. 2004) (confidential
witnesses were not described with sufficient particularity to demonstrate that they were privy to the
information alleged); *In re Rackable Sys.*, No. C 09-0222 CW, 2010 U.S. Dist. LEXIS 2663, at *22-
*23 (N.D. Cal. Jan. 13, 2010) (confidential witnesses "only provide[d] vague assertions about the
financial conditions" of the company); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 141 (D. Conn.
2007) (none of the confidential witnesses were "alleged to have been involved in or to have any
familiarity with the process of setting or estimating loss reserve").

while the plaintiffs "do not point to any particular document or conversation that would have informed" defendants of the alleged fraud, "plaintiffs' allegations of scienter . . . will ultimately rest not on the presence of absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture pained by the Complaint, it is at least as likely as not that defendants acted with scienter") (citation omitted); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1060 (C.D. Cal. 2008) (holding that information from confidential sources was adequate and rejecting defendants' argument that plaintiffs were required to allege that the sources "spoke[] [with] or had other contact with any of the seven non-management directors"); *In re Xethanol Corp. Sec. Litig.*, No. 06 Civ. 10234 (HB), 2007 U.S. Dist. LEXIS 65935, at *9 (S.D.N.Y. Sept. 7, 2007) (rejecting defendants' argument that plaintiffs failed to identify reports or statements in which defendants were made aware of the alleged fraud and holding that letters and statements made by anonymous former employees were sufficient "to show that Defendants were told, knew or should have known that their statements . . . were false when made").[23]

### 5.  Defendants' Suspicious Insider Trading Creates a Strong Inference of Scienter

The allegations that Defendants made the false and misleading statements at issue to enable them to sell millions of dollars of Company stock at artificially inflated prices satisfy the motive and opportunity elements of scienter. *See Cabletron*, 311 F.3d at 40 (finding that insider sales combine "with other aspects of the complaint to produce a strong inference of scienter") (citation omitted).

---

[23]  Defendants' statement that "only one of the confidential witnesses offers any specific dates on which a report was issued or a meeting took place" (Def. Mem. at 40) is patently false. *See, e.g.,* ¶66 (CW3 and CW4 noted that weekly Sales Pipeline Reports were distributed to senior executives *every Monday*); ¶68 (CW3 stated that monthly teleconferences took place on the *third Friday of every month* and, according to CW4, Defendant Ryan hosted the monthly calls *beginning in 2009*); ¶69 (CW5 discussed *quarterly* senior executive meetings); ¶83 (CW6 stated that a meeting was held *in October 2008* during which Coventry announced that they were not renewing their contract with CVS Caremark); ¶85 (according to CW3, Defendants received a Sales Pipeline Report on *May 12, 2008*, that put the New Jersey account at the highest risk for termination).

Stock sales by insiders contribute to a strong inference of scienter if the sales are unusual in amount

or occur at suspicious times.  *See Boston Scientific*, 523 F.3d at 92.  In *Boston Scientific*, the First

Circuit found insider sales probative of scienter where the sales occurred prior to the announcement

which caused the stock to drop at the end of the Class Period.  As the Court noted:

> It fits with plaintiff's theory that defendants would have sold stock at this time,
> knowing that the price would drop when the manufacturing change, acknowledging a
> defect, was announced.  If defendants were unaware . . . a fact finder could
> reasonably ask why they would have sold so much stock at a time when the company
> appeared to be soaring . . . .

*Id.* at 92-93.

Here, the insider sales are highly unusual, particularly when considered in context.  While

Defendants were concealing information they knew about CVS Caremark's contract losses and

failing PBM business, over the course of only three months, Defendants quickly disposed of more

than 1 million shares of Company stock, reaping over $40 million in proceeds.  ¶¶9, 204.  As set

forth in the Complaint, between August 7, 2009 and November 2, 2009, Defendant McLure sold

500,000 shares of CVS Caremark stock, or 98% of his personally held shares, for a total of

approximately $17.7 million in proceeds; Defendant Ryan sold 400,000 shares of CVS Caremark

stock, or approximately 22% of his personally held shares, for total proceeds of approximately $13.7

million; and Defendant Rickard sold 251,520 shares of Company stock, 52% of his personally held

shares during the Class Period, for proceeds of approximately $8.5 million.[24]  ¶109.

---

[24]    Defendants miscalculate the percentage of stock sold by including stock options as part of
their holdings.  For example, Defendants wrongly assert that the "400,000 shares that Mr. Ryan sold
on August 7, 2009 constitute 5.4%" of his holdings, which they allege were 7,398,279 in March
2009.  Def. Mem. at 37 n.28.  However, as the March 2009 Proxy Statement that Defendants
reference clearly states, the 7,398,279 includes 4,584,114 "shares of common stock not currently
owned, but subject to options."  When determining the percentage of an individual defendant's
shares that were sold during the class period, it is inappropriate to include options in the calculation.
*See In re Oxford Health Plans Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (stating that "vested
options are not shares").  Even if the Court were to include Defendants' vested options, Defendants
McLure, Rickard and Ryan respectively sold 60%, 19.6% and 7% of their total holdings.  ¶¶109,

The amounts of these sales are significant and stand in stark contrast to the insider trading patterns of the preceding year, when Defendant Rickard sold no shares of CVS Caremark stock and Defendant McLure sold about half the percentage of holdings he sold from August to November 2009. ¶205. Moreover, in contrast to his $13.7 million sale in August 2009, Defendant Ryan has not sold a single share since the end of the Class Period – when the artificial inflation in CVS Caremark's share price was removed. ¶109. Given the timing of the trades and the amount of the trading, the insider trading allegations give rise to and support a strong inference of scienter. *See Fitzer v. Sec. Dynamics*, 119 F. Supp. 2d 12, 25 (D. Mass. 2000).

