UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

—————————————————— x

RICHARD MEDOFF, Individually and On
Behalf Of All Others Similarly Situated,

                  Plaintiff,

       vs.

CVS CAREMARK CORPORATION,
THOMAS M. RYAN, DAVID RICKARD, and
HOWARD McLURE,

                Defendants.

—————————————————— x

Civil Action No. 1:09-cv-00554-S-DLM

REPLY MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS

HINCKLEY, ALLEN & SNYDER LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island  02903
Telephone:  (401) 274-2000
Facsimile:  (401) 277-9600

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800

*Attorneys for Defendants*

# TABLE OF CONTENTS

P<small>AGE</small>

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ...............................................................................................................4

    I.    PLAINTIFFS FAIL TO STATE A CLAIM AS TO THE PRELIMINARY
        EARNINGS PREDICTION ...........................................................................4

        A.    The Preliminary Earnings Prediction is a Forward-Looking Statement ..........4

        B.    The Preliminary Earnings Prediction Is Entitled to the Protection of the
              Safe Harbor Because It Was Accompanied by Meaningful, Narrowly
              Tailored Cautionary Statements ........................................................................6

        C.    The Preliminary Earnings Prediction Is Entitled to the Protection of the
              Safe Harbor Because Plaintiffs Do Not Plead Facts Supporting a Strong
              Inference That Defendants Knew It Was False or Misleading When Made ...9

    II.    PLAINTIFFS FAIL TO STATE A CLAIM WITH RESPECT TO ALL OF
        THE REMAINING PURPORTEDLY ACTIONABLE STATEMENTS
        ALLEGED IN THE COMPLAINT .....................................................................11

        A.    Plaintiffs' Remaining Allegations Fail To Allege Loss Causation ...............11

        B.    Even If Plaintiffs Had Alleged Loss Causation as to the Remaining
              Allegations, the Vast Majority of the Supposedly False or Misleading
              Statements They Identify Are Not Actionable ...............................................19

              1.    Plaintiffs' theory that Defendants did not disclose potential
                        contract losses fails as a matter of law .................................................19

              2.    Generalized statements regarding the Company's strategic
                        business model, sales outlook, and "success" of the merger
                        are inactionable corporate puffery ........................................................20

    III.    THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF
        SCIENTER AS TO ANY OF PLAINTIFFS' CLAIMS .........................................24

        A.    Plaintiffs' Allegations Regarding Insider Stock Sales Fail to Give Rise
              to a Strong Inference of Scienter ..................................................................24

1.  Mr. Ryan's single stock sale was not suspicious .................................25

2.  Messrs. Rickard and McLure traded pursuant to 10b5-1 plans, which—together with the surrounding circumstances—affirmatively negate the inference of scienter............................................................26

B.  The Complaint's Remaining Allegations Fail to Allege That Defendants Acted with a High Degree of Recklessness .....................................................28

1.  Plaintiffs fail to plead facts supporting their assertion that Defendants knew that customer service problems were causing contract losses ........................................................................................28

2.  Plaintiffs fail to identify any specific contract-related information that would have put Defendants on notice that their statements were false or misleading .....................................................................30

3.  The statements in the Complaint attributed to confidential witnesses do not support a strong inference of scienter......................32

IV.  PLAINTIFFS DO NOT STATE A CLAIM FOR CONTROL PERSON LIABILITY.............................................................................................................34

V.  PLAINTIFFS' FOOTNOTE REQUEST FOR LEAVE TO AMEND SHOULD BE DENIED .........................................................................................34

CONCLUSION.......................................................................................................................36

# TABLE OF AUTHORITIES

CASES

PAGE

ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46 (1st Cir. 2008).........................................30, 35

Acito v. Imcera Group, Inc., 47 F.3d 47 (2d Cir. 1995) ...............................................................25

In re Aetna, Inc. Secs. Litig.,
      No. 07-4451, 2009 U.S. Dist. LEXIS 48910 (E.D. Pa. June 9, 2009).......................................9

Aldridge v. A.T. Cross Corp., 284 F.3d 72 (1st Cir. 2002) ...........................................................10

In re Allaire Corp. Sec. Litig., 224 F. Supp. 2d 319 (D. Mass. 2002) ...............................21, 22, 27

In re Ames Dep't Stores, Inc. Stock Litig., 991 F.2d 953 (2d Cir. 1993)......................................22

Ark. Pub. Emp. Ret. Sys. v. GT Solar Int'l, Inc.,
      No. 08-CV-312-JL, 2009 U.S. Dist. LEXIS 93820 (D.N.H. Oct. 7, 2009)............................22

Backman v. Polaroid Corp., 910 F.2d 10 (1st Cir. 1990) .............................................................15

Baron v. Smith, 380 F.3d 49 (1st Cir. 2004) ................................................................................10

Beach v. Healthways, Inc.,
      No. 3:08-0569, 2009 U.S. Dist. LEXIS 17809 (M.D. Tenn. Mar. 9, 2009) ...........................22

In re Biogen IDEC, Inc. Sec. Litig.,
      Civil Action No. 05-10400-WGY, 2008 WL 4810045 (D. Mass. Oct. 25, 2009)...................24

In re Boston Sci. Corp. Sec. Litig.,
      490 F. Supp. 2d 142 (D. Mass. 2007), rev'd on other grounds,
      Miss. Pub. Emps. Ret. Sys. v. Boston Sci. Corp., 523 F.3d 75 (1st Cir. 2008)......................23

In re Boston Sci. Corp. Sec. Litig., 604 F. Supp. 2d 275 (D. Mass. 2009)...................................17

In re Bristol-Meyers Squibb Sec. Litig., 586 F. Supp. 2d 148 (S.D.N.Y. 2008)..........................28

Brumbaugh v. Wave Systems Corp., 416 F. Supp. 2d 239 (D. Mass. 2006)................................10

In re Cabletron Sys. Inc., 311 F.3d 11 (1st Cir. 2002)...........................................................28, 32

Cal. Pub. Emps. Ret. Sys. v. Chubb Corp., 394 F.3d 126 (3d Cir. 2004)................................32, 33

Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235 (D. Mass. 2001)........................21

Catogas v. Cyberonics, Inc., No. 07-20787, 2008 WL 4158923 (5th Cir. Sept. 8, 2008).......15, 16

In re Champion Enterprises Inc., Sec. Litig.,
    144 F. Supp. 2d 848 (E.D. Mich. 2001), aff'd, 346 F.3d 660 (6th Cir. 2003)...........................7

In re Chipcom Corp. Sec. Litig.,
    No. 95-11114-DPW, 1996 U.S. Dist. LEXIS 22257 (D. Mass. Apr. 29, 1996).....................23

In re Coca-Cola Enters. Sec. Litig., 510 F. Supp. 2d 1187 (N.D. Ga. 2007)................................12

In re Credit Suisse-AOL Sec. Litig., 465 F. Supp. 2d 34 (D. Mass. 2006) ..................................17

In re Cytyc Corp. Sec. Litig.,
    No. 02-12399-NMG, 2005 U.S. Dist. LEXIS 6166 (D. Mass. Mar. 1, 2005)..................22, 23

In re Dell Inc., Sec. Litig., 591 F. Supp. 2d 877 (W.D. Tex. 2008)...............................................13

In re Donald Trump Casino Sec. Litig., 7 F.3d 357 (3d Cir. 1993)..................................................6

Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005) ............................................... passim

Eisenstadt v. Centel Corp., 113 F.3d 738 (7th Cir. 1997)............................................................23

In re First Marblehead Corp. Sec. Litig., 639 F. Supp. 2d 145 (D. Mass. 2009)..........................18

In re First Union Corp. Sec. Litig.,
    Civil No. 3:99CV237-H, 2006 U.S. Dist. LEXIS 5083 (W.D.N.C. Jan. 20, 2006) ...............12

Fitzer v. Sec. Dynamics Techs., 119 F. Supp. 2d 12 (D. Mass. 2000) .........................................21

Foman v. Davis, 371 U.S. 178 (1962) .........................................................................................35

In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261 (S.D.N.Y. 2009) ........................25

In re Gilead Scis. Sec. Litig.,
    536 F.3d 1049 (9th Cir. 2008), cert denied, 129 S. Ct. 1993 (2009) ......................................17

In re Glenayre Techs. Inc. Sec. Litig.,
    No. 96 CIV. 8252(HB), 1998 WL 915907 (S.D.N.Y. Dec. 30, 1998),
    aff'd, 201 F.3d 431 (2d Cir. 1999).........................................................................................25

Glover v. DeLuca,
    No. 2:03-CV-0288, 2006 U.S. Dist. LEXIS 76093 (W.D. Pa. Sept. 29, 2006)......................18

Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999)................................................. *passim*

Harris v. Ivax Corp., 182 F.3d 799 (11th Cir. 1999) ................................................................5, 9

In re Hi/fn, Inc. Sec. Litig.,
    No. C 99-4531 SI, 2000 U.S. Dist. LEXIS 11631 (N.D. Cal. Aug. 9, 2000) ........................22

In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574 (S.D.N.Y. 2007) ............................26

In re Ibis Tech. Sec. Litig., 422 F. Supp. 2d 294 (D. Mass. 2005) ......................................9, 10, 20

Institutional Invs. Group v. Avaya, Inc., 564 F.3d 242 (3d Cir. 2009).........................................25

Ledford v. Peeples, 605 F.3d 871 (11th Cir. 2010) ........................................................................34

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005)................................................12, 18

Magruder v. Halliburton Co.,
    Civil Action No. 3:05-CV-1156-M, 2009 WL 854656 (N.D. Tex. Mar. 31, 2009)...............17

Maldonado v. Dominguez, 137 F.3d 1 (1st Cir. 1998)...................................................................29

McCasland v. FormFactor Inc.,
    No. C 07-5545 SI, 2008 U.S. Dist. LEXIS 60544 (N.D. Cal. July 25, 2008) ........................25

Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049 (9th Cir. 2008)...........................31

Miss. Pub. Emps. Ret. Sys. v. Boston Sci. Corp., 523 F.3d 75 (1st Cir. 2008)................24, 26, 29

N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35 (1st Cir. 2008) ......6

In re Nash Finch Co. Secs. Litig., 502 F. Supp. 2d 861 (D. Minn. 2007) ....................................22

In re NetSolve, Inc., 185 F. Supp. 2d 684 (W.D. Tex. 2001) .......................................................22

In re NovaGold Res. Inc. Sec. Litig., 629 F. Supp. 2d 272 (S.D.N.Y. 2009) ................................9

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) ............................................................................22

Orton v. Parametric Tech Corp., 344 F. Supp. 2d 290 (D. Mass. 2004) ................................21, 23

Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261 (5th Cir. 2007)...............16

In re Parametric Tech. Corp. Sec. Litig., 300 F. Supp. 2d 206 (D. Mass. 2001)......................9, 10

In re Peritus Software Services, Inc. Sec. Litig., 52 F. Supp. 2d 211 (D. Mass. 1999)...........23, 29

v

In re Qwest Commc'ns Int'l, Inc. Sec. Litig., 387 F. Supp. 2d 1130 (D. Colo. 2005) .................34

In re Rhodia S.A. Sec. Litig., 531 F. Supp. 2d 527 (S.D.N.Y. 2007) ...........................................18

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004) ...........................................................................9

Rosen v. Textron, Inc., 321 F. Supp. 2d 308 (D.R.I. 2004) .......................................................5, 24

Rosenbaum Capital LLC v. Boston Commc'ns Group, Inc.,
    445 F. Supp. 2d 170 (D. Mass. 2006) .....................................................................................22

