UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RICHARD MEDOFF, Individually and On Behalf Of All Others Similarly Situated, | ) ) ) | No. 1 :09-cv-00554 |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) ) | |
| CVS CAREMARK CORPORATION, et al. | ) ) | |
| Defendants. | ) ) | |

SUPPLEMENTAL MEMORANDUM OF LAW
IN FURTHER OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT

ORR & RENO
WILLIAM L. CHAPMAN
JEFFREY C. SPEAR
One Eagle Square, P.O. Box 3550
Concord, NH 03302-3550
Telephone: 603/224-2381
603/223-9007 (fax)

BARRY J. KUSINITZ
155 South Main Street, Suite 405
Providence, RI 02903
Telephone: 401/831-4200 401/831-7053 (fax)
bkusinitz@bdglawyers.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT ROTHMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LABATON SUCHAROW LLP
JOSEPH A. FONTI
140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)

## PRELIMINARY STATEMENT

Lead Plaintiffs respectfully submit this supplemental memorandum of law in opposition to Defendants' motion to dismiss as ordered by the Court's Procedural Order, entered March 22, 2011 ("Procedural Order") (Docket No. 45).[1]  The Court requested that the parties address the Supreme Court's recent decision in *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011), on the issue of materiality and scienter, and the First Circuit's recent decision in *Anima S.G.P.R.A. v. Gozani*, No. 10-1048, 2011 WL 924242 (1st Cir. Mar. 18, 2011), as to materiality alone.  Both of these cases further support denial of Defendants' motion to dismiss.

*Matrixx* reaffirmed the standard for pleading materiality under Section 10(b), finding that a plaintiff's allegations must plausibly suggest a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." 131 S. Ct. at 1318 (citations omitted).  The facts of *Matrixx* are instructive.  There, plaintiffs alleged defendants knew of evidence linking the company's cold medicine product to the loss of the sense of smell.  Rather than disclosing this specific adverse fact to investors, Matrixx issued boilerplate, generic risk warnings and aggressive earnings guidance.  *Id.* at 1315, 1323.  Undertaking a contextual analysis, the Supreme Court concluded that the complaint sufficiently pled materiality based on alleged "facts suggesting a <u>significant risk</u> to the commercial viability of Matrixx's leading product." *Id*. at 1323 (emphasis added).

---

[1]  Lead Plaintiffs submit this brief further to their Memorandum of Law in Opposition to the Motion to Dismiss the Corrected Consolidated Complaint (Docket No. 36) (the "Opposition Brief" or "Opp. Br.").  Capitalized terms, unless otherwise defined herein, have the same meaning as defined in the Opposition Brief and the Corrected Consolidated Class Action Complaint ("Complaint") (Docket No. 33).  Defendants' Memorandum of Law In Further Support of Defendants' Motion to Dismiss, dated April 29, 2011 (Docket No. 46), is referred to throughout as "Defendants' Supplemental Brief" or "Def. Supp. Br."  References to "¶__" are to the Complaint.

*Anima*, issued a week before *Matrixx*, concluded that a company need only disclose risks that are "near certain[]" to occur, presenting a conflict with the "substantial risk" standard adopted by the Supreme Court in *Matrixx*.  2011 WL 924242, at *14.  In *Anima*, plaintiffs alleged that defendant NeuroMetrix concealed the risk of insurance companies not reimbursing physicians for using the company's neurological testing device.  The First Circuit disagreed, concluding that "a risk of non-reimbursement *specifically was disclosed*," *id*. at 14 (emphasis in original), and that defendants' press release "state[d] explicitly that the ultimate resolution of the issue is unknown and, by reasonable implications, out of its hands." *Id.*

Both under the controlling "substantial risk" standard—as well as the *Anima* standard—the Complaint adequately alleges materially false statements and omissions that would have "significantly altered the 'total mix' of information if made available." *Matrixx*, 131 S. Ct. at 1318.  "This case arises from Defendants' materially false and misleading statements relating to the Merger, and, in particular, the success and profitability of the PBM business."  ¶1.  Contrary to Defendants' repeated characterizations, the allegations are not merely limited to Defendants' failure to disclose certain contract losses that had yet to occur or to meet forward-looking "Preliminary Earnings Predictions."  Def. Supp. Br. at 6-7.  Instead, the Complaint centers on Defendants' concealment of the: (i) contemporaneous failure of the merger of Caremark into CVS; (ii) inability to integrate the two companies' systems and personnel; (iii) inability to provide adequate service to the Company's customers; (iv) resulting frequent, consistent, and repeated complaints from customers; and (v) known fact that billions of dollars in contracts had been terminated because of the service and integration problems during the Class Period.  Opp. Br. at 12-13.  Rather than disclose these materially adverse facts, Defendants made false statements concerning the Merger, the integration process, and the Company's future prospects,

and gave investors knowingly false earnings guidance.  Then, just three days later, Defendants

launched a $40 million selling spree of personally held Company shares.  ¶¶106-09.[2]

