UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

City of Brockton Retirement
System *et al.*

    v.

CVS Caremark Corporation *et al.*

                           Civil No. 09-cv-554-JL
                           Opinion No. 2012 DNH 106

## **OPINION AND ORDER**

This putative class action, brought against CVS Caremark and certain of its officers by disappointed investors, raises several questions about the adequate pleading of federal securities fraud claims.  The lead plaintiffs, who manage retirement funds for certain municipal and county employees in Massachusetts, have sued the company, its chief executive officer, its chief financial officer, and the former president of its pharmacy services division, alleging a number of fraudulent statements and omissions in violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5.

The plaintiffs claim that, following the merger of CVS and Caremark, the defendants made misstatements or non-disclosures as to customer service issues that had plagued the integration, resulting in lost business and, ultimately, a significant drop in the company's share price when the issues and their impact were

finally revealed during the company's third-quarter 2009 earnings call on November 5, 2009.  Thus, the plaintiffs seek to represent a class of investors who acquired CVS Caremark stock between that day and October 30, 2008, when they claim the fraudulent misstatements and omissions began.  This court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 15 U.S.C. § 78aa (Exchange Act).

The defendants have moved to dismiss the plaintiffs' complaint, arguing that it fails to state a claim for relief. See Fed. R. Civ. P. 12(b)(6).  First, the defendants argue that none of the alleged misstatements or nondisclosures is actionable, because they are (a) mere "puffery," (b) rely on a non-existent duty to disclose, or (c) in the case of an earnings projection that was revised downward during the November 2009 earnings call, protected by the statutory "safe harbor" for forward-looking statements, see 15 U.S.C. § 77z-2(c)(1)(2). Second, the defendants argue that, aside from the inactionable statement protected by the safe harbor, the plaintiffs have failed to plausibly allege that any of the alleged misstatements or omissions caused the plaintiffs' loss.  Third, the defendants argue that, in any event, the complaint fails to "state with particularity facts giving rise to a strong inference that the

defendant[s] acted with the required state of mind," as required by the statutory pleading standard, id. § 78u-4(b)(2).

The court agrees that the plaintiffs have not plausibly alleged that--with the exception of the earnings projection--any of the claimed misstatements or omissions caused the loss they suffered when the price of CVS Caremark shares declined following the earnings call of November 2009.  The court further agrees that the plaintiffs cannot premise their claims on the earnings projection, because it is protected by the statutory safe harbor. So, after oral argument, the court grants the defendants' motion to dismiss, for the reasons explained fully below.

I.   **Applicable legal standard**

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal v. Ashcroft, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In deciding whether a complaint meets this standard, a court may "draw on its judicial experience and common sense," but must "assume [the] veracity" of

"well-pleaded factual allegations."  Id. at 679.  Allegations
that "are no more than conclusions," however, "are not entitled
to the assumption of truth."  Id.

## II.  **Background**

In ruling on the defendants' motion to dismiss for failure
to state a claim, the court accepts the allegations of the
complaint, including those that follow, as true.  See, e.g., Gray
v. Evercore Restructuring L.L.C., 544 F.3d 320, 324 (1st Cir.
2008).  The court has also culled facts from other documents
submitted by the parties, and cognizable on a Rule 12(b)(6)
motion, including CVS Caremark's public filings, see N.J.
Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d
35, 43 (1st Cir. 2008), and transcripts of the company's earnings
calls referenced in the complaint, see Shaw v. Digital Equip.
Corp., 82 F.3d 1194, 1220 (1st Cir. 1996).

## A.   **CVS-Caremark merger**

In March 2007, CVS (then the nation's largest retail
pharmacy chain) and Caremark (then the nation's second-largest
prescription benefits manager) completed a merger, creating "the
nation's premier integrated pharmacy services provider."
Following the merger, defendant Thomas M. Ryan, who had been the
president and CEO of CVS, became the president and CEO of CVS

Caremark; defendant David Rickard, who had been the executive vice president and CFO of CVS, became the executive vice president and CFO of CVS Caremark; and defendant Howard McLure, who had been the senior executive vice president and COO of Caremark, became the president of Caremark Pharmacy Services, a division of CVS Caremark.

A prescription benefits manager, or "PBM," like Caremark administers prescription drug benefits on behalf of employers, government agencies, labor unions, and other entities, known as "sponsors," that provide those benefits as part of health insurance plans.  The sponsors pay fees to the PBM under a contract for its services, which include managing prescription drug claims submitted by those enrolled in the plan.  PBMs also negotiate the prices that the sponsors pay to drug manufacturers for their products, which are then sold either through retail pharmacies (like CVS) who have their own contracts with the PBMs or through the PBMs' own mail-order pharmacies.

The CVS-Caremark merger, then, was described by the companies as a way to "[l]everage the purchasing power of the largest prescription drug retailer along with one of the largest PBMs to create the lowest PBM price structure in the industry" (formatting altered).  CVS acknowledged, though, that offering the lowest cost was not enough to ensure the success of CVS-

Caremark:  the sponsors would also insist on "execution and service."  The key to this, in turn, was effectively integrating the computer systems used in carrying out the benefit administration functions at Caremark with those already in place at PharmaCare, the smaller PBM that CVS operated pre-merger.

The plaintiffs allege that, nearly two years after the merger was completed, CVS Caremark had yet to carry out this integration, leading to repeated customer complaints and, ultimately, the loss of three significant sponsors who decided they would not renew their PBM contracts with CVS Caremark after they expired at the end of 2009:  Coventry Health Care, Chrysler (the Michigan-based automaker), and Horizon Blue Cross Blue Shield of New Jersey (which used CVS Caremark's PBM in administering a benefit plan for New Jersey state employees).  The plaintiffs claim that the defendants, despite knowing these contracts would not be renewed, and that they would not be renewed because of the customer service problems at CVS Caremark, made a number of public statements to the contrary.

