UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| ——————————————— x | | |
| RICHARD MEDOFF, Individually and On Behalf Of All Others Similarly Situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 1:09-cv-00554-S-DLM |
| vs. | : | |
| | : | |
| CVS CAREMARK CORPORATION, THOMAS M. RYAN, DAVID RICKARD, and HOWARD McLURE, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| ——————————————— x | | |

SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS

HINCKLEY, ALLEN & SNYDER LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island  02903
Telephone:    (401) 274-2000
Facsimile:    (401) 277-9600

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:    (212) 450-4000
Facsimile:    (212) 701-5800

*Attorneys for Defendants*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ....................................................................................................... 3

ARGUMENT ............................................................................................................. 8

I.  PLAINTIFFS FAIL TO ALLEGE AN ACTIONABLE MISSTATEMENT
    OR OMISSION ................................................................................................... 9

    A.  Plaintiffs Fail to Plead That the Alleged Misstatements Were Untrue ................. 10

    B.  Most of the Alleged Misstatements Are Inactionable Corporate Puffery .............. 14

II.  THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE
     OF SCIENTER ................................................................................................. 16

     A.  The Complaint's Allegations Fail to Allege That Defendants Acted with
         Recklessness or Conscious Intent to Defraud ........................................................ 17

         1.  Plaintiffs Do Not Allege That Defendants Had Reason to
             Believe Their Statements Were Untrue. ........................................................ 19

         2.  Plaintiffs Do Not Allege with Particularity That Defendants
             Had Access to Contradictory Facts. ............................................................. 19

     B.  Plaintiffs' Allegations Based on Confidential Witness Statements Do
         Not Support a Strong Inference of Scienter. ......................................................... 21

     C.  Plaintiffs' Allegations Regarding Insider Stock Sales Fail to Give Rise
         to a Strong Inference of Scienter. ......................................................................... 22

III.  PLAINTIFFS DO NOT STATE A CLAIM FOR CONTROL PERSON
      LIABILITY ...................................................................................................... 25

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

### CASES

PAGE

ACA Fin. Guar. Corp. v. Advest, Inc.,
    512 F.3d 46 (1st Cir. 2008) ................................................................................. 8, 17, 20

Aldridge v. A.T. Cross Corp.,
    284 F.3d 72 (1st Cir. 2002) ............................................................................................ 9, 11

Basic Inc. v. Levinson,
    485 U.S. 224 (1988) ................................................................................................ 11

Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.,
    394 F.3d 126 (3d Cir. 2004) ........................................................................................ 21, 22

City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.,
    632 F.3d 751 (1st Cir. 2011) .................................................................................. 23

City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.,
    699 F. Supp. 2d 331 (D. Mass. 2010) ...................................................................... 24

City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.,
    399 F.3d 651 (6th Cir. 2005) ........................................................................................ 18-19

Dura Pharm., Inc. v. Broudo,
    544 U.S. 336 (2005) ................................................................................................ 8

Greebel v. FTP Software, Inc.,
    194 F.3d 185 (1st Cir. 1999) ........................................................................ 17, 23, 24,  25

Grossman v. Novell, Inc.,
    120 F.3d 1112 (10th Cir. 1997) ........................................................................................ 15

Hill v. Gozani,
    638 F.3d 40 (1st Cir. 2011) ................................................................................................ 8, 9

In re Art Tech. Grp., Inc. Sec. Litig.,
    394 F. Supp. 2d 313 (D. Mass. 2005) ...................................................................... 12

In re Bos. Tech., Inc. Sec. Litig.,
    8 F. Supp. 2d 43 (D. Mass. 1998) ...................................................................... 20

In re Cabletron Sys., Inc.
    311 F. 3d 11 (1st Cir. 2002) ........................................................................................ 24

ii

In re Gildan Activewear, Inc. Sec. Litig.,
  636 F. Supp. 2d 261 (S.D.N.Y. 2009)................................................................. 23

In re Int'l Rectifier Corp. Sec. Litig.,
  No. CV 07-02544-JFW (VBKx), 2008 WL 4555794 (C.D. Cal. May 23, 2008) ................. 25

In re Peritus Software Servs., Inc. Sec. Litig.,
  52 F. Supp. 2d 211 (D. Mass. 1999) ................................................................... 16

In re Rackable Sys., Inc. Sec. Litig.,
  No. C 09-0222 CW, 2010 WL 199703 (N.D. Cal. Jan. 13, 2010)........................... 21

In re Razorfish, Inc. Sec. Litig.,
  No. 00 CIV. 9474, 2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001)........................ 16

Makor Issues & Rights v. Tellabs, Inc.,
  513 F.3d 702 (7th Cir. 2008) ............................................................................ 18

Malin v. XL Capital Ltd.,
  499 F. Supp. 2d 117 (D. Conn. 2007)................................................................. 21

Mass. Ret. Sys. v. CVS Caremark Corp.,
  716 F.3d 229  (1st Cir. 2013)...................................................................... passim

Matrixx Initiatives, Inc. v. Siracusano,
  131 S. Ct. 1309 (2011)...................................................................................... 11

Miss. Pub. Emps. Ret. Sys. v. Bos. Scientific Corp.,
  523 F.3d 75 (1st Cir. 2008)............................................................................... 23

N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.,
  537 F.3d 35 (1st Cir. 2008)......................................................................... 21, 23

Novak v. Kasaks,
  216 F.3d 300 (2d Cir. 2000)............................................................................. 20

Phillips v. Scientific-Atlanta, Inc.,
  374 F.3d 1015 (11th Cir. 2004) ........................................................................ 18

Rombach v. Chang,
  355 F.3d 164 (2d Cir. 2004)............................................................................. 14

Rosen v. Textron, Inc.,
  321 F. Supp. 2d 308 (D.R.I. 2004)................................................................. 8, 23

Scritchfield v. Paolo,
  274 F. Supp. 2d 163 (D.R.I. 2003).................................................................... 14

Shaw v. Digital Equip. Corp.,
    82 F.3d 1194 (1st Cir. 1996) ............................................................................... 14

Shields v. Citytrust Bancorp, Inc.,
    25 F.3d 1124 (2d Cir. 1994) ............................................................................... 15

Simon v. Am. Power Conversion Corp.,
    945 F. Supp. 416 (D.R.I. 1996) ..................................................................... 14, 15

Sloman v. Presstek, Inc.,
    Civil Action No. 06-cv-377-JD, 2007 WL 2740047 (D.N.H. Sept. 18, 2007) ................ 16-17

Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,
    365 F.3d 353 (5th Cir. 2004) ............................................................................. 18

Stiegele ex. rel. Viisage Tech., Inc. v. Bailey,
    No. 0510677-MLW, 2007 WL 4197496 (D. Mass. Aug. 23, 2007) ..................................... 25

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.,
    531 F.3d 190 (2d Cir. 2008) ......................................................................... 18, 20

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    551 U.S. 308 (2007) ..................................................................................... 2, 16

Watterson v. Page,
    987 F.2d 1 (1st Cir. 1993) ................................................................................. 4

Wietschner v. Monterey Pasta Co.,
    294 F. Supp. 2d 1102 (N.D. Cal. 2003) ................................................................ 24