Defendants' August sales are particularly suspect because they occurred only days after Defendants expressed "great confidence" in the Company's ability to retain current clients and made bullish projections of "an EPS growth of at least 13 to 15% next year." ¶¶205-06; *see Stevelman*, 174 F.3d at 85-86 (sale of officer's stock in proximity to allegedly false optimistic statements was sufficient to show their unusual and suspicious nature). The day after Defendants issued these positive projections, on August 5, 2009, Defendants received a letter confirming that CVS Caremark had lost the New Jersey contract, which was valued at over $1 billion per year. ¶¶107, 206.[25] Rather than disclose the loss to investors and admit that their 2010 earnings projection could not be met, Defendants instead chose to personally profit from the undisclosed information. Indeed, only two

205. Contrary to Defendants' assertion (*see* Def. Mem. at 36-37), there is no minimum level of sales at which insider trading becomes unusual. Courts have found that sales in amounts significantly smaller than those alleged here are sufficient to support scienter. *See, e.g., Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 379-80 (5th Cir. 2004) (CEO's sales of 16% of his stock within days of false statements contributed to strong inference of scienter); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) (sale of 175,000 shares, earning $3.5 million, combined with timing of misrepresentations, satisfied scienter); *Oxford Health Plans*, 187 F.R.D. at 140 (sale of 11% and 17% of holdings were "not insignificant" and supported an inference of scienter).

[25]    By August 2009, Defendants also knew that the FTC had initiated an investigation into the Company's practices. ¶¶206, 209.

days after receiving confirmation of New Jersey's non-renewal, on August 7, 2009, Defendants Ryan and McLure collectively sold over 600,000 shares of their CVS Caremark stock for proceeds of more than $20 million.  ¶¶107, 109, 206.  Defendant Rickard sold $8.5 million worth of Company stock only 10 days later, on August 17, 2009.  ¶¶107, 109.  All of Rickard's and McLure's Class Period sales, and 99.6% of Ryan's sales, took place *after* Defendants' statements regarding CVS Caremark's 2010 outlook and *after* the receipt of the August 5, 2009 letter confirming the loss of the New Jersey account and ended just ***three days before*** Defendants announced that the 13-15% EPS growth for 2010 was "not going to happen."  ¶¶108-09, 206.

Defendants fail to acknowledge or defend the fact that, upon learning about the loss of the New Jersey account (but before the loss was disclosed to the market), Defendants nevertheless decided to take advantage of CVS Caremark's inflated stock price, selling their shares on this inside information.  Instead, Defendants advance a variety of purported justifications to explain away their stock sales.  None of these excuses, however, when the totality of Plaintiffs' allegations are considered, provides a more "compelling" inference negating scienter.  For example, Defendants argue that Rickard purportedly sold his stock in connection with his retirement from CVS Caremark. *See* Def. Mem. at 35.  However, stock sales associated with retirement do not necessarily negate scienter, as an inference that the retiree participated in inflating the stock price to fund retirement activities is equally as compelling.[26]  *See Goldman v. Belden*, 754 F.2d 1059, 1071 (2d Cir. 1985) (finding that the "question of whether [] retirement was the motivation for [defendant's] stock sales is a question that would be inappropriate for decision even on a summary judgment motion") (citation omitted); *Kaplan v. Rose*, 49 F.3d 1363, 1379-80 (9th Cir. 1994) (evidence of stock sales linked to retirement was sufficient to defeat summary judgment for defendants because the court

---

[26]     *Greebel*, 194 F.3d at 206, which Defendants cite (*see* Def. Mem. at 35), does not hold that retirement gives insiders a free ticket to commit securities fraud.

found a material factual issue existed as to whether defendants artificially inflated stock to fund retirement activities).[27]  The fact remains that Defendants sold their shares at suspicious times (*i.e.*, the sales began on August 17, 2009 – only days after Defendants received notice that CVS Caremark had lost the New Jersey account and ended on November 2, 2009 – just three days before Defendants disclosed the truth).  ¶107.

Defendants also argue that their insider trading is not probative of scienter because Defendants McLure and Rickard made sales pursuant to Rule 10b5-1 trading plans.  *See* Def. Mem. at 34-36.  To the contrary, Defendants' 10b5-1 trading plans, which were adopted ***during the Class Period*** to dispose of significant amounts of stock, ***support*** an inference of scienter because the plans were adopted at a time when the insider possessed material non-public information.  *See Freudenberg v. E*Trade Fin. Corp.*, No. 07 Civ. 8538, 2010 U.S. Dist. LEXIS 46053, at *77 (S.D.N.Y. May 11, 2010) (finding that defendants' "Rule 10b5-1 trading plans – adopted during the Class Period – to dispose of significant amounts of stock during the Class Period may evidence scienter").  A 10b5-1 trading plan may give rise to an inference of scienter because "'a clever insider might 'maximize' their gain from knowledge of an impending price drop over an extended amount.'"  *Id.* (quoting *In re Immucor Inc. Sec. Litig.*, No. 05-2276, 2006 U.S. Dist. LEXIS 72335, at *53 n.8 (N.D. Ga. Oct. 4, 2006)).