Scritchfield v. Paolo, 274 F. Supp. 2d 163 (D.R.I. 2003) .................................................5, 20, 23

Sekuk Global Enterprises v. KVH Indus.,
    No. 04-306, 2005 U.S. Dist. LEXIS 16628 (D.R.I. Aug. 11, 2005) .......................................24

In re Sepracor, Inc. Sec. Litig., 308 F. Supp. 2d 20 (D. Mass. 2004) ............................................6

Shaw v. Digital Equip. Corp., 82 F.3d 1194 (1st Cir. 1996) .......................................................23

Simon v. American Power Conversion Corp., 945 F. Supp. 416 (D.R.I. 1996) .....................21, 23

Sloman v. Presstek, Inc.,
    No. 06-cv-377-JD, 2007 U.S. Dist. LEXIS 69475 (D.N.H. Sept. 18, 2007) ...........................6

In re Smith & Wesson Hold. Corp. Sec. Litig., 604 F. Supp. 2d 332 (D. Mass. 2009).............6, 22

In re Stone & Webster, Inc. Sec. Litig., 414 F.3d 187 (1st Cir. 2005) .........................................31

Swack v. Credit Suisse First Boston, 383 F. Supp. 2d 223 (D. Mass. 2004)................................17

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) ..........................................4, 24

In re The Warnaco Group, Inc. Opinion Sec. Litig., 388 F. Supp. 2d 307 (S.D.N.Y. 2005) ........18

Van Ormer v. Aspen Tech., Inc., 145 F. Supp. 2d 101 (D. Mass. 2000).......................................21

Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102 (N.D. Cal. 2003) .........................26, 27

## STATUTES & RULES

15 U.S.C. § 78j(b)............................................................................................34

15 U.S.C. § 78t.................................................................................................34

15 U.S.C. § 78u-5(d)........................................................................................20

15 U.S.C. § 78u-5(i)(1)......................................................................................4

17 C.F.R. § 240.10b5.......................................................................................34

Fed. R. Civ. P. 9(b)..........................................................................................11

## OTHER AUTHORITIES

H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess. (1995)...........................4, 5, 7, 20

Defendants[1] respectfully submit this reply memorandum of law in further support of their motion to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and section 78u-4(b) of the PSLRA.

## PRELIMINARY STATEMENT

Plaintiffs seek to recover for losses incurred when CVS Caremark's stock price declined on one day and one day only:  November 5, 2009.  Plaintiffs do not and cannot dispute that.  Nor can plaintiffs dispute that the Supreme Court's landmark opinion in Dura Pharmaceuticals, Inc. v. Broudo holds that plaintiffs in securities cases like this one *must* plead that the stock price drop was caused by a corrective disclosure, *i.e.*, the disclosure of information that revealed a prior misstatement or omission.  544 U.S. 336, 347 (2005).  Under Dura, if there is no plausible connection between the corrective disclosure and the prior alleged fraud, the complaint fails to plead loss causation.  In the absence of such a connection, the alleged fraud could not, as a matter of both law and logic, have caused the loss for which plaintiffs seek to recover.  Thus, the *only* alleged misstatements or omissions that could be actionable in this case are those for which some previously withheld "truth" was revealed on the November Call.

In the face of this clear law, plaintiffs' Opposition ("Pls. Opp.") conspicuously diverts attention from the actual words spoken on the November Call, quoting words and phrases in isolation and eliding Mr. Ryan's actual statements.  But a review of the transcript of the November Call (provided as Exhibit 7 of the Portnoy Declaration) reveals what is, at bottom, one—and only one—possible corrective disclosure:  Mr. Ryan's giving formal earnings guidance, which lowered the expectation for 2010 earnings he had expressed three months before in his Preliminary Earnings Prediction.

---

[1] Defined terms used herein have the same meaning as in the Memorandum of Law in Support of Defendants' Motion to Dismiss ("Def. Mem."), unless otherwise specified.

Mr. Ryan's August 2009 Preliminary Earnings Prediction is a classic forward-looking statement. Consequently, it is protected by the PSLRA's statutory safe harbor and therefore inactionable for two independent reasons: (1) because it was accompanied by meaningful cautionary language warning investors of all of the risks plaintiffs now allege materialized; and (2) because plaintiffs do not plead facts sufficient to allege that Mr. Ryan had actual knowledge that the Preliminary Earnings Prediction was false or misleading when made. Plaintiffs' Opposition ignores the PSLRA's definition of forward-looking statements and distorts the substantial body of case law that confirms that the cautionary language provided in connection with the Preliminary Earnings Prediction moors it well within the first inlet of the statutory safe harbor. Likewise, as to the second inlet, the Opposition fails to point to any sufficiently particularized allegations in the Complaint that Mr. Ryan had *actual knowledge* that the Preliminary Earnings Prediction was wrong. Indeed, plaintiffs make no attempt to argue that Mr. Ryan's detailed description on the November Call of contract losses that occurred *after* the Preliminary Earnings Prediction does not accurately account—to the dollar—for the adjustment in expectations.

The only other statement from the November Call that plaintiffs, in their Opposition, attempt to construe as corrective are three words Mr. Ryan spoke with respect to the earlier loss of a portion of a single customer account: namely that "some service issues" factored into Coventry's decision in May 2009 not to renew the commercial business portion of its relationship. (Compl. ¶ 76; Pls. Opp. at 12.) Aside from these three words (and the downward adjustment in 2010 earnings expectations, which is doubly protected by the safe harbor), there is literally no other hint of a corrective disclosure in the November Call. Plaintiffs would have the Court conclude that Mr. Ryan's passing remark that there were "some service issues" with one

portion of one customer account (the loss of which had been disclosed nearly six months earlier) somehow constituted an admission that the entire CVS Caremark merger had failed and that the Company was suffering from pervasive, systemic service issues.  That position finds no support in the transcript of the November Call.  Setting aside that Mr. Ryan's remark was limited to a single contract with a single customer, plaintiffs plead no facts supporting the proposition that service issues were the exclusive—or even primary—cause of that particular contract loss.  Nor do plaintiffs contend that CVS Caremark had ever previously given *any* reason for the loss of Coventry commercial business or provide any reason why CVS Caremark was under a duty at any time to explain some or all of the reasons for particular contract losses.  Thus, there was nothing "corrective" about the disclosure that "some service issues" played a role in the loss of a portion of Coventry's business.  And in any case, as to the other contract losses discussed on the November Call—no aspect of which plaintiffs claim to have been previously concealed— plaintiffs concede that Defendants expressly noted that price and factors *other than* service explained those losses.  (Compl. ¶ 74; Pls. Opp. at 8.)

Separately, as set forth in greater detail in Defendants' opening brief and below, all or part of the Complaint also fails for the following additional, independent reasons:

- Plaintiffs concede that Defendants have no duty to disclose potential contract losses.  Insofar as their claims depend on allegations that Defendants did not disclose contracts they were merely *likely* to lose, plaintiffs' claims must fail.

- The vast majority of the alleged misstatements in the complaint are classic examples of inactionable puffery and therefore are either immaterial as a matter of law or are not alleged to be false with sufficient particularity.

- The Complaint must be dismissed in its entirety because plaintiffs have failed to meet their heightened burden under the PSLRA of pleading a strong inference of scienter as to any of the alleged misstatements or omissions.  Although plaintiffs attempt to discharge this pleading burden by reference to Defendants' stock trades and supposed statements by confidential witnesses, neither Defendants' trading patterns nor the allegations attributed to the confidential witnesses nor plaintiffs' other conclusory allegations are, together or alone, sufficient to plead the requisite

strong inference under <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322-23 (2007).

## ARGUMENT

I.  **PLAINTIFFS FAIL TO STATE A CLAIM AS TO THE PRELIMINARY EARNINGS PREDICTION.**

   A.  **The Preliminary Earnings Prediction Is a Forward-Looking Statement.**

The sole alleged misstatement that was actually addressed for the first time on the November Call was Mr. Ryan's Preliminary Earnings Prediction, made on the August Call, that he "would be very disappointed if [CVS Caremark] didn't have an EPS growth of at least 13 to 15% next year."  (Compl. ¶ 160.)  Although such predictions of future earnings are precisely what Congress intended to protect with the safe harbor for forward-looking statements, plaintiffs contend that the safe harbor does not apply because the "statements regarding earnings projections . . . were *based on* 'present facts' relating to the subject matter underlying the projections."  (Pls. Opp. at 25 (emphasis added); <u>accord id.</u> (arguing that the safe harbor does not apply because the projection was "tied to currently available information") (emphasis omitted).)  Plaintiffs' proposed exception—which would apply to literally every earnings projection and would therefore swallow the safe harbor rule whole—is inconsistent with the words of the statute and finds no support in the case law.

The PSLRA's definition—which plaintiffs do not even cite, much less address—expressly defines a "forward-looking statement" to include statements containing a "projection of revenue[]" or "earnings (including earnings loss) per share" as well as statements of "future economic performance."  <u>See</u> 15 U.S.C. § 78u-5(i)(1); <u>see also</u> H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess., at 45 (1995) ("The definition covers . . . certain financial items, including projections of revenues, income and earnings.").  Such financial projections are not created out of thin air from crystal balls or Ouija boards; rather, they must necessarily derive from "present

4

facts" and "currently available information."  Congress enacted the safe harbor to encourage companies to "discuss publicly their future prospects" without "fear of baseless and extortionate securities lawsuits" if the projections are not met.  H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess., at 32 (1995).  It would be a bizarre result indeed if only projections that had *no* basis at all in any presently available information were protected by the safe harbor.

The case law recognizes as much.  Conclusions about future prospects, including revenue projections, "often rest both on historical observations and assumptions about future events." Harris v. Ivax Corp., 182 F.3d 799, 806 (11th Cir. 1999).  This Court's own jurisprudence on the safe harbor recognizes the distinction between predictions of revenue like the Preliminary Earnings Prediction (even if based on current information) and actual *statements* of current or past results.  Compare Scritchfield v. Paolo, 274 F. Supp. 2d 163, 187 (D.R.I. 2003) (holding that CEO's prediction of "$15 million *in revenues* by the end of 2000" is a non-actionable forward-looking statement) (emphasis added) with Rosen v. Textron, Inc., 321 F. Supp. 2d 308, 321 (D.R.I. 2004) (declining to apply the safe harbor to "statements *of either current or past earnings*—not the type of financial information subject to different results based on unforeseen or unexpected circumstances") (emphasis added); (see also Defs. Mem. at 14-15.)

Plaintiffs' effort to distinguish these cases on the basis that the financial projections they analyzed "were not based on current or historical facts that rendered the projections false" (Pls. Opp. at 25 n.10) cannot be squared with the plain language of the PSLRA.  And the only case plaintiffs cite in their support is inapposite.  Plaintiffs characterize the holding in N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35 (1st Cir. 2008) as "finding that financial projections based on present facts were not protected by the statutory safe harbor."  But the statement at issue in that portion of the decision was a lengthy description of

the "*current state* of the MS market." Id. at 46 (emphasis added).  The quoted statement did not

project or predict earnings, revenue, or any other financial metric, and is therefore fundamentally

different from the Preliminary Earnings Prediction, which is itself a classic forward looking

statement.[2]

### B.    The Preliminary Earnings Prediction Is Entitled to the Protection of the Safe Harbor Because It Was Accompanied by Meaningful, Narrowly Tailored Cautionary Statements.