Tellingly, while Defendants continue to promote their unfounded arguments, they do not

contest that the material reasons <u>why</u> the Company lost key contracts and missed its earnings

guidance—*i.e.*, the failed integration and service issues—were <u>known at the time</u> Defendants

made their actionable statements but were hidden from investors.  As revealed on November 5,

2009, the service and integration problems undermined the viability of CVS Caremark's PBM

business, leading one analyst to write that Defendants' disclosure of the truth provided

"undeniable evidence today that it has mismanaged the Caremark acquisition and destroyed

shareholder value."  ¶¶184, 193.[3]

## ARGUMENT

I.   *Matrixx* And *Anima* Further Support Denial of Defendants'
     Motion To Dismiss As It Relates To Materiality

A.   *Matrixx* Reaffirmed That The Complaint Adequately Pleads That
     Defendants Are Liable For Materially False Statements And Omissions

*Matrixx* reaffirmed that, to plead materiality under Section 10(b), a plaintiff need only

allege a "'substantial likelihood that the disclosure of the omitted fact would have been viewed

by the reasonable investor as having significantly altered the 'total mix' of information made

available.'"  *Matrixx*, 131 S. Ct. at 1318 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32

---

[2] Just last week—nearly a year after Lead Plaintiffs filed the Complaint—CVS Caremark disclosed that the U.S. Securities and Exchange Commission (the "SEC") has issued subpoenas related to the same course of conduct Lead Plaintiffs allege here.  *See* CVS Caremark Form 10-K for the period ended March 31, 2011 at 12.

[3] The Court's Procedural Order requested additional briefing on two specific issues: (1) "whether the defendants had a duty to disclose the risks of losing customer contracts when, according to the defendants, those losses were not 'substantially certain' to occur," and (2) "whether the plaintiffs have sufficiently alleged facts plausibly suggesting that the defendants acted with the requisite level of scienter."  March 22, 2011 Order at 1. Defendants' Supplemental Brief references additional elements of §10(b) that are outside the scope of this order. Lead Plaintiffs refer the Court to the arguments set forth in the Opposition Brief pertaining to Puffery (Opp. Br. at 16-20), the Safe Harbor (Opp. Br. at 24-29), Confidential Witnesses (Opp. Br. at 43-46), and Loss Causation (Opp. Br. at 55-63).

(1988) and *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  As in *Basic*, the Supreme Court again rejected a bright-line rule for materiality, and required a fact-specific analysis of the "source, content, and context" of the alleged misstatement.  *Id*. at 1321 (quoting *Basic*, 485 U.S. at 232 (internal quotation omitted)).  While "§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information . . ., [d]isclosure is required under these provisions only when necessary 'to make . . . statements made, in the light under which they were made, not misleading.'"  *Id.* (quoting 17 C.F.R. § 240.10b-5(b)).

To survive a motion to dismiss, Lead Plaintiffs "need only allege 'enough facts to state a claim to relief that is plausible on its face.'"  *Matrixx*, 131 S. Ct. at 1322 n.12 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); Opp. Br. at 15.  *Matrixx* reaffirms that the allegations of materiality must simply "raise a reasonable expectation that discovery will reveal evidence," *id.* at 1323 (quoting *Twombly*, 550 U.S. at 556), and "allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009)).

**The Facts of *Matrixx* Are Instructive**

In *Matrixx*, the plaintiffs alleged that the defendant company failed to disclose the possible link between its cold medicine Zicam, the company's core product, and the loss of the sense of smell.  Plaintiffs alleged that over several years, doctors and medical researchers had contacted Matrixx to report a possible link.  In September 2003, one of these doctors planned to present his observations at a medical conference, but Matrixx warned he was unauthorized to disclose the company's name.  Two months later, two product liability lawsuits were filed.  These developments threatened the commercial viability of Matrixx's primary product.  *Matrixx*, 131 S. Ct. at 1315-16.

Under the guise of these risk warnings, rather than disclose the truth, Matrixx told investors that Zicam was "poised for growth" and had "very strong momentum." *Id.* at 1315. Matrixx further expressed its expectation that revenues would "'be up in excess of 50% and that earnings, per share for the full year [would] be in the 25 to 30 cent range.'" *Id.* A few months later, in January 2004, "Matrixx raised its revenue guidance, predicting an increase in revenues of 80 percent and earnings per share in the 33-to-38-cent range." *Id.*

All the while, Matrixx warned investors only of the potential "'material adverse effect' that could result from product liability claims, 'whether or not proven to be valid,'" and further stated that "product liability actions could materially affect Matrixx's 'product branding and goodwill,' leading to reduced customer acceptance." *Id.* (citations omitted). In response to media reports, Matrixx denied any connection between its product and the loss of smell, claiming that such reports were unfounded and misleading. *Id.* at 1316.