**B.   Defendants' allegedly false or misleading statements**

The plaintiffs allege that, during an October 30, 2008, conference call to investors, Ryan said that the CVS Caremark PBM business "continues to retain existing clients and attract new

ones.  We will continue to gain share because . . .  [w]e have excellent service."  During the same call, Ryan also mentioned CVS Caremark's loss of one of its contracts with Coventry, for its "Med-D" business[1]--a development which Rickard had disclosed, and explained as "due in large part to price," in an earlier earnings call, in July 2008.  In the October 2008 earnings call, Ryan stated that, despite CVS Caremark's loss of the Coventry "Med-D" contract (and "a couple of [other] large accounts"), "our model is working" and "the wins and losses are in fair balance."

In a later earnings call, on January 9, 2009, Rickard explained that, while CVS Caremark's PBM business had in fact realized a number of "wins" in terms of renewed contracts, many of those "wins" resulted from "re-pricing," i.e., CVS Caremark's agreement to lower fees than it had been getting.  Ryan denied, however, that CVS Caremark had "re-priced because we had inferior service."  Ryan also stated, in response to a question about the integration of the company's PBM computer systems, that "[a]ll the systems are able to talk to each other . . . .  We have got no issue with our systems."

---

[1]"Part D" of Medicare, established by the Medicare Modernization Act of 2003, essentially provides a federal subsidy for private insurance plans to offer prescription drug coverage to Medicare beneficiaries.

During another earnings call the next month, on February 19, 2009, Ryan stated that, in 2008, CVS Caremark's PBM business "had an excellent client retention and achieved all time industry sales and new business growth . . . .  So for anyone wondering if our offerings are resonating they certainly are."  CVS Caremark's Form 10-K for its 2008 fiscal year, filed on February 27, 2009, struck a similarly upbeat tone, stating, "We believe the breadth of capabilities resulting from the Caremark [m]erger are resonating with our clients and contributed to our success at renewing existing clients . . . in the 2008 selling season."  Rickard used much the same language during a meeting with institutional investors on March 10, 2009, telling them, "our model is resonating in the PBM marketplace."

The plaintiffs charge that, at the time each of the foregoing statements was made, it was false or misleading in light of the status of CVS-Caremark's contracts to provide PBM services to three different sponsors:  Coventry, New Jersey, and Chrysler.  Indeed, the plaintiffs allege that "by fall 2008, it was practically official within the company that each of these contracts was not going to be renewed."  The plaintiffs further allege that, before CVS-Caremark's loss of these contracts was disclosed to the market, each of the individual defendants knew about it--as well as that "these contracts were lost due to poor

service arising from the company's failed integration" following
the merger--yet failed to disclose it before making approximately
$40 million through sales of their own CVS-Caremark stock.

**C.   Earnings calls of May 2009 and August 2009**

In CVS Caremark's earnings call of May 5, 2009, Ryan stated
that, "when you think about renewals, where we are right now at
this point in the season, we're essentially on plan, in good
shape."  This was true, he maintained, even though, "we lost the
Coventry commercial contract, which is about $1 billion in
sales."  (Again, Ryan had mentioned in the call of October 2008
that CVS Caremark had lost the Coventry "Med-D" contract.)

In a subsequent earnings call, on August 4, 2009, Ryan
reviewed the "highlights" of the company's performance for the
second quarter of 2009, and acknowledged "some disappointments"
in the company's PBM business.  These included the loss of the
Coventry account, which Ryan described as "worth $1.4 billion,"
and "the Chrysler [United Auto Workers] retirees," a contract
worth $400 million.  But Ryan cited "[t]he fact that both clients
and their members love our integrated proactive pharmacy care
offerings" as giving him "great confidence going forward."

Ryan also stated:

9

> While we are not giving guidance for 2010, I know there
> are some questions with respect to Med-D regulatory
> changes and its [*sic*] impact on our 2010 earnings
> . . . .  We have now finalized our Med-D bids and have
> really had a chance to do some early handicapping on
> the various regions and what we think we'll keep and
> get.  So now we think the net impact of the Med-D
> network differential next year . . . will be in the
> range of $0.05 to $0.07 a share in 2010.
>
> Now, even with this, I'd be very disappointed if we
> didn't have an [earnings per share] growth of at least
> 13 to 15% next year.  As I said, we haven't completed
> our plan for 2010, and it's too early to give specific
> guidance.  But I did want to give you some visibility
> on the Med-D impact next year; so we expect a great '09
> and we look forward to an even better '10.

As the defendants point out, this earnings call had opened

with a statement from CVS Caremark's senior vice president of

investor relations that the call would include "certain forward-

looking statements" that "are subject to risks and uncertainties

that could cause actual results to differ materially."  This

executive also directed the investors on the call to the section

of the company's most recently filed quarterly report cautioning

that "[a]ctual results may differ materially from those

contemplated by the forward-looking statements for a number of

reasons."  These reasons included, according to the report, the

company's "ability to realize fully the incremental revenues and

other benefits from the Caremark merger," "the possibility of

client loss," "the impact of the Medicare prescription drug

benefit on our business," and "[t]he effect on our [PBM] business

10

of a declining margin environment attributable to increased

competition in the [PBM] industry and increased client demands

for lower prices, enhanced service offerings, and/or higher

service levels."

**D.    Earnings call of November 5, 2009**

On November 5, 2009, the same day that CVS Caremark released

a report of its earnings for the third quarter of 2009, Ryan

participated in another call with investors.  He stated:

> As you all know, on our last quarterly call, I said I
> would--we were not in position to provide 2010 guidance
> at that time, which we weren't, because we hadn't done
> our budget.  But I also said we'd be disappointed if we
> didn't have an [earnings-per-share] growth of at least
> 13 to 15% next year for the enterprise.  To get to that
> 13 to 15% growth rate, I expected strong double-digit
> growth in our retail business, which I still do, and I
> expected low-to-mid single digit [growth] in our PBM
> business, which is not going to happen.  What's
> changed?  Well, like I said, we lost more PBM business
> than we expected since the [August 4, 2009] call, $2
> billion in contracts.  We lost the Med-D duals in 15
> regions, which was $1.7 billion . . . .  And we
> extended the $4 billion [Federal Employee Program]
> contract through 2011 at the client's request . . . .
>
> Given all of that, it now looks like operating profit
> in the PBM will decline in 2010, perhaps as much as 10
> to 12% . . . .  10 percentage basis points of that
> change is Med-D alone.