## STATUTES & RULES

15 U.S.C. § 78u-4(b)(1) ............................................................................... 2, 8, 12

15 U.S.C. § 78u-4(b)(2). ....................................................................................... 8

15 U.S.C. § 78u-4(b)(3)(A) ................................................................................... 8

17 C.F.R. § 240.10b5-1(c)(1)(i)(A) ......................................................................... 7

Fed. R. Civ. P. 9(b) ........................................................................................... 1

Private Securities Litigation Reform Act of 1995 ............................................... passim

Defendants CVS Caremark Corporation ("CVS Caremark" or the "Company"), Thomas

M. Ryan, David Rickard, and Howard McLure (collectively the "Individual Defendants" and,

together with CVS Caremark, the "Defendants") respectfully submit this supplemental

memorandum of law in support of their motion to dismiss the Corrected Consolidated Class

Action Complaint (the "Complaint"), pursuant to Federal Rules of Civil Procedure 9(b) and

12(b)(6) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## PRELIMINARY STATEMENT

On remand from the First Circuit, only a narrow subset of the claims in the Complaint

remains.  Specifically, Plaintiffs can no longer proceed on the claim they asserted in their

original complaint:  that Mr. Ryan's statement on the Company's second-quarter 2009 earnings

call that he would be disappointed if the Company did not experience 13-15% growth in 2010

(the "Preliminary Earnings Prediction") was allegedly false or misleading.  Nor, as the First

Circuit made clear, can Plaintiffs pursue a theory related to alleged misstatements about the

success of the combined CVS Caremark business model.  Instead, the Court of Appeals held that

Plaintiffs could sufficiently allege loss causation only as to alleged misstatements about "the

success of CVS Caremark's integration and the quality of its service."  Mass. Ret. Sys. v. CVS

Caremark Corp., 716 F.3d 229, 239 (1st Cir. 2013) (the "First Circuit Decision").

In reaching its decision on loss causation, the Court of Appeals made clear that it was not

concluding that Plaintiffs could satisfy the PSLRA's heightened pleading standards as to any

alleged misstatement about merger integration or service.  Instead, it left for this Court the

threshold questions of (i) whether Plaintiffs have pled an actionable misstatement and (ii)

whether Plaintiffs have pled the requisite strong inference of scienter.  Plaintiffs cannot meet

their heightened pleading burden on either.

First, Plaintiffs have failed to satisfy the PSRLA's requirement that they "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). This is not a case in which plaintiffs allege that some statement of objective fact (e.g., a revenue or expense item) in a company-generated public document is false. Instead Plaintiffs contend that a handful of isolated, generalized verbal comments—made by two individuals over the course of thirteen months, largely in response to questions on earnings calls—are actionable misstatements. But they have not alleged with the requisite specificity that any of these scattered statements were, when considered in context, actually false or misleading (or the reasons why). Moreover, as expressions of subjective and generalized corporate optimism or "puffery," the statements are inactionable as a matter of law.

Second, even if Plaintiffs could identify an actionable misstatement, the Complaint's allegations would fail for the independent reason that they also do not raise a strong inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007). The Complaint is devoid of well-pled allegations that any senior executive had the conscious intent to defraud or the high degree of recklessness required by the First Circuit as to any of the statements on which Plaintiffs now base their claims. The vast majority of the anonymous witnesses cited in the complaint—only half of whom were even still employed by the Company during the alleged class period—are not alleged even to have had any contact with any senior executive at the Company, much less the two Individual Defendants who made any of the statements Plaintiffs now allege to be false. Thus, even if the assertions attributed to the anonymous witnesses could plausibly suggest systemic as opposed to isolated problems (which they cannot), none could remotely support the notion—much less the strong inference required

2

by the PSLRA—that any relevant executive was aware of those issues or otherwise had the requisite scienter at the time of any alleged misstatement.  Finally, Plaintiffs' allegations relating to stock sales by Messrs. Ryan, Rickard and McLure are of no import: Among other things, they involved percentages of their holdings that are too small, as a matter of law, to support any inference of scienter.

## BACKGROUND

### A.    <u>Procedural History</u>

Plaintiffs filed their initial complaint on November 17, 2009, alleging a single fraudulent statement:  the Preliminary Earnings Prediction.  On May 3, 2010, Plaintiffs filed a Consolidated Class Action Complaint, followed several weeks later by the Complaint.  Although the Preliminary Earnings Prediction remained a prominent feature, those later complaints also included the narrow allegations regarding integration and service that remain in the case.  Defendants moved to dismiss the Complaint in its entirety.

In an order dated June 18, 2012 (ECF No. 50) (the "District Court Decision"), this Court granted Defendants' motion on two grounds.  First, the Court found that the Preliminary Earnings Prediction was an inactionable forward-looking statement protected by the PSLRA's safe-harbor provisions.  And second, the Court dismissed Plaintiffs' claims <u>other than</u> those based on the Preliminary Earnings Prediction, concluding that Plaintiffs had failed to adequately plead loss causation.  Because those two grounds were dispositive, the Court declined to consider other, independent bases for dismissal that Defendants had raised.  District Court Decision at 17.

Plaintiffs appealed this Court's ruling on loss causation but did not appeal the  ruling that the Preliminary Earnings Prediction was a forward-looking statement.  Thus, that ruling remains law of the case.  As to loss causation, however, the First Circuit vacated and remanded, holding that Plaintiffs had plausibly alleged loss causation for a narrow set of potential claims.  In its

opinion, the First Circuit held that Plaintiffs "fail to state a claim regarding the business model itself." <u>Mass. Ret. Sys.</u>, 716 F.3d at 239.  But the Court of Appeals held that Plaintiffs had plausibly alleged loss causation as to any alleged misstatements about "the success of CVS Caremark's integration and the quality of its service."  <u>Id.</u>  The First Circuit expressly noted that it was not addressing any of the "alternative grounds for dismissal," including Plaintiffs' failure to meet their burden under the heightened pleading standards of the PSLRA to plead actionable misstatements and their failure to plead the requisite strong inference of scienter.  <u>See id.</u> at 244. The Court of Appeals left those issues for this Court to address in the first instance.  <u>Id.</u>

**B.**      **The Relevant Allegations**[1]

In the wake of the First Circuit Decision on loss causation, the only statements on which Plaintiffs could possibly state a claim relate to:  (i) the quality of service provided by the Company's Pharmacy Benefits Management ("PBM") segment to its clients; and (ii) the post-merger integration of CVS Corporation and Caremark Rx, Inc.

**1.**      **Alleged Misrepresentations**

Within the 97-page, 235-paragraph Complaint, only a limited number of allegations even arguably relate to purported service or integration issues.[2]  None of these allegations describes a

---

[1] Defendants respectfully refer the Court to its earlier opinion on Defendants' motion to dismiss for a description of CVS Caremark's business.  <u>See</u> District Court Decision at 4-6.  For purposes of this brief, the non-conclusory factual allegations in the Complaint are taken as true.  The facts described herein are taken from the Complaint, as well as from publicly available documents and other sources central to plaintiffs' claim or sufficiently referred to in the Complaint.  <u>See</u> <u>Watterson v. Page</u>, 987 F.2d 1, 3-4 (1st Cir. 1993).