Here, Defendants were already aware of the fact that the Company's customers were at the highest risk for terminating their contracts with CVS Caremark (indeed, New Jersey and Coventry had already done so) at the time Defendants Rickard and McLure adopted their trading plans.[28]

---

[27]    Nor does Defendant Rickard's post-Class Period sale vitiate his intent to profit from illegal insider trading.  *See* Def. Mem. at 36.  Simply because Rickard could have, but did not, profit more handsomely from his sales does not infer innocence in his prior sales.

[28]    Although Defendants claim that McLure's trading plan "set up the exercise of 600,000 stock options in increments of 100,000 per month to be exercised on the first available trading day of each

Accordingly, Defendants' trading plans are not a cognizable defense to scienter. *See, e.g., Biogen Idec*, 2007 U.S. Dist. LEXIS 98076, at *40 ("The attempt to use such trading plans as a non-suspicious explanation is undermined . . . when such plans are entered into during the Class Period.") (citation omitted); *Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*, 497 F.3d 546, 554 (5th Cir. 2007) (Plaintiff "convincingly suggests that the attempt to use the 10b5-1 Plan as a non-suspicious explanation is flawed because . . . [defendants] entered into the Plan during the Class Period").[29]

In any event, Defendants' attempt to assert the affirmative defense of a Rule 10b5-1 trading plan is premature on a motion to dismiss. *See Boston Scientific*, 523 F.3d at 92 (averments of insider sales contributed to a strong inference of scienter even if a 10b5-1 trading plan existed because, absent discovery, there was no evidence of "when the trading plans went into effect, that such trading plans removed entirely from defendants' discretion the question of when sales would occur, or that they were unable to amend these trading plans"); *In re Able Labs. Sec. Litig.*, No. 05-2681 (JAG), 2008 U.S. Dist. LEXIS 23538, at *103 n.40 (D.N.J. Mar. 24, 2008) ("10b5-1 trading plan does not provide an absolute defense to a claim of insider trading. Rather, it requires an additional

---

month" (Def. Mem. at 35), as the Complaint alleges, Defendant McLure sold 200,000 shares on August 7, 2009 – a date that was not the first available trading day for that month.

[29]     The cases Defendants cite with respect to 10b5-1 trading plans are inapposite because they either do not involve trading plans entered into during the class period or do not rely on the existence of the trading plans in finding that the stock sales were not suspicious. *See City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 425 (D. Del. 2009) (referring to a trading plan, but without indicating when plan was adopted, the court found that the sales were not unusual in scope or timing because "defendants sold the same number of shares every month with each sale amounting to less than 1% of each defendant's total holdings"); *Stiegele ex. rel. Viisage Tech. v. Bailey*, No. 05-10677-MLW, 2007 U.S. Dist. LEXIS 86469, at *34 (D. Mass. Aug. 23, 2007) (sales were made pursuant to a "pre-existing" 10b5-1 trading plan not entered into during the class period); *In re Int'l Rectifier Corp. Sec. Litig.,* No. CV 07-02544-JFW (VBKx), 2008 U.S. Dist. LEXIS 44872, at *62 (C.D. Cal. May 23, 2008) (stock sales made pursuant to 10b5-1 plans entered into during the class period were not suspicious given the lengthy four year class period).

factual finding of good faith.   Not only can this Court not make such factual findings when considering a motion to dismiss, but this Court must also draw all inferences in favor of the non-moving party."); *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 734 (S.D. Ohio 2006) ("[a]s it is typically premature to raise affirmative defenses in a motion to dismiss, this Court will not consider the impact of [defendant's] purported 10b5-1 trading plan at this stage of the pleadings").

Defendants' knowledge, in conjunction with the insider stock sales, demonstrates a strong inference that Defendants intended to withhold material negative information about the Company long enough to enable them to dispose of large amounts of Company stock before the disclosure of the information would take the inflation out of the stock price.  Allegations of insider sales "provide additional ballast to [the] argument for scienter.  They suggest further motive for securities fraud, and they combine with other aspects of the complaint to produce a strong inference of scienter overall." *Cabletron*, 311 F.3d at 40 (citation omitted).[30]

### D. Plaintiffs Have Sufficiently Alleged Claims Against McLure

Defendants argue that because McLure did not make "a single false or misleading statement, [he can] only be found liable under a control person theory."  Def. Mem. at 45 n.34.  They are wrong.  Plaintiffs specifically allege that McLure (and the other Defendants) engaged in a course of deceptive conduct during the Class Period.  ¶¶66, 68, 85, 222-25.  Accordingly, McLure is subject to liability under the group pleading doctrine and under the scheme liability theory of Rules 10b-5(a) and (c).[31]

---

[30]   As a result of Defendants' insider sales, CtW Investment Group, a CVS Caremark shareholder, has urged the SEC to investigate sales of Company stock made by CVS Caremark senior executives between August and November 2009.  ¶207.

[31]   Rules 10b-5(a) and (c) provide for liability for one who "(a) employ[ed] any device, scheme or artifice to defraud" or "(c) engage[d] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. §§240.10b-5(a), (c).