The first inlet of the PSLRA's safe harbor—which shelters all forward-looking

statements "that are accompanied by meaningful cautionary statements," Greebel v. FTP

Software, Inc., 194 F.3d 185, 201 (1st Cir. 1999), squarely applies here and protects the

Preliminary Earnings Prediction.  (See Defs. Mem. at 15-19.)  Defendants do not, as plaintiffs'

contend, point only "to a single boilerplate sentence made during an earnings call" (Pls. Opp. at

26) to invoke the safe harbor's protection.  Rather, the Preliminary Earnings Prediction was

accompanied by a host of cautionary language that was "substantive and tailored to the specific

future projections, estimates or opinions . . . which the plaintiffs challenge." In re Smith &

Wesson Hold. Corp. Sec. Litig., 604 F. Supp. 2d 332, 341 (D. Mass. 2009) (quoting In re Donald

Trump Casino Sec. Litig., 7 F.3d 357, 371-72 (3d Cir. 1993)).

Plaintiffs do not even address—much less dispute—that the Preliminary Earnings

Prediction contains all the indicia of uncertainty that are the hallmarks of the doctrine.

(Defs. Mem. at 16.)  For instance, they do not address the facts that Mr. Ryan did not identify a

---

[2] Plaintiffs' reliance on Sloman v. Presstek, Inc., No. 06-cv-377-JD, 2007 U.S. Dist. LEXIS 69475 (D.N.H. Sept. 18, 2007), and In re Sepracor, Inc. Securities Litigation, 308 F. Supp. 2d 20 (D. Mass. 2004), is misplaced. (Pls. Opp. at 25 n.11.)  The Sloman court relied on the defendants' omission of "unfavorable revenue factors" that directly influenced the reliability of the projected growth.  Sloman, 2007 U.S. Dist. LEXIS, at *17.  By contrast, on the August 4 call, Mr. Ryan directly addressed the very contract losses that plaintiffs allege prohibited the Company from achieving its earnings growth.  (See Defs. Mem. at 24.)  Plaintiffs quote selectively from an inapposite discussion of cautionary language in In re Sepracor.  See In re Sepracor, 308 F. Supp. 2d at 34 (discussing sufficiency of cautionary statements).

specific growth target or that he warned investors and analysts that it was "too early to give specific guidance."  (Compl. ¶ 160.)  Such statements demonstrate the equivocal nature of the Preliminary Earnings Prediction and confirm that it reflected Mr. Ryan's view of the future—a view that was subject to unforeseen intervening events.

Instead, plaintiffs argue that none of the cautionary statements surrounding the Preliminary Earnings Prediction warned about the "problems already in existence"—specifically, the impact of post-merger integration and service issues, loss of existing customers and failure to win potential new customers, and the impact of the CMS Spread Regulation.  (Pls. Opp. at 27.) But, as set forth in the following chart, even a cursory review of the relevant cautionary language demonstrates that it specifically addressed each of these risks.[3]  (See Defs. Mem. at 17-18.)

| Allegedly Undisclosed Problem | Corresponding Cautionary Language: List of Risks Identified by CVS Caremark |
|---|---|
| Integration and Service Issues | Actual results may differ because of "our ability to realize fully the incremental revenues and other benefits from the Caremark merger." (Ex. 3, Second Quarter 2009 10-Q at 32.)[4] |
|  | Actual results may differ because of "the effect on our Pharmacy Services business of a declining margin environment attributable to increased competition in the pharmacy benefit management industry and increased client demands for lower prices, enhanced service offerings and/or higher service levels." (Id. at 33.) |
| Customer Loss | Actual results may differ because of "the possibility of client loss and/or the failure to win new client business." (Id. at 32.) |

---

[3] Plaintiffs cite no authority for the proposition that the Company's incorporation by reference of the 2008 10-K is limited to the Risk Factors section of that document.  Contrary to plaintiffs' assertion, courts consider the entirety of an incorporated document, even if defendants referred investors to a specific portion thereof.  See, e.g., In re Champion Enterprises Inc., Sec. Litig., 144 F. Supp. 2d 848, 862 (E.D. Mich. 2001), aff'd, 346 F.3d 660 (6th Cir. 2003).  This is consistent with Congress's intent in enacting the PSLRA.  See H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess., at 45 (1995) (noting that the provision permitting issuers to incorporate written cautionary language was intended to provide "an optional, more flexible rule for oral forward-looking statements").

[4] Citations to Exs. 1-12 refer to exhibits to the Declaration of Lawrence Portnoy, dated July 2, 2010. Citations to Exs. 13-20 refer to exhibits to the Reply Declaration of Lawrence Portnoy, dated October 4, 2010.

| | "[A]pproximately one third of a PBM's customer base typically is subject to renewal each year, and therefore we face challenges in competing for new business and retaining or renewing business. . . . There can be no assurance that we will be able to win new business on terms as favorable to the Company as the present terms.  Accordingly, our failure to renew or win PBM business could adversely affect our business, financial position and results of operations.  (Ex. 1, 2008 10-K at 20.) |
|---|---|
| CMS Spread Regulation | "[I]n January 2009, CMS issued [the CMS Spread Regulation] . . . The Medicare Drug Benefit continues to attract a high degree of legislative and regulatory scrutiny, and the applicable government rules and regulations continue to evolve.  Accordingly, it is possible that legislative and regulatory developments could materially affect our Medicare Part D business or profitability."  (Id, at 13.) |
| | Actual results may differ because of "risks regarding the impact of the Medicare prescription drug benefit on our business."  (Ex. 3, Second Quarter 2009 10-Q at 33.) |
| | Actual results may differ because of "litigation, legislative and regulatory risks associated with our business or the . . . pharmacy benefit management industry generally."  (Id.) |

Likewise, plaintiffs' assertion that the Company's cautionary language was insufficient because Defendants were allegedly aware of "complaints from customers" and because Defendants received weekly reports listing contracts at relative risk of nonrenewal is unfounded. (Pls. Opp. at 27.)  In fact, as set forth above, Defendants did offer targeted cautionary statements on precisely these issues, including by warning of "the possibility of client loss and/or the failure to win new client business."  This cautionary statement, by its very terms, contemplates losses of contracts due to all manner of current and future conditions.  Nothing about it is limited to yet-unmanifested problems; nor is it limited in the possible causes of customer loss.  Plaintiffs propose an impossible standard under which Defendants must warn not only of the risk, but also each and every one of the various current and future conditions that could lead to the

manifestation of that risk.  The safe harbor simply does not require this level of granular detail.[5]

See Harris v. Ivax Corp., 182 F.3d 799, 807 (11th Cir. 1999) ("The statute requires the warning

only to mention 'important factors that could cause actual results to differ materially from those

in the forward-looking statement.'  It does not require a listing of all factors.") (internal citation

omitted); In re NovaGold Res. Inc. Sec. Litig., 629 F. Supp. 2d 272, 294 n.10 (S.D.N.Y. 2009)

(rejecting plaintiffs' argument that "cautionary language [must] disclose a risk in perfect detail");

In re Aetna, Inc. Secs. Litig., No. 07-4451, 2009 U.S. Dist. LEXIS 48910, at *73 (E.D. Pa.

June 9, 2009) ("A corporation need not provide every detail of a potential risk to qualify for safe

harbor treatment; instead, it need only provide sufficient detail to make investors aware of the

source, magnitude and certainty of the contemplated risk."), aff'd, No. 09-2970, 2010 U.S. App.

LEXIS 17002 (3d Cir. Aug. 11, 2010).

> **C.      The Preliminary Earnings Prediction Is Entitled to the Protection of the Safe Harbor Because Plaintiffs Do Not Plead Facts Supporting a Strong Inference That Defendants Knew It Was False or Misleading When Made.**

The Preliminary Earnings Prediction is also protected under the second inlet of the safe

harbor:  because plaintiffs have not pled facts demonstrating that Mr. Ryan had actual knowledge

---

[5] In Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004), which plaintiffs cite, the Second Circuit *upheld the district court's dismissal with prejudice of a securities suit*, noting that plaintiffs' allegations of supposed risks that had already transpired did not support an inference that the defendant company was in financial trouble.  See Rombach, 355 F.3d at 173-74 ("A company that operates 119 separate facilities nationwide is bound to have problems assimilating this or that property, to have disputes over payments with vendors and landlords, and to have some bills unpaid by reason of contested amounts or spot episodes of illiquidity; the allegations in the complaint are consistent with unremarkable circumstances short of financial peril or instability.").  This case is analogous.  In the context of a PBM business with hundreds of customers and billions of dollars in revenues, plaintiffs' unremarkable allegations of customer complaints (which are inevitable) and of certain contracts bearing a higher risk of non-renewal than others (which is necessarily the case) do not render meaningful cautionary language insufficient and certainly do not support a securities action.  Because, as noted in Defendants' opening brief, this case is consistent with In re Ibis Tech. Sec. Litig., 422 F. Supp. 2d 294 (D. Mass. 2005), and In re Parametric Tech. Corp. Sec. Litig., 300 F. Supp. 2d 206 (D. Mass. 2001) (see Defs. Mem. at 18-19), the same result—dismissal of any claim that is based on the forward-looking Preliminary Earnings Prediction—is appropriate here.

that the statement was false or misleading when made.[6]  In the three sentences of their Opposition they devote to this issue, plaintiffs offer an inapplicable legal standard and ignore a number of their own allegations.  (See Pls. Opp. at 28-29.)

The PSLRA provides that, to survive the motion to dismiss, plaintiffs must "plead *with particularity* facts giving rise to a *strong inference* that [Mr. Ryan] made the [Preliminary Earnings Prediction] with *actual knowledge* that [it was] false or misleading."  In re Ibis Tech., 422 F. Supp. 2d at 310-11 (internal citations omitted) (emphasis added);[7] see also Baron v. Smith, 380 F.3d 49, 55 n.3 (1st Cir. 2004); In re Parametric Tech., 300 F. Supp. 2d at 219.  Ignoring this standard, plaintiffs claim that the Preliminary Earnings Prediction is actionable if Mr. Ryan "had no reasonable basis to predict an 'EPS growth of at least 13 to 15% next year.'"  (Pls. Opp. at 28.) But the PSLRA requires more; it requires actual *knowledge* of falsity, and plaintiffs have failed to plead with particularity facts that Mr. Ryan or CVS *knew* that the Preliminary Earnings Prediction was false when made.

---

[6] As noted in Defendants' opening brief (Defs. Mem. at 15), the First Circuit has made clear that satisfaction of *either* of the two inlets is sufficient to require dismissal under the safe harbor.  Greebel v. FTP Software, Inc., 194 F.3d 185, 201 (1st Cir. 1999).

[7] In re Ibis Tech. further explains:

> Ordinarily, a plaintiff may demonstrate the intent necessary to prove its section 10(b) case by showing "either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002).  However, under the safe harbor provisions, "recklessness" is not sufficient to establish liability for forward-looking statements.  See Greebel, 194 F.3d at 200-01 (distinguishing safe harbor and contribution provisions of the PSLRA, that require "actual knowledge" to establish liability, from the substantive definition of "scienter" that has been adopted by the First Circuit and includes recklessness).  *Consequently, the dismissal of securities fraud claims based on forward-looking statements is warranted if the statements are not accompanied by cautionary language and the plaintiff fails to plead with particularity facts giving rise to a strong inference that the defendant made the statements with actual knowledge that they were false or misleading.*

422 F. Supp. 2d at 310-11 (emphasis added).  Plaintiffs' suggestion that a court should not apply the higher "actual knowledge" standard on a motion to dismiss is wrong.  (See Pls. Opp. at 28 n.14 (citing Brumbaugh v. Wave Systems Corp., 416 F. Supp. 2d 239 (D. Mass. 2006).)