The Supreme Court "believe[d] that these allegations suffice to 'raise a reasonable expectation that discovery will reveal evidence' satisfying the materiality requirement." *Id.* at 1323 (quoting *Twombly*, 550 U.S. at 556). The Supreme Court concluded that "[v]iewing the allegations of the complaint as a whole, the complaint alleges facts suggesting a significant risk to the commercial viability of Matrixx's leading product." *Id.* Such allegations establish that it "is substantially likely that a reasonable investor would have viewed this information 'as having significantly altered the 'total mix' of information made available.'" *Id.* (citation omitted).

**<u>Defendants Concealed The Significant Risks To The Viability Of The PBM Business</u>**

Here, viewing the Complaint as a whole, Lead Plaintiffs have alleged that Defendants failed to disclose facts concerning the commercial viability of CVS Caremark's PBM business and the impact on the Company's earnings. Contrary to Defendants' attempt to narrow this case

to one about potential contract losses, the Complaint alleges that Defendants concealed the link between the (i) failed merger integration and service disruptions, and (ii) loss of over $4.5 billion in terminated contracts during the Class Period.  From the inception of the Merger, and throughout the Class Period, investors and analysts expressed concern about the viability of the Merger because of the Company's ability to appropriately service its customers.  Defendants responded with materially false and misleading assurances.  For example:

- <u>All About Service</u>: The press release dated November 1, 2006 announcing the Merger stated that the purpose included "providing high-quality, cost-effective services."  ¶51. Upon announcement of the Merger, analysts expressed "serious concerns about the 'merger of equals' structure of the transaction and the heightened integration risk."  ¶57. In response to these concerns, CEO Ryan acknowledged that customers "want to get calmed down that . . . we're still going to focus on execution and service."  ¶55.  Ryan further stated the Merger was "all about . . . service . . . we think we can out-service and out-sell our competition here," ¶54, meaning that profitable new business would have to result from superior service, not bargain prices.

- <u>Systems Are Integrated</u>: In January 2009, Ryan declared that the integration was complete, "[a]ll the systems are able to talk to each other . . .  We have got no issues with our systems."  ¶121.

- <u>Client Satisfaction</u>: Throughout 2008 and 2009, Defendants misrepresented that clients "love[d] [CVS Caremark's] integrated proactive pharmacy care offerings," and that the Company's capabilities and offerings were "resonating with [] clients."  ¶¶112, 125, 133, 159.  According to Defendants, both new and existing clients reported "high customer satisfaction scores," and the PBM business had "excellent client retention."  ¶¶125,159.

- <u>No Hidden Agenda</u>: In January 2009, Defendants announced a surprise price reduction for over half of the Company's PBM clients.  ¶¶96, 118.  Analysts immediately questioned whether poor service prompted this un-negotiated price cut.  ¶¶96, 119.  Ryan responded that there was "No trade-offs because of our service . . . [T]here was no hidden agenda here about giving a lower price because of lack of service."  ¶¶97, 120.

- <u>EPS Growth Of At Least 13-15%</u>: On August 4, 2009, Ryan expressed "great confidence" in the Company's ability to retain existing clients and win new business during the 2010 selling season.  ¶159.  Ryan stated that he "would be very disappointed if [CVS Caremark] didn't have an EPS growth of at least 13 to 15%" in 2010.  ¶¶106, 160; Opp. Br. at 11.

- <u>We Can Deliver</u>: As late as September 2009, CFO Rickard was touting new business, and attributing it to "what we offer employers and other payors in terms of the products and services that we now can deliver." ¶172.

Like *Matrixx*, this "is not a case about a handful of anecdotal reports." *Matrixx*, 131 S. Ct. at 1322. As discussed in the Opposition Brief, for example, every Monday, Defendants received Sales Pipeline Reports, which by May 2008 revealed that $6.25 billion annually in contracts were at risk for termination, and nearly $3.5 billion annually in contracts were at highest risk. ¶¶65-67; Opp. Br. at 35-36. Defendants also participated in monthly and quarterly meetings to address the service issues. ¶¶68-70; Opp. Br. at 33, 42.

While Defendants told investors that they had "completed the integration" and that "[a]ll the systems are able to talk to each other," ¶71, integration issues, especially those related to computer systems, were causing tens of thousands of claim errors, the need for manual data entry, and the denial of benefits for eligible employees. ¶¶87-92. At the same time, internal documents reflected tens of thousands of errors, resulting in denial of benefits and over 40,000 plan participants not receiving the appropriate medications. ¶¶87-88, 91. The failure of the integration also resulted in significant over-billing. New Jersey alone was over-billed approximately $40 million. ¶¶89-90; *see also* ¶¶78, 92.[4] These facts, together with the others alleged in the Complaint, suggest a "significant risk" to the viability of the Company's PBM business, and under *Matrixx* must have been disclosed.