Earlier in the call, Ryan had noted that, during the most recent

"selling season," CVS-Caremark's PBM business had suffered "some

big client losses," to the tune of some $4.5 billion.  He

explained that "approximately two-plus billion of those came

. . . since the last call," i.e., on August 4, 2009,

> I think you know about obviously the State of New
> Jersey.  This was a bid that the state wanted on a
> stand-alone basis, so it was kind of a price and carve-
> out issue.  We lost the State of Ohio and the managed
> Medicare business.  It was carved in, which is about
> 500 plus million [dollars].  And then we had another
> 600 million [dollars] miscellaneous.  These were
> basically smaller clients . . . that just really wanted
> essentially smaller PBMs. So in total, that was about
> $2 plus billion since the last call.
>
> And then, lastly, we had $1.7 billion that we lost in
> Med-D business . . . .  So, net-net, it's about $4.8
> billion in loss . . . for 2010 and approximately almost
> $3.7 billion since the last call.  If you look at the
> losses, total the losses with the Med-D and the $4.5
> billion contract losses they really come from four
> contracts plus the Med-D lives.  The two really that I
> mentioned and then Chrysler and Coventry.

Ryan also announced the retirement of McClure--who was the

president of Caremark Pharmacy Services and, according to Ryan,

"the chief architect of [the CVS Caremark] integrated model."

Later in the call, a market analyst asked Ryan, "why, in the

long run, you're still optimistic about the combined model?  And

maybe sort of what's gone wrong in the last year or two and why

you think that's going to get better in the next year or two?"

In his response, Ryan again acknowledged "some big losses,"

including "Coventry, which--we lost the Med-D business, and then

we obviously expected to lose the commercial business" and

"Chrysler, we lost the retirees.  It's the smallest piece of it.
It went to where Ford and General Motors were, with Michigan
Blues," i.e., Blue Cross Blue Shield of Michigan.  Ryan added,
"If you look at these contracts that we lost, none of them were
because of the model.  There were varying reasons some price, one
service, there were varying reasons, but none of them were
because of the model."

> At another point in the call, an analyst asked Ryan:
> But then you look at the PBM numbers, and it gives
> everyone heart palpitations.  So number one is why are
> people kind of shying away from Caremark's PBM?  If
> it's not the combined model, and you kind of said maybe
> it's--there must be some reason that you're not proving
> you're good enough to stand alone [*sic*] PBM to keep
> those business [*sic*].  How do you change those people's
> minds?  And so I guess that's my first question.

In response, Ryan stated, "[e]xecution and performance, it's not
the products . . . .  Now we need to tweak the marketing message
a little, which we're doing to make sure that it's clear about
how those operate and what those actually are and when they hit
and what the savings are and the benefit to the payers."

Ryan went on to explain that the downturn in CVS Caremark's
PBM business was due to "some stand-alone issues":

> the Coventry contract, when we lost Med-D, we knew we
> were going to lose the commercial business.  There were
> some service issues on that one . . . .  Chrysler, we
> still keep the actives.  We lost the retirees . . . .
> [T]here were a variety of issues . . . .  I will tell
> you this, we didn't lose anybody that said, well,

because you guys are combined with a retailer, we're leaving.  None of that.

Nevertheless, the plaintiffs allege, Ryan's statements during this call amounted to a disclosure of "the truth about [CVS Caremark's] failure to integrate the merged entity, which resulted in the loss of billions of dollars in PBM contracts, and that the CVS Caremark retail-PBM model had failed to gain acceptance by customers in the pharmaceutical benefit market." The plaintiffs further allege that, in response, "investors reacted severely, causing the share price of CVS Caremark stock to collapse," dropping from $36.15 (the share price at the close of the market the previous day, November 4, 2009) to $28.87 at the close of the market on the day of the earnings call (again, November 5, 2009), a total of roughly 20 percent.

In support of this allegation, the plaintiffs quote from several analysts' reports of the earnings call.  One report noted that CVS Caremark had "[s]tun[ned] with [the] news of additional PBM non-renewals" on the call and that the "[s]urprise nature of [this] disclosure [had] raise[d] credibility issues" for the company's management, because "the magnitude of the loss was discovered on the call."  Other reports observed that the "announcement show[ed] a breakdown in the Caremark model," since the company's PBM business had "lost $4.5 billion with a

14

retention rate of only 92%" and that CVS Caremark had "provided undeniable evidence . . . that it has mismanaged the Caremark acquisition and destroyed shareholder value."

This lawsuit was commenced on November 17, 2009, less than two weeks after the third-quarter earnings call and concomitant drop in the CVS Caremark share price.

## II.  **Analysis**

The plaintiffs claim that, through the conduct just described, the defendants "were knowing or reckless participants in defrauding investors in connection with their material misrepresentations and omissions concerning the success of the merger," in violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  As the Supreme Court has explained, the elements of such a claim are:

> (1) a material misrepresentation (or omission);
>
> (2) scienter, i.e., a wrongful state of mind;
>
> (3) a connection with the purchase or sale of a security;
>
> (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation";
>
> (5) economic loss; and
>
> (6) "loss causation," i.e., a causal connection between the material representation and the loss.

Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342-43 (2005)
(italics and citations omitted).

In moving to dismiss the plaintiffs' complaint, the
defendants argue that it fails to plausibly allege the requisite
causal connection between the claimed misrepresentations or
omissions and the loss--which, again, the plaintiffs allegedly
sustained when the price of CVS Caremark shares fell by roughly
20 percent immediately following the earnings call of November 5,
2009.  The plaintiffs attribute this drop to the disclosure,
during the call, of facts the defendants had previously
misrepresented or failed to disclose, namely, CVS Caremark's
"failure to integrate the merged-entity, which resulted in the
loss of billions of dollars of PBM contracts, and that the CVS
Caremark retail-PBM model had failed to gain acceptance in the
marketplace."  The defendants, however, point out that CVS
Caremark did not in fact "disclose" during the call that it had
failed "to integrate the merged-entity" or "gain [its] acceptance
in the marketplace," and that, while the company discussed the
loss of several large PBM contracts during the call, those losses
had actually been disclosed several months earlier.  Thus, the
defendants argue, the alleged "disclosures" during the November
2009 call could not plausibly have caused the plaintiffs' loss in
the value of their holdings in CVS Caremark.