[2] Given the First Circuit's holding that "[Plaintiffs] fail to state a claim regarding the business model itself," <u>Mass. Ret. Sys.</u>, 716 F.3d at 239, many related allegations are no longer at issue either.  For example, even if they could otherwise constitute actionable misstatements, the following allegations are all categorically non-actionable in light of the First Circuit Decision:  "We expect the company to continue to execute on its unique vertically-integrated drug retail/PBM model" (Compl. ¶ 129), "our model is working" (<u>id.</u> ¶ 113), "the breadth of capabilities resulting from the Caremark Merger are resonating with our clients and contributed to our success" (<u>id.</u> ¶ 133), and the "answer" to the question "whether our model is resonating in the PBM marketplace . . . has to be a resounding yes" (<u>id.</u> ¶ 135).

single alleged misstatement in a public filing or any other written document.[3]  Instead, Plaintiffs

identify a scattered collection of individual sentences and phrases spoken by Mr. Ryan or, in one

case, by Mr. Rickard, on earnings calls and at investor conferences.

Plaintiffs' proposed Class Period begins on October 30, 2008, when CVS held its third-

quarter earnings call for 2008.  (Compl. ¶ 112.)  In discussing the Company's record-breaking

PBM selling season, Mr. Ryan commented generally on the Company's service performance.

(See, e.g., id. ¶ 112 ("[w]e will continue to gain share because . . . . [w]e have excellent

service").)  On January 9, 2009, the Company held a conference call to provide guidance for

2009 to investors and analysts.  (Id. ¶ 118.)  In response to an analyst question about the

PharmaCare computer system,[4] Mr. Ryan said that the system would not likely be fully moved

over to the Caremark system until at least the end of 2009.  (Ex.[5] 1, Jan. 9, 2009 CVS Caremark

Corporation Guidance Announcement—Final ("Jan. 9 Tr."), at 13.)  He added that the systems

already used by Caremark would not undergo any significant conversion in 2009.[6]  When an

analyst followed up to ask whether the computer systems will nevertheless "be able talk to each

other," Mr. Ryan explained: "All the systems are able to talk to each other. . . . We have got no

issue with our systems."  (Id.; cf. Compl. ¶ 121.)   Nowhere on that call or any other did Mr.

Ryan or any other CVS executive state that every aspect of the two companies' businesses and

systems had been fully integrated with no problems.  In fact—in a portion of the discussion with

---

[3] The only allegations in the Complaint from the Company's public filings are generalized comments relating to the combined CVS Caremark model (e.g., Compl. ¶ 133 (From CVS Caremark Form 10-K:  "We believe the breadth of capabilities resulting from the Caremark Merger are resonating with our clients . . . .")), and thus are also inactionable under the First Circuit Decision, see Mass. Ret. Sys., 716 F.3d at 239.

[4] PharmaCare was the small PBM business operated by CVS before the merger with Caremark.

[5] Citations styled "Ex. __-__" refer to exhibits to the Declaration of Lawrence Portnoy, dated July 25, 2013.

[6] This potential conversion of the three Caremark systems was not "integration" and was unrelated to the merger.  Caremark operated those systems separately before the merger and continued to do so afterward.

analysts on this very call that Plaintiffs did not quote—Mr. Ryan said precisely the opposite, explaining that the migration of the PharmaCare system to the legacy Caremark systems would likely not be complete until at least the fourth quarter of 2009.  (Ex. 1, Jan. 9 Tr., at 13.)

On the same call, Mr. Ryan discussed the Company's repricing of PBM contracts during the 2008 selling season.  (See Compl. ¶ 118 ("[A] larger than ever portion of our client book repriced for '09.  That was comprised of renewals that we bid aggressively plus improved pricing on other contracts that were not up for renewal.").)  One analyst asked if this repricing was necessary due to poor service, to which Mr. Ryan responded, "[T]hese are accounts that we kind of wanted to lock down.  No trade-offs because of our service.  We just got the JD Power Associates Health Plan PBM of the Year for our service and our call centers.  So the notion that we had to reprice because the service was poor, our service in our PBM business is the best it has been. . . . So there was no hidden agenda here about giving a lower price because of lack of service if that is what you are asking."  (Id. ¶ 121.)

Mr. Rickard later spoke at an investor conference where he also commented on the repricing that took place during the 2008 selling season.  (Id. ¶ 137 ("A couple of major contracts became extremely competitive and we did have some pull-forward of contracts to lock up business going forward. . . . So I think that you can complain about not making as much financial progress this year as some competitors.  That's certainly true.  I think, however, that we have done the things strategically that needed to be done to make this merger successful.") (emphasis omitted).)  While Mr. Rickard did discuss the service benefits of CVS Caremark's integrated PBM and the integration, including that it was a "somewhat slow process," (Ex. 2, CVS Caremark Corporation at Raymond James Institutional Investor Conference—Final, at 6), Plaintiffs have not alleged that any of those statements was false.

On May 5, 2009, during the Company's second-quarter conference call, Mr. Ryan reviewed the Company's loss of the Coventry commercial contract, which he described as being worth about $1 billion in revenue.  (Id. ¶ 141.)  While Mr. Ryan explained that the loss was "not unexpected" (Id.), he did not discuss any of the reasons for the loss.[7]

### 2.    Scienter Allegations

In support of their claim that Defendants acted with the requisite scienter, Plaintiffs rely primarily on allegations of stock sales by the Individual Defendants.  (Compl. ¶ 204.)  But Plaintiffs also concede facts negating any inference of scienter that can be drawn from these trades.  For instance, Mr. Rickard and Mr. McLure both traded pursuant to "pre-arranged 10b-5 trading plans"[8] (id. ¶ 205), and Mr. Ryan made only two trades during the alleged class period, which amounted to only 5.4% of his total holdings of stock (id. ¶ 109).

The remaining scienter allegations, purportedly based on information from anonymous witnesses, include a variety of conflicting, irrelevant, and conclusory allegations about isolated customer service and integration issues.  (See, e.g., id. ¶¶ 68, 69, 98.)  But none of these is a particularized allegation concerning any Defendant's state of mind.  None describes a single conversation or meeting with any of the Individual Defendants and none describes whether or how the Individual Defendants would have known about the alleged integration or service issues.

In fact, most of the anonymous witnesses referenced in the Complaint did not work at the Company during the alleged Class Period, and the remainder worked there for only small

---

[7] Plaintiffs also claim that, on the Company's August 4, 2009 earnings call, Mr. Ryan failed to disclose that the Company "lost a verbal commitment from a potential customer due to service-related and transparency issues." (Compl. ¶ 165.)  The Complaint makes clear, however, that the service issues referred to could not have been CVS Caremark's:  Mr. Ryan explained that this customer had been "with the incumbent for a while" (id. ¶ 162 (emphasis added)), meaning that the potential customer was dissatisfied with some other PBM's service, but ultimately chose not to switch, because "the pricing was so good, it was hard to pass up" (id.).