As an initial matter, McLure is liable under the "group pleading doctrine." Under the group pleading doctrine, false or misleading statements "conveyed in annual reports, quarterly and year-end financial results, or other group-published information" may be imputed to other corporate officers and to the Company. *Rosen*, 321 F. Supp. 2d at 327; *see also Serabian*, 24 F.3d at 368 ("'In cases of corporate fraud where the false or misleading information is conveyed in . . . annual reports . . . or other 'group published information,' it is reasonable to presume that these are the collective actions of the officers.'") (quoting *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987)). As President of the Company's Pharmacy Services, McLure had direct information regarding the PBM's service problems and contract losses, and was aware of, and contributed to, Defendants' public statements. *See, e.g.*, ¶¶68-70. Accordingly, McLure is liable for the misstatements and omissions made during the Class Period. *See Allaire*, 224 F. Supp. 2d at 340-41 (finding that a senior executive remained liable under the "group pleading" doctrine, even though no specific false or misleading statements were attributed to him because facts were alleged showing he knew of misstatements, but failed to correct them).

Moreover, McLure is liable under the theory of scheme liability. In *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), the Supreme Court confirmed that alleging a materially false statement (or omission) is ***not*** a prerequisite to stating a claim under Section 10(b), recognizing that "[c]*onduct itself can be deceptive.*" *Id.* at 158. Although the Supreme Court affirmed the district court's dismissal of plaintiffs' scheme claims in *Stoneridge*, the issue facing the Court was whether third party suppliers (rather than company executives) could be liable for securities fraud. *See id.* at 153, 160-61. The Court concluded that the third-party suppliers' deceptive conduct was "too remote to satisfy the requirement of reliance." *Id.* at 161.

Here, unlike the third-party suppliers in *Stoneridge*, McLure's deceptive conduct was not "remote" or unknown to investors.[32]  In fact, Defendant Ryan explicitly informed investors that McLure was the "***chief architect** of [the] integrated model.*"  ¶¶10, 190.  As alleged, investors were well aware that McLure was responsible for overseeing the integration of the PBM into the merged Company, and that he was thus at the center of Defendants' fraud.  ¶¶10, 190-91.  Indeed, simultaneous with Defendants' disclosure that the Merger integration was a complete failure, the Company announced McLure's termination, prompting one analyst to observe that "his departure was ***not exactly voluntary**.*"  ¶191.

Similar to Lead Plaintiffs' allegations against McLure, the court in *In re Bristol-Myers Squibb Co. Securities Litigation*, 586 F. Supp. 2d 148 (S.D.N.Y. 2008) ("*BMS*"), sustained plaintiffs' scheme claims against a corporate insider whose deceptive conduct was "at the heart" of the alleged fraud.  Plaintiffs alleged a scheme claim against the Senior Vice President ("V.P.") who "was the lead [BMS] representative involved in the settlement negotiations" concerning a patent dispute with a competitor.  *Id*. at 152, 153-57.  Like McLure, the Senior V.P. argued that because he did not make any false statements, he could not be held liable under Section 10(b).  *See id*. at 169-70.  The *BMS* court rejected that argument, reasoning that even though the Senior V.P.'s deceptive conduct was not specifically disclosed to investors, his "behavior [was] ***at the heart*** of Bristol-Myers's false and misleading conduct" and "investors relied on his good faith" in fulfilling his fiduciary

---

[32]    Other courts have applied *Stoneridge* to sustain fraud allegations against primary actors who did not make statements, like McLure, reasoning that the holding in *Stoneridge* is limited to secondary actors, like third-party vendors.  *See, e.g., In re Micron Tech., Inc. Sec. Litig.*, No. 06-CV-85-S-BLW, 2009 U.S. Dist. LEXIS 13793, at *12 (D. Idaho Feb. 23, 2009) (explaining that, "in contrast to the issue presented in *Stoneridge*, the defendants are not secondary actors"); *Able Labs.*, 2008 U.S. Dist. LEXIS 23538, at *82 n.33 (sustaining scheme claims because, "[i]n stark contrast [to *Stoneridge*], the allegations before this Court involve high ranking officers of the Company, and not outside third parties").

responsibilities as a company officer.  *Id.* at 170.  Here, like in *BMS*, the "allegations are more than adequate to satisfy [Section] 10(b) and the requirements of the *Stoneridge* decision."  *Id.*

### E.    Plaintiffs Have Sufficiently Pled Loss Causation

Defendants also argue that the Complaint fails to plead loss causation  – *i.e.*, "the proximate causal link between the alleged misconduct (material misrepresentation[s and omissions]) and Plaintiffs' economic harm."  *Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 79-80 (D.D.C. 2008) (citing *Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).  In particular, Defendants contend that the Complaint fails to adequately allege a causal connection between their alleged misrepresentations and the 20% decline in CVS Caremark's share price on November 5, 2009.  *See* Def. Mem. at 22-26.  This argument, however, completely ignores the Complaint's well-pled loss causation allegations, and raises numerous questions of fact that are not only improper at this stage of the litigation, but are squarely at odds with the facts alleged in the Complaint.