In fact, the allegations in the Complaint support an inference contrary to plaintiffs' assertion:  Mr. Ryan *did* have an affirmative, reasonable basis for the Preliminary Earnings Prediction.  As explained in Defendants' opening brief, Mr. Ryan explained in detail in August the basis for his Preliminary Earnings Prediction, including an acknowledgment of the Coventry and Chrysler losses.  More importantly, on the November Call he provided an even more detailed explanation for the downward adjustment of his expectations by reference to a series of specific events that took place *after* the August call.  (Defs. Mem. at 20.)

Plaintiffs offered no response to this in their Opposition.  They have never argued that Mr. Ryan's explanation was false or misleading in any way or that Mr. Ryan did not explain—to the dollar—the reason for the downward adjustment.  Any inference that Mr. Ryan *knew* that his August Preliminary Earnings Prediction was false is, therefore, directly contradicted by portions of the transcripts of the earnings calls that plaintiffs have never contended were inaccurate.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM WITH RESPECT TO ALL OF THE REMAINING PURPORTEDLY ACTIONABLE STATEMENTS ALLEGED IN THE COMPLAINT.

The Complaint's remaining alleged misstatements are equally inactionable.  In particular, the Complaint fails to state a claim because (i) plaintiffs have not adequately pled loss causation for any alleged misstatements or omissions other than the Preliminary Earnings Prediction, and (ii) the vast majority of the supposed false or misleading statements are otherwise inactionable.

### A.   Plaintiffs' Remaining Allegations Fail To Allege Loss Causation.

Aside from Mr. Ryan's downward adjustment of the Preliminary Earnings Prediction— an inactionable forward-looking statement—plaintiffs' case hinges on Mr. Ryan's passing reference on the November Call to "some service issues" in connection with the loss of the commercial business portion of the Coventry account.  (Pls. Opp. at 12, 14, 37.)  That single

remark is the only other piece of information that plaintiffs could possibly claim as a corrective disclosure.  And because those three words are demonstrably insufficient to plead loss causation under the Supreme Court's holding in <u>Dura</u>, plaintiffs' claim must fail.[8]

Plaintiffs cannot dispute that their Complaint seeks to plead loss causation by reference to a single alleged corrective disclosure:  the November Call.  Plaintiffs entitle a section of the Complaint "Loss Causation/Economic Loss," in which they plead that they "suffered an economic loss when the artificial inflation was removed from CVS Caremark's stock price on November 5, 2009."  (Compl. ¶ 211.)  The Loss Causation section concludes: "In sum, when the truth about the Defendants' fraud was revealed on November 5, 2009, CVS Caremark's stock price declined as the artificial inflation came out of the stock, and Lead Plaintiffs and other members of the Class were damaged thereby."  (Compl. ¶ 213; <u>accord</u> Pls. Opp. at 63.)

This is precisely the sort of fraud-on-the-market stock-drop case that the Supreme Court addressed in <u>Dura</u>.  In such cases, <u>Dura</u> requires that a plaintiff plead that, on the alleged corrective disclosure date, a Company's "share price fell significantly *after the truth became known*."  544 U.S. 336, 347 (2005) (emphasis added).  This rule necessarily requires plaintiffs to identify precisely *what* "truth" was allegedly revealed for the first time on the applicable corrective disclosure date.  That is, <u>Dura</u> requires that there must be a plausible causal connection between the alleged corrective disclosure (i.e., the disclosure of the "truth") and the

---

[8] Whether loss causation pleading is evaluated under Rule 9(b) or the PSLRA's heightened standard, <u>see</u>, <u>e.g.</u>, <u>In re First Union Corp. Sec. Litig.</u>, Civil No. 3:99CV237-H, 2006 U.S. Dist. LEXIS 5083, at *16-18 (W.D.N.C. Jan. 20, 2006), Rule 8(a)(2)'s more relaxed standard, <u>see</u>, <u>e.g.</u>, <u>In re Coca-Cola Enters. Sec. Litig.</u>, 510 F. Supp. 2d 1187, 1203 (N.D. Ga. 2007) (noting that <u>Dura</u> did not specifically decide this issue), or something in between, <u>see</u> <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 174-75 (2d Cir. 2005), is irrelevant to the conclusion called for here under <u>Dura</u>, which assumed "at least for argument's sake" that Rule 8(a)(2) applied, 544 U.S. at 346.  As in <u>Dura</u>, plaintiffs' loss causation allegations here are so deficient that they fail under any of these standards.

prior alleged fraud.  Id. at 343; accord In re Dell Inc., Sec. Litig., 591 F. Supp. 2d 877, 907-08 (W.D. Tex. 2008).

A review of the text of the November Call reveals that—other than the disclosure with regard to the 2010 earnings prediction, which is protected by the safe harbor rule—the only aspect of the November Call that plaintiffs could possibly contend is a corrective disclosure is Mr. Ryan's passing reference to "some service issues" in discussing the loss of the commercial business portion of the Coventry account.  Plaintiffs effectively concede that information about the losses of the other contracts described in the Complaint was already available to the public well before the November Call and was not disclosed for the first time on the November Call. (Pls. Opp. at 59-61.)[9]  The November Call is, for example, silent with respect to service issues in connection with other accounts in question.  And it is likewise silent as to any information that one could plausibly interpret as an admission that the merger had not succeeded.  (See Pls. Opp. at 61 n.38 (identifying the "service issues" quotation with regard to the Coventry commercial business as the only example of any information that had not already been fully available to the public).)

---

[9] Though plaintiffs ask the Court to ignore a news article reporting on the loss of the New Jersey contract months before the November Call (Pls. Opp. at 59-60), they cannot dispute that their own complaint does not (because it cannot) allege that the loss of the New Jersey contract was not already known publicly before the November Call.  The Court, therefore, need not consider the article to conclude that plaintiffs have failed to plead that the loss of the New Jersey contract became known for the first time on the November Call.

And in any case, even if the market had not been aware of the loss of the New Jersey contract until November 5, Mr. Ryan's statements make clear that the loss of the New Jersey contract was an insignificant portion of the negative third-quarter results.  Of the 10-12% decline in the PBM business, Mr. Ryan attributes 10% of this 10-12% to the Med-D losses.  (Ex. 7, Nov. 5 Tr. at 5 ("[I]t now looks like operating profit in the PBM will decline in 2010, perhaps as much as 10 to 12%.  I want to point out that approximately 10 basis points of that – 10 percentage basis points of the change is Med-D alone.").)  The other 0-2%, Mr. Ryan explains, resulted from the $500 million loss of the State of Ohio contract, the $1 billion loss from an early renegotiation of the Federal Employees Program contract, $600 million in additional, smaller contract losses, and the $1 billion loss of the New Jersey contract.  (See id. at 4-5.)  Therefore, even if the loss of the New Jersey contract was disclosed to the market for the first time on November 5—which it was not—plaintiffs cannot plausibly plead that the New Jersey loss alone would have had any measureable impact on CVS Caremark's stock price.

Mr. Ryan's passing reference to the reason for the loss of a single portion of a single relationship six months earlier could not, as a matter of law, constitute a sufficient disclosure of any previously hidden "truth" to meet plaintiffs' pleading burden on loss causation.  As an initial matter, Mr. Ryan's statement did not even address an actionable misstatement or omission about the Coventry business.  The fact and magnitude of the loss of the Coventry commercial business had been disclosed in May of 2009—months before both the Preliminary Earnings Prediction and the November Call.  (See Compl. ¶ 75; Ex. 13, May 5, 2009 First Quarter 2009 Earnings Call Transcript at 3 ("As you probably heard last week, we lost the Coventry commercial contract, which is about $1 billion in revenues.").)  And, contrary to plaintiffs assertions, there had been no prior statements by the Company about the *reason* for the loss of the Coventry commercial business.

In this way, plaintiffs wrongly seek to conflate the two separate and distinct Coventry contracts—the Med-D contract and the commercial contract—to manufacture an actionable statement where one does not exist.  The Company had indicated in July 2007 that the loss of the Coventry Med-D contract was not due to service issues, but instead due "in large part to price." (Compl. ¶ 74.)  Defendants have never suggested otherwise, and the reasons for the loss of the Coventry Med-D contract were not addressed on the November Call.  When CVS Caremark announced the loss of the separate Coventry commercial business in May 2008—over nine months after the Med-D business loss was announced—no reason for the loss was given, as plaintiffs implicitly concede.  (Pls. Opp. at 37.)  Thus, when Mr. Ryan mentioned "some service issues" as one possible reason for the loss of the commercial business on November 5, he was not contradicting anything the Company had said previously about the loss of that business.  Furthermore, plaintiffs fail to plead facts supporting the proposition that service issues were the

14

exclusive—or even primary—cause of Coventry commercial loss.  Nor do they provide any

authority for the argument that CVS Caremark was under any duty to disclose the *reason* for any

single contract loss.  See, e.g., Backman v. Polaroid Corp., 910 F.2d 10, 12 (1st Cir. 1990)

(holding that, even if information is material, "there is no liability under Rule 10b-5 unless there

is a duty to disclose it") (internal citations omitted).

Nor could one plausibly conclude—as plaintiffs would have the Court do—that these

three words somehow constitute a revelation of more systemic service issues, that the merger had

somehow not succeeded, or that its business model as a whole was a failure.  Mr. Ryan

specifically explained on the November Call that only one of the contract losses was service-

related; the rest of the major contracts, he stated, were terminated for reasons *other than*

service.[10]  The analyst reports that plaintiffs themselves cite—purportedly in support of their

theory that "the truth was revealed on November 5"—similarly fail to identify any problems

related to service, integration, or the combined business model, much less service issues

associated with the loss of a portion of the Coventry business months before.[11]

This case is functionally indistinguishable from Catogas v. Cyberonics, Inc., No. 07-

20787, 2008 WL 4158923 (5th Cir. Sept. 8, 2008).  The sole basis on which plaintiffs attempt to

distinguish Catogas is by reference to "information regarding the 'service issues' resulting from

---

[10] (Ex. 7, Nov. 5 Tr. at 14 (emphasizing that "service issues" related to the loss of the Coventry commercial contract was a "stand-alone issue[]"); id. at 18 ("Well, we can go through the individual pieces, but as I mentioned, on the $5 billion that we lost, *one was service* on one of the health plan side . . .") (emphasis added); id. ("There were varying reasons some price, *one service*, there were varying reasons, but none of them because of the model.") (emphasis added).)

[11] (See Ex. 14, HSBC analyst report at 2 ("The magnitude of the loss by itself, does not seem meaningful enough to cause significant spread widening, or a downgrade."); id. (pointing out that CVS had a 92% retention rate and that the announced losses were only associated with four large contracts as well as the Medicare Part D business); Ex. 15, Credit Suisse analyst report at 1 (stating that Credit Suisse is "maintaining our Outperform rating mostly because we can't justify selling the stock at 10x earnings and *see today's 20% drop as an overreaction*.") (emphasis added); id. ("Our PBM consultant call today suggested that CVS' issue is its message more than the model.").)

the Merger's failed integration and their crippling effect on the PBM business were first

disclosed on the November Call." (Pls. Opp. at 61 n.38.) But because the stray reference to

"service issues" cannot constitute a corrective disclosure as a matter of law, the Fifth Circuit's

reasoning applies squarely here.[12]

In the absence of a statement in the November Call to support their theory, plaintiffs

instead selectively quote from the transcript of the call in ways that affirmatively distort what

was actually said:

- For example, it is demonstrably false that Mr. "Ryan admitted that CVS
  Caremark's customers were, in fact *abandoning* its PBM business due to failed
  "*[e]xecution and performance*" (Pls. Opp. at 57-58). At no point during the
  November Call does Mr. Ryan say anything about customers "abandoning" the
  PBM business. To the contrary, he reports that the Company had a 92% retention
  rate, gained 125 new clients and achieved $1.4 billion in contract wins for the
  selling season. (See Ex. 7, Nov. 5 Tr. at 4.) And Mr. Ryan's statement about
  "execution and performance" related to the Company's "marketing message," and
  was *not* in reference to service or integration issues. (See id. at 14) The Credit
  Suisse analyst report on which plaintiffs rely confirms that the message, and not
  the model, was the Company's problem. (Ex. 15, Credit Suisse analyst report
  ("Our PBM consultant call today suggested that CVS' issue is its *message more
  than the model*") (emphasis added).)