To the contrary, Defendants concealed these facts from investors. As Ryan explained at the close of the Class Period, while the Company had "honest, open discussion[s] of the areas that need to be fixed," he had been "hesitant to do it with the investor community." ¶196. CVS Caremark's internal emails and documents reveal that employees were instructed to conceal the

---

[4] These rampant integration issues and customer complaints led to low morale and high employee turnover, including senior personnel at the highest ranks of the Company. ¶99. By March 2008, nearly half of the team servicing New Jersey had left according to internal documents. *Id.*

truth from customers as well.  ¶¶101-05.  As an April 2, 2008 email stated, in response to customer complaints from New Jersey, CVS Caremark employees were admonished "NOT [to] be telling [New Jersey account] callers that participants are not" entered in the computer systems, and therefore cannot obtain their medications.  ¶100.  New Jersey explicitly raised these service issues with CVS Caremark, writing in a May 6, 2008 email that these problems are "directly impacting our client satisfaction . . . All this is unacceptable."  ¶102; *see also* ¶103 (regarding Blue Cross/Blue Shield of South Carolina).  While by the Fall of 2008 it was well known within the Company that Coventry was terminating its commercial contract, employees were placed under a "gag order."  ¶79.  Similarly, Ryan personally took part in a call with Chrysler to address similar integration-related service issues.  ¶¶93-94; Opp. Br. at 38-39.

As Ryan acknowledged on November 5, 2009, at the time Defendants issued their false statements, they knew that the failed integration and service issues resulted in contract terminations.  For instance, at the close of the Class Period, Ryan disclosed that the contract with Coventry—worth over $4 billion annually—was lost because of "service issues," stating:

> Coventry was a service issue.  Coventry was an issue we had two years ago.  We lost the Med D business [in mid-2008] because in my mind, because of service . . . But once the Med D went over, [we] kind of knew we were going to lose the commercial business the following year because it kind of just flows together . . . So price is not the issue.  We don't want to—if we don't want to lose it for price, we're not going to lose it because we buy them better [than anybody else] but there were some messaging issues and then some service issues.

¶197.

Ryan later stated: "we dropped the ball in some client service issues that we shouldn't have.  And we're owning up to it and we're fixing it.  So, that's what happened, and it obviously was a big one with Coventry because the natural falloff is we know we're going to lose the commercial business following [the loss of Med D]."  ¶198.  Indeed, over a year after

Defendants declared that Caremark had been fully integrated, ¶71, in February 2010, the Company disclosed that the PBM business "has five segments that haven't been fully integrated."  ¶200.

These disclosures were in stark contrast with Defendants' statements in May 2009 when they first disclosed the loss of the Coventry commercial contract.  Rather than disclose the specific reason, they merely indicated that the loss "was not unexpected," following the loss in 2008 of the Coventry Med-D contract, which Rickard falsely claimed was "due in large part to price." ¶75.[5]

**Earnings Guidance Was Materially False**

Similarly, like the defendants in *Matrixx*, Defendants knew that their guidance of a 13-15% increase in earnings for 2010 was materially false and misleading at the time of their statement on August 4, 2009—if not, the very next day.  *See Matrixx*, 131 S. Ct. at 1315.  As Ryan explained on November 5, 2009, the projection was based on the assumption of "low to mid to single digits [growth] in our PBM business."  ¶¶106, 182.  For argument's sake, if the years of complaints arising from tens of thousands of errors did not give rise to Defendants' knowledge that New Jersey was terminating its contract, ¶¶87-89 (quoting emails and discussing internal documents), New Jersey confirmed the termination in writing on August 5, 2009.  ¶90. With this confirmed contract loss—valued at over $1 billion annually—Defendants' earnings guidance was knowingly false.

Having just spoken to investors, Defendants had an immediate duty to disclose not only the loss of the New Jersey contract, but more importantly that (i) the loss was due to Merger-

---

[5] Defendants also concealed the material impact of regulations affecting the Company's Med-D insurance business, SilverScript Insurance Company.  ¶110.  Following the regulations' enactment in February 2009, the Company misrepresented that the Med-D business was "starting out basically right on plan early this year" with "no surprises," ¶126; *see also* ¶152 (referring to the regulatory change as a mere "headwind").  On November 5, 2009, Defendants revealed for the first time that the regulation in fact reduced earnings by 10% or $1.7 billion.  ¶182.

integration issues, and (ii) as a result, the Company could not meet its previously disclosed earnings guidance.  *See* Opp. Br. at 20-24.  Instead, Defendants waited three months to advise investors of the impact of the New Jersey loss, despite having the opportunity in intervening statements to the market in September and October 2009.  ¶¶172-178.  This delay provided time for $40 million in personal stock sales between August and November 2009.  ¶90; *see also* ¶¶106-09; Opp. Br. at 46-52.