16

The defendants acknowledge that the November 2009 earnings call contained one disclosure that could plausibly have caused that day's precipitous drop in the CVS Caremark share price:  the fact that the company would not experience the 13-15 percent growth that Ryan had previously predicted, in the earnings call of August 2009.  But the defendants argue that the plaintiffs cannot premise their securities fraud claims on the August 2009 growth prediction, because that was a "forward-looking statement" shielded from liability by the statutory "safe harbor" provision, 15 U.S.C. § 77z-2(c)(1).

As fully explained <u>infra</u>, the court agrees that the plaintiffs have not plausibly alleged loss causation except as to the earnings projection, but that they cannot premise their claims on the projection because it is shielded by the statutory safe harbor.  Accordingly, the court grants the defendants' motion to dismiss.  The court need not and does not address any of the defendants' other arguments for dismissal.

## A.  Forward-looking statement

With exceptions not relevant here, the "safe harbor" provision of the PSLRA provides that a person like the defendants

> shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that--

17

(A) the forward-looking statement is--

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

. . .

(B) the plaintiff fails to prove that the forward-looking statement--

(i) if made by a natural person, was made with actual knowledge by the person that the statement was false or misleading . . . .

15 U.S.C. § 77z-2(c)(1).  As the court of appeals has observed, this "safe harbor" provision thus "has two alternative inlets: the first shelters forward-looking statements that are accompanied by meaningful cautionary statements.  The second . . . precludes liability for a forward-looking statement unless the maker of the statement had actual knowledge that it was false or misleading."  Greebel v. FTP Software, Inc., 194 F.3d 185, 201 (1st Cir. 1999) (citations omitted).

The defendants argue that both of these "inlets" shield Ryan's statement, during the August 2009 earnings call, that he would "be very disappointed if we didn't have an [earnings per share] growth of at least 13 to 15% next year."  While the plaintiffs conceded at oral argument that this was a "forward-

looking statement" under § 77z-2,[2] they argue that it is not entitled to the protection of the safe harbor because it was not accompanied by meaningful cautionary language, and Ryan knew that the projection was false or misleading at the time he made it. The court need not address whether the plaintiffs have plausibly alleged Ryan's knowledge that the statement was false or misleading.  On any plausible reading of Ryan's remarks during the August 2009 call and the contemporaneous quarterly report, the earnings projection was "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially," 15 U.S.C. § 77z-2(c)(1).

First, the statement itself was couched in cautionary terms. Ryan prefaced the projection by saying that, while CVS Caremark was "not giving guidance for 2010," the company had "finalized [its] Med-D bids and have really had a chance to do some early

---

[2]The plaintiffs had argued in their memorandum in opposition to the motion to dismiss that Ryan's statement did not even qualify as a forward-looking, because it "was tied to <u>currently available information</u>."  Whatever else can be said of this argument, it cannot be reconciled with the statutory definition of "forward-looking statement," which includes "a statement containing a projection of revenues, income, earnings per share, . . . or other financial items," without making any exception for such statements if they are "tied to currently available information."  15 U.S.C. § 77z-2(i)(A) (parentheticals omitted). The plaintiffs also do not dispute that the projection was "<u>identified</u> as a forward-looking statement." <u>Id.</u> (emphasis added).

handicapping on the various regions and what we think we'll keep and get."  Immediately after stating that he would "be very disappointed if we didn't have an EPS growth of at least 13 to 15% next year," Ryan struck another cautionary note, explaining, "we haven't completed our plan for 2010, and it's too early to give specific guidance."  So the statement itself identified at least two "important factors that could cause actual results to differ materially":  that CVS Caremark's "early handicapping" of the results of its bids for Med-D business would prove too optimistic, and that the company's "plan" (i.e., its budget) would prove too expensive, to produce the earnings predicted.[3]

Second, the statement was accompanied by the further cautionary statements in CVS Caremark's contemporaneous quarterly report, to which the company's vice president of investor relations expressly referred listeners at the outset of the August 2009 earnings call.  These statements identified risks including "the possibility of client loss" and "[t]he effect on our [PBM] business of a declining margin environment attributable to increased competition in the [PBM] industry and increased client demands for lower prices, enhanced service offerings, and/or higher service levels."

---

[3]As the defendants pointed out at oral argument, Ryan's use of the term "handicapping" connotes gambling and, hence, risk.

These were essentially the risks that materialized to cause CVS Caremark to revise the earnings projection, as Ryan later explained during the November 2009 earnings call.  Then, Ryan stated that his predicted 13-15% earnings growth per share was "not going to happen" because CVS Caremark had (a) lost $2 billion in PBM contracts, (b) lost "the Med-D duals in 15 regions," and (c) extended the Federal Employee Program contract, apparently on terms less lucrative to CVS Caremark.  So, just as the company had warned in the August 4 earnings call and its accompanying quarterly filing, CVS Caremark had (a) suffered some "client loss," (b) won fewer of the Med-D bids than Ryan's "early handicapping" predicted, and (c) succumbed to "increased client demands for lower prices."

"To invoke the safe harbor's protection, it is not necessary for a defendant to describe 'the particular factor that ultimately causes the forward-looking statement not to come true,' as long as the warnings accompanying the statement 'mention important factors that could cause actual results to differ materially from those in the forward-looking statement.'" In re Ibis Tech. Sec. Litig., 422 F. Supp. 2d 294, 311 (D. Mass. 2006) (quoting Harris v. Ivax Corp., 182 F.3d 799, 807 (11th Cir. 1999) (further quotation marks omitted by the court)).  Indeed, the text of § 77z-2(c)(1) requires no more.  In any event, CVS

Caremark did describe the factors that ultimately caused the forward-looking statement not to come true, as just discussed. It follows that Ryan's earnings prediction was "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" so as to bring it within the statutory safe harbor of § 77z-2(c)(1).  See In re Nova Gold Resources Inc. Sec. Litig., 629 F. Supp. 2d 272, 293-94 (S.D.N.Y. 2009) (ruling that the predicted cost and economic viability of a project were "forward-looking statements accompanied by cautionary language, eligible for protection under the PSLRA safe harbor" when accompanying language "indicate[d] that the cost figure and prediction of the [p]roject's economic viability were subject to risks regarding capital costs, the very risks which ultimately materialized").