[8] A 10b5-1 plan is a contract between an executive and a broker that contains detailed instructions to sell specified amounts of securities on particular dates or at specified prices.  See 17 C.F.R. § 240.10b5-1(c)(1)(i)(A).

portions of the alleged Class Period.  (See id. ¶ 33.)  And no confidential witness is alleged to have ever even met any of the Individual Defendants, much less have particularized evidence of what those Individual Defendants were thinking at the time they made the alleged misstatements.

## ARGUMENT

The elements of a securities fraud claim are (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); accord Rosen v. Textron, Inc., 321 F. Supp. 2d 308, 316 (D.R.I. 2004).

To survive a motion to dismiss a securities fraud suit, plaintiffs must satisfy the heightened pleading standards of both Federal Rule of Civil Procedure 9(b) and the PSLRA.  See Hill v. Gozani, 638 F.3d 40, 54-55 (1st Cir. 2011).  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The PSLRA "augments Rule 9(b)'s particularity requirement."  Rosen, 321 F. Supp. 2d at 317.  It further requires that a complaint alleging a Rule 10b-5 violation (i) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and (ii) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(1), (2)(A).  The First Circuit has explained that these pleading requirements are "notably strict and rigorous."  ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 n.7 (1st Cir. 2008) (internal quotation marks omitted).  Because Plaintiffs fail to meet them, the Complaint must be dismissed.  See 15 U.S.C. § 78u-4(b)(3)(A) (where pleading requirements are not met, "the court shall . . . dismiss the complaint").

I.       **PLAINTIFFS FAIL TO ALLEGE AN ACTIONABLE MISSTATEMENT OR OMISSION**

The First Circuit held that the only basis upon which Plaintiffs could adequately plead loss causation is that "the November 5 call, as a whole, plausibly revealed to the market that CVS Caremark had problems with service and the integration of its systems." Mass. Ret. Sys. v. CVS Caremark Corp., 716 F.3d 229, 240 (1st Cir. 2013).  Thus, to survive a motion to dismiss Plaintiffs must allege in the particularized fashion required by the PSLRA and Federal Rule of Civil Procedure 9(b) the precise statements that they claim misrepresented the purportedly hidden "truth" that was revealed on the November 5 call.  And they must do so in a way that "specif[ies] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." Hill, 638 F.3d at 55 (second alteration in original) (internal quotation marks omitted); see Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002) (a plaintiff must provide "facts that show exactly why the statements or omissions were misleading" (emphasis added)).

Yet Plaintiffs have not alleged that anyone from CVS Caremark ever said that the Company had no "problems with service."  And they cannot do so.  Likewise, they have not alleged that anyone from CVS Caremark ever said there were no problems at all with integration of any of the Company's systems.  Again, no one ever said such a thing.  Instead, in the absence of any such statement, Plaintiffs are left to string together equivocal and generalized statements contained in stray sentences and phrases made by Individual Defendants over time.  Inspection of these statements reveals that they are not alleged to be false with the particularity required by the PSLRA and, in any event, are the sort of vague, subjective statements that are consistently found to be inactionable.

9

## A.      Plaintiffs Fail to Plead That the Alleged Misstatements Were Untrue

As an initial matter, Plaintiffs do not allege that any Defendant claimed that CVS had <u>no</u>

problems with service.  Instead, Plaintiffs take issue with more generalized positive statements

by CVS Caremark's executives about the Company's service.  Plaintiffs point to the following

statements:  (i) "we're still going to focus on execution and service" (Compl. ¶ 55), (ii) "clients

are telling us that we've kept our focus on service" (<u>id.</u> ¶ 71), (iii) "our PBM continues to retain

existing clients and attract new ones" due to "excellent service" (<u>id.</u> ¶ 112), (iv) the Company has

"excellent client retention" and "outstanding customer service" (<u>id.</u> ¶ 125), and (v) the PBM

business has "high customer satisfaction" (<u>id.</u> ¶ 159).

Plaintiffs cannot seriously claim that any of these statements is false.  Plaintiffs do not

contend that employees at CVS Caremark did not "focus on execution and service," or dispute

that some of the Company's clients reported that it remained focused on service.  Nor do

Plaintiffs contend that CVS Caremark did not retain some clients and gain others, at least in part

based on its service.  The Company had over 3,000 clients under contract at the time (Ex. 3,

Final Transcript:  Q2 2009 Earnings Call, at 3), and CVS Caremark (i) was recognized by J.D.

Power and Associates for excellent service (Compl. ¶ 125), (ii) won over $8 billion worth of

business in 2008 (<u>id.</u>), (iii) won $1.4 billion worth of business in 2009 (<u>id.</u> ¶ 183), and (iv) won

125 new clients in 2009 (Ex. 4, Final Transcript:  Q3 2009 Earnings Call, at 4).

Plaintiffs' allegation that Mr. Ryan failed to disclose on the May 5, 2009 earnings call

that "service was known to be the reason" for the loss of the Coventry commercial contract

(Compl.  ¶ 75) similarly fails to plead an actionable misstatement or omission.  Plaintiffs do not

allege that there was any statement at all about the reason for the loss of the Coventry

commercial contract, much less an actionable false statement.  Nor can they claim that there was

anything misleading about his not disclosing the reason for the loss of the contract:  Plaintiffs

cannot point to any duty requiring Mr. Ryan to disclose the reasons for contract losses.  "Silence,

absent a duty to disclose, is not misleading."  Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17

(1988); see Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1321 (2011) ("[Section]

10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material

information.").[9]

 Plaintiffs also fail to plead with the specificity required by the PSLRA any misstatement

regarding the reasons for CVS Caremark's re-pricing of certain PBM contracts.  Plaintiffs take

issue with Mr. Ryan's explanation that CVS Caremark's decision to re-price a number of PBM

contracts during the 2009 selling season was not "because of our service" and that "there was no

hidden agenda here about giving a lower price because of lack of service." (Compl. ¶ 120

(emphases omitted).)  In particular, they claim, with no additional detail or support, that the

Company "failed to disclose that during the 2009 selling season, CVS Caremark unilaterally

reduced prices on over 50 percent of its existing PBM contracts in order to retain customers that

were dissatisfied with the Company's inferior service, integration-related issues, and lack of

transparency."  (Id. ¶ 122.)[10]

 But Plaintiffs fail to plead the basis for this bare assertion with anything approaching the

particularity the PSLRA requires.  The PSLRA demands that, "if an allegation regarding the

---

[9] In any event, Plaintiffs' two anonymous witnesses who purport to recount service problems do so by providing only anecdotal details.  (See Compl. ¶¶ 77-78.)  Neither individual is alleged to have been involved in contract negotiations between CVS Caremark and Coventry, and therefore neither would have had any personal knowledge as to Coventry's thought process in switching PBMs.  The PSLRA, however, requires greater precision. See Aldridge, 284 F.3d at 78 ("The plaintiff must provide factual support for the claim that the statements or omissions were fraudulent, that is, facts that show exactly why the statements or omissions were misleading." (emphasis added)).