In *Dura*, 544 U.S. at 346, the Supreme Court clarified the standard for pleading loss causation under Section 10(b).  While Defendants cite generally to *Dura*, they do not acknowledge its fundamental holding: that loss causation is governed by the relaxed notice requirements of Federal Rule of Civil Procedure 8(a)(2) ("Rule 8") and, accordingly, Plaintiffs need only plead a "short and plain statement" that provides "***some indication*** of the loss and the causal connection that the plaintiff has in mind."  *Id.*; *see also Brumbaugh*, 416 F. Supp. 2d at 256 (explaining that "Fed. R. Civ. P. 8(a)(2) applies to the pleading of economic loss and proximate causation").[33]  This standard is "not meant to impose a great burden upon the plaintiff" and a securities fraud complaint is

---

[33]     *See also In re Brooks Automation Inc. Sec. Litig.*, No. 06-11068-RWZ, 2007 U.S. Dist. LEXIS 88045, at *25 (D. Mass. Nov. 6, 2007) (finding that "the complaint's allegations of loss causation are, under Rule 8(a)(2), sufficient at this stage") (citation omitted); *Sloman*, 2007 U.S. Dist. LEXIS 69475, at *34 ("The allegation of loss causation is subject only to the liberal pleading standards of Rule 8(a)(2).").

sufficient so long as it sets forth what the alleged loss and causal connection to the fraud "might be." *Dura*, 544 U.S. at 347; *accord Sekuk Global*, 2005 U.S. Dist. LEXIS 16628, at *47-*48.

*Dura* also made clear that plaintiffs are not required to plead loss causation in a rigid or formulaic manner. *See Dura*, 544 U.S. at 346 (explaining that "neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss").[34]  As Judge Scheindlin explained in *Hunt v. Enzo Biochem Corp*.:

> There are several possible methods of pleading loss causation. . . . Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, a plaintiff may plead that it is the materialization of the undisclosed condition or event that causes the loss.  Alternatively a plaintiff may identify particular disclosing events that reveal the false information, and tie the dissipation of artificial price inflation to those events. . . .  [T]here is no requirement that the disclosure take a particular form or be of a particular quality . . . .

530 F. Supp. 2d 580, 594 (S.D.N.Y. 2008) (internal quotes and citations omitted); *see also In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 46-47 (D. Mass. 2006) (similar); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-06 (S.D.N.Y. 2005) ("a corrective disclosure is not necessary where, as here, plaintiffs allege that the subject of the misrepresentations and omissions caused their loss").  Moreover, "neither the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure be a 'mirror image' tantamount to a confession of fraud." *Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at *82.[35]

---

[34]     In *Dura*, the Supreme Court cited with approval the Second Circuit's decision in *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.* 343 F.3d 189 (2d Cir. 2003).  *See Dura*, 544 U.S. at 344.  In *Emergent Capital*, the Second Circuit held that proximate cause in a securities case exists when "damages suffered by plaintiff [are] a foreseeable consequence of any misrepresentation or material omission." *Id.* at 197.

[35]     *See also In re Bristol-Meyers Squibb Sec. Litig.*, No. 00-1990 (SRC), 2005 U.S. Dist. LEXIS 18448, at *52 (D.N.J. Aug. 17, 2005) (rejecting defendants' argument that plaintiffs must "show that the loss was caused by a corrective disclosure that mirrors, with precision, the alleged fraud"); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283-89 (S.D.N.Y. 2008) (same); *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 546 (N.D. Ill. 2007) (explaining that "a corrective

Far exceeding the "short and plain statement" required under Rule 8 and *Dura*, the Complaint alleges precisely how Defendants' misrepresentations (and omissions) and fraud-related disclosures were causally connected to CVS Caremark's 20% stock drop on November 5, 2009.  Specifically, the Complaint explains that:

- <u>Prior to and at the outset of the Merger</u>, Defendants consistently acknowledged that service would distinguish CVS Caremark from its competitors.  For example, during an analyst conference on March 13, 2007, Ryan pledged that "[n]o one is going to be able to out-cost us in the market . . . . So then *it's all about . . . service*."  ¶¶2, 54, 59.  Ryan also boasted that "*we think we can out-service* and out-sell our competition here."  ¶54.  Following the Merger, as early as November 1, 2007, Ryan told investors that CVS Caremark was fully integrated – "*quickly and successfully*."  ¶¶4, 71.

- <u>Throughout the Class Period</u>, Defendants reaffirmed that the Merger was a success.  For instance, during the January 9, 2009 earnings call, Ryan claimed that CVS Caremark faced "*no issues* with [its integrated] systems," and continued to tout its *"top of the game" service*.  ¶¶71, 120.

- Furthermore, in an effort to assure investors that CVS Caremark would meet projected earnings, Defendants continually represented that the Company's PBM business was meeting or exceeding expectations.  For instance, in <u>May 2009</u>, Ryan reaffirmed that the 2010 selling season was "*on plan, in good shape*," stating that "we are *exactly where we need to be*."  ¶63; *see also* ¶¶64, 112-13, 120, 125-26, 133, 135-36, 140, 142, 148-50, 159-60, 172, 175.

- <u>On August 4, 2009</u>, during the Company's second quarter earnings call, Ryan told investors that he "would be very disappointed if [CVS Caremark] didn't have EPS growth of at least 13 to 15% next year" and emphasized "*high customer satisfaction scores*."  ¶¶159-60.  Analysts were "encouraged" by this news and maintained their positive outlook.  ¶¶168-71.

- <u>On November 5, 2009</u>, investors learned the truth about the failed integration of CVS Caremark and the resulting downturn in the Company's PBM business.  Specifically, during the November 5 Call, Ryan revealed that the Company *would not achieve 13 to 15% EPS growth* – as previously projected – due to lost PBM business.  In contrast to his prior assurances of the Company's "top of the game" service, Ryan admitted that CVS

_____

disclosure [need not], on its face, specifically identify or explicitly correct a previous representation, or expressly disclose the particular fraudulent scheme the plaintiff alleges").