- Similarly, plaintiffs claim that Mr. Ryan informed investors that the New Jersey
  contract was "not lost on price" (and therefore, they speculate, must have been
  lost on service). (Pls. Opp. at 61 n.39.) This is the exact opposite of what was
  actually said. In response to the question "why are you losing contracts?" Mr.
  Ryan explained that the New Jersey contract loss *was* due to pricing issues:
  "there was some price issues there. I guess that was more aggressively priced
  from a competitor than we would have done." (Ex. 7, Nov. 5 Tr. at 18.)

Defendants do not—as plaintiffs assert (Pls. Opp. at 59)—ask the Court to make findings

of fact here and are not presenting a fact-based truth-on-the-market defense. Plaintiffs' pleading

---

[12] Plaintiffs' attempt elsewhere in their Opposition to disparage the Fifth Circuit as a whole by reference to
a single decision rendered in the class certification context (Pls. Opp. at 62-63 n.41) is puzzling. Defendants did not
cite to Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261 (5th Cir. 2007), and that case has no
bearing on *pleading* standards for loss causation. The conclusion reached by a different panel of the Fifth Circuit in
Catogas follows directly from the Supreme Court's guidance in Dura; nothing in First Circuit or any other case law
suggests otherwise.

failure here is more fundamental and rooted in <u>Dura</u>:  based only on the allegations in plaintiffs'

Complaint and focused closely on *what was actually said* on the November Call, it is clear as a

matter of law that plaintiffs cannot establish a causal link between the disclosure on the

November Call and the alleged fraud.[13]  This is also not—as plaintiffs contend—about a

requirement that the disclosure be a "mirror image" of the alleged fraud (Pls. Opp. at 56, 59

n.37).  Plaintiffs' pleading failure is more basic:  there is simply an insufficient connection

between the disclosure about "some service issues" with one contract and the alleged

misstatements and omissions in plaintiffs' Complaint.

Finally, plaintiffs cannot survive by contending that the November Call somehow

represents a "materialization" of some previously undisclosed risk (Pls. Opp. at 62).  The only

possible manifestation of any such "materialization" on the November Call is the downward

adjustment of 2010 earnings expectations.  And, as explained above (<u>see</u> <u>supra</u>, Point I), both

inlets of the safe harbor for forward-looking statements foreclose this aspect of plaintiffs' case.

In fact, the analysis under the first inlet explains definitively why there is no materialization of

an undisclosed risk here:  the Company *did* disclose in its filings, which it referenced on the

---

[13] Nothing in <u>In re Boston Scientific Corp. Securities Litigation</u>, 604 F. Supp. 2d 275 (D. Mass. 2009) or <u>In re Gilead Scis. Securities Litigation</u>, 536 F.3d 1049 (9th Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 1993 (2009) undermines <u>Dura</u>'s clear holding that a failure adequately to plead loss causation requires dismissal on a motion to dismiss.  And the cases cited by plaintiffs—<u>In re Credit Suisse-AOL Sec. Litig.</u>, 465 F. Supp. 2d 34 (D. Mass. 2006) and <u>Swack v. Credit Suisse First Boston</u>, 383 F. Supp. 2d 223 (D. Mass. 2004)—address the truth-on-the-market defense in the context of reliance, not in connection with loss causation.  Defendants here do not attempt to undermine plaintiffs' pleading of *reliance*; rather, they merely put forth the indisputable facts which render plaintiffs' *loss causation* argument impossible:  namely that the information disclosed on the November Call did not "reveal the truth" about any prior actionable misstatement or omission.  <u>See</u> <u>Magruder v. Halliburton Co.</u>, Civil Action No. 3:05-CV-1156-M, 2009 WL 854656, at *11 (N.D. Tex. Mar. 31, 2009) ("[T]he revelation of confirmatory information, or information already known to the market, cannot constitute a corrective disclosure.")

In any event, none of those cases addressed a situation where—as here—there was such a complete absence of a link between the disclosure and the alleged fraud.  <u>See</u> <u>Credit Suisse-AOL</u>, 465 F. Supp. 2d at 41, 48 (revelation about questionable accounting practices and cover up of material downturn in advertising revenue where alleged fraud was that defendants reported inflated earnings numbers and concealed downturn in advertising market); <u>Swack</u>, 383 F. Supp. 2d at 229, 239 (revelation was the decline of Razorfish's stock price where the alleged fraud was defendants' allegedly false and misleading research reports regarding the quality of Razorfish stock).

August call, precisely the risks that plaintiffs now claim materialized.  (See supra, Point I;

Defs. Mem. at 17-18.)  Where "substantial indicia of the risk that materialized are

unambiguously apparent on the face of the disclosures alleged to conceal the very same risk," a

plaintiff's loss causation allegations fail.  Lentell, 396 F.3d at 177.  In other words, the

"materialization of a concealed risk" theory fails where the risk was not actually "concealed."

See id. at 177 (finding that risks of devaluation and market volatility of stocks not concealed

where the analyst reports recommending "buy" and "accumulate" contained sufficient warnings

of those very risks).[14]  Indeed, it would effectively write the PSLRA's safe harbor out of

existence if plaintiffs could simply allege that the revision of a forward-looking statement

amounted to the "materialization of a concealed risk."  The robust and narrowly tailored risk

disclosures made in CVS Caremark's public filings therefore preclude a finding that any risk had

been previously "concealed."

    In the end, plaintiffs seek to meet their burden on loss causation by simple reference to

the size of the stock price drop and trading volume on November 5.  (Pls. Opp. at 63.)  But the

Supreme Court in Dura made crystal clear that the existence of a stock price drop alone is

insufficient to plead loss causation because of the host of other non-actionable factors that may

cause that stock price drop, including simple real-time changes in a business (like the post-

---

[14] See also In re First Marblehead Corp. Sec. Litig., 639 F. Supp. 2d 145, 164-65 (D. Mass. 2009) (relying on defendant company's "detailed disclosures regarding credit criteria and default rates . . . and the risks associated with [the company's] . . . *projected financial results*" to reject plaintiffs' loss causation allegations that "there was a concealed fraud or risk to be disclosed to the market.") (emphasis added); In re Rhodia S.A. Sec. Litig., 531 F. Supp. 2d 527, 547 (S.D.N.Y. 2007) (finding "warnings about the steady decline of the company" undercut any arguments that defendants concealed any risk even where defendants allegedly lied about *reasons* for disappointing earnings); Glover v. DeLuca, No. 2:03-CV-0288, 2006 U.S. Dist. LEXIS 76093, at *127-36 (W.D. Pa. Sept. 29, 2006) (rejecting plaintiffs' loss causation allegations where company's "contemporaneous public statements" repeatedly warned of its liquidity issues and associated risks); In re The Warnaco Group, Inc. Opinion Sec. Litig., 388 F. Supp. 2d 307, 318 (S.D.N.Y. 2005) (finding inadequate pleading of loss causation where company's inability to obtain waivers from creditors—the very risk that plaintiffs alleged was "concealed"—was disclosed in audit opinion accompanying company's financial statement).

August contract losses here that plaintiffs do not claim to have been improperly concealed).  <u>See</u>
544 U.S. at 342-43.  For that reason, plaintiffs have not met their pleading burden on loss
causation, and the claims must be dismissed with prejudice.

> **B.    Even If Plaintiffs Had Alleged Loss Causation as to the Remaining
> Allegations, the Vast Majority of the Supposedly False or Misleading
> Statements They Identify Are Not Actionable.**
>
> > **1.    Plaintiffs' theory that Defendants did not disclose potential contract
> > losses fails as a matter of law.**

By failing to dispute that CVS Caremark lost the Coventry, Chrysler, and New Jersey
contracts in April, July, and August of 2009, respectively, plaintiffs acknowledge that neither Mr.
Ryan nor any other Defendant could have known that the contracts were actually lost before
those dates.  At best, therefore, plaintiffs allege that Defendants *should have known* that contract
losses were *likely* to occur.  But, as explained in Defendants' moving brief, there is no duty to
disclose an outcome that is merely likely to occur.  (<u>See</u> Defs. Mem. at 28.)

In any event, plaintiffs concede that the Company's disclosure of particular contract
losses is relevant only insofar as it pertains to the impact of those losses on the Company's
financial forecasts (<u>see</u> Pls. Opp. at 21 ("The issue is not about Defendants' failure to disclose
potential contract losses . . . .")), which are themselves protected by the safe harbor (<u>see</u> <u>supra</u>,
Point I).  For instance, in arguing that Defendants had a "duty to correct" the Preliminary
Earnings Prediction after learning of the subsequent loss of the New Jersey contract, plaintiffs
write that "[d]efendants knew that without the $1 billion in annual revenue from New Jersey,
[the Preliminary Earnings Prediction] would be impossible to achieve."  (Pls. Opp. at 23-24.)
First, plaintiffs do not dispute that the loss of the New Jersey contract was known to investors
and analysts before November 5.  (<u>See</u> Defs. Mem. at 24 n.15; <u>supra</u>, Section II.A.)  Second,
plaintiffs plead no facts supporting the proposition that the loss of the New Jersey contract would

have rendered the Preliminary Earnings Prediction false or misleading.  To the contrary, Mr.

Ryan's statements make clear that the loss of the New Jersey contract was not among the several

significant factors impacting the Company's earnings outlook. (See supra, Section II.A.)

Moreover, the PSLRA expressly provides that a company need not revise, update, or correct

statements protected by the safe harbor.  See 15 U.S.C. § 78u-5(d); see also H.R. Conf. Rep.

No. 104-369, 104th Cong. 1st Sess., at 46 (1995) ("This legislation also makes clear that nothing

in the safe harbor provision imposes any duty to update forward-looking statements.");

(Defs. Mem. at 15 n.10.)

> ### 2.    Generalized statements regarding the Company's strategic business model, sales outlook, and "success" of the merger are inactionable corporate puffery.

In their Opposition, plaintiffs selectively quote, elide, and mischaracterize Defendants'

statements in support of their argument that the statements were something other than vague,

general, and loosely optimistic corporate puffery.  However, a full consideration of the types of

alleged misstatements and omissions demonstrates that most fall squarely with the confines of

the puffery doctrine.[15]

Plaintiffs do not and cannot take issue with the framework of the puffery analysis set

forth in Defendants' opening brief, which is drawn from this Court's decision in Scritchfield.[16]

---

[15] As noted in Defendants' opening brief, plaintiffs make virtually no effort to identify which allegations in the Complaint constitute supposed misstatements or omissions.  Instead, plaintiffs merely reproduce lengthy block quotes and repeat the same generalized allegations.  To the extent plaintiffs purport to challenge statements made before the beginning of the class period, such statements cannot serve as the basis for liability—whether puffing or not.  See In re Ibis Tech. Sec. Litig., 422 F. Supp. 2d 294, 313 n.19 (D. Mass. 2005) (noting that defendants cannot be liable for statements made outside the class period).