**Investors' Reaction Further Supports Materiality**

Lead Plaintiffs' allegations of materiality are further supported by the telling reaction of investors.  Upon learning the truth, the share price collapsed 20% in a single day on 13 times the average daily volume during the Class Period.  ¶212; Opp. Br. at 22 n.8.  Analysts reacted harshly, writing, for example, that Defendants' admission "provided undeniable evidence today that it has mismanaged the Caremark acquisition and destroyed shareholder value."  ¶¶11, 193, 212.  Another analyst concluded that the "[s]urprise nature of [the] disclosures raises credibility issues" for CVS Caremark and its senior managers.  ¶¶191, 212.

**B.     The Complaint Satisfies The *Anima* Standard**

Defendants do not address the fact that the First Circuit's decision in *Anima*, which was issued a week before *Matrixx*, is inconsistent with *Matrixx* in certain respects.  As set forth in Part I.A., the Supreme Court reaffirmed the contextual analysis of *Basic* and held that concealing a "significant risk" may be material to shareholders.  *Anima*, on the other hand, required a showing of "near certainty" that the risk would materialize before disclosure is required.  2011 WL 924242, at *14.  After *Matrixx*, this is no longer the law.  *Matrixx*, 131 S. Ct. at 1323.  In view of *Matrixx*, Plaintiffs in *Anima* are seeking *en banc* review.[6]

---

[6] The Court of Appeals in *Anima* set out the legislative history of the PSLRA and its targeting of perceived abuses in class action litigation and to curb frivolous lawyer-driven litigation.  *Anima*, 2011 WL 924242, at *9-10.

In *Anima*, the First Circuit acknowledged the "omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action." *Id*. at *12 (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009)).  In reaching its conclusion, the First Circuit recognized that in "cases where the risk approaches a certainty, courts have no difficulty in finding a duty of disclosure.  But where the level of risk is unknown and the existence of a risk is disclosed, we shall hesitate to conclude that [a] disclosure is misleading merely because it did not state that the risk was 'serious.'" *Id*. at *15.[7]

The plaintiffs' allegations in *Anima* centered on physicians' insurance reimbursement for using NeuroMetrix's neurological scanning device.  *Anima*, 2011 WL 924242, at *6.  The complaint in *Anima* alleged, *inter alia*, defendants failed to disclose that: (i) there was a "serious risk" that insurers would disallow reimbursement for use of the company's product, an issue of "critical importance to [] profitability"; and (ii) internal experts believed that the company's business strategy regarding billing was incorrect and possibly fraudulent.  *Id*. at *11, 12.  The First Circuit concluded the company "*specifically* [] *disclosed*" the risk that reimbursement policies were unsettled and that denials would undermine the company's business.  *Id*. at *15 (emphasis in original).  The *Anima* Court also considered the existence of internal disagreement

---

As the drafters of the PSLRA envisioned, this meritorious action is led by three public-sector pension funds, which have suffered sizable losses due to Defendants' fraud.  Those institutional investors, appointed by the Court pursuant to the PSLRA's Lead Plaintiff provisions, 15 U.S.C. § 78u-4(a), are fulfilling their fiduciary responsibility, filing a Complaint that contains particularized allegations, quotation of internal documents and reports, and detailed factual allegations exceeding the PSLRA's stringent standard.  Indeed, last week—nearly a year after Lead Plaintiffs filed the Complaint—CVS Caremark disclosed that the SEC has issued a subpoena "requesting, among other corporate records, information relating to public disclosures made by the Company in 2009 concerning its PBM and Medicare Part D businesses and information concerning ownership and transactions in the Company's securities by certain officers of the Company."  CVS Caremark Form 10-K for the period ended March 31, 2011 at 12.

[7] Defendants submit that *Matrixx* requires disclosure of only adverse events that "had *actually* transpired." Def. Supp. Br. at 6-7.  *Matrixx*, however, held that the complaint need only allege "facts suggesting a significant risk." *Matrixx*, 131 S. Ct. at 1323.  The Supreme Court concluded that Matrixx was required to disclose "information indicating a significant risk to its leading revenue-generating product," not merely events that had actually transpired.  *Id*.  Nevertheless, here, Defendants knew that billions of dollars of contracts had in fact been lost due to concealed service and merger-related problems during the Class Period.

between certain reimbursement experts and senior management, but concluded the company had no duty to disclose adverse opinions unless the failure of the chosen business strategy approached "near certainty." *Id.* at *14.  In the context of the statements at issue, the Court concluded no further disclosure was required. *Id.*

Here, the Complaint's well-pled allegations meet even the higher, non-controlling standard of *Anima*.  As discussed in Part I.A. above, Defendants had actual knowledge of the fact that the Merger had failed and that customers had terminated billions of dollars in contracts during the Class Period due to poor service.  Opp. Br. at 35-40.  Lead Plaintiffs do not merely allege "near certainty," but actual knowledge that the undisclosed risk had come to pass.  For instance, as Ryan stated at the close of the Class Period, by mid-2008, Defendants knew that Coventry terminated its Med D contract due to service issues and <u>at that time</u> learned that Coventry was not renewing its commercial contract in May 2009 for the same reason.  Opp. Br. at 36-37.[8]

Similarly, on August 5, 2009, after New Jersey confirmed that it had terminated CVS Caremark, Defendants knew their earnings guidance from the prior day was false.  ¶106.  Rather than correct their prior statement and reveal that the loss of the contract was due to service issues, Defendants made additional false statements to investors and unloaded $40 million in stock despite their knowledge of material non-public adverse information.