The plaintiffs argue that the cautionary statements accompanying Ryan's projection were nevertheless insufficient because they failed to "warn[] about problems already in existence that would prevent CVS Caremark from realizing a 13-15% earnings growth, namely, that, due to [its] severe integration and service issues:  (i) existing customers were leaving the company or failing to renew contracts; and (ii) potential customers were choosing competitors."

In the August 2009 call itself, however, Ryan specifically mentioned that both Coventry and the Chrysler retirees would not be renewing their contracts with CVS Caremark for PBM services.[4] The quarterly report likewise warned about "increased competition" but, in any event, the plaintiffs have not identified any of CVS Caremark's "potential customers [who] were choosing competitors" at the time of the earnings projection, so there is no plausible basis for calling that a "problem already in existence" anyway.  By virtue of the statutory safe harbor, then, the defendants cannot be "liable with respect to" the August 2009 earnings prediction, because it was "identified as a forward-looking statement, and [was] accompanied by meaningful

---

[4]While Ryan did not mention the risk of losing the New Jersey contract, CVS Caremark was not informed that New Jersey was taking its business elsewhere until the day after the earnings projection.  The plaintiffs suggest that the defendants knew of the risk of that development at the time of the earnings projection but, again, the projection was accompanied by warnings that CVS Caremark might lose clients.  Cautionary statements trigger the statutory safe harbor even if they do not "predict all the details of a contingency that came to pass."  Nova Gold Resources, 629 F. Supp. 2d at 294.  So the fact that CVS Caremark did not specifically mention the risk of losing the New Jersey contract--a loss which was expected to affect the profitability of the company's PBM business by 2 percent at the most, see Part I.D, supra--is not enough to bring the earnings prediction outside of the safe harbor.  Cf. Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004) (ruling that a company's failure to disclose "a handful of incidents" marginally affecting its profitability did not negate safe harbor protection for its statements expressing optimism on that score).

cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 77z-2(c)(1).

**B.   Loss causation**

As noted <u>supra</u>, a claim under § 10(b) or Rule 10b-5 requires "'loss causation,' i.e., a causal connection between the material representation and the loss." <u>Dura</u>, 544 U.S. at 342. This requires the plaintiff to allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 173 (2d Cir. 2005); <u>see also</u>, <u>e.g.</u>, <u>Greenberg v. Crossroads Sys., Inc.</u>, 364 F.3d 657, 666 (5th Cir. 2004). As one court has explained, "this may be achieved by alleging that the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted," or "that the defendant's misrepresentations or omissions concealed a risk that later materialized to cause the plaintiff's loss." <u>In re AOL Time Warner, Inc. Sec. Litig.</u>, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (citing <u>Lentell</u>, 396 F.3d at 173-76). A complaint's allegations of loss causation need not satisfy the elevated pleading standards applicable to certain

other elements of federal securities law claims, but only the
"short and plain statement" standard set forth in Rule 8(a)(2) of
the Federal Rules of Civil Procedure.[5] Dura, 544 U.S. at 346.

The complaint's stated loss causation theory is that, as a
result of the defendants "misrepresenting or omitting facts
concerning CVS Caremark's business, operations, and prospects,"
the plaintiffs "purchased CVS Caremark stock at artificially
inflated prices and suffered an economic loss when the artificial
inflation was removed on November 5, 2009," the day of that
year's third quarter earnings call.  It was then, the plaintiffs
allege, that "investors learned the truth about the company's
failure to integrate the merged-entity, which resulted in the
loss of billions of dollars of PBM contracts, and that the CVS
Caremark retail-PBM model had failed to gain acceptance in the
marketplace.  As a direct result of [these] disclosures, CVS
Caremark's stock price dropped 20 percent."

Thus, the plaintiffs assert, the November 5, 2009 earnings
served as a "corrective disclosure" of the defendants' previous
misstatements and nondisclosures as to CVS Caremark's "failure to

_____

[5]Dura did not expressly reject a heightened standard for
pleading loss causation under § 10(b) and Rule 10b-5, but
"assume[d], at least for argument's sake, that neither the Rules
nor the securities statutes impose any further requirement in
respect to the pleading of proximate causation or economic loss."
544 U.S. at 346.  This court will make the same assumption here.

integrate the merged-entity, which resulted in the loss of
billions of dollars of PBM contracts, and that the CVS Caremark
retail-PBM model had failed to gain acceptance in the
marketplace."  One problem with this theory, as the defendants
point out, is that the earnings call simply did not contain many
of these claimed "disclosures."[6]  Statements "do not amount to a
corrective disclosure" when "they do not reveal to the market the
falsity of the prior" misstatements (or disclose the previously
undisclosed information).  Lentell, 396 F.3d at 175 n.4.  A
further problem with the plaintiffs' loss causation theory, as
the defendants also point out, is that CVS Caremark's "loss of
billions of dollars of PBM contracts" had been disclosed several
months before the November 5, 2009 call.  A plausible loss
causation theory cannot rest on the "disclosure" of "already-
public information."  In re Omnicom Group, Inc. Sec. Litig., 597
F.3d 501, 512 (2d Cir. 2010).  As discussed in detail infra,
these problems are fatal to the loss causation theory pled in the

_____

[6]Again, the defendants do not question that, during the
November 5, 2009 call, Ryan disclosed that CVS Caremark would not
realize the 13-15% growth he had previously forecast, or that
this disclosure could have caused the steep drop in the company's
stock that followed.  In fact, the defendants argue that it was
precisely this disclosure that caused the stock to drop.  As
discussed supra, however, the plaintiffs cannot base their claims
on that statement, because it is protected by the statutory safe
harbor provision.

plaintiffs' amended complaint (except insofar as it rests on the CVS Caremark's disclosure that it would miss its earlier earnings projection, which as discussed <u>supra</u>, cannot support the plaintiffs' claims for the independent reason that the projection falls within the statutory safe harbor).