[10] Notably, Plaintiffs' conclusory assertions provide no plausible explanation why Mr. Ryan's stated reason for re-pricing—"to lock-up additional contracts" (Compl. ¶¶ 118, 120)—was incorrect when uttered.

statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Plaintiffs here do not identify a single contract that was re-priced during the 2009 selling season, let alone one that was re-priced due to service.  None of their anonymous witnesses, for example, is alleged to have participated in any contract negotiations.  And while Plaintiffs contend generally that CVS Caremark's "Sales Pipeline Reports" reflected an aggregate amount of PBM business "at risk" in 2008 (see Compl. ¶ 67), they fail to identify the date of any particular report or identify any particular contract at risk because of alleged issues with service.  And they most definitely cannot allege that any "at risk" contract was re-priced due to service issues.[11]  Plaintiffs have thus failed to specify the basis for their belief that Mr. Ryan's statement about re-pricing was untrue.  See In re Art Tech. Grp., Inc. Sec. Litig., 394 F. Supp. 2d 313, 320-21 (D. Mass. 2005) ("Where, as here, the complaint fails to set forth the source of the information and the reasons for the belief, the complaint must be dismissed." (internal quotation marks omitted)).

And Plaintiffs do not—because they cannot—allege that any Defendant ever claimed that there would be no problems with integration or that integration was complete.  To the contrary, Mr. Ryan stated in January 2009 that PharmaCare's computer systems had not been fully converted to Caremark's, nor would they be for some time:  "[M]ost of the [P]harma[C]are system is in the process of moving over.  We will have that completed . . . probably in the fourth

---

[11] In the same way, Plaintiffs' anonymous witnesses who claim that service underlay the loss of the Coventry (Compl. ¶¶ 77-78), New Jersey (id. ¶¶ 87-90), and a portion of the Chrysler (id. ¶¶ 93-94) contracts cannot serve as the basis for Plaintiffs' belief.  Those contracts were lost outright; they were not re-priced.  Moreover, the allegations that Mr. Ryan admitted in November 2009, after the close of the alleged Class Period, that "we dropped the ball in some client service issues" (id. ¶ 198) does not relate to any particular contract other than Coventry, and thus adds nothing to Plaintiffs' theory of fraud.

quarter of this year."[12]  (Ex. 1, Jan. 9 Tr., at 13.)

It was during that same call, in response to a follow-up question from an analyst asking whether the PharmaCare and Caremark systems could "talk to each other," that Mr. Ryan stated that "[a]ll the systems are able to talk to each other" and "[w]e have got no issue with our systems."  (Compl. ¶ 121.)  Plaintiffs' contention that those statements were "false because Defendants knew that since March 2007, the Company's computer systems were not integrated" (id. ¶ 122) is thus based on a distorted reading of two selectively quoted phrases.  A review of the surrounding statements reveals that Mr. Ryan was not stating that there were no integration problems or that the merger was an unqualified success; nor was he stating that any computer system was free of integration problems.  Rather, he was responding to a specific question from a specific analyst about whether specific systems—one for PharmaCare and several for Caremark—would be able to "talk to each other."  They were certainly not statements about the existence or lack thereof of integration issues in any computer system impacting client service.[13]

Plaintiffs do not allege particularized facts plausibly linking Mr. Ryan's statement to the re-pricing of "over 50 percent of [the Company's] exiting PBM contracts" (id.).  Two of the contracts the Complaint specifically names (New Jersey and Coventry) were legacy Caremark contracts, and thus any problems converting the PharmaCare systems to be Caremark-compatible would not have affected those clients.  And because all three of those contracts were lost outright, purported service issues with those contracts could not have resulted in re-pricing.

---

[12] Plaintiffs' allegation that the Company admitted in February 2010 that integration was not complete  (see Compl. ¶ 200) is thus consistent with the timeline Mr. Ryan described, which merely set a probable end date for converting certain PharmaCare systems.

[13] The vagueness of the term "systems" further undercuts plaintiffs' allegation.  Indeed, the Complaint refers to various systems (see, e.g., Compl. ¶ 77 (customer databases); id. ¶ (client billing)) without identifying any as the one to which Mr. Ryan was referring when he spoke of "systems."

### B.   Most of the Alleged Misstatements Are Inactionable Corporate Puffery

Even if Plaintiffs could sufficiently allege that any of the statements was false, which they cannot, those statements would not be actionable because it is well settled that such "vague, or loosely optimistic statements about a company" are inactionable "puffery" because, given their generalized and unverifiable nature, a reasonable investor would not rely on them. Scritchfield v. Paolo, 274 F. Supp. 2d 163, 172 (D.R.I. 2003); cf. Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("[C]ompanies must be permitted to operate with a hopeful outlook [and are] not required to take a gloomy, fearful or defeatist view of the future."). This Court has endorsed a "contextual approach to assessing the applicability of the puffery defense." Scritchfield, 274 F. Supp. 2d at 175.

Alleged misstatements such as "[w]e will continue to gain share because . . . [w]e have excellent service" (id. ¶ 112) and descriptions of CVS Caremark's "excellent client retention" (id. ¶ 125) are archetypes of inactionable puffery. The description of "excellent" service is exactly the sort of subjective optimistic statement on which courts have refused to premise a securities fraud claim. See, e.g., Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996) (characterizing as inactionable puffery "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information"), superseded on other grounds by statute, 15 U.S.C. § 78u-4(b); Simon v. Am. Power Conversion Corp., 945 F. Supp. 416, 428-29 (D.R.I. 1996).

Simon is instructive. There, the court assessed the puffery defense against statements including "we are gaining market share, we are gaining momentum, and our revenues are strong" and "1995 [is going] to be a busy year." 945 F. Supp. at 428. The court not only held that those

14

statements were not actionable, it noted that "the market could have expected nothing less from a CEO, i.e. predictions of . . . improvements and a busy year." Id. at 429.  So too here.  The market would have rightly expected Mr. Ryan, as CEO, to make optimistic statements about CVS Caremark's ability to gain market share and its "excellent service."  See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129-30 (2d Cir. 1994) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."), superseded on other grounds by statute, 15 U.S.C. § 78u-4(b).

      Statements about the "success" of CVS Caremark's integration efforts are likewise inactionable.  (See, e.g., Compl. ¶ 137 ("[W]e have done the things strategically that needed to be done to make this merger successful.").)  Numerous courts have characterized similar statements as puffery.[14]  For instance, the Tenth Circuit found that claims by Novell's CEO, shortly after Novell acquired WordPerfect, "that Novell had experienced 'substantial success' in integrating the sales forces of the two companies, that the merger was moving 'faster than we thought,' and that the merger presented a 'compelling set of opportunities for the company'" were "correctly determined by the district court as a matter of law to be immaterial statements of corporate optimism."  Grossman v. Novell, Inc., 120 F.3d 1112, 1121 (10th Cir. 1997); see id. at 1121-22 ("These are the sort of soft, puffing statements, incapable of objective verification, that courts routinely dismiss as vague statements of corporate optimism.").  Similarly, the Southern District of New York dismissed allegations that defendants had misrepresented the success of a recent merger—including statements that the "[C]ompany successfully converged service

---

[14] Additionally, these courts all applied the puffery doctrine to statements of past or present condition, thus belying any suggestion that puffery is a defense against statements of future performance only.

offerings and pricing," that the company's "major integration efforts [were] complete," and that

the company was "hitting on all cylinders now that we have successfully integrated our

acquisitions"—explaining that "'integration' is far too loose and uncertain a term on which to

premise a claim of securities fraud in this context." In re Razorfish, Inc. Sec. Litig., No. 00 CIV.