Caremark's customers were, in fact, ***abandoning*** its PBM business due to failed "*[e]xecution and performance.*"   ¶¶182, 184.

- Moreover, for the first time, Ryan conceded that, with respect to Coventry, ***Defendants had known for 10 months that the Company was "going to lose the commercial business" due to "service issues.***"   ¶¶10, 76, 184.  Ryan also quantified the magnitude of the PBM's lost business (exceeding ***$4.5 billion annually***) and revealed McClure's termination.   ¶¶10, 182-83, 190.

- Analysts were stunned by these revelations.  For example, on November 6, 2009, an HSBC analyst reacted to the "***[s]urprise nature of [Defendants'] disclosures,***" noting that the disclosures "*raise[d] credibility issues . . . with respect to everything from earnings guidance to the business model itself*" and raised questions "as to how much of the ***rest of the PBM contracts are vulnerable to nonrenewal.***"   ¶¶191, 212.  That same day, a Credit Suisse analyst further admonished that "***CVS provided undeniable evidence*** . . . that it has ***mismanaged the Caremark acquisition and destroyed shareholder value.***"   ¶193.

- <u>Following the November 5 Call</u>, CVS Caremark's share price plummeted, dropping from $36.15 to $28.87 – ***or over 20%*** – in a single day of trading, on volume that exceeded ***13 times*** the Class Period average.   ¶212.  According to an analyst with Morgan Stanley, this staggering decline "***fully pric[ed] in today's bad news.***"   ¶195.

These well-pled allegations amply satisfy the "short and plain statement" required by Rule 8 and

*Dura*, and provide more than sufficient notice of the causal connection that Plaintiffs have in mind.

Nothing more is required at this stage of the litigation.

Defendants expressly concede that the Complaint adequately alleges a causal connection

between CVS Caremark's November 5 stock drop and their revelation that the Company would miss

its EPS guidance for the third quarter of 2009 due to the PBM business.  *See* Def. Mem. at 22-24.[36]

With respect to the rest of the alleged misstatements and omissions, Defendants argue that they

---

[36]   Indeed, acknowledging that the Complaint provides "fair notice" of Plaintiffs' loss causation theory, Defendants argue ***only*** that all of the EPS-related statements were forward-looking and, accordingly, are not actionable under the PSLRA.  *See* Def. Mem. at 22-24.  For the reasons set forth in §III.B.3, above, this argument is without merit.

"were either not addressed on the November 5 Call,[37] were already known to the market, or both."

Def. Mem. at 24-25.  These arguments – which would require the Court to parse through the alleged

disclosures and make factual findings as to how, if at all, they are causally related to the alleged

misstatements – are wholly improper at the pleading stage.  *See, e.g., In re Boston Scientific Corp.*

*Sec. Litig.*, 604 F. Supp. 2d 275, 287 (D. Mass. 2009) (noting that "loss causation[] issues are more

properly addressed on summary judgment or at trial") (citation omitted); *In re Gilead Scis. Sec.*

*Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (agreeing with the Second and Third Circuit that "loss

causation 'is a matter of proof at trial and is not to be decided on a Rule 12(b)(6) motion to

dismiss'") (quoting *Emergent Capital*, 343 F.3d at 197).

For example, Defendants' argument that the "magnitude of the lost business, including the

loss of the New Jersey account, and the true impact on the Company's earnings" was "already

known to the market" (Def. Mem. at 24) invokes their affirmative defense of "truth-on-the-market,"

which cannot be considered at this juncture.  *See, e.g., Credit-Suisse AOL*, 465 F. Supp. 2d at 54

(explaining that the "'truth on the market' defense is intensively fact-specific and rarely appropriate

for review on a 12(b)(6) motion"); *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 238 (D.

Mass. 2004) (noting that "the extent of the market's knowledge . . . is a fact-specific question that is

rarely an appropriate basis for dismissal") (citation omitted).  To support their argument that the loss

of New Jersey was known to the market prior to the November 5 Call, Defendants improperly

attempt to rely on an unsubstantiated internet source that purportedly reveals this information.  *See*

---

[37]     Defendants incorrectly contend that certain of the alleged misstatements and omissions were
"not addressed on the November 5 Call."  Def. Mem. at 24.  Although Defendants do not provide the
Court with any specific analysis, or otherwise explain what they mean by this, they appear to be
suggesting that a corrective event must "mirror" the alleged misstatements and omissions.  But, as
explained above, "neither the Supreme Court in *Dura*, nor any other court addressing the loss
causation pleading standard[,] require a corrective disclosure be a 'mirror image' tantamount to a
confession of fraud."  *Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at *82.

Def. Mem. at 24.  However, on a motion to dismiss, a court may only consider documents attached to the complaint as exhibits or incorporated in it by reference and matters of public record, including the contents of documents required to be filed with the SEC.  *See In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 195 (S.D.N.Y. 2003).  The internet source does not fall within any of these narrow exceptions that permit the Court to go beyond the four corners of the Complaint and, therefore, cannot be considered here.  In any event, the internet source does not evidence that the information was ***available*** to investors "as early as August 11, 2009," as Defendants allege.  *See Callahan v. Harvest Bd. Int'l, Inc.*, 138 F. Supp. 2d 147, 159 (D. Mass. 2001) (declining to take judicial notice of a website where defendants failed to provide "the date on which the plaintiff 'discovered' the website").