[16] Plaintiffs' misleadingly cite Scritchfield in asserting that Defendants concede that their statements were inaccurate.  (See Pls. Opp. at 16.)  First, Defendants unequivocally do not concede the falsity of any of the statements plaintiffs allege were false or misleading.  Second, with respect to many of the statements, plaintiffs have not even pled with specificity how or why they are false.  (See, e.g., Compl. ¶ 135 ("As we head into the 2010 selling season, our sales team is very optimistic about the opportunities that lie ahead.") (emphasis omitted).)  The (…continued)

(Defs. Mem. at 29-33.)  Under that approach, the general, optimistic statements in plaintiffs' Complaint about CVS Caremark's post-merger business model and strategy (see id. at 29-30 n.20), its Maintenance Choice product (id. at 30 n.21), and its 2010 PBM sales outlook (id. at 20 n.22) are all inactionable puffery.  (Id. at 29-33.)

Plaintiffs choose not to address the host of cases cited in Defendants' opening brief that reach the same conclusion when analyzing comparable statements.  See, e.g., Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235, 253 (D. Mass. 2001) (finding puffery where an executive stated that the "company's new focus is 'dead on right'"); Orton v. Parametric Tech Corp., 344 F. Supp. 2d 290, 300-01 (D. Mass. 2004) (Young, J.) (finding the statement "We are pleased with . . . the confirmation we are receiving from the market and our customers on the importance of product development as the core of competitive advantage" to be a subjective opinion and, therefore, inactionable puffery); id. at 301 (finding the statement "I am confident that our . . . products position us for leadership in the product development space" to be puffery); Van Ormer v. Aspen Tech., Inc., 145 F. Supp. 2d 101, 107 n.5 (D. Mass. 2000) (deeming the statement "we are very pleased with our performance" inactionable puffery); Fitzer v. Sec. Dynamics Techs., 119 F. Supp. 2d 12, 23 (D. Mass. 2000) ("Any statements made by the defendants relating to whether Security Dynamics was 'well positioned' are ultimately no more than nonactionable 'puffing.'").[17]

Instead, plaintiffs rely on inapposite authority and misinterpret applicable case law.  For instance, plaintiffs' grossly miscite In re Allaire Corp. Sec. Litig., 224 F. Supp. 2d 319 (D. Mass.

_____

(continued…)
puffery doctrine does not require that Defendants concede that particular statements were false; rather, the doctrine posits that, even if Defendants' statements were false (which they were not), they are nevertheless inactionable.

[17] Plaintiffs' attempt (Pls. Opp. at 17 n.6) to distinguish Simon v. American Power Conversion Corp., 945 F. Supp. 416 (D.R.I. 1996) is addressed below on page 23-24.

2002), for the proposition that statements for which a defendant lacks a reasonable basis are necessarily not puffery.  (Pls. Opp. at 18.)  The discussion plaintiffs cite in <u>Allaire</u> does not pertain at all to puffery, but instead to scienter, 224 F. Supp. 2d at 337; this is not surprising, as the question of whether a defendant has a reasonable basis for a statement goes to that defendant's state of mind, not the materiality of the statement.  And the cases plaintiffs invoke are readily distinguishable from this case, including because they involve alleged misrepresentations of concrete and verifiable financial metrics, as opposed to generalized opinions about future prospects.  <u>See, e.g.</u>, <u>In re Smith & Wesson Hold. Corp. Sec. Litig.</u>, 604 F. Supp. 2d 332, 336 (D. Mass. 2009) (distinguishable because the statements at issue there entailed concrete financial figures allegedly contradicted by verifiable information in defendants' possession, whereas here, the puffing statements were largely vague, unverifiable opinions about the Company's sales outlook).[18]  Indeed some of the cases plaintiffs cite do not address puffery at all.  <u>Beach v. Healthways, Inc.</u>, No. 3:08-0569, 2009 U.S. Dist. LEXIS 17809 (M.D. Tenn. Mar. 9, 2009); <u>In re NetSolve, Inc.</u>, 185 F. Supp. 2d 684 (W.D. Tex. 2001).

Moreover, contrary to plaintiffs' contention, numerous courts have expressly held that the puffery doctrine applies to "statements concerning both current affairs and future prospects."  <u>In re Cytyc Corp. Sec. Litig.</u>, No. 02-12399-NMG, 2005 U.S. Dist. LEXIS 6166, at *73 (D. Mass.

---

[18]  <u>See also</u> <u>Rosenbaum Capital LLC v. Boston Commc'ns Group, Inc.</u>, 445 F. Supp. 2d 170, 173 (D. Mass. 2006) (distinguishable because the statements at issue there were detailed assessments by the defendants regarding the outcome of a particular law suit—far from the vague and optimistic statements made by Mr. Ryan); <u>Novak v. Kasaks</u>, 216 F.3d 300, 304 (2d Cir. 2000) (distinguishable because plaintiffs alleged that defendants' statements contradicted measurable inventory information); <u>In re Ames Dep't Stores, Inc. Stock Litig.</u>, 991 F.2d 953, 959 (2d Cir. 1993) (distinguishable because plaintiffs alleged that statements contradicted concrete internal projections); <u>In re Hi/fn, Inc. Sec. Litig.</u>, No. C 99-4531 SI, 2000 U.S. Dist. LEXIS 11631 at *16 (N.D. Cal. Aug. 9, 2000) (distinguishable because allegedly offending statements allegedly contradicted verifiable knowledge of imminent reductions in orders); <u>Ark. Pub. Emp. Ret. Sys. v. GT Solar Int'l, Inc.</u>, No. 08-CV-312-JL, 2009 U.S. Dist. LEXIS 93820, at **35-36 (D.N.H. Oct. 7, 2009) (finding statements actionable because defendants did not offer an explanation as to why they constituted puffery); <u>In re Nash Finch Co. Secs. Litig.</u>, 502 F. Supp. 2d 861, 879 (D. Minn. 2007) (deeming statements actionable because they made "specific predictions about growth and earnings per share or specific representations about the procession of the integration").

Mar. 1, 2005).[19]  Indeed, the courts this Court cited in analyzing the puffery defense in

Scritchfield found statements squarely pertaining to past performance and present position to be

inactionable.[20]  See, e.g., Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1219 (1st Cir. 1996)

(statement that things were "[currently] going reasonably well" ruled immaterial); Greebel v.

FTP Software, Inc., 194 F.3d 185, 207 (1st Cir. 1999) (statements touting "increased" sales and

noting that a venture was "off to a good start" deemed inactionable puffery); Eisenstadt v. Centel

Corp., 113 F.3d 738, 746-47 (7th Cir. 1997) (company's statement that a bidding process was

"continu[ing] to go very well" deemed inactionable); In re Peritus Software Services, Inc. Sec.

Litig., 52 F. Supp. 2d 211, 227 (D. Mass. 1999) (Young, J.) (the statement "the acquisition . . .

has been a success" deemed puffery).

Plaintiffs also argue that puffing statements from a public filing or investor call must be

actionable (Pls. Opp. at 17 n.6 (attempting to distinguish Simon v. American Power Conversion

Corp., 945 F. Supp. 416 (D.R.I. 1996)), by suggesting different standards apply to press releases

and public filings.  They are wrong.  Indeed, courts routinely deem such puffing statements

inactionable—including in cases plaintiffs cite in their opposition.  See, e.g., In re Boston Sci.

Corp. Sec. Litig., 490 F. Supp. 2d 142 (D. Mass. 2007) (finding statements made in a defendant

company's Form 10-K to be puffery), rev'd on other grounds, Miss. Pub. Emps. Ret. Sys. v.

Boston Sci. Corp., 523 F.3d 75 (1st Cir. 2008); Sekuk Global Enterprises v. KVH Indus., No. 04-

---

[19] See also Orton v. Parametric Tech. Corp., 344 F. Supp. 2d at 300 ("The corporate puffery rule covers loose optimism about both an issuer's current state of affairs and its future prospects.") (internal quotations omitted); In re Chipcom Corp. Sec. Litig., No. 95-11114-DPW, 1996 U.S. Dist. LEXIS 22257, at *37 (D. Mass. Apr. 29, 1996) ("[V]ague and general positive comments—"puffery"—concerning the present or future are not actionable.") (emphasis in original).

[20] Plaintiffs citation to Scritchfield is inapposite.  There, this Court held that a company's statement of "present status and capabilities" was actionable because it connoted that the company was "comparatively superior to" competitors.  Scritchfield v. Paolo, 274 F. Supp. 2d 163, 175 (D.R.I. 2003).  None of the statements plaintiffs challenge in the instant case entails such a comparison.

306, 2005 U.S. Dist. LEXIS 16628, at *33 (D.R.I. Aug. 11, 2005) (holding that a statement made

on an earnings conference call was "loosely optimistic" puffery).

### III.   THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER AS TO ANY OF PLAINTIFFS' CLAIMS.

The Complaint must be dismissed for the independent reason that plaintiffs fail to plead

particularized facts giving rise to a strong inference of scienter that is "cogent and at least as

compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v.

Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).  Tellabs requires the Court to consider

"competing inferences rationally drawn from the facts alleged."  Here, the facts alleged in the

Complaint do not give rise to a strong inference of scienter, requiring dismissal of the Complaint.

Id.; In re Biogen IDEC, Inc. Sec. Litig., Civil Action No. 05-10400-WGY, 2008 WL 4810045, at

*5 (D. Mass. Oct. 25, 2009).

### A.   Plaintiffs' Allegations Regarding Insider Stock Sales Fail to Give Rise to a Strong Inference of Scienter.

Plaintiffs do not—and cannot—dispute that pleading motive and opportunity without

factual support, whether in the form of insider trading allegations or otherwise, is insufficient by

itself to establish a strong inference of scienter.  See Miss. Pub. Emps. Ret. Sys. v. Boston Sci.

Corp., 523 F.3d 75, 92 (1st Cir. 2008); Greebel v. FTP Software, Inc., 194 F.3d 185, 197 (1st

1999); Rosen v. Textron, Inc., 321 F. Supp. 2d 308, 322 (D.R.I. 2004).  Instead, at most, they

claim that the trades by Messrs. Rickard, McLure, and Ryan combine with other allegations to

meet their pleading burden.  But as explained below and in Defendants' opening brief, the

Individual Defendants' trading activity does not support—and indeed affirmatively

undermines—any inference of scienter.

## 1.  Mr. Ryan's single stock sale was not suspicious.

Mr. Ryan's stock sales do not raise a strong inference of scienter as he only sold 5.4% of his total holdings.[21]  See Acito, 47 F.3d at 54 (noting that a sale of only 11% of holdings, absent other allegations, suggested that the trading was not unusual); In re Gildan Activewear, 636 F. Supp. 2d at 270-71 (finding that "total sales amounting to a relatively low percentage of an insider's percentage of stock holdings militate against an inference of scienter" where defendants sold 22.5% and 4.9% of holdings); In re Glenayre Techs. Inc. Sec. Litig., No. 96 CIV. 8252(HB), 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998), aff'd, 201 F.3d 431 (2d Cir. 1999) (finding that a sale of only 5% of holdings did not raise an inference of scienter).  Plaintiffs do not cite to a single case where sales of 5.4% or less were deemed to support a strong inference of scienter. (See Pls. Opp. at 47-48 n.24.)

Plaintiffs also fail to plead that Mr. Ryan's sale was inconsistent with his prior trading history.  Moreover, the approaching expiration of the stock options he exercised provides a compelling competing explanation for his stock sale.  (See Ex. 16, Mr. Ryan's August 8 Form 4).