---

[8] The Court of Appeals also noted in *Anima* that plaintiffs had complained of "pervasive" problems, and while "the PSLRA does not require plaintiffs to plead evidence . . . more meat was needed on these bones." *Anima*, 2011 WL 924242, at *19 (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 63 (1st Cir. 2008)).  In contrast, the Complaint details numerous instances of persistent, consistent, and pointed complaints from CVS Caremark's clients, as well as Defendants' efforts and instructions to conceal the truth from customers—allegations that Defendants do not acknowledge. *Supra* I.A.; Opp. Br. at 6-10; ¶¶77-79, 87-89.

### C.      Defendants' Invocation of General Risk Disclosures Is Unavailing Under Both *Matrixx* and *Anima*

Ignoring that the Complaint does not arise from "potential contract losses," Defendants argue that their disclosures were sufficient to avoid liability.  Without any citation, Defendants submit that "CVS Caremark had no duty to disclose the risk of specific potential contract losses, particularly where CVS Caremark had already disclosed the general risk of contract losses in its public filings."  Def. Supp. Br. at 4.  In making this argument, Defendants quote their generic disclosure that: "our failure to renew or win PBM business could adversely affect our business, financial position and result of operation."  Def. Supp. Br. at 4; *see also* Opp. Br. at 26-27.  Defendants submit—again without citation—that, "[u]nder those circumstances, there is no need to disclose anything further about risk of loss of any particular contract."  Def. Supp. Br. at 4.

*Matrixx* confirms that this is not the law.  The Supreme Court rejected the invocation of generic risk disclosures in the face of existing facts—especially if they indicate that the risk has materialized.  *Matrixx*, 131 S. Ct. at 1315.  Moreover, Defendants' suggestion of a bright line rule (*i.e.*, that they had no duty to disclose the risk of specific potential contract losses, because CVS Caremark had already disclosed the general risk of contract losses in its public filings) was also expressly rejected in *Matrixx*.  *Id.* at 1318-19.

*Anima* similarly assessed the context of the disclosures at issue.  Like *Matrixx*, the First Circuit recognized that while not all material facts need be disclosed, a company cannot "omit any facts 'necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading.'"  *Anima*, 2011 WL 924242, at *12; *Matrixx*, 131 S. Ct. at 1321.  While applying the non-controlling "near certainty" standard, the First Circuit, undertaking a fact-specific analysis, concluded that the particular risk at issue—the risk of non-reimbursement—was "*specifically disclosed*."  *Id.* at *14 (emphasis added).  The First Circuit

pointed to the fact that defendants "state explicitly that the ultimate resolution of the issue is unknown and, by reasonable implications, out of its hands." *Id*. at *14-15.  Indeed, the First Circuit recognized that defendants' particular disclosures became more explicit over time about the risks the company faced.

     *Anima* distinguished between explicit risk warnings versus generic boilerplate disclosures like those at issue here.  *Id.* at *15 ("A statement of risk does not insulate the speaker from liability, particularly where it is 'generic and formulaic.'") (citation omitted).  Indeed, the First Circuit recognized that in cases like this one, where "risks were referenced . . . by way of generalized risk factors, and the real potential problems were 'glossed over as a future risk of *limited* magnitude,'" disclosure may be required.  *Id*. at *13 (quoting *Lormand*, 565 F.3d at 247 (emphasis in original)).

     Here, unlike *Anima*, the consequence of the failed Merger, customer dissatisfaction, and service problems was known: the termination of $4.5 billion in contracts during the Class Period.  As discussed in Part I.A. above, Defendants' attempt to point to boilerplate general risk disclosures regarding the failure to renew or win PBM business in the future is unavailing.  *See* Opp. Br. at 26.  At no point prior to November 5, 2009 did Defendants disclose the existence of the contemporaneous service issues, the problems with the Merger integration, customer complaints, or the true cause of the contract losses.  Defendants have not, and cannot, dispute this fact.[9]

*       *       *

---

[9] Defendants contend that the Complaint fails to plead loss causation because the "contract losses that underlie plaintiffs' allegations had already been disclosed by the Company or was known publicly . . . " Def. Supp. Br. at 2. Like their other arguments, this contention is predicated on Defendants' characterization—not the allegations—of the Complaint. Lead Plaintiffs fully briefed loss causation and addressed Defendants' argument in the Opposition Brief at pages 55-63.