### 1.   Alleged "disclosures" that were not in fact made

As just discussed, an integral part of the plaintiffs' loss causation theory is that, during the November 5, 2009 earnings call preceding that day's steep drop in the CVS Caremark share price, "investors learned the truth about the company's failure to integrate the merged-entity, which resulted in the loss of billions of dollars of PBM contracts, and that the CVS Caremark retail-PBM model had failed to gain acceptance in the marketplace."  But, far from "disclosing" or even acknowledging in that call "that the CVS Caremark retail-PBM model had failed to gain acceptance in the marketplace," Ryan steadfastedly--and repeatedly--<u>denied</u> that was the case.  He also specifically denied that the company's business model was the reason it had lost any of its PBM contracts.

Quoting a snippet of one of Ryan's other comments during the call, plaintiffs assert that he "admitted that CVS Caremark's customers were, in fact, abandoning its PBM business due to

failed '[e]xecution and performance.'"  But Ryan "admitted" no
such thing.  To the contrary, Ryan was asked, "[h]ow do you
change [the] minds?" of those "people kind of shying away from
Caremark's PBM," and responded "[e]xecution and performance"
(while again reiterating that it was not the combined CVS
Caremark model that had cost it any of its contracts).  See id.
This exchange cannot plausibly be taken as a statement that
customers were "abandoning" CVS Caremark on account of its
deficient "execution and performance"--let alone deficient
execution and performance arising from a "failure to integrate"
post-merger, as the plaintiffs would have it.

    Similarly, the November 2009 earnings call was devoid of any
"disclosure" that, as the plaintiffs allege, "the company's
failure to integrate the merged-entity" had "resulted in the loss
of billions of dollars of PBM contracts."  To the contrary,
insofar as Ryan gave the reasons why CVS Caremark had lost
particular PBM contracts, those reasons were:

> • as to New Jersey:  "This was a bid that the state
> wanted on a stand-alone basis, so it was kind of a
> price and carve-out issue"; Ryan also stated that "they
> wanted a stand-alone PBM model and there were some
> price issues there";
>
> • as to Chrysler:  "[W]e lost the retirees . . . .  It
> went to where Ford and General Motors were, with
> Michigan Blues";

     • as to Coventry:  "[W]hen we lost Med-D, we knew we were going to lose the commercial business.  There were some service issues on that one."

None of these statements, on its face, amounts to a "disclosure" that CVS Caremark had lost the PBM contracts at issue due to its "failure to integrate the merged entity," and the plaintiffs, by and large, do not offer any explanation as to how the statements could plausibly be read that way (they conceded at oral argument that the November 2009 call contained no disclosure that the New Jersey contract had been lost due to service problems).

    The sole exception is Ryan's statement as to the Coventry contract, which the plaintiffs characterize as a disclosure that the contract had been lost "due to 'service issues' that resulted from CVS Caremark's failed integration."  In stating that the company had lost the Coventry contract due to "some service issues," however, Ryan did not attribute those "service issues" to the integration.  Indeed, in the very same breath, Ryan denied that CVS Caremark had lost any of the PBM contracts due to the combination of the two companies, or that there was a single factor at work in the fall-off in CVS Caremark's PBM business (again, Ryan attributed each of the lost contracts to a "stand-alone issue").  So, like the other statements from the earnings call just discussed, Ryan's acknowledgment that CVS Caremark lost the Coventry contract due to "some service issues" cannot

plausibly be taken as a "disclosure" of a "failure to integrate the merged-entity" or "gain [its] acceptance in the marketplace."

The plaintiffs do not make any developed argument to the contrary, nor do they identify any other statements during the call that could plausibly amount to these alleged "disclosures."[7] This is a significant omission, in light of the plaintiffs' own characterization of "the PBM's integration and service failures" as "the very heart of this litigation."  Instead, the plaintiffs rely heavily on excerpts from reports by market analysts, published in the wake of the call, that the "Caremark merger is clearly not working," that CVS Caremark had "provided undeniable evidence . . . that it had mismanaged the Caremark acquisition,"

---

[7] Pointing out that loss causation can be established not only by a corrective disclosure, but also by the materialization of a previously concealed risk, the plaintiffs suggest that "previously concealed risks materialized on the November 5 call regarding the failed integration, the adverse effect of resulting 'service issues' on the PBM business, and integrity of CVS Caremark's management."  This is largely a restatement of the plaintiff's theory that the "failed integration" was "disclosed" on the November call and, as just discussed at length, it was not--the very existence of that problem was denied.  Insofar as the plaintiffs are arguing that the risk of the "integrity of CVS Caremark's management" materialized when McLure's departure was announced during the call, that personnel decision (as apart from the reasons behind it) also could not have plausibly caused the company's share price to fall by 20 percent.  See infra Part III.B.3.  So the earnings call cannot plausibly support a "materialization" theory of loss causation any more than it can support a "corrective disclosure" theory of loss causation.

that the company's PBM business "was essentially a free option" (i.e., it conferred no value on the company), and the like.

But plaintiffs do not explain how these analysts' remarks, harsh as they were, can serve to alter the nature of what Ryan actually said during the November 5 earnings call, when, again, he denied any problems with the CVS Caremark PBM model.  It may well be that these analysts did not credit Ryan's denials, but the plaintiffs' loss causation theory is not that Ryan was lying during the November 5 call--it is that, after lying about the CVS Caremark PBM business over the previous year, he finally told the truth about it during the November 5 call, causing the share price to drop precipitously.  The analysts' reports do not lend the requisite plausibility to this loss causation theory.  See Omnicom, 597 F.3d at 512-14 (rejecting a loss causation theory that a company's share price fell when "negative press stirred investors' concerns that other problems were lurking" aside from those that had actually been disclosed).