9474, 2001 WL 1111502, at *1-2 (S.D.N.Y. Sept. 21, 2001) (alterations in original) (emphases

omitted).  And the District of Massachusetts held that the statement that Peritus Software's

acquisition of Millennium Dynamics "has been a success" was inactionable, even though

plaintiff had pled that "Peritus had lost most of the Millennium sales force and had virtually

stopped selling Millennium products," because "the 'success' comment seems exactly the type of

'rosy affirmation' frequently held nonactionable under the corporate puffery doctrine." In re

Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp. 2d 211, 217, 229 (D. Mass. 1999).

## II.     THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

Even if Plaintiffs could sufficiently allege misstatements about "the success of CVS

Caremark's integration and the quality of its service," Mass. Ret. Sys. v. CVS Caremark Corp.,

716 F.3d 229, 239  (1st Cir. 2013)—which they cannot—Plaintiffs must also allege with

particularity facts giving rise to a strong inference that Defendants made those specific scattered

statements about service and integration with an intent to defraud or with a high degree of

recklessness.  Plaintiffs fail to do so.

To adequately allege scienter under the PSLRA, Plaintiffs must allege with particularity

facts giving rise to a strong inference of scienter that is "cogent and at least as compelling as any

opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues &

Rights, Ltd., 551 U.S. 308, 324 (2007).  In assessing claims of scienter, a court must weigh "not

only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from

the facts alleged." Id. at 314; Sloman v. Presstek, Inc., No. 06-cv-377-JD, 2007 WL 2740047, at

16

*7 (D.N.H. Sept. 18, 2007).  The First Circuit requires plaintiffs to plead that defendants acted

with "either conscious intent to defraud or a 'high degree of recklessness.'"  ACA Fin. Guar.

Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008).  The definition of recklessness is

decidedly strict and "comes closer to being a lesser form of intent than merely a greater degree of

ordinary negligence."  Greebel v. FTP Software, Inc., 194 F.3d 185, 199 (1st Cir. 1999) (internal

quotation marks omitted); see id. at 198 (adopting a definition of recklessness "involving not

merely simple, or even inexcusable, negligence, but an extreme departure from the standards of

ordinary care" (internal quotation marks omitted)).  Plaintiffs' allegations do not satisfy this

heightened pleading requirement.

### A.   The Complaint's Allegations Fail to Allege That Defendants Acted with Recklessness or Conscious Intent to Defraud

As explained above, the isolated statements on which Plaintiffs now base their claim

were all oral statements made by Mr. Ryan, often in response to questions on earnings calls, or in

only one case an oral statement by Mr. Rickard at an investor conference.[15]  (See, e.g., Compl. ¶¶

119-120 (Mr. Ryan's statement that there were "[n]o trade-offs because of our service," in

response to analyst question); id. ¶ 121 (Mr. Ryan's statement that "[a]ll the systems are able to

talk to each other," in response to analyst question).)

Under the circumstances here—involving isolated statements made by individual

executives[16]—the relevant inquiry is whether the executive making the particular statement at

---

[15] The only statements by Mr. Rickard that arguably remain in the case are statements he made during a Raymond James Institutional Investor Conference on March 10, 2009.  (See Compl. ¶¶ 135, 137.)  However, most of his statements at this conference were directly related to the combined business model and thus are not actionable under the First Circuit Decision.  (E.g., id. ¶ 135 ("our model is resonating in the PBM marketplace").)  Mr. Rickard did discuss the repricing of contracts at the end of the 2008 selling season, but none of his remarks pertain in any way to service or integration.  Mr. McLure is not alleged to have made any of the statements in the Complaint.

[16] As noted above, supra, n.3, the only allegations in the Complaint from the Company's public filings relate to the combined CVS Caremark model, and thus are no longer at issue following the First Circuit Decision, see Mass. Ret. Sys., 716 F.3d at 239.

issue had the requisite scienter when the statement was made.  "To establish corporate liability

for a violation of Rule 10b-5 requires 'look[ing] to the state of mind of the individual corporate

official or officials who make or issue the statement (or order or approve it or its making or

issuance, or who furnish information or language for inclusion therein, or the like) rather than

generally to the collective knowledge of all the corporation's officers and employees acquired in

the course of employment.'"  Makor Issues & Rights v. Tellabs, Inc., 513 F.3d 702, 708 (7th Cir.

2008) (emphases added) (alteration in original) (quoting Southland Sec. Corp. v. INSpire Ins.

Solutions, Inc., 365 F.3d 353, 366 (5th Cir. 2004)); see Teamsters Local 445 Freight Div.

Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 195 (2d Cir. 2008) (PSLRA's "strong

inference" requirement "means that the pleaded facts must create a strong inference that

someone whose intent could be imputed to the corporation acted with the requisite scienter"

(emphasis added)).  As Plaintiffs have not adequately pled that Messrs. Ryan and Rickard—the

Defendants alleged to have made or participated in making the misstatements still at issue—

acted with scienter, they cannot plead scienter as to any Defendant, including the Company.

     In any event, as explained in detail below, Plaintiffs do not allege any particularized facts

giving rise to a strong inference that any senior executive whose scienter could be imputed to the

Company, much less Mr. Ryan or Mr. Rickard, ever learned of systemic integration or service

problems—let alone at the time the isolated oral statements on which Plaintiffs now base their

case were uttered.[17]  For that reason, Plaintiffs have failed to meet their burden on scienter.

---

[17] Because the alleged misstatements here involve isolated and generalized verbal statements by specific individuals, the Court need not decide whether the First Circuit would categorically reject the notion that scienter could ever be pled collectively (i.e., without reference to a specific individual's state of mind)—as did the Fifth and Eleventh Circuits, see Southland Sec. Corp., 365 F.3d at 366; Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015,1017-18 (11th Cir. 2004)—or whether it would accept collective scienter pleading in circumstances involving "so dramatic an announcement" by a corporation that it necessarily "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false," Dynex, 531 F.3d at 195 (emphasis added) (quoting Makor Issues & Rights, 513 F.3d at 710); see also City of Monroe Emps. Ret. Sys. (…continued)

### 1.  Plaintiffs Do Not Allege That Defendants Had Reason to Believe Their Statements Were Untrue

Most fundamentally, the undisputed facts in the Complaint and reflected in the calls make clear that there was more than ample support for each of the statements in the Complaint about the quality of service and state of integration.  See supra Point I.  In particular, Plaintiffs plead facts directly supporting the subjective statements that service was excellent, or the more objective statements that the PBM was retaining a vast majority of its existing clients.  See supra at 10.  For example, in 2009 J.D. Power and Associates recognized CVS Caremark for excellence in customer service for the third time (Compl. ¶ 125), the Company won over $8 billion of business during the 2008 selling season (id.), won $1.4 billion of additional business during the 2009 selling season (id. ¶ 183), and won 125 new clients during the 2009 selling season (Ex. 4, Final Transcript: Q3 2009 Earnings Call, at 4).  Even if all of Plaintiffs' unsupported assertions about service issues at CVS Caremark were true, the undisputed facts in the Complaint provide support for the Individual Defendants' statements and therefore fatally undermine any inference that the Individual Defendants intentionally or recklessly misrepresented any facts about service or integration.