Moreover, to successfully assert the truth-on-the-market defense, a defendant must prove that the corrective information was "conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)).  A posting from an internet source hardly provided the public with the truth about the New Jersey contract with the intensity and credibility legally required to counterbalance Defendants' misrepresentations and omissions.  Even if the Court were to consider Defendants' truth-on-market defense, Defendants' arguments are squarely at odds with the facts alleged in the Complaint.  For example, Defendants spend several pages of their brief arguing that, apart from their EPS-related disclosures, all of the adverse information disclosed on the November 5 Call was known to the market "weeks or even months earlier."  In support of this argument, Defendants set forth the dates when the market previously learned that CVS Caremark lost the New Jersey, Chrysler and Coventry contracts, and suggest that Defendants merely "confirmed" the same information on the November 5 Call.  Def. Mem. at 24, 26.

To the contrary, the Complaint explains that, on the November 5 Call, investors learned for the first time that CVS Caremark lost the Coventry contract – valued at more than $4 billion annually – due to "*service issues*" that resulted from CVS Caremark's failed integration. ¶¶76, 184.[38] Accordingly, Defendants' purported "disclosures" of contract losses did not disclose the reasons behind those losses – *i.e.*, the PBM's integration and service failures – which is the very heart of this litigation. Nor did Defendants reveal the magnitude of the lost contracts and their true impact on the Company's earnings. ¶183. This corrective information was critical in view of Defendants' prior misrepresentations that that the Merger was a success, that CVS Caremark was fully integrated, and that the Company was thriving on its "top of the game" service. Indeed, it is telling that Defendants do not (and cannot) point to a single instance where this material adverse news was disclosed prior to November 5.[39]

Defendants' argument is also belied by the reaction of numerous analysts. For example, as discussed above, the Complaint explains that following the November 5 Call, an HSBC analyst commented on the "*surprise nature of [Defendants'] disclosure,*" noting that the disclosures "*rais[ed] credibility issues . . . with respect to everything from earnings guidance to the business*

---

[38]    Defendants claim that *Catogas v. Cyberonics, Inc.*, 292 Fed. Appx. 311 (5th Cir. 2008), is "right on point" for the proposition that the November 5 Call aggregated previously disclosed information concerning the magnitude and impact of lost business. However, in *Catogas*, the Court held that the complaint failed to provide the causal connection necessary to establish loss causation because the *entirety* of the press release at issue "did not reveal anything . . . that had not already been disclosed to the investing public." *Id*. at 315. Here, as described above, information regarding the "service issues" resulting from the Merger's failed integration and their crippling effect on the PBM business were first disclosed on the November 5 Call.

[39]    Defendants contend that they did not reveal on the November 5 Call that the New Jersey contract was lost due to service issues. *See* Def. Mem. at 26. Not so. In fact, Ryan specifically informed investors on the November 5 Call that "the majority of that business *was not lost on price*," indicating that it was lost on service. *See* Portnoy Decl. Ex. 7 at 24. Defendants also claim that Ryan told investors that "the majority of major clients who terminated did so for reasons *other than* service." Def. Mem. at 26 (emphasis in original). Although Defendants cite to the November 5 transcript in support of this proposition, the transcript does not reflect any such statement by Ryan.

*model itself.*"  ¶191.  Moreover, a Credit Suisse analyst remarked that "*CVS provided undeniable evidence today that it has mismanaged the Caremark acquisition* and *destroyed shareholder value.*"  ¶¶193, 212.  These well-pled allegations – all of which Defendants ignore – eviscerate any suggestion that the disclosures at issue were merely "confirmatory."

In addition, Defendants overlook the previously concealed risks that materialized on the November 5 Call regarding the failed integration, the adverse affect of resulting "service issues" on the PBM business, and integrity of CVS Caremark's management.  The fact that CVS Caremark's share price fell 20% when these risks materialized was a foreseeable consequence of Defendants' misconduct.[40]  These facts, as well, were not "confirmatory," and support a finding of loss causation at the pleading stage.  *See, e.g., Credit Suisse-AOL*, 465 F. Supp. 2d at 45-50 (plaintiffs adequately alleged loss causation where disclosures reflected the materialization of a concealed risk); *Parmalat*, 375 F. Supp. 2d at 307 (sustaining loss causation "where, as here, the risk allegedly concealed by defendants materialized during that time and arguably caused the decline in shareholder [] value"); *cf. Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at *81-*83 (loss causation sufficiently pled where the "'truth' about the company's underlying condition, when revealed, cause[d] the 'economic loss'").[41]

---

[40]     As explained *supra*, Plaintiffs can establish loss causation under *Dura* in more than one way, including by alleging a corrective disclosure or identifying the materialization of a concealed risk.  Further, as one court recently cautioned at summary judgment, "[T]he wholesale rejection of the materialization theory can lead to an untenable result.  If loss causation could only be proven by showing that a defendant made a traditional corrective disclosure, defendants could escape liability under §10(b) simply by avoiding corrective disclosures."  *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 07-CV-61542, slip op. at 50 n.40 (S.D. Fla. Aug. 18, 2010) (rejecting defendants' motion for summary judgment regarding plaintiffs' failure to establish loss causation).