---

[21] Contrary to plaintiffs' assertion (Pls. Opp. at 47 n.24), the overwhelming weight of authority holds that stock options *must be* included in a calculation of total holdings.  See Institutional Invs. Group v. Avaya, Inc., 564 F.3d 242, 279 n.55&56 (3d Cir. 2009) (calculating defendants' total holdings by including stock options); Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) (including shares and options when calculating percentage of defendant's holdings sold during class period); In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 271 n.5 (S.D.N.Y. 2009) (noting that the weight of the authority indicates that "options are to be taken into account in comparing the volume of an insider's sales to his shareholdings"); McCasland v. FormFactor Inc., No. C 07-5545 SI, 2008 U.S. Dist. LEXIS 60544, at *35 (N.D. Cal. July 25, 2008) ("The correct measure of an insider's ownership is both the shares and vested options to purchase shares held [by] the insider.") (citations omitted).  Indeed, because all of the trades at issue here were exercises of stock options, it would be illogical to exclude such options from the calculation of Defendants' total holdings.  (See Ex. 10, Mr. McLure 10b5-1 trading plan at Ex. B; Ex. 9, Mr. Rickard 10b5-1 trading plan at 1-2; Ex. 16, Mr. Ryan's August 8 Form 4).

The 5.4% is calculated by dividing the number of shares sold (400,000) by Mr. Ryan's total holdings (7,398,279).  It is unclear how plaintiffs arrive at 7%.  (Compl. ¶ 109; Pls. Opp. at 47 n.24.)

### 2.     Messrs. Rickard and McLure traded pursuant to 10b5-1 plans, which—together with the surrounding circumstances—affirmatively negate the inference of scienter.

Plaintiffs cannot dispute that courts regularly find, at the pleading stage, that 10b5-1 plans negate or undercut an inference of scienter.  See, e.g., In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007) (finding that "timing and amount of the sales do not raise a strong inference of scienter" where defendant's sales were made pursuant to 10b5-1 trading plan); Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003) (holding that the use of a 10b5-1 trading plan "could raise an inference that the sales were pre-scheduled and not suspicious").  Instead, they claim that the timing around which Messrs. Rickard and McLure entered into their plans is somehow suspicious and supports an inference of scienter.  (Pls. Opp. at 46-52.)[22]

But the facts alleged in plaintiffs' Complaint affirmatively contradict any such inference.  Plaintiffs' argument that Defendants may have acted upon "knowledge of an impending price drop" when setting up a 10b5-1 plan during the class period does not make sense where, as here, the Defendants did not control the information that they are alleged to have concealed from the market.  This is because clients and competitors often publicized large contract signings.  Indeed, several of Mr. Rickard's and Mr. McLure's sales were made shortly *after* public announcements

---

[22] In Mississippi Public Employees' Retirement System v. Boston Scientific Corp., a case that plaintiffs cite for this proposition, the court refused to consider the 10b5-1 plans at issue because there was no evidence of when the plans were entered into or whether they gave the defendants any discretion over the sales.  523 F.3d at 92.  Here, however, Defendants have provided copies of the plans, which indicate when they commenced and the fact that Defendants have no discretion over sales made pursuant to the plans.  (See Ex. 10, Mr. McLure 10b5-1 trading plan; Ex. 9, Mr. Rickard 10b5-1 trading plan.)

of large contract losses, which negates any inference that the Defendants set up these plans to "maximize" their gain or to capitalize on any alleged fraud.[23]

In addition, the circumstances around both Mr. McLure's and Mr. Rickard's trades further negate any inference of scienter.  The fact that Mr. Rickard was retiring at the end of 2009, as announced in February of that year, negates plaintiffs' allegation that his stock sales were suspicious.  Wietschner, 294 F. Supp. 2d at 1116.  Despite plaintiffs' attempt to suggest an adverse inference from Mr. Rickard's retirement, his Form 4s conclusively demonstrate that his two trades were exercises of stock options set to expire shortly after they were sold.  (See Ex. 17, Mr. Rickard's August 18 Form 4 (showing that options for 251,000 shares were expiring on 9/1/2009); Ex. 18, Mr. Rickard's December 15 Form 4 (showing that options for 80,000 shares were expiring on 1/03/2010).)  The impending expiration of stock options is the very scenario in which a defendant's retirement has been found to negate any inference of fraudulent intent.  See Greebel, 194 F.3d at 206 (pointing out that retiring individuals often have a limited period of time to exercise stock options).

The allegations regarding Mr. McLure's trading are irrelevant because plaintiffs have not alleged that Mr. McLure made or contributed to a single false or misleading statement.  (Defs. Mem. at 37.)  The case plaintiffs cite—In re Allaire Corp. Securities Litigation—proves Defendants' point.  There, a senior executive was found liable even though no specific false or misleading statements were attributed to him because "the vast majority of the Defendants' false or misleading statements [were] contained in either SEC filings . . . or in press releases."  224 F. Supp. 2d 319, 340 (D. Mass. 2002).  By contrast, Mr. McLure cannot be liable because the

_____

[23] For example, Mr. Rickard sold a quarter of his shares shortly after the stock price drop (see Ex. 18, Mr. Rickard's December 15 Form 4); Mr. McLure sold 200,000 of his shares after the New Jersey contract loss was make public and 100,000 of his shares shortly after the Company announced—mid-quarter—its Medicare Part D losses on October 2, 2010 (see Ex. 19, Mr. McLure's September 3 Form 4; Ex. 20, Mr. McLure's October 5 Form 4).

statements plaintiffs challenge were made on earnings calls where the speaker was an

identifiable individual (and never Mr. McLure).  See In re Cabletron Sys. Inc., 311 F.3d 11, 41

n.16 (1st Cir. 2002) (noting that the group pleading presumption would not have applied where

"the complaint did not allege [the defendant's] participation in the production of any group-

published documents such as SEC filings").[24]

**B.      The Complaint's Remaining Allegations Fail to Allege That Defendants Acted with a High Degree of Recklessness.**

**1.      Plaintiffs fail to plead facts supporting their assertion that Defendants knew that customer service problems were causing contract losses.**

The crux of plaintiffs' scienter claim is that Defendants allegedly knew that contracts

were being lost *due to* service issues.  (Pls. Opp. at 30 (claiming that Defendants "had personal

knowledge that service related issues were *causing* clients to terminate their contracts with CVS

Caremark") (emphasis added).)  But plaintiffs offer only conclusory statements in support of this

assertion.  (See, e.g., Compl. ¶ 77 (conclusory assertion that "by mid-2008 . . . it was clear within

the Company that Coventry had decided to abandon CVS Caremark because of severe service

issues"); id. ¶ 82 (conclusory assertion that "the Coventry contract was lost due to poor

implementation and service issues").)

Neither plaintiffs' allegations regarding "complaints from customers" expressing their

"frustration" (Pls. Mem. at 32), nor plaintiffs' claim that monthly and quarterly meetings

"revealed that, contrary to Defendants' public representations, the Company's retail-PBM model

---

[24] Plaintiffs' attempt to argue in the alternative that Mr. McLure is liable under "scheme liability" fails.  In re Bristol-Meyers Squibb Securities Litigation—the case cited by plaintiffs in support of this proposition—is wholly inapplicable.  In that case, the district court found that an individual defendant's behavior was "at the heart" of the Company's false and misleading conduct because it was alleged that the defendant "secretly negotiated a settlement with illegal oral side agreements," knowingly withheld information about these negotiations from the shareholders, the Board and the federal monitor, and "failed to correct" another defendant's misstatements.  586 F. Supp. 2d 148, 179 (S.D.N.Y. 2008).  There are no such particularized allegations here of illegal and manipulative action on the part of Mr. McLure.

was a failure and the Company was experiencing severe service problems with its PBM

business" (Pls. Mem. at 33) establishes a compelling inference that Defendants knew that the

Company had lost or would lose contracts *as a result of* service or integration issues.[25]  Indeed,

the very paragraphs of the Complaint that plaintiffs cite in making this argument allege only that

"service issues were commonly the subject of discussion" at these meetings.  (Compl. ¶¶ 68-70.)

Under First Circuit law, "the pleading of scienter may not rest on a bare inference that a

defendant must have had knowledge of the facts."  In re Peritus Software Services, Inc. Sec.

Litig., 52 F. Supp. 2d 211, 229 (D. Mass. 1999) (finding allegation that defendants "discussed

major problems with the acquisition" inadequate to plead even recklessness) (citing Maldonado v.

Dominguez, 137 F.3d 1, 9 n.4 (1st Cir. 1998)).

In addition, contrary to plaintiffs' conclusory allegations (see Pls. Opp. at 31), the

allegations in the Complaint (and the substance of the documents cited in the Complaint)

strongly support an inference that the contract losses the Company sustained in the third quarter

of 2009 resulted from factors *other than* service.  For example:

- The Company had received the JD Power award for excellence in customer service for the *third* time.  (Compl. ¶¶ 120, 125.)

- The Company had a 92% client retention rate for the 2010 selling season.  (Compl. ¶ 191.)

- The Company had gained 125 *new* clients in the 2010 selling seasons and had achieved $1.4 billion in contract wins.  (Ex. 7, Nov. 5 Tr. at 4.)

---

[25] Mississippi Public Employees' Retirement System v. Boston Scientific Corp. is factually distinguishable. There, the defendant company received adverse reports from doctors regarding a defect with a medical device produced by the company; the company then made a manufacturing change to the product, but allegedly concealed the reason for the change—the adverse reports—from the public.  See 523 F.3d at 81.  The court found that plaintiffs had adequately pled scienter because the company admitted in its SEC filings that it made the change *in response* to complaints and that it had been investigating the problem.  Id. at 90-91.  No such allegations of knowledge are alleged here.

Indeed, on the November Call—when plaintiffs allege that the service issues and unsuccessful integration were "first disclosed" (Pls. Opp. at 61 n.38)—Mr. Ryan was asked why the company was losing contracts.  In response, he stated without equivocation, that "none of [the contract losses] were because of the model.  There were varying reasons some price, *one service*, there were varying reasons, but none of them because of the model."  (Ex. 7, Nov. 5 Tr. at 9 (emphasis added).)[26]  Plaintiffs have no answer to this.

> **2.      Plaintiffs fail to identify any specific contract-related information that would have put Defendants on notice that their statements were false or misleading.**

Whether and when Defendants knew that the Coventry, New Jersey and Chrysler contracts had been lost or were going to be lost is irrelevant because all three contract losses were disclosed to investors months before the November Call and, therefore, could not have caused any loss on that date.  (See Defs. Mem. at 22-26; supra, Section II.A.)  Regardless, plaintiffs' claims regarding contract losses fail because the Complaint does not identify the specific information that Defendants purportedly learned from the Sales Pipeline Reports as well as monthly and quarterly meetings and phone calls that would have put them on notice that their disclosures were false or misleading.  (Defs. Mem. at 40-42.)