For all the reasons herein and in Lead Plaintiffs' Opposition Brief, these allegations suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement.  Defendants' motion to dismiss should be denied.

## II.     *Matrixx* Reaffirms That The Complaint Adequately Pleads Defendants Acted With Fraudulent Scienter

The *Matrixx* Court reaffirmed the pleading standard for scienter under *Tellabs*, which was addressed extensively in the Opposition Brief.  Opp. Br. at 29-30.  Plaintiffs must state with particularity facts giving rise to the strong inference that defendants acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Matrixx*, 131 S. Ct. at 1323 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)).  Courts must holistically review the allegations, taking into account "plausible opposing inferences," and find scienter if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 1324 (quoting *Tellabs*, 551 U.S. at 323, 324, 326).

## Fraudulent Scienter Is The Only Plausible Inference

The Supreme Court in *Matrixx* reaffirmed that the PSLRA "requires courts to take into account 'plausible opposing inferences'" from the facts alleged in the Complaint, which must be accepted as true. *Matrixx*, 131 S. Ct. at 1324 (quoting *Tellabs*, 551 U.S. at 323); Opp. Br. at 30. Having now submitted three briefs on the issue, Defendants have failed to offer <u>any</u> opposing innocent inference, let alone one that is plausible.  Other than conclusory arguments, Defendants do not, and cannot, refute the Complaint's allegations, including:

- As Ryan stated at the end of the Class Period, he knew that Coventry's contract was lost due to service issues—not price—by May 2008, and he knew <u>at that time</u> that the commercial contract would be lost for the same reason.  In total, these contracts accounted for $4 billion in annual revenue. *Supra* I.B.; ¶¶74-83; Opp. Br. at 36-37.

15

- By no later than August 5, 2009, Defendants knew that New Jersey had confirmed its over $1 billion contract was terminated.  By that date Defendants knew it was impossible that the Company would meet the guidance of 13-15% earnings growth given only one day earlier.  ¶¶84-90, 106, 160; Opp. Br. at 38.

- Internal CVS Caremark emails evidence frequent, consistent customer complaints, and instructions to employees to conceal the true reason for the service problems—the failed integration.  ¶¶87-88, 101-04.

- Defendants participated in monthly and quarterly conference calls where the details of integration and service-related problems and complaints were addressed at length.  ¶¶68-70; Opp. Br. at 42.

- Defendants received weekly Sales Pipeline Reports that reflected $6.5 billion annually in contracts at risk of loss, and $3.5 billion annually at highest risk of loss.  ¶67.

Defendants have not directly addressed these particularized allegations of scienter, nor have they proffered any plausible competing innocent inference, let alone one that is more compelling.[10]

### Defendants' Insider Trading Further Supports A Strong Inference of Scienter

Defendants rely on the First Circuit's decision in *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.* ("*Waters*"), 632 F.3d 751 (1st Cir. 2011), to contend that Defendants' sales of over $40 million CVS Caremark stock from August 5, 2009 through the end of the Class Period do not support a strong inference of scienter.  While this argument is outside the scope of the Court's Procedural Order, and was previously briefed (*See* Opp. Br. at 46-52), Lead Plaintiff is compelled to reply.

---

[10] Defendants submit that the "relative significance of the affected business in relation to the company's overall business, is probative of whether or not defendants acted with requisite scienter in failing to disclose the underlying negative information."  Def. Supp. Br. at 8 n.6.  This much is correct.  *See, e.g.*, Opp. Br. at 40-42 (regarding core operations).  However, without citation, Defendants incorrectly—and categorically—state that the failure to disclose a single contract cannot provide a basis for a strong inference of scienter.  *Id.*  Again, this case does not center on the loss of a single contract, but the failure of CVS Caremark's PBM business, which generated in excess of $8 billion in annual revenue.  *See, e.g.*, ¶125.  On November 5, 2009, Ryan disclosed that while his earnings guidance from August 2009 included a low- to mid-single digit increase in the PBM business revenue, the PBM revenue would decline between 10-12%.  ¶182.  Indeed, when the truth was revealed, one analyst concluded "[w]e do not consider the value of the PBM segment in arriving at our price target [for CVS Caremark stock].  We view the PBM essentially a free option."  ¶194.  In essence, despite Defendants' earlier statements to the contrary, the PBM business provided no value to shareholders.

*Waters* reaffirmed that allegations of insider trading "in suspicious amounts or at suspicious times" support an inference of scienter.  632 F.3d at 760 (citations omitted); *see also* Opp. Br. at 46-47.  Although, contrary to *Tellabs*, Defendants address these insider sales in isolation, *Waters* recognized that the context of a defendant's stock sales, including selling history, stock price movement, and timing relative to the disclosure of the truth, must be considered as part of a holistic analysis.  *Waters*, 632 F.3d at 761.  *Waters* also concluded that in addition to considering the shares of stock that defendants held, the court should also consider the number of shares a defendant could have sold through their exercise of vested options.  *Id.*; *see also* Opp. Br. at 47 n.24.