The plaintiffs also protest that "it is wholly improper at the pleading stage" for the court to "parse through the alleged disclosures and make factual findings as to how, if at all, they are casually related to the alleged misstatements."  It is essential "at the pleading stage," however, for a plaintiff bringing a claim under § 10(b) or Rule 10b-5 to plausibly state a

casual connection between the defendant's alleged misstatements
or omissions and the plaintiff's loss.  See Dura, 544 U.S. at
347.  Here, the plaintiffs have attempted to do so by theorizing
that their loss occurred "as a direct result of [the]
disclosures" made during the November 5, 2009, earnings call,
when "investors learned the truth about the company's failure to
integrate the merged-entity, which resulted in the loss of
billions of dollars of PBM contracts, and that the CVS Caremark
retail-PBM model had failed to gain acceptance in the
marketplace."  It is not "improper" for this court, in ruling on
the defendants' motion to dismiss, to evaluate the plausibility
of this theory in light of what was actually "disclosed" during
the earnings call.  Cf. Shaw, 82 F.3d at 1220 (refusing to let "a
plaintiff maintain a claim of fraud by excising an isolated
statement from a document and importing it into the complaint").

Again, Ryan's remarks during the call did not, either on
their face or any plausible construction, constitute a disclosure
of his company's "failure to integrate the merged entity" or its
"fail[ure] to gain acceptance in the marketplace" (he denied
those things).[8]  Because the defendants did not make these

---

[8]In a footnote in their opposition to the motion to dismiss,
the plaintiffs protest that "neither the Supreme Court in Dura,
nor any other court addressing the loss causation pleading
standard require a corrective disclosure be a 'mirror image'

disclosures on November 5, 2009 (or, so far as the complaint indicates, any time prior to that point), they could not have logically--let alone plausibly--been the cause of the loss the plaintiffs suffered when the shares they held in CVS Caremark declined in value that day.  See Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 186-87 (4th Cir. 2007) (finding that plaintiffs had inadequately pled loss causation based on a disclosure that did not "reveal the 'true facts'" they alleged to have been concealed).

### 2.   Alleged "disclosures" of what was already known

The plaintiffs further argue that, during the November 2009 call, "Ryan also quantified the magnitude of the PBM's lost business (exceeding $4.5 billion)" for the first time.  As the defendants point out, however, the plaintiffs affirmatively allege in their complaint that CVS Caremark disclosed the loss of

---

tantamount to a confession of fraud."  Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).  But neither can a plaintiff plead loss causation by treating the corrective disclosure as a "magic mirror," conjuring up in it any statement he likes regardless of what was actually said.  Indeed, Freudenberg expressly recognizes that "the relevant truth required under Dura is not that a fraud was committed per se, but that the truth about the company's underlying condition, when revealed, causes the economic loss."  Id.  The plaintiffs here have not plausibly alleged that what they say was "the truth about [CVS Caremark's] underlying condition" was actually "revealed" in the November 2009 call.

both the Coventry and Chrysler business--worth about $1.8 billion between them--several months earlier.

Ryan first discussed the loss of the Coventry contract in the May 5, 2009, earnings call.  In the next earnings call, on August 4, 2009, Ryan discussed the loss of both the Coventry contract, which he described as "worth $1.4 billion," and "the Chrysler [United Auto Workers] retirees," a contract worth $400 million.  Thus, while Ryan discussed the losses of the contracts with both Coventry and the Chrysler retirees during the November 2009 call that immediately preceded the sharp decline in CVS Caremark stock, he did not "disclose" those losses during the call such that this "disclosure" could have plausibly caused the decline.  The plaintiffs do not argue otherwise.[9]

CVS Caremark's loss of the other PBM contract that was allegedly the subject of fraudulent misstatements and nondisclosures, New Jersey, had also been made public several months earlier (albeit not in an earnings call).  As the defendants point out, an on-line news article of August 11, 2009,

---

[9]Instead, the plaintiffs argue that "on the November 5 call, investors learned for the first time that CVS Caremark lost the Coventry account . . . due to service issues that resulted from CVS Caremark's failed integration."  As just discussed, though, Ryan did not in fact attribute the "service issues" with the Coventry account to the "failed integration" and, indeed, denied that it was the combination of CVS and Caremark that had caused Coventry to take its business elsewhere.

reported that "[t]he prescription drug plan for 800,000 active and retired New Jersey government employees and others who receive pharmacy benefits through the state will change to Medco Health Solutions in 2010."[10]   John Reitmeyer, <u>State Benefits to Change over to Medco Health in 2010</u>, www.northjersey.com/news/ state/social_services.   A near-contemporaneous article in <u>The Providence Journal</u> likewise reported that "New Jersey announced this week it will switch the prescription drug plan for 800,000 active and retired employees from CVS Caremark Corp. to New Jersey-based rival Medco Health Solutions in 2010."   Paul Grimaldi, <u>New Jersey dropping CVS Caremark drug plan</u>, Providence J., Aug. 13, 2009.   This article quotes analysts who called this development "another in a 'disconcerting' pattern of contract losses for the pharmacy-benefits arm" of CVS Caremark.   <u>Id.</u>

---

[10]In their opposition memorandum, the plaintiffs argued that the court could not consider this article in ruling on the defendants' Rule 12(b)(6) motion.  A court ruling on a motion to dismiss, however, may consider "documents the authenticity of which are [*sic*] not disputed by the parties."  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  The plaintiffs do not question that the version of the article is what it purports to be, namely, an on-line news story reporting, on August 11, 2009, that the plan providing prescription drug benefits to New Jersey state employees was changing to Medco.  So, even in the Rule 12(b)(6) context, the court may consider the article for the purpose advanced by the defendants, namely, to show that CVS Caremark's loss of the New Jersey contract had been reported several months prior to the November 2009 earnings call.  Indeed, the plaintiffs conceded as much at oral argument.

In light of these reports, the plaintiffs do not argue that
CVS Caremark's loss of the New Jersey contract was disclosed for
the first time during the November 2009 earnings call.  At oral
argument, in fact, they maintained only that this development
"wasn't public before" the August 11, 2009, on-line news article.
But, as just noted, CVS Caremark's loss of the New Jersey
contract _was_ public well before the relevant event for loss
causation purposes, i.e., the November 2009 drop in share price.