### 2.  Plaintiffs Do Not Allege with Particularity That Defendants Had Access to Contradictory Facts

Moreover, the 97-page Complaint lacks any specific allegation that Defendants knew of widespread service problems at CVS Caremark.  Plaintiffs' claims that Defendants should have known about service issues from weekly Sales Pipeline Reports and monthly and quarterly

---

<span style="float:right">(continued…)</span>

v. Bridgestone Corp., 399 F.3d 651, 683-84 (6th Cir. 2005) (applying a multifactor analysis on the question of collective scienter in a case involving alleged misstatements in press releases and public filings).  Setting aside the fact that the statements at issue here are anything but dramatic, they were not corporate announcements.  Rather, they were comments by individual executives, in many cases unscripted responses to analyst questions.

meetings and phone calls (see, e.g., Compl. ¶¶ 65, 68, 69) fail because the Complaint does not identify the specific information that Defendants purportedly learned that would have put them on notice that their statements were false or misleading.  See Dynex, 531 F.3d at 196 ("'[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.'" (emphasis added) (quoting Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000))); In re Bos. Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 57 (D. Mass. 1998) ("[P]laintiff must allege details of [defendants'] alleged fraudulent involvement, including specifics as to what defendants had knowledge of and when.  To satisfy this requirement, complaints typically identify internal reports, memoranda, or the like, and allege both the contents of those documents and defendants' possession of them at the relevant time." (second alteration in original) (footnote, citation, and internal quotation marks omitted)).

Plaintiffs' vague allegations of "customer problems" reflected in the Sales Pipeline Reports (Compl. ¶ 65) and "service issues" discussed at meetings (id. ¶ 88) do not state the specific contents of those reports and meetings.  See Bos. Tech, 8 F. Supp. 2d at 57.  Nor do they specify when Defendants would have learned of information contradicting their public statements, thus rendering it impossible to determine whether the Individual Defendants even possessed contradictory facts at the various times they spoke.  See ACA Fin., 512 F.3d at 62-63 (plaintiffs must "include[] details about . . . whether this information was known to defendants at the relevant time") (emphasis added)).  Plaintiffs therefore have not pled the "details of defendants' alleged fraudulent involvement."  Bos. Tech., 8 F. Supp. 2d at 57 (brackets omitted). Plaintiffs' conclusory allegations, moreover, do not explain how "problems" or "service issues" with certain customers are inconsistent with Mr. Ryan's generalized and subjective statements that CVS Caremark, on the whole, had "excellent" or "outstanding" customer service.

**B.      Plaintiffs' Allegations Based on Confidential Witness Statements Do Not Support a Strong Inference of Scienter**

None of Plaintiffs' anonymous witnesses supports an assertion that the particular oral statements made by Messrs. Ryan and Rickard were made with an intent to defraud.  Plaintiffs do not allege that any confidential witness has <u>ever</u> met any of the Individual Defendants. Moreover, only one confidential witness offers specific dates on which a report was issued or a meeting took place (Compl. ¶ 85), and this date falls <u>outside</u> the alleged class period.  The other confidential witnesses fail to offer any details about <u>when</u> information allegedly became known. <u>See</u> <u>N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.</u>, 537 F.3d 35, 52-53 (1st Cir. 2008) (dismissing information from confidential witnesses where several of the witnesses did not allege when certain facts became known).  Moreover, six of Plaintiffs' thirteen confidential witnesses—CW1, CW2, CW8, CW11, CW12, and CW13—did not even work for CVS Caremark during the alleged class period.  (<u>See</u> Compl. ¶ 33.)  A seventh—CW5—is alleged to have been employed at the Company during only the first month of the alleged class period (November 2008).  (<u>Id.</u>)  As both a practical matter and as a matter of law, none of these confidential witnesses could provide information, based on personal knowledge, that is probative of Defendants' state of mind at the time of any of the allegedly false or misleading statements. <u>See</u> <u>Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.</u>, 394 F.3d 126, 154 (3d Cir. 2004); <u>In re Rackable Sys., Inc. Sec. Litig.</u>, No. C 09-0222, 2010 WL 199703, at *8 (N.D. Cal. Jan. 13, 2010) (finding it unlikely that four of the confidential witnesses had personal knowledge of defendants' relevant state of mind, because none was employed at the company during the class period); <u>Malin v. XL Capital Ltd.</u>, 499 F. Supp. 2d 117, 141 (D. Conn. 2007) (information from confidential witnesses, "although substantial in amount," is inadequate to support inference of scienter where "the bulk of the information relayed by the [confidential witness] relates to the time prior to the

21

start of the Class Period"), aff'd, 312 F. App'x 400 (2d Cir. 2009).

Even those confidential witnesses alleged to be employed by the Company during the alleged class period do not claim that any Individual Defendant was aware of any of the anecdotal service problems the confidential witnesses purport to describe.  For example, CW7, an Audit Department Team Leader from 1994 to March 2009, purports to offer information about a computer system called "Reflections," yet fails to link anything produced through Reflections with the knowledge of any Defendant.  (Compl. ¶¶ 33, 78.)  Likewise, CW 6, a former Client Liaison Coordinator from 2005 through February 2009, claims that "service levels were low" but says nothing about whether, and if so how, Defendants were made aware of this. (Id. ¶¶ 33, 77.)  And CW9, a former customer call-center employee from 2005 through August 2009, contends that during "busy season (January through March each year) groups of as many as '40,000' plan participants would go 'months' without getting their appropriate medication." (Id. ¶¶ 33, 91.)  But CW9 does not claim that the problems he or she purports to describe occurred during the alleged class period.  Further, CW9 does not allege that the Individual Defendants, or anyone whose knowledge could be imputed to the Company, ever learned of these problems.  Nor would they have:  In 2009, CVS Caremark served a total of 53 million plan members across its thousands of PBM clients.  (Ex. 5, CVS Caremark 2009 Annual Report, at 6.)

Such defects render ineffective the allegations purportedly supported by confidential witness statements.  See Chubb Corp., 394 F.3d at 155 (the "sheer volume of confidential sources cited cannot compensate for" the lack of factual particularity).

### C.  Plaintiffs' Allegations Regarding Insider Stock Sales Fail to Give Rise to a Strong Inference of Scienter

Plaintiffs cannot create a strong inference of scienter simply by alleging insider trading. Indeed, under First Circuit law, allegations of insider trading cannot, in and of themselves,

suffice to plead scienter.  Miss. Pub. Emps. Ret. Sys. v. Bos. Scientific Corp., 523 F.3d 75, 92

(1st Cir. 2008); Greebel, 194 F.3d at 197.  Rather, to raise a strong inference of scienter,

Plaintiffs must allege insider trading "in combination with other evidence."  Bos. Scientific, 523

F.3d 92.  Plaintiffs attempt to do so by claiming that Defendants' trades were unusual and

made in either suspicious amounts or at suspicious times.  But these allegations fall short.