[41]     Not surprisingly, Defendants cite mostly to case law in the Fifth Circuit – the circuit with the most stringent standard for pleading loss causation.  But even the Fifth Circuit does not support Defendants' attempt to delve into the merits of Plaintiffs' loss causation theory at this stage, reserving that analysis for class certification.  *See Oscar Private Equity Inv. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 271 (5th Cir. 2007) (requiring plaintiffs to "prove" loss causation in order to

In sum, despite raising numerous factual challenges to Plaintiffs' loss causation allegations, Defendants completely ignore the *only* inquiry that is actually relevant at this stage of the litigation: whether, in accordance with Rule 8 and *Dura*, the Complaint provides "fair notice" of Plaintiffs' loss causation theory. Yet, rather than respond to the well-pled facts that strongly support loss causation under *Dura* – including the statements of numerous securities analysts, the 20% stock drop, and the extraordinarily heavy trading volume on November 5 – Defendants, by and large, fail to address them. Their silence is telling.

### F. The Complaint Alleges Control Person Liability Under Section 20(a) of the Exchange Act

The Complaint also adequately pleads that the Individual Defendants are liable as control persons pursuant to Section 20(a) of the Exchange Act. To allege a claim under Section 20(a), a plaintiff must plead: (1) an underlying violation by a controlled person or entity; and (2) control over the primary violator by the defendant. *See Stone & Webster*, 414 F.3d at 194.

Defendants Ryan, Rickard and McLure do not contest that they are "control persons" of CVS Caremark who had primary responsibility for the dealings of the Company.[42] Rather, Defendants'

---

establish reliance at class certification). Even at the class certification stage, the approach in *Oscar*, however, has been widely rejected outside of the Fifth Circuit, most recently by the Seventh Circuit, which explained that "*Oscar Private Equity* represents ***a go-it-alone strategy*** by the [F]ifth [C]ircuit. It is not compatible with this circuit's decisional law [], and we disapprove of its holding." *Schleicher v. Wendt,* No. 09-2154, 2010 U.S. App. LEXIS 17367, at *19 (7th Cir. Aug. 20, 2010) (acknowledging *Oscar* "has not been adopted by any other circuit, and it has been rejected implicitly by some").

[42]    In a footnote, Defendants argue that the Section 20(a) claim against Defendant McLure should be dismissed because the "Complaint contains no individualized allegations as to [his] purported control of the Company." Def. Mem. at 45 n.34. Defendants, however, ignore the Complaint's allegations that Defendant McLure, as President of the Company's PBM division, had overseen the integration of the PBM into the merged Company and, according to Defendant Ryan, was "a chief architect of [the] integrated model." ¶¶10, 190-91. In any event, the question of control is one of fact "that will not ordinarily be resolved summarily at the pleading stage . . . [because the] issue raises a number of complexities that should not be resolved on such an underdeveloped record." *Cabletron*, 311 F.3d at 41 (citation omitted).

only argument for dismissing Plaintiffs' Section 20(a) claim is that Plaintiffs have not adequately alleged an underlying Section 10(b) claim. *See* Def. Mem. at 45. Because, as demonstrated above, the Complaint has more than sufficiently alleged underlying securities fraud violations against CVS Caremark and the Individual Defendants, it also adequately alleges a control person claim against each of the Individual Defendants. *See Smith & Wesson*, 604 F. Supp. 2d at 345.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint should be denied in its entirety.[43]

DATED:  September 3, 2010                    BARRY J. KUSINITZ (RI Bar No. 1404)


                                  */s/ Barry J. Kusinitz*
                                  BARRY J. KUSINITZ

                                  155 South Main Street, Suite 405
                                  Providence, RI  02903
                                  Telephone:  401/831-4200
                                  401/831-7053 (fax)
                                  bkusinitz@bdglawyers.com

                                  *Liaison Counsel*

                                  ROBBINS GELLER RUDMAN
                                    & DOWD LLP
                                  SAMUEL H. RUDMAN
                                  ROBERT ROTHMAN
                                  FAINNA KAGAN
                                  58 South Service Road, Suite 200
                                  Melville, NY  11747
                                  Telephone:  631/367-7100
                                  631/367-1173 (fax)

---

[43]     Although Plaintiffs believe that they have more than adequately stated claims against all Defendants, in the event the Court finds the Complaint to be deficient in any respect, Plaintiffs respectfully request leave to amend in accordance with Fed. R. Civ. P. 15(a). *See In re Gtech Holdings Corp. Sec. Litig.*, No. 94-0294P, 1995 U.S. Dist. LEXIS 22078, at *34 (D.R.I. Feb. 3, 1995) (citing Fed. R. Civ. P 15(a) for the proposition that "[l]eave to amend 'shall be freely given when justice so requires'").

LABATON SUCHAROW LLP
JOSEPH A. FONTI
STEPHEN W. TOUNTAS
NICHOLAS R. HECTOR
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)

*Co-Lead Counsel for Plaintiff*

LAW OFFICES OF BERNARD M.
   GROSS, P.C.
DEBORAH R. GROSS
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

*Additional Counsel for Plaintiff*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Memorandum

Of Law In Opposition To The Motion To Dismiss The Corrected Consolidated Class Action

Complaint was filed electronically with the Clerk of Courts using the CM/ECF system, which will

send notification of such filing to all counsel of record on the 3rd day of September, 2010.


*/s/ Barry J. Kusinitz*
BARRY J. KUSINITZ