Plaintiffs cannot simply assert that Defendants knew or must have known certain information by virtue of their positions in the Company.  See, e.g., ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 62-63 (1st Cir. 2008) ("The plaintiffs have not included details about . . . whether this information [allegedly belying defendants' statements] was known to the

---

[26] Likewise, plaintiffs provide absolutely *no* support for their allegation that "[a]s a result of the Company's inferior customer service, Defendants were forced to lower prices on over 50% of the Company's contracts, including those that were years from renegotiation." (Pls. Opp. at 34.)  They do not identify any particular contracts that were repriced, and they rely on the conclusory and unsupported allegation that Defendants "falsely stat[ed]" that the repricings were not due to service issues.  (Id.)

defendants at the relevant time."); <u>Metzler Inv. GMBH v. Corinthian Colls., Inc.</u>, 540 F.3d 1049, 1068 (9th Cir. 2008) ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud."). <u>In re Stone & Webster, Inc. Securities Litigation</u> does not suggest otherwise. There, the regularly distributed financial reports were only one of many facts that plaintiffs alleged in support of their scienter claim. 414 F.3d 187, 210-11 (1st Cir. 2005). In addition to the reports, a confidential source who was the "head of S&W's Development Corporation" stated that *the monthly financials did not comport with the reported quarterly earnings*; the company's vendors stopped delivering materials to project sites because they had not been paid; vendors and subcontractors placed calls to the defendant CEO *directly* to complain and threatened to walk off the project; a list of overdue accounts was sent *directly* to the CEO; the company was forced to sell its headquarters building; and other allegations leaving no doubt that defendants knew that their public statements—claiming that the company had sufficient cash to cover its expenses—were false. <u>Id.</u> Plaintiffs here rely entirely on the allegation that two of the three Individual Defendants usually received weekly Sales Pipeline Reports that listed certain contracts as at relative risk for termination.[27] This not only fails to allege that Defendants *knew* the contracts were going to be lost, but also fails to allege information contradicting any of the Company's public statements.[28]

---

[27] According to plaintiffs, Mr. Rickard did not receive the Sales Pipeline reports. (Compl. ¶ 66.)

[28] Footnote 16 of plaintiffs' Opposition reflects the leaps in logic on which plaintiffs seek to rely in their Complaint. Plaintiffs purport to equate a contract's appearance on a weekly report with the Defendants' knowledge of that contract's loss or impending loss. The problem Defendants identify is not a lack of "evidence," as plaintiffs suggest. Rather, it is a more basic pleading failure: that a contract is at a high *risk* of loss, does not mean it necessarily *will* be lost or that it should be disclosed as such.

### 3.    The statements in the Complaint attributed to confidential witnesses do not support a strong inference of scienter.

In challenging plaintiffs' allegations based on confidential sources, Defendants do not suggest that plaintiffs' description of the confidential witnesses' "job title and responsibilities" or "the timeframe during which he or she was employed by the Company" are lacking (Pls. Opp. at 43).  Rather, Defendants make a more basic point:  even crediting the allegations attributed to the confidential witnesses, the Complaint pleads nothing about any Defendant's state of mind at the time of alleged misstatements and omissions.  (See Defs. Mem. at 38-40.)  Plaintiffs' argument that these confidential witnesses are relevant because "it shows that CVS Caremark was experiencing significant service and integration problems even before the Class Period began" emphasizes exactly why the statements of these witnesses are *not* relevant:  because their allegations do not address what the Defendants allegedly knew about why certain major contracts were lost and when they allegedly knew it.[29]

Plaintiffs' examples demonstrate exactly how inadequate their scienter allegations are (see Pls. Opp. at 43-44):

- ▪ The allegation that "service issues were commonly the subject of discussion" during senior executive meetings (Pls. Opp. at 43) does not indicate whether purported service issues impacted particular contracts, at which particular meetings service issues were discussed, whether any of the Individual Defendants attended any of these

---

[29] Plaintiffs' attempt to distinguish the case law cited by Defendants displays a misunderstanding of the case law regarding confidential witnesses.  (See Pls. Opp. at 45 n.22.)  Plaintiffs are required to plead enough detail about a confidential witness "to support the probability that a person in the position occupied by the source would possess the information alleged."  In re Cabletron, 311 F.3d at 29.  Here, plaintiffs claim that their confidential sources support the allegations that Defendants knew their statements were allegedly false and misleading when made.  (Pls. Opp. at 43.)  However, confidential sources that were not employed by the Company during the class period cannot be said to have possessed such information, no matter what their position and no matter how specifically their position is alleged.  (See Defs. Mem. at 39.)  The cases cited by Defendants in their opening brief support this point.  See e.g., Cal. Pub. Emps. Ret. Sys. v. Chubb Corp., 394 F.3d 126, 154 (3d Cir. 2004) (finding that even a former vice president was not a reliable confidential source where he was not employed by company at time of alleged events).  Plaintiffs fail to cite any case that says otherwise.  In fact, they concede that "the Complaint does not allege that the confidential witnesses had knowledge of events after they left the Company."  (Pls. Opp. at 45.)

meetings, or whether these meetings included discussions of contract losses *resulting from* service issues.  And, CW5, who is alleged to have made this statement, was not ever employed by the company after November 2008, the beginning of the Class Period.  (Compl. ¶ 33.)

- The statement that "service levels were low" (Pls. Opp. at 43) again says nothing about how the Defendants were allegedly made aware of this or how this would have put them on notice that service or integration issues were *causing* contract losses.

- The allegation that, prior to the Class Period, the merger of the information systems did not function properly (id.) does not allege anything about how the systems were performing during the Class Period or what the Defendants knew about alleged issues with systems integration or, more fundamentally, what impact those issues were having.

- The allegation that PBM plan participants would go "months" without getting appropriate medication (Pls. Opp. at 43-44) again says nothing about how Defendants allegedly knew of this information nor how it would have indicated that contracts were being lost because of such issues.

- Finally, the allegation—from a confidential witness who only worked at the company until May 2008—that service problems with the Chrysler account were "very much in the open" (id. at 44) fails to show how Defendants knew that the Chrysler contract would be lost due to service issues.[30]

And, in any event, plaintiffs do not even attempt to argue that any of the confidential witnesses they identified had any connection whatsoever to the forecasting process and therefore could shed no light at all on the Defendants' discussions of future earnings.

Despite the volume of confidential sources that plaintiffs cite in their Complaint, the allegations attributable to these sources fail to raise a strong inference of scienter.  See Chubb Corp., 394 F.3d at 155 (noting that the "sheer volume of confidential sources cited cannot compensate for . . . inadequacies" including the lack of factual particularity).[31]

---

[30] And, in fact, the Company did *not* lose any aspect of the Chrysler business due to services issues.  As articulated in Defendants' opening brief, the Company *retained* its Chrysler business with respect to the active employees and non-union retirees, undercutting any inference that the VEBA portion of the loss was attributable to any service issues.  (See Defs. Mem. at 43.)

[31] Plaintiffs' allegations with respect to the CMS Spread Regulation and Maintenance Choice similarly fail to plead a strong inference of scienter.  (See Defs. Mem. at 44-45.)  In the face of clear statements by the Company to the contrary, plaintiffs maintain that Defendants "downplayed the effect the [CMS Spread Regulation] would (…continued)

## IV.    PLAINTIFFS DO NOT STATE A CLAIM FOR CONTROL PERSON LIABILITY.

Plaintiffs effectively concede that their claims under § 20(a) cannot survive in the absence of a primary violation of Section 10(b) of the Exchange Act and Rule 10b-5.  (Pls. Opp. at 63-64.)  As explained above and in Defendants' opening brief, plaintiffs have failed to do so. Accordingly, plaintiffs' Section 20(a) "control person" claim must be dismissed as to each of the Individual Defendants.[32]

## V.    PLAINTIFFS' FOOTNOTE REQUEST FOR LEAVE TO AMEND SHOULD BE DENIED.

The Court should deny plaintiffs' request (Pls. Opp. at 64 n.43) to amend their complaint and instead dismiss the Complaint with prejudice.  The First Circuit is clear that leave to replead a complaint should not be granted where the amendment would be futile or unproductive. "Grounds for denial include 'undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . .

---

have on the Company."  (Pls. Opp. at 42 n. 21.)  Plaintiffs harp on the word "headwind" used by Mr. Rickard at the May 15, 2009 investor meeting, but the transcript reflects that Mr. Rickard was describing several changes that would impact the company and categorizing each as either a "headwind" or a "tailwind," while caveating that the full impact of the Regulation was still "unknown."  (Ex. 8, transcript of CVS Caremark's May 15, 2009 annual analyst/investor meeting at 38.)  Indeed, on August 4—three months before the alleged corrective disclosure—the company announced the exact impact that the Regulation would have on the Company's earnings.  (See Compl. ¶ 164.)

Plaintiffs fail to provide even one factual allegation to support their claim that the Maintenance Choice offering was not driving renewals or gaining new contracts; their conclusory and baseless allegations should not be credited.  (Defs. Mem. at 45.)

[32] Allegations that Mr. McLure oversaw aspects of the merger integration are not enough, as plaintiffs suggest (Pls. Opp. at 63 n.42), to plead control sufficiently for purposes of  plaintiffs' § 20(a) claim, given that plaintiffs have failed to plead that Mr. McLure had any control with respect to the alleged misstatements or omissions attributed to Mr. Ryan or Mr. Rickard.  See In re Qwest Commc'ns Int'l, Inc. Sec. Litig., 387 F. Supp. 2d 1130, 1148-49 (D. Colo. 2005) (holding that to find defendant liable as a control person under 20(a), plaintiff must allege facts showing that defendant had control "over the primary violator"); see also Ledford v. Peeples, 605 F.3d 871, 893 (11th Cir. 2010) (finding defendant was a control person under 20(a) where he "was responsible for [other defendant's] conduct in violation of § 10(b) and Rule 10b-5(b)" including other defendant's actionable misstatements).  For that additional reason, plaintiffs' § 20(a) claim against Mr. McLure must fail.

[and] futility of amendment.'"  <u>ACA Financial Guaranty Corp. v. Advest, Inc.</u>, 512 F.3d 46, 56 (1st Cir. 2008) (quoting <u>Foman v. Davis</u>, 371 U.S. 178, 182-83 (1962)).

Plaintiffs have not identified what they would or could change in their pleadings to address the deficiencies in the Complaint, and they cannot rely on this Court to instruct them on how to do so.  Moreover, plaintiffs have had months with ample extensions to get their complaint right and have had the opportunity to talk to numerous confidential sources.  As the First Circuit has made clear:  "The plaintiffs do not get leisurely repeated bites at the apple, forcing a district judge to decide whether each successive complaint was adequate under the PSLRA."  <u>Id.</u> at 57.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Complaint be dismissed with prejudice for failure to state a claim.

Dated:   Providence, Rhode Island
         October 4, 2010

<div style="margin-left: 40%;">

By:   /s/ William R. Grimm
      William R. Grimm #1938
      HINCKLEY, ALLEN & SNYDER LLP
      50 Kennedy Plaza, Suite 1500
      Providence, Rhode Island  02903
      Tel.    (401) 274-2000
      Fax.    (401) 277-9600
      Email.  wgrimm@haslaw.com

      DAVIS POLK & WARDWELL LLP
      Lawrence Portnoy *(pro hac vice)*
      Edmund Polubinski III *(pro hac vice)*
      Jessica K. Foschi *(pro hac vice)*
      450 Lexington Avenue
      New York, New York  10017
      Tel.    (212) 450-4000
      Fax.    (212) 701-5800
      Email.  Lawrence.Portnoy@davispolk.com
              Edmund.Polubinski@davispolk.com
              Jessica.Foschi@davispolk.com

      *Attorneys for Defendants*

</div>

CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2010, a copy of the foregoing Reply Memorandum of Law in Support of Defendants' Motion to Dismiss was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

                 /s/ Mitchell R. Edwards
                 Mitchell R. Edwards #6942
                 Hinckley, Allen & Snyder LLP
                 50 Kennedy Plaza, Suite 1500
                 Providence, RI  02903
                 401-274-2000
                 401-277-9600 (fax)
                 medwards@haslaw.com