Based on the facts in *Waters*, where no other allegations—individually or holistically—supported a strong inference of scienter, 632 F.3d at 760-61, the First Circuit concluded that the allegations of insider sales were also insufficient.  One defendant sold his shares early in the class period at a price near the low for the period, and another defendant repurchased shares throughout the class period.  *Id.* at 761, 762.  The third defendant sold 7% of his shares during the third quarter, and 22% of the remainder in the fourth quarter, at a price only slightly lower than the class period high.  *Id.* at 761.  While the facts pertaining to this defendant "could lend support to plaintiff's inference of scienter," the First Circuit concluded that "no context [was] provided" to give rise to a strong inference of scienter.  *Id.* (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197-98 (1st Cir. 1999)).

Here, in contrast, the context of Defendants' insider sales, considered together with all of Lead Plaintiffs' other particularized allegations, further supports a strong inference of scienter.  *See* Opp. Br. at 47.  Over a three month period, beginning immediately after Ryan provided the misleading earnings guidance, Defendants disposed of more than one million shares of Company

stock, resulting in over $40 million in proceeds.  ¶¶9, 106-09, 204-06, 208.  All of Rickard's and

McLure's Class Period sales, and 99.6% of Ryan's sales during the Class Period, took place after

Defendants' false statements (and omissions) regarding CVS Caremark's 2010 outlook and after

the receipt of the August 5, 2009 letter confirming the loss of the New Jersey account.  *See*, *e.g.*,

¶¶109, 206.  The Individual Defendants' sales include:

- Defendant McLure, head of the PBM segment, sold 500,000 shares of CVS Caremark stock, or 60% of his personally held shares, including vested options, for a total of approximately $17.7 million in proceeds.  ¶¶107, 109, 205; Opp. Br. at 47 and n.24. McLure was fired as a result of the failed Merger.  ¶190; Opp. Br. at 12.

- Defendant Ryan, CEO, sold 400,000 shares of CVS Caremark stock, or approximately 7% of his personally held shares, including vested options, for total proceeds of approximately $13.7 million.  ¶¶107, 109, 205; Opp. Br. at 47 and n.24.

- Defendant Rickard, CFO, sold 251,520 shares of Company stock, 19.6% of his personally held shares during the Class Period, including vested options, for proceeds of approximately $8.5 million.  ¶¶107, 109, 205; Opp. Br. at 47 and n.24.

Defendants attempt to invoke a 10b5-1 trading plan that was adopted during the Class

Period, at a time when Defendants had possessed material, non-public information.  This defense

is unavailing and has been consistently rejected by courts.  Opp. Br. at 50-52.  Indeed, since the

end of the Class Period, Ryan has not made a single sale despite the existence of the 10b5-1

trading plan.  ¶109; Opp. Br. at 48.

In view of the factual context, Defendants' insider sales further support a strong inference

of scienter, individually and holistically with the Complaint's well-pled allegations.

## CONCLUSION

For the all the reasons stated herein and in the Opposition Brief, Lead Plaintiffs respectfully submit that Defendants' motion to dismiss should be denied in full and discovery be permitted to commence.

DATED: May 13, 2011                          BARRY J. KUSINITZ (RI Bar No. 1404)

ORR & RENO                                        _____/s/ Barry J. Kusinitz_____
WILLIAM L. CHAPMAN                             BARRY J. KUSINITZ
JEFFREY C. SPEAR
One Eagle Square, P.O. Box 3550           155 South Main Street, Suite 405
Concord, NH  03302-3550                      Providence, RI 02903
Telephone: 603/224-2381                       Telephone: 401/831-4200
603/223-9007 (fax)                                Fax: 401/831-7053
                                                        bkusinitz@bdglawyers.com

*Of Counsel*                                          *Liaison Counsel*

ROBBINS GELLER RUDMAN            LABATON SUCHAROW LLP
 & DOWD LLP                                       JOSEPH A. FONTI
ROBERT ROTHMAN                            140 Broadway, 34th Floor
58 South Service Road, Suite 200          New York, NY 10005
Melville, NY 11747                              Telephone: 212/907-0700
Telephone: 631/367-7100                     Fax: 212/818-0477
631/367-1173 (fax)

*Counsel for Lead Plaintiff*                     *Counsel for Lead Plaintiffs*
*City of Brockton Retirement System and*     *Plymouth County Retirement System and*
*Co-Lead Counsel for the Class*             *Norfolk County Retirement System and*
                                                        *Co-Lead Counsel for the Class*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing

Supplemental Memorandum Of Law In Further Opposition To Defendants' Motion To Dismiss

The Corrected Consolidated Class Action Complaint was filed electronically with the Clerk of

Court using the CM/ECF system, which will send notification of such filing to all counsel of

record on the 13th day of May, 2011.


_____/s/ Joseph A. Fonti_____
JOSEPH A. FONTI