"To allege loss causation in this case, [the] plaintiffs
would have to allege that the market reacted to <u>new facts</u>
disclosed in [November 2009] that revealed [the defendants']
previous representations to have been fraudulent." Teachers'
Ret. Sys., 477 F.3d at 187 (emphasis added; footnote omitted).
The plaintiffs cannot do that because, as just discussed, the
losses of the Coventry, Chrysler, and New Jersey contracts were
not "new facts disclosed" in the November 2009 earnings call
precipitating that day's decline in the CVS Caremark share price.
Indeed, a plaintiff cannot show loss causation when the claimed
disclosures fail "to reveal some then-undisclosed fact with
regard to the specific misrepresentations alleged in the
complaint." Omnicom Grp., 597 F.3d at 511.  So, while the
plaintiffs here allege that, starting in October 2009, the
defendants fraudulently misstated or withheld facts tending to

show that CVS Caremark would lose the Coventry, Chrysler, and New Jersey contracts, they have not plausibly connected those misstatements and omissions to the drop-off in the company's stock price on November 5, 2009--because the loss of each of those contracts had been disclosed several months prior.[11]  The plaintiffs have stated no plausible theory of loss causation based on the lost PBM contracts.  See id.; Teachers' Ret. Sys., 477 F.3d at 187-88.

### C.   Actual disclosures that could not have plausibly caused CVS Caremark's share price to drop 20 percent

At oral argument on the motion to dismiss, the plaintiffs appeared to retreat considerably from the theory of loss causation pled in their complaint, identifying the causative disclosures in the November 2009 call as only:  (1) that CVS Caremark had lost the Coventry contract due to service, (2) Ryan's "execution and performance" comment, and (3) that McClure (the head of the company's Caremark Pharmacy Services

---

[11]The Coventry, Chrysler, and New Jersey contracts accounted for a substantial portion--but not all--of the $4.5 billion in lost PBM business discussed during the November 2009 call.  See Part I.D, supra.  But the plaintiffs do not allege that, prior to the call, the defendants had fraudulently misstated or withheld facts about any of that other lost PBM business.  Even if those other losses were disclosed for the first time on the November 2009 call, then, that fact would not support the plaintiffs' stated loss causation theory.

division) had been "fired."  Unlike the other alleged disclosures
of the company's "failure to integrate the merged-entity" and the
like, these disclosures have the virtue of aligning--though not
perfectly--with things that Ryan actually "disclosed" during the
November 2009 call.  They nevertheless do not support a plausible
theory of loss causation.

     First, as already discussed, Ryan said only that CVS
Caremark had lost the Coventry contract due to "some service
issues."  He did not say that those issues were born of
integration difficulties attendant to the merger or, for that
matter, any other systemic problem.  In fact, he denied that was
the case, and attributed the company's loss of the other PBM
contracts to entirely different reasons.  The plaintiffs do not
explain how disclosing that a single contract had been lost due
to "some service issues"--when the loss of the contract had
itself been disclosed nearly six months earlier--could have
plausibly caused CVS Caremark's share price to tumble 20 percent.

     Second, as also already discussed, Ryan did not blame the
company's lost PBM business on failed "execution and
performance."  He identified "execution and performance" as the
way to "change [the] minds" of "people kind of shying away from
Caremark's PBM."  A CEO's acknowledgment, in the face of
disappointing earnings news, that his or her company needs to

"execute" or "perform" better cannot plausibly be taken as a "disclosure" of large-scale problems with the company's business structure or model (especially when, again, the CEO denies the existence of any such problems).  Nor could such an acknowledgment--as opposed to the bad news on earnings which accompanied it--supply a plausible explanation for the contemporaneous drop in the company's share price, particularly of the magnitude that occurred here.

Third, McClure's "firing"--which Ryan, in a euphemism recalling manager Terry Francona's separation from the Boston Red Sox following their epic collapse at the end of the 2011 season, characterized as a "retirement"--could not have plausibly caused the 20 percent decline in CVS Caremark shares either.  As the Second Circuit has observed, when a company's share price declines after one of its executives leaves because of fraud or other problems there, "it is generally the facts underlying the fraud and resignation that causes [*sic*] a compensable investor's loss."  Omnicom, 597 F.3d at 514 (emphasis added).  Thus, when "the resignation [does] not add to the public knowledge any new material fact" that had previously been misrepresented or withheld, it usually cannot serve as the necessary tie between the misrepresentations or non-disclosures and the loss.  Id. That was the case here.  Even accepting the plaintiffs'

characterization of McClure's departure as a "firing" precipitated by the company's lost PBM business, the fact of those losses (the Coventry, Chrysler, and New Jersey contracts) had been disclosed several months prior to the November 5 call and fall-off in CVS Caremark shares.  See Part III.B.2, supra.

So the announcements during the November 2009 call--that "some service issues" had caused CVS-Caremark to lose the Coventry contract, that the company could change the minds of those unimpressed by its PBM business through "execution and performance," and that McClure was leaving the company--could not, either individually or collectively, have plausibly caused its share price to decline by 20 percent by the end of that day. Indeed, that much is clear from the fact that the plaintiffs' theory (before oral argument, at least) was not that these disclosures had themselves caused the stock to drop, but that they had "confirmed the fundamental failure of the PBM integration," and it was this "confirmation" that caused the stock to drop.  As is clear by now, however, these disclosures did not, on any plausible construction, serve as a "confirmation" of such problems with the CVS Caremark merger.  The plaintiffs have simply not alleged a plausible loss causation theory based on "disclosures" that were actually made.

IV.  **Conclusion**

For the foregoing reasons, the defendants' motion to dismiss[12] is GRANTED.  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  June 14, 2012

cc:  Barry J. Kusinitz, Esq.
     David A. Rosenfeld, Esq.
     Deborah R. Gross, Esq.
     Robert M. Rothman, Esq.
     William R. Grimm, Esq.
     Edmund Polubinski, III, Esq.
     Jessica Kate Foschi, Esq.
     Lawrence Portnoy, Esq.
     Mitchell R. Edwards, Esq.
     Joseph A. Fonti, Esq.

---

[12]Document no. 34.

41