To begin, nothing about the amounts of the trades is unusual.  Although Plaintiffs focus

on the dollar value of Mr. Ryan's sale, the fact remains that Mr. Ryan sold only 5.4% of his total

holdings[18]—an amount that, as a matter of law, does not support a strong inference of scienter.

See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751,

760-62 (1st Cir. 2011) (alleged stock sales did not "offer the requisite support for a strong

inference of scienter" where one defendant had sold only 4.82% of his holdings in the class

period and the other had sold approximately 29% of his holdings during the class period).

Likewise, Mr. Rickard's sales constituted only 22% of his holdings (with only 17% sold during

the alleged class period).  See id.; see also In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp.

2d 261, 270-71 (S.D.N.Y. 2009) (finding that low-percentage stock sales of 22.5% and 4.9%

"militate against an inference of scienter").  And allegations pertaining to Mr. McLure's trading

are wholly irrelevant because Plaintiffs have not alleged that Mr. McLure made a single false or

misleading statement.[19]  N.J. Carpenters, 537 F.3d at 56 (finding allegations of insider trading

---

[18] Plaintiffs allege that Mr. Ryan sold "22% of his shares personally held during the Class Period, and over 7 percent of his total holdings, including vested options."  (Compl. ¶ 109.)  However, the Company's 2009 Definitive Proxy Statement, filed March 24, 2009 on SEC Schedule 14A, reflects that Mr. Ryan owned 7,398,279 shares. The 400,000 shares that Mr. Ryan sold on August 7, 2009 constitute 5.4% of that total ownership.  (See Ex. 6, CVS Caremark 2009 Definitive Proxy Statement, at 12.)  In addition, the First Circuit has unambiguously held that the proper way to calculate the percentage of a defendant's holdings sold is to include available stock options.  Waters Corp., 632 F.3d at 760-61.

[19] Even if the group pleading doctrine survives in the First Circuit, only "group-published documents such as SEC filings" fall under its scope.  See Rosen v. Textron, Inc., 321 F. Supp. 2d 308, 328 n.14 (D.R.I. 2004).  None (…continued)

insufficient to establish scienter where the insider "made none of the statements alleged to be misleading, and there is no specific allegation that [he] was any more knowledgeable than any of the other individual defendants"); City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 699 F. Supp. 2d 331, 345 (D. Mass. 2010) (disregarding allegations with respect to seven alleged insiders accused of selling stock because none were responsible for making any alleged misstatements to investors), aff'd, 632 F.3d 751.

Nor is the timing of any of the trades unusual.  Plaintiffs fail to plead that Mr. Ryan's sales were inconsistent with his prior trading history, let alone "well beyond [his] normal patterns of trading."  Greebel, 194 F.3d at 198; see also id. at 198 n.11 (requiring that plaintiffs allege this information as it is "readily available" to them through public filings).  Plaintiffs also fail to plead that Mr. Rickard's trades were suspiciously timed.  Mr. Rickard announced in February 2009 that he would be retiring from CVS Caremark at the end of the year.  (See Ex. 7, Final Transcript: Q4 2008 Earnings Call, at 6.)  Under well-established law, this fact negates Plaintiffs' allegation that the timing of his stock sales were suspicious.  "It is not unusual for individuals leaving a company . . . to sell shares," because "they often have a limited period of time to exercise their company stock options."  Greebel, 194 F.3d at 206; Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1116-17 (N.D. Cal. 2003) (trading not suspicious where defendant sold 37% of his holdings, including sales outside of the class period, in connection with planned retirement).  That Mr. Rickard's trades during the alleged class period were made in accordance with a 10b5-1 trading plan (Compl. ¶ 205) further rebuts allegations of suspicious timing.  Mr. Rickard's 10b5-1 trading plan, entered into on March 19, 2009,

---

(continued…)

of the oral statements at issue here is "group-published," and therefore none can be attributed to the other Defendants.  See In re Cabletron Sys., Inc., 311 F.3d 11, 41 n.16 (1st Cir. 2002).

contemplated two trades:  the exercise of 251,250 stock options on August 17, 2009, followed by the exercise of 80,000 stock options on December 14, 2009.  (Ex. 8, Rickard 10b5-1 Trading Plan, at 2.)  As the plan lays out, these options were "[s]ubject to [t]rading [w]indows," and the first possible trade date under the Plan was August 17, 2009.  (Id. at 1.)  What is more, the second trade took place after Plaintiffs' alleged November 5 disclosure date and therefore after the alleged class period.  It defies common sense that Mr. Rickard would have waited until after the alleged fraud was disclosed to sell Company shares.

Mr. McLure likewise traded through a 10b5-1 trading plan, which was entered into on June 19, 2009 and set up the exercise of 600,000 stock options in increments of 100,000 per month to be exercised on the first available trading day of each month.  (Ex. 9, McLure 10b5-1 Trading Plan, at Exhibit B.)  The fact of a 10b5-1 plan alone "rebuts an inference of scienter and supports the reasonable inference that stock sales were pre-scheduled and not suspicious."[20] Stiegele ex. rel. Viisage Tech., Inc. v. Bailey, No. 05-10677-MLW, 2007 WL 4197496, at *13 (D. Mass. Aug. 23, 2007).

## III.   PLAINTIFFS DO NOT STATE A CLAIM FOR CONTROL PERSON LIABILITY

Because Plaintiffs have failed to allege a primary violation of Section 10(b) and Rule 10b-5, they cannot recover from the Individual Defendants under Section 20(a) of the Exchange Act.  See, e.g., Greebel v. FTP Software, Inc., 194 F.3d 185, 207 (1st Cir. 1999).

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Complaint be dismissed for failure to state a claim.

---

[20] Contrary to Plaintiffs' conclusory assertions, the fact that Mr. Rickard and Mr. McLure entered into these trading plans during the alleged class period is not, in and of itself, suspicious.  In re Int'l Rectifier Corp. Sec. Litig., No. CV 07-02544-JFW (VBKx), 2008 WL 4555794, at *19 (C.D. Cal. May 23, 2008).

25

Dated:   Providence, Rhode Island
         July 25, 2013

By:  /s/ William R. Grimm
     William R. Grimm #1938
     HINCKLEY, ALLEN & SNYDER LLP
     50 Kennedy Plaza, Suite 1500
     Providence, Rhode Island  02903
     Telephone:    (401) 274-2000
     Facsimile:    (401) 277-9600


     DAVIS POLK & WARDWELL LLP
     Lawrence Portnoy *(pro hac vice)*
     Edmund Polubinski III *(pro hac vice)*
     450 Lexington Avenue
     New York, New York  10017
     Telephone:    (212) 450-4000
     Facsimile:    (212) 701-5800
     Email.  Lawrence.Portnoy@davispolk.com
             Edmund.Polubinski@davispolk.com

     *Attorneys for Defendants*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 25, 2013, a copy of the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

 /s/ William R. Grimm      
William R. Grimm #1938
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI  02903
401-274-2000
401-277-9600 (fax)
wgrimm@haslaw.com

27