## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RICHARD MEDOFF, Individually and On Behalf Of All Others Similarly Situated, | ) ) ) | No. 1 :09-cv-00554 |
| Plaintiff, | ) ) | **CLASS ACTION** |
| v. | ) ) ) | |
| CVS CAREMARK CORPORATION, et al. | ) ) | |
| Defendants. | ) ) ) | |

## SUPPLEMENTAL BRIEFING IN FURTHER OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOLLOWING THE RULING OF THE FIRST CIRCUIT COURT OF APPEALS

ORR & RENO
WILLIAM L. CHAPMAN
JEFFREY C. SPEAR
One Eagle Square, P.O. Box 3550
Concord, NH  03302-3550
Telephone: 603/224-2381
603/223-9007 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT ROTHMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

BARRY J. KUSINITZ
155 South Main Street, Suite 405
Providence, RI 02903
Telephone: 401/831-4200
401/831-7053 (fax)
bkusinitz@bdglawyers.com

LABATON SUCHAROW LLP
JOSEPH A. FONTI
SERENA HALLOWELL
140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................................1

II.     PROCEDURAL HISTORY.............................................................................3

III.    STATEMENT OF FACTS ..............................................................................4

IV.     ARGUMENT ...................................................................................................9

        A.      Standard On A Motion to Dismiss............................................................9

        B.      The Complaint Adequately Alleges A Causal Connection Between
                Defendants' Misrepresentations and Shareholders' Losses.....................9

        C.      Defendants Made Actionable Misstatements Of Material Fact...........10

        D.      Under *Matrixx*, Defendants Withheld Material Information ................12

        E.      Defendants' Failed to Disclose Material Information ...........................13

V.      The Complaint's Detailed Allegations Raise A Strong Inference Of
        Scienter ........................................................................................................15

        A.      Legal Standard .......................................................................................15

        B.      Defendants Knew Or Recklessly Ignored That Widespread Service
                Issues Were Compromising Billions Of Dollars Of PBM Contracts .................15

                1.      Ryan Admitted Actual Contemporaneous Knowledge  That
                        Coventry Was At Risk Because Of Service Issues...................16

                2.      Defendants Received Reports Concerning Risk To The
                        PBM Contracts.........................................................................17

                3.      Defendants Attended Sales Meetings At Which Service
                        Related Problems Were Discussed ...........................................19

                4.      The Financial Impact Of The Service Problems And Their
                        Pervasiveness Support A Strong Inference Of Scienter ............20

        C.      Defendants' Insider Trading Creates A Strong Inference of
                Scienter ...................................................................................................21

        D.      Defendants' Announcement Of A Settlement With The SEC
                Stemming From The Same Facts At The Core Of This Complaint
                Further Supports Scienter .......................................................................24

CONCLUSION.......................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)................................................................16

*In re Allaire Corp. Sec. Litig.*,
224 F. Supp. 2d 319 (D. Mass. 2002)..........................................11, 12

*In re Arthrocare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010).............................................23

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..........................................................................13

*Bell Atl. v. Twombly*,
550 U.S. 544 (2007)..........................................................................11

*In re Biogen Idec Sec. Litig.*,
2007 US Dist. LEXIS 98076 (D. Mass. Oct. 25, 2007)....................23

*In re Bristol-Myers Squibb Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008)........................................16, 25

*Brumbaugh v. Wave Systems*,
416 F. Supp. 2d 239 (D. Mass. 2006) ...........................................2, 10

*In re Cabletron*, *Sys. Inc.*,
311 F3d 11 (1st Cir. 2002)....................................................... passim

*Constar Int'l Inc. Sec. Litig.*,
585 F.3d 774 (3d Cir. 2009).............................................................13

*Cornwell v. Credit Suisse Group*,
No. 08 Civ. 3758 (VM), slip op. (S.D.N.Y. Feb. 11, 2010) .............19

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) .............................................25

*Freudenberg v. E*Trade. Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)..............................................24

*Gent v. CUNA Mut. Ins. Society*,
611 F.3d 79 (1st Cir. 2010)................................................................2

*George v. China Automotive,*
   2012 U.S. Dist. LEXIS 111730 (S.D.N.Y. Aug. 8, 2012) ..................................................23

*Goldman v. Belden,*
   754 F.2d 1059 (2d Cir. 1985)............................................................................................23

*Hill v. Gozani,*
   638 F.3d 40, *reh'g denied*, 651 F3d 151 (2011) ("*Anima*") .........................................9, 14, 15

*Hill v. State Street,*
   2011 WL 3420439 (D. Mass. Aug. 3, 2011) .........................................................13

*In re Int'l Rectifier Corp. Sec. Litig.,*
   2008 U.S. Dist. LEXIS 44872 (C.D. Cal. May 23, 2008) ....................................................24

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
   513 F.3d 702 (7th Cir. 2008) ..........................................................................................20

*Massachusetts Retirement Sys v. CVS Caremark Corp.*
   ("*CVS*"), 716 F.3d 229 (1st Cir. 2013)............................................................................. passim

*Matrixx Initiatives, Inc. v. Siracusano,*
   131 S. Ct. 1309 (2011)...........................................................................................12, 13, 15

*Miss. Pub. Emps. Ret. Sys. v. Boston Scientific Corp.,*
   523 F.3d 75 (1st Cir. 2008)............................................................................................ passim

*In re Nash Finch Co. Secs. Litig.,*
   502 F. Supp. 2d 861 (D. Minn. 2007)................................................................................11

*New Jersey Carpenters Pension v. Biogen IDEC Inc.,*
   537 F.3d 35 (1st Cir. 2008)...........................................................................................17

*Novak v. Kasaks,*
   216 F.3d 300 (2d Cir. 2000)...............................................................................16, 17, 18

*Rosen v. Textron,*
   321 F. Supp. 2d 308 (D.R.I. 2004)................................................................................10, 12

*Rothman v. Gregor,*
   220 F.3d 81 (2d Cir. 2000).............................................................................................19

*In re Scholastic Corp. Sec. Litig.,*
   252 F.3d 63 (2d Cir. 2001).......................................................................................13, 14, 21

*Scritchfield v. Paolo,*
   274 F. Supp. 2d 163 (D.R.I. 2003)......................................................................................10

*Silverstrand Investments v. AMAG Pharma., Inc.*,
    707 F.3d 95 (1st Cir. 2013) ................................................................14

*Simon v. American Power Conversion Corp.*,
    945 F. Supp. 416 (D.R.I. 1996) ..........................................................12

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
    604 F. Supp. 2d 332 (D. Mass. 2009) ................................................10

*South Ferry v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ..............................................................20

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ............................................................11

*Stevelman v. Alies Research Inc.*,
    174 F.3d 79 (2d Cir. 1999) ..................................................................22

*Stiegele ex. rel. Viisage Tech. v. Bailey*,
    No. 05-10677-MLW, 2007 U.S. Dist. LEXIS 86469 (D. Mass. Aug. 23, 2007) ...................23

*Teamsters Local 445 v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ................................................................17

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................15

*In re VeriFone, Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ..............................................................21

## STATUTES

15 U.S.C. § 78u-4 ................................................................................20

Securities Act of 1933, 15 U.S.C. § 77a et seq. ..................................2

Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. ..................2

## OTHER AUTHORITIES

17 C.F.R. §229.303(a)(3)(ii) ...............................................................14

Fed. R. Civ. P. 12(b)(6) ........................................................................4

I.       **PRELIMINARY STATEMENT**

This case arises from Defendants' fraudulent misstatements and omissions concerning the significant integration and service problems that resulted from the multi-billion dollar merger between CVS Corp. ("CVS") and Caremark RX Inc. ("Caremark") (together, "CVS Caremark" or the "Company").  When these material adverse facts were revealed to investors, the Company's stock price plummeted 20%.  ¶¶1-2.[1]

Indeed, throughout the Class Period, Defendants told the Company's shareholders that business for the merged prescription benefits manager ("PBM") would be won or lost on its service – *i.e.*, delivering the right drug at the right place at the right time, and adhering to contract terms with plan sponsors.  Rather than disclose the truth, Defendants repeatedly misled investors by continually touting that the Company fully and successfully integrated the two entities, and that customers were pleased with the resulting "excellent service."  In reality, the Company faced significant integration failures, which prevented it from being able to adequately service its PBM plan participants, who often were left waiting for benefits for months, provided the wrong drug at the wrong price, or denied benefits altogether.  These merger-related service and integration problems had severe repercussions, causing several large customers to terminate their contracts worth billions of dollars.  Tellingly, shortly before investors learned the truth, the Individual Defendants capitalized on their knowledge of these material, non-public facts, selling over $40 million of their CVS Caremark stock at artificially inflated prices.

Defendants would have this Court believe that the allegations are much ado about nothing.  This contention is belied by their recent settlement with the Securities Exchange

---

[1]  "¶__" references are to the Corrected Consolidated Class Action Complaint ("Complaint") (ECF No. 33). Capitalized terms not defined herein have the meaning defined in the Complaint.  Emphasis is added unless otherwise noted, and internal citations and quotations are omitted.

Commission ("SEC"), announced August 2, 2013, resulting in a $20 million settlement of the SEC's claims, including those arising from the same course of conduct here.[2]   To put the SEC settlement into perspective, it is **20 times higher than the median SEC settlement**.[3]

Further, Defendants' arguments are undermined by the market's stunned reaction to the disclosure of the truth, including the Company's 20% share price decline on heavy trading volume, and the response of securities analysts who not only questioned Defendants' handling of the merger, but specifically spotlighted their credibility in light of their previously positive statements about the so-called successful integration of the PBM business.   And Defendants' suggestion that Plaintiffs' claims are without merit is severely undercut by the First Circuit's recent decision, sustaining the Complaint's well-pled allegations with respect to loss causation. *See Massachusetts Retirement Sys v. CVS Caremark Corp.* ("*CVS*"), 716 F.3d 229, 242 (1st Cir. 2013) (finding that Plaintiffs adequately pled that the Company's 20% share price decline was "causally related to [Defendants'] misstatements regarding the integration of CVS and Caremark").

As detailed herein, the Complaint alleges an actionable securities fraud claim.

---

[2] *See* CVS Caremark Press Release, August 2, 2013 ("CVS Press Release"), Ex. 1, CVS Caremark 8-K, filed August 2, 2013; 2011 10-K, filed February 17, 2012 ("2011 10-K").  This Court may take judicial notice of publicly filed facts detailed in this brief that are not "not subject to reasonable dispute." *Gent v. CUNA Mut. Ins. Society*, 611 F.3d 79, 84, n.5 (1st Cir. 2010) (*citing* Fed. R. Evid. 201(b)); *Brumbaugh v. Wave Systems Corp.*, 416 F.Supp.2d 239, 251 n.12 (D. Mass. 2006) (considering Company statements in SEC filings on motion to dismiss).

On August 2, 2012, the Company announced a $20 million settlement with the SEC relating to an "investigation by the SEC of certain events that occurred in 2009."  The settlement resolved alleged violations of the Securities Act of 1933 and the Securities Exchange Act of 1934.  The investigation "focused on events that occurred in the third and fourth quarters of 2009, including *certain public disclosures made by the Company, transactions in the Company's securities by certain current and former employees*."  CVS Press Release.  The settlement followed SEC subpoenas issued to the Company "relating to public *disclosures made by the Company in 2009 concerning its PBM* and Medicare Part D businesses and *information concerning ownership and transactions in the Company's securities by certain officers of the Company.*"  2011 10-K, pg. 29.  Later, the SEC again sought "information concerning *securities transactions by certain employees of the Company and public disclosures made by the Company during 2009.*"  *Id.*

[3] NERA Economic Consulting, SEC Settlement Trends: 2H12 Update, January 14, 2013.

Accordingly, Defendants' motion to dismiss should be denied in its entirety.

## II.    PROCEDURAL HISTORY

By Order entered June 18, 2012 (the "Order"), this Court dismissed the Complaint after

reaching the dispositive conclusion that loss causation had not been adequately pled.  ECF No.

50.  Lead Plaintiffs appealed the Order to the First Circuit Court of Appeals.

On May 24, 2013, the First Circuit issued an Opinion and Order ("Opinion") holding that

the Complaint's "allegations indicate that the drop in CVS Caremark's share price was causally

related to its misstatements regarding the integration of CVS and Caremark, and these allegations

are sufficiently plausible to foreclose dismissal."  *CVS*, 716 F.3d at 242.  The First Circuit then

remanded the case for the Court to consider in the first instance whether Lead Plaintiffs allege an

actionable misstatement or omission and whether Lead Plaintiffs adequately pled scienter, issues

that were "briefed before the district court but not on appeal."  *Id*. at 244.  Although the Opinion

did not definitively hold that the Complaint adequately pled an actionable misstatement or

omission, the First Circuit provided analysis that clearly supports such a determination:

- "Ryan later told analysts that a worrisome repricing of contracts was unrelated to concerns about … service, and he reiterated that CVS's systems were working with Caremark's.  **Several facets of the November 5 call, however, revealed that Ryan's previous statements were misrepresentations**."  *Id.* at 239.

- "[I]t is reasonable to infer that the market understood Ryan's statement about 'service issues' with Coventry to imply problems with integration, which **would have corrected Ryan's previous statements that the integration had proceeded smoothly**."  *Id.* at 240-241.

- "[A]llegations indicate that the **drop in CVS Caremark's share price was causally related to its misstatements regarding the integration of CVS and Caremark**, and these allegations … foreclose dismissal."  *Id.* at 242.

Following remand, Defendants sought leave to submit "supplemental briefing" in further

support of their motion to dismiss.  Defendants claimed that the additional briefing would

alleviate the Court's need to "pick through the old briefs" for relevant arguments and would

allow the parties to "account for intervening developments in the law." ECF. No. 59. Instead, Defendants inappropriately have used this briefing to revise their theories of the case, and to make meritless arguments they chose not to make before. They do not cite a single new case (other than the Opinion). Regardless, one thing remains the same. Their new arguments still fail to satisfy their heavy burden associated with a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

## III.    STATEMENT OF FACTS

### Pre-Class Period

In November 2006, CVS and Caremark announced that they would merge. ¶50. By merging, they intended to provide low cost services that only a combined retail pharmacy and PBM could offer. CVS CEO Thomas M. Ryan ("Ryan") recognized that the Company's success would depend on its ability to deliver quality service. *See, e.g.*, ¶54 ("it's all about … ***service … we can out-service** and out-sell **our competition here**); ¶55 ("[T]he two things that **[plan sponsors are]** most concerned about*, one is that there's no ***degradation of service*** … And they want to get calmed down that … we're still going to focus on ***execution and service***").

The predicate to providing effective service was the complete integration of the two companies' systems and technologies. ¶¶54, 56-57. A failed integration could cause service-related mistakes in the pricing and delivery of drugs. One analyst expressed "serious concerns" about the "heightened integration risk." ¶57. In response to these types of concerns, Ryan expressed confidence about the prospects for integration: "***I don't mean to diminish any integration because there's always risk, but it's relatively straight-forward***." ¶58.

CVS and Caremark merged in March 2007, creating CVS Caremark. Soon after, on November 1, 2007 Ryan declared "we are operating as one company" and that he was "***pleased that [CVS Caremark] completed the integration of both the organization and our back end systems quickly and successfully***." ¶¶4, 71. To further reassure customers and investors, on a

May 1, 2008 earnings call, Ryan claimed that the Company's "clients are telling us that we've kept our focus on **service, which was their primary concern following our merger**." ¶71.

**Class Period Misrepresentations And Omissions About Service And Integration**

On October 30, 2008, the first day of the Class Period, Ryan told analysts, "our PBM continues to retain existing clients and attract new ones. We will continue to gain share because ... **[w]e have excellent service**." ¶112. Ryan acknowledged that CVS Caremark had lost some major clients, but he said that new business would roughly offset the losses. *Id.*

In January 2009, Ryan stated on an earnings call that the Company secured many of its "2009 wins" because it "repriced a significant amount of business," including "over half of our PBM business," to take "key accounts ... off the table and reprice early for all the reasons that you can imagine." ¶118. Reacting to this news, an analyst asked Ryan, "**Is there a concern about the service** for the systems and how can you get people past that also for 2010?" ¶119. Ryan denied that service problems caused the repricing, stating that there was no "hidden agenda here about giving a lower price because of lack of service." ¶120. Another analyst asked Ryan whether CVS Caremark's systems "are able to talk to each other," to which Ryan responded "**All the systems are able to talk to each other .... We have got no issue with our systems**." ¶121.

Defendants' misleading assurances that the merger integration was a success and that customers were pleased with service continued throughout 2009. For instance:

- <u>February 27, 2009</u>—CVS Caremark's 2008 Form 10-K stated: "We believe the breadth of capabilities resulting from the Caremark Merger are resonating with our clients and contributed to our success at renewing existing clients and obtaining a significant number of new clients in the 2008 selling season." ¶133.

- <u>March 10, 2009 Investor Conference</u>—Rickard stated "we have done the things strategically that needed to be done to make this merger successful." ¶137.

- <u>May 5, 2009 Earnings Call</u>—An analyst asked Ryan "where does it stand where you can win [new business] on service or the new model, as opposed to price?" ¶143. Ryan replied: the "real tenor and tone of the discussion [with prospective

customers] is around the services that one can provide[.]"  ¶144.  Ryan then misleadingly informed investors that the loss of the $1 billion Coventry commercial contract was "not unexpected," failing to correct Rickard's' July 2008 statement that falsely attributed the loss of the Coventry Medicare Part D ("Med-D") to price, instead of the real reason: service issues.  ¶¶74-75.

- <u>August 4, 2009 Earnings Call</u>—Ryan reiterated his "great confidence" in CVS Caremark's PBM business: "The fact that [] clients … love our integrated proactive pharmacy care offerings, gives me great confidence going forward." ¶159.

- <u>September 11, 2009 Thomas Weisel Partners Healthcare Conference</u>: Rickard attributed the $10 billion of gross new business for the past two years to the "products and services that we now can deliver."  ¶172.

**Defendants Had Knowledge Of Serious Service And Integration Problems Affecting CVS Caremark's PBM Business That Contradicted Their Public Statements**

Defendants' false statements that CVS Caremark's PBM had "excellent service" and "high customer satisfaction," and that the merged Company was integrated such that "[a]ll the systems are able to talk to each other" (¶¶71, 112, 121, 159), were contradicted by facts known to Defendants concerning post-merger service and integration failures.  These problems contributed to the loss of several major clients, including $3 billion in annual revenue from Coventry, Horizon Blue Cross Blue Shield of New Jersey ("New Jersey"), and Chrysler.  ¶72.

<u>Coventry</u>:  Contrary to Rickard's public claims in 2008, that the loss of Coventry's Med-D business was "due in large part to price," Ryan later admitted that it was a "service issue" and that Defendants knew when they lost the Med-D business they would lose the commercial business as well.  ¶¶74-76, 197.  In other words, Defendants knew they were going to lose the $1 billion commercial contract due to service issues no later than July 2008.

Corroborating Ryan's admission, a former CVS Caremark Client Liaison Coordinator and a point-of-contact for Coventry ("Coventry Client Liaison"), detailed  problems with the integration.  ¶77.  For example, participants complained they were told that they would receive a prescription drug at a certain price, but they would be given a more expensive substitute without

their consent.  *Id*.  By as early as June 10, 2008, the Company knew from internal Sales Pipeline Reports ("Reports") that Coventry was at the highest risk for termination.  ¶¶79-82.

New Jersey:  Similarly, the State of New Jersey employees' contract, worth approximately $1.3 billion annually, was beset by significant customer service problems.  ¶¶84-92.  Due to the failed integration post-Merger, the Company had "no information on their formularies, [and] no information on their drug costs," resulting in the denial of participant benefits.  ¶¶86, 89-92.  Reports showed approximately 11,000 error records that indicated that plan participants were being improperly rejected by the Company's computer system.  ¶¶87-88.  By May 2008, Defendants learned through the Reports that the New Jersey contract was at a high risk for termination as a result of client dissatisfaction with service.  ¶¶85, 86.  Although the New Jersey contract was officially terminated in August 2009, Defendants did not publicly report the loss until November 5, 2009, denying that the loss was due to service issues.  ¶¶76, 90.

Chrysler:  After the merger, CVS Caremark employees had to resort to manual data entry to get the participants' correct information into its systems, and service failures relating to the merger led to contentious meetings between the two companies.  ¶93.  Defendants knew by mid-2008, but did not disclose, that the Chrysler contract was at high risk for loss due to service issues.  ¶¶93-94.  When in August 2009 Defendants disclosed that the contract had been lost, they concealed that it had been lost because of service issues.  ¶¶163-65.

Defendants were personally kept apprised of these severe merger integration and service problems through the detailed weekly Reports and frequent meetings and conferences addressing the integration failure and the impact thereof.  ¶¶65-70.

**The Individual Defendants Capitalized On Non-Public Knowledge Through Stock Sales**

Instead of disclosing to shareholders the truth about the PBM business post-merger, the Individual Defendants capitalized on their insider information.  Within days of CVS Caremark's

August 4, 2009 conference call, during which Ryan made positive statements regarding the Company's financial health, the Individual Defendants began selling significant portions of their Company holdings.  ¶106.  These sales lasted until November 2, 2009, just days before Ryan disclosed service problems with the PBM business, which caused a significant stock price drop. ¶107.  All told, between August 7, 2009 and November 2, 2009, the Individual Defendants sold more than 1 million shares of Company stock for over $40 million.  ¶¶9, 107, 109, 204.

Just days after filing their motion asking this Court to dismiss this case on the basis that the statements at issue were not material and there was no suspicious insider trading, the Company issued a press release confirming that the Company had reached a $20 million settlement with the SEC stemming from an investigation into alleged violations of the Exchange Act that occurred in 2009, including "public disclosures" during the Class Period, and "*transactions in the Company's securities by certain current and former employees*."  *See supra* n.2.

**CVS Caremark Discloses The Truth**

On November 5, 2009, during the Company's earnings call with analysts, investors learned for the first time the true condition of the post-merger PBM business.  ¶179.  Ryan announced that McLure, President of Caremark Pharmacy Services and a "chief architect of [the] integrated model," was suddenly "retir[ing]" from the Company—absent a successor.  ¶¶10, 190. Ryan also revealed that CVS Caremark had experienced "some big client losses" totaling $4.5 billion, including the loss of the New Jersey, Coventry, and Chrysler contracts.  ¶183.  Ryan further admitted the Coventry contract loss was in part due to "service issues."  ¶¶181, 183-84.

Later in the call, a market analyst asked Ryan, "what's gone wrong in the last year or two."  Nov. 5, 2009 CVS Earnings Call, Def. Br. Ex. 4.  In response, Ryan acknowledged "some big losses," attributing them to "varying reasons[:] some price, one service … none of them

because of the model." *Id.*  Analysts participating on the call were shocked.  For instance, one

analyst asked: "you look at the PBM numbers and it gives everyone heart palpitations ... why are

people shying away from Caremark's PBM?"  ¶184.  Ryan responded that the Company must

improve its "[e]xecution and performance," while noting, for the first time, that the Coventry

contract was lost due to "service issues" and not on price as previously disclosed.  *Id*.  In

response to these disclosures regarding the loss of PBM business resulting from the Company's

widespread service problems, CVS Caremark's stock price plummeted by over 20%.  ¶195.

 Despite Ryan's attempts to quell the uproar, analysts were not persuaded.  One analyst

reported that CVS Caremark had "stun[ned] with news of additional PBM non-renewals."  ¶191.

Other reports observed that CVS Caremark had "provided undeniable evidence ... that it has

mismanaged the Caremark acquisition and destroyed shareholder value."  ¶¶192-93.  One analyst

considered "the PBM as essentially a free option."  ¶194.

## IV. ARGUMENT

### A. Standard On A Motion to Dismiss

 At the pleading stage, the Court must accept all well-pled facts as true and draw all

reasonable inferences in favor of the plaintiff.  *See Miss. Pub. Emps. Ret. Sys. v. Boston*

*Scientific Corp.*, 523 F.3d 75, 85 (1st Cir. 2008).  Indeed, to survive a motion to dismiss, a

complaint need only allege facts sufficient to demonstrate "a plausible entitlement to relief."

*Hill v. Gozani*, 638 F.3d 40, 55, *reh'g denied*, 651 F3d 151 (2011) ("*Anima*") (*quoting Bell Atl.*

*v. Twombly*, 550 U.S. 544, 559 (2007)).

### B. The Complaint Adequately Alleges A Causal Connection Between Defendants' Misrepresentations and Shareholders' Losses

 The First Circuit concluded that the "allegations indicate that the drop in CVS

Caremark's share price was causally related to its misstatements regarding the integration of

CVS and Caremark." *CVS*, 716 F.3d 242.  Yet, Defendants contend that their statements are not

actionably false and that they had no duty to disclose omitted information.  Def. Br. at 9-11.

Defendants are wrong on both counts.[4]

## C.  Defendants Made Actionable Misstatements Of Material Fact

Defendants' sole challenge to the materiality of the alleged misstatements is that many –

though not all – of these statements are corporate puffery.  Def. Br. 14-16.  Importantly, by

"interposing the puffery defense," Defendants "conced[e] that the offending statements were

technically inaccurate."  *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 172, n.13 (D.R.I. 2003).

Statements may be deemed "puffery" only when they are "'so vague, so general, or so

loosely optimistic that a reasonable investor would find [them] unimportant to the total mix of

information.'"  *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 342 (D.

Mass. 2009) (*quoting Brumbaugh v. Wave Systems*, 416 F. Supp. 2d 239, 250 (D. Mass. 2006)).

In determining whether a statement is "mere puffery or [an] actionable misstatement," the Court

should "look[] not only to the challenged language itself, but also the context in which the

statement was made."  *Textron*, 321 F. Supp. 2d at 320.  "[D]ismissals on this ground are

increasingly rare."  *Brumbaugh*, 416 F. Supp. 2d at 250 at 250, n.11.

Here, Defendants' concrete statements to investors that the integration of CVS with

Caremark was "completed" (*see, e.g.*, ¶71), and that "[a]ll of the systems are able to talk to each

other" (*id.*) are objectively provable and not puffery.  Similarly, statements concerning the

success of the CVS Caremark Merger (¶¶63-64, 112-13, 121-25, 132-33, 135, 150, 159), as well

---

[4] Defendants suggest that none of the statements here are "group-published."  Def. Br. n.19.  They are
incorrect.  Lead Plaintiffs plead that McLure is liable for the misstatements in CVS's 2008 10-K by virtue of the
"group pleading presumption, [under which] 'the plaintiff may impute false, or misleading statements conveyed in
annual reports … or other group-published information to corporate officers.'"  *Rosen v. Textron*, 321 F. Supp. 2d
308, 327 (D.R.I. 2004); *In re Cabletron, Sys. Inc.*, 311 F3d 11, 40 (1st Cir. 2002).

as the PBM's "excellent client retention" and "outstanding customer service" (*see, e.g.*, ¶¶112, 125, 139, 172), taken in context, are not so vague, general, or loosely optimistic that a reasonable investor would consider them unimportant.[5]  *See In re Nash Finch Co. Secs. Litig.*, 502 F. Supp. 2d 861, 880 (D. Minn. 2007) (statements regarding the smooth integration process and the satisfaction/retention of customers were material).

For instance, a reasonable investor would consider statements regarding the success of a company's integration of two businesses as material, especially where, as here, successful integration was the only way the Company could maintain and attract clients and continue to generate the billions of dollars in associated earnings.  *See* ¶57; *see In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 327 (D. Mass. 2002) (concluding that puffery can be found only if a reasonable investor and market as a whole would find the statement unimportant to the total mix of information).  The actionable falsity of these statements is further supported by the First Circuit's view that part of the November 5th call "corrected Ryan's previous statements that the integration had proceeded smoothly."  *CVS*, 716 F.3d at 241.  The First Circuit's holding that Lead Plaintiffs alleged plausible corrective statements supports a finding that Lead Plaintiffs also alleged actionable false statements.  *See id.,* at 242 (the "allegations indicate that the drop in CVS Caremark's share price was causally related to its misstatements regarding the integration of CVS and Caremark, and these allegations are sufficiently plausible to foreclose dismissal.").

A reasonable investor would similarly consider statements touting "excellent service" as

---

[5] As to Ryan's statement that "[a]ll the systems are able to talk to each other," Defendants argue that it was not about integration. Def. Br. 13.  Defendants' interpretation of the meaning of these words is strained.  In context, this statement confirmed what Defendants had continually assured investors and analysts, that despite the market's stated concerns about service and integration (¶¶81, 93, 108), from a client perspective Defendants "have got no issue with [their] systems," had "done the things strategically that needed to be done to make this merger successful" (¶¶4, 71, 137) and had "completed the integration of both the organization and back end systems quickly and successfully." *Id.*  The import of these statements was that the PBM business was thriving and service and integration were not problematic.  This is false.  *E.g.* ¶¶112, 118, 130.  Lead Plaintiffs' allegation of falsity is plausible, and therefore must be accepted by the Court. *Twombly*, 550 U.S. at 555; *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

important where, like here, the Company emphasized that its success was contingent on service. *See, e.g.,* ¶¶2, 54-55, 71 ("clients are telling us that we've kept our focus on service, **which was their primary concern following our merger**."). *See Textron*, 321 F. Supp. 2d at 320 (holding that in determining whether a statement is "mere puffery or [an] actionable misstatement," the court should "look[] not only to the challenged language itself, but also the context in which the statement was made."); *Allaire*, 224 F. Supp. 2d at 335.[6]  In fact, not only did investors rely upon Defendants' statements, but so too did analysts, further undermining Defendants' arguments that they are "puffery."  *See, e.g.,* ¶¶116-17, 123, 129-32, 147, 155-58.[7]

### D.    Under *Matrixx*, Defendants Withheld Material Information

Defendants fail to attack the materiality of the omitted information.  This is no accident. The omissions alleged clearly altered the "total mix" of information made available.  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (*quoting Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

Defendants made false statements concealing pervasive post-merger service and integration issues in the Company and the link between those issues and significant contract losses that the Company suffered.  Far from "members lov[ing] [CVS Caremark's] integrated proactive pharmacy care offerings," ¶159, some of the Company's largest PBM clients were

---

[6] Citing to *Simon v. American Power Conversion Corp.*, 945 F. Supp. 416, 428 (D.R.I. 1996), Defendants argue that courts have upheld the puffery defense when evaluating statements analogous to the ones at issue here. *See* Def. Br. 14-15.  Defendants' argument is flawed for all of the reasons articulated in the MTD Opp. ECF No. 36, p. 17, n.6.  If anything, *Simon* supports the actionable nature of the misstatements alleged here.

[7] Moreover, at the time these statements were made, Defendants did not have a reasonable basis for their positive assessment of the success of the merger and the PBM business's service offerings, which takes the statements out of the realm of "puffery." *See Allaire*, 224 F. Supp. 2d at 337 (statements actionable where it was alleged that defendants lacked a rational basis for their statements).  Specifically, while Defendants made positive representations about the Company's "resonating" retail-PBM model (*see* ¶¶125, 133, 135) and touted that clients "love our integrated proactive pharmacy care offerings" (¶159), Defendants knew that the purported benefits of the merger were not resonating with existing clients and that customers were, in fact, dissatisfied with the Company's PBM because of severe integration and service issues.  ¶¶76-94, 99-105.  *See infra* Section V (scienter).

fleeing because of post-merger chronic service issues.  ¶¶77-94.  Had this information been

revealed during the Class Period, it would have significantly altered the total mix of information

in the market.  *See Basic*, 485 U.S. at 231, 236.

Indeed, *the very day* that this information *was* revealed, the stock price plummeted 20%,

a drop that the First Circuit concluded was "causally related to [Defendants'] misstatements

regarding the integration of CVS and Caremark."  *CVS*, 716 F. 3d at 242; *Hill v. State Street*,

2011 WL 3420439, at *15 (D. Mass. Aug. 3, 2011) (concluding the "materiality of State Street's

statements" was supported by an analysis of "how the market reacted," including a decline in

share price of 8.44%).  Market commentary also supports materiality.  Upon the announcement

of the merger, analysts voiced "serious concerns" about the "heightened integration risk."  ¶57.

Those concerns came to fruition upon the revelation of the news, leading analysts to express their

stunned disapproval.[8]  *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)

("The sharp criticism from industry analysts … indicates the weight given to information.");

*Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 783 (3d Cir. 2009).[9]

### E.    Defendants' Failed to Disclose Material Information

While materiality alone does not necessitate disclosure, disclosure is required to make

statements "in the light of the circumstances under which they were made, not misleading."

*Matrixx*, 131 S. Ct. at 1321.  In other words, if a party elects to disclose certain material facts, he

---

[8] The November 5, 2011 analyst commentary included the following comments: Gabelli: "Caremark merger clearly is not working" (¶193); Credit Suisse: (titled "Caremark Officially Broken, What Now?"): "CVS provided undeniable evidence today that it has mismanaged the Caremark acquisition and destroyed shareholder value" (*id.*); Deutsche Bank: "We view the PBM as essentially a free option." ¶194.  The First Circuit held in regard to loss causation that these analysts' understanding of Ryan's statements helped inform the statements' actual meaning. *CVS,* 716 F.3d 242-43.  Under this logic, the analysts' reactions also support the conclusion that Defendants made material misrepresentations in the first place.

[9] Aside from market reaction and commentary, the materiality of the omissions is further bolstered by Defendants' own admissions.  *See, e.g.*, ¶¶55, 71 (Ryan: Company "clients are telling us that we've kept our focus on service, **which was their primary concern following our merger**.").

must speak fully and truthfully. *See Anima*, 638 F.3d at 51. The Complaint adequately establishes that Defendants made numerous material misstatements that gave rise to this duty.[10]

Post-merger, Defendants spoke at length about the market's concern about integration and service. *See, e.g.*, ¶¶55, 57, 71. In attempting to assuage the concerns of shareholders and analysts, Defendants affirmatively told the market that their PBM "offerings are resonating" with clients (¶¶74-75, 125); that they had done the things "strategically" that needed to be done "to make this merger successful" (¶137); that they had "completed the integration of both the organization and back end systems quickly and successfully" (¶¶4, 71); and that "[a]ll the systems are able to talk to each other .... We have got no issue with our systems." ¶121. The Company also assured shareholders that its decision to "unilaterally reduce [] prices on over 50 percent of its existing PBM contracts" had nothing to do with service. ¶122.[11]

In electing to make these misleading statements, Defendants hid the true state of the Company: post-merger, the Company faced significant integration and service problems in its PBM business which led to the loss of the Company's largest clients.[12] These statements gave

---

[10] Defendants also violated their duty pursuant to Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), to disclose that the long-term and pervasive service problems arising from the post-merger integration failures could, and did, jeopardize billions in revenue. "Item 303 requires the disclosure of 'any known ... uncertainties that ... the registrant reasonably expects will have a material ... unfavorable impact on net sales[,] revenues[,] or income from continuing operations.'" *Silverstrand Investments v. AMAG Pharma., Inc.*, 707 F.3d 95, 102-103 (1st Cir. 2013); *Scholastic*, 252 F.3d at 76-77 (holding a violation of 303 actionable under 10(b)).

[11] Defendants attack the particularity with which Lead Plaintiffs plead that CVS Caremark re-priced 50% of its contracts because of service. Def. Br. 12. Defendants did not read the Complaint carefully. As alleged, on a January 9, 2009 earnings call ***Ryan admitted***, this repricing impacted "over half of our PBM business," including contracts that were not yet up for renewal. ¶118. This is sufficiently particularized to support the allegations. Given the pervasive service and integration problems that the Company was facing at the same time (¶¶ 60-86), it is certainly plausible that the real reason for this repricing was to retain customers dissatisfied with the Company's inferior service, integration-related issues, and lack of transparency. ¶122. *See CVS*, 716 F.3d at 239 ("***Ryan later told analysts that a worrisome repricing of contracts was unrelated to concerns about CVS Caremark's service***, and he reiterated that CVS's systems were working with Caremark's. Several facets of the November 5 call, however, revealed that ***Ryan's previous statements were misrepresentations***.").

[12] Coventry is a specific example of a substantial contract loss due to service. ¶¶73-83. Defendants claim that there was no "statement at all" about the reason for the loss of the Coventry commercial contract and that silence, absent a duty to disclose, is not actionable. Def. Br. 10-11. Defendants misunderstand the facts. First, although not

*(continued ... )*

rise to Defendants' duty to disclose and are actionable. *See Matrixx*, 131 S. Ct. at 1321; *Anima*, 638 F.3d at 51.

## V.     The Complaint's Detailed Allegations Raise A Strong Inference Of Scienter

### A.     Legal Standard

Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter, either conscious misbehavior or recklessness. *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-24 (2007). The Court must: (i) "accept all factual allegations in the complaint as true"; (ii) consider the allegations "collectively"; and (iii) take into account "plausible, non culpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 322-24, 326. The Court must sustain a complaint where the inference of scienter alleged is "cogent and at least as compelling as any opposing inference," *i.e.*, a tie. *Id.* In *Matrixx*, the Supreme Court reinforced that allegations of a complaint **must** be reviewed holistically, and that the scienter inquiry cannot be limited to any "bright-line rule[s]." 131 S. Ct. at 1313.

### B.     Defendants Knew Or Recklessly Ignored That Widespread Service Issues Were Compromising Billions Of Dollars Of PBM Contracts

A strong inference of Defendants' scienter arises because Lead Plaintiffs allege that Defendants knew, or had access to, contemporaneous information showing that numerous and significant service issues resulting from post-merger systems integration problems were costing

---

*( … continued)*

pled as a Class Period false statement, the Company did tell the market on July 31, 2008 that the Coventry Med-D business was lost *on price*. ¶74. They then admitted, on November 5, 2009, one day after the end of the Class Period, that "when we lost Med D, we knew we were going to lose the commercial business, there were some service issues on that." ¶76. Between those two contradictory statements, Ryan told the market on May 5, 2009 that the commercial business had been lost—but omitted to state why. ¶75. This omission is actionable in light of the contract's significance to the Company (¶¶74, 80, 141, 146), the statements Defendants made regarding it being lost on price, and Ryan's later admission in November of 2009 that he had known since 2008 that the commercial component would be lost because of service issues. *See Matrixx*, 131 S. Ct. at 1321; *Hill,* 638 F.3d 40, 51.

the Company several multi-billion dollar contracts at the time that Defendants made false and misleading statements indicating the contrary.  These are classic allegations of scienter.  *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (finding scienter when defendants "knew facts or had access to information suggesting that their public statements were not accurate ... or [] failed to check information they had a duty to monitor"); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).  As detailed below, Defendants' argument that the allegations fail because Lead Plaintiffs do not plead when or how Defendants knew of the "widespread service problems" is factually incorrect.  Def. Br. 19-21.  *See* ¶¶63-105.  Moreover, given the pervasive and serious nature of the Company's service problems, Defendants almost certainly knew of or at a minimum recklessly ignored these service problems.  *Boston Scientific*, 523 F.3d at 91-92 ("the company's [CFO] ... would presumably have been aware of the status of the company's 'ongoing monitoring'").[13]

### 1.    Ryan Admitted Actual Contemporaneous Knowledge That Coventry Was At Risk Because Of Service Issues

Ryan admitted that he knew that service issues had cost the Company billions in revenue as early as July 2008, when CVS lost the Coventry Med D business.  ¶74.  Ryan also admitted that at that time he knew that ongoing service problems were jeopardizing Coventry's multi-billion dollar commercial business.  ¶76 ("when we lost Med D, *we knew* we were going to lose the commercial business, there were some service issues on that.").  Despite his actual knowledge that billions of dollars of revenue were compromised by post-merger service issues, Ryan made contemporaneous false statements that CVS Caremark's PBM was fully integrated and that service was not a problem for PBM customers.  ¶¶112, 118-21, 133, 143-44, 159.

---

[13] McLure is liable under the theory of scheme liability. *In re Bristol-Myers Squibb Sec. Litig.*, 586 F. Supp. 2d 148, 169-70 (S.D.N.Y. 2008).  *See* ¶222.

Further, Ryan failed to correct a former statement by Rickard that Coventry was lost on price.

¶¶74-75.  Even disregarding the clearly strong inference of conscious fraud that these allegations

support, "securities fraud claims typically have sufficed to state a claim based on recklessness

when they have specifically alleged defendants' knowledge of facts … contradicting their public

statements."  *Novak*, 216 F.3d at 308.

### 2. Defendants Received Reports Concerning Risk To The PBM Contracts

Contemporaneously with their misleading statements, Defendants were provided with

weekly "Sales Pipeline Reports" that specifically identified contracts that were substantially

likely to be lost "***and any obstacles potentially hindering their renewal***."[14]  ¶¶33, 65.  On the

basis of these Reports and other information, Lead Plaintiffs allege that Defendants knew that the

Company was at high risk of losing the $3 billion in revenue generated by the Coventry, New

Jersey, and Chrysler contracts as a result of service issues caused by "problems with the

integration of computer systems following the merger."  *CVS*, 716 F.3d at 234.  Such problems

were indicative of the widespread integration problems that permeated all of CVS Caremark's

PBM business.  Thus, Defendants were provided with information that would have informed

them that their rosy statements about service and integration were misleading or simply false.[15]

"[A]s early as June 10, 2008," the Report "reveal[ed] that … nearly 90 percent of" the

---

[14] Defendants erroneously argue that Lead Plaintiffs fail to plead the contents of the Reports with the requisite specificity.  Def. Br. 12.  For example, in *Dynex*, cited by Defendants, the Second Circuit held that plaintiffs' allegations of "access" to information failed because their "broad reference to raw data lacks even an allegation that these data had been collected into reports that demonstrated" falsity.  *Teamsters Local 445 v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).  The obvious difference here is that Lead Plaintiffs allege specific weekly Reports that list at risk contracts and the reasons why those contracts were at risk.

[15] Defendants argue that Lead Plaintiffs do not plead when or how Defendants learned of the service problems.  Def. Br. 19-20.  To the contrary, the Complaint alleges that, every Monday, Ryan and McLure received Reports that illustrated in detail the PBM clients most at risk for loss.  ¶¶33, 66.  The details provided about timing easily distinguish this case from the authority cited by Defendants, *New Jersey Carpenters Pension v. Biogen IDEC Inc.*, 537 F.3d 35 (1st Cir. 2008), in which former employees did not impart when critical information became known.

"$1.1 billion in annual revenue" attributable to the "Coventry commercial contract … was deemed at risk." ¶80. As discussed, by then, CVS Caremark had already lost Coventry's Med-D business because of service issues relating to integration problems, and Defendants knew that the commercial business was then at risk for the same reasons. ¶198. These services issues were well known and widespread.[16] *See e.g.,* ¶77 (noting mid-2008 "problems with the integration of computer systems" resulting in inability "to access participants' information").

In addition, by no later than May 12, 2008, the Reports revealed that the New Jersey contract was at the "highest risk" of loss. ¶85. Indeed, by November 2008, CW6 stated that it was practically "official" within the Company that the New Jersey account was going to be lost. *Id.* As noted by the First Circuit, Lead Plaintiffs allege that the New Jersey contract was "at risk" due to egregious post-merger service issues "[b]ecause it had failed to integrate its computer systems." *CVS*, 716 F.3d at 233-34.

Defendants also knew from at least mid-2008, that Chrysler was at risk for loss, if not that it was a foregone conclusion the contract would be terminated. ¶94. Chrysler was at risk due to post-merger service issues, such as that CVS Caremark employees "had to resort to manual data entry" to get the participants' correct information into its systems. ¶93.

Defendants' receipt of these weekly Reports prior to their issuance of materially false and misleading statements, suffices to support a strong inference that they knew or recklessly ignored the post-merger service-related integration problems endemic at the Company. *Boston Scientific*, 523 F.3d at 87-88 (a strong inference of scienter was alleged where "defendants received

---

[16] Defendants assert that the Coventry Client Liaison (CW6) does not provide sufficient information. Def. Br. 22. Defendants miss the point. CW6's knowledge of service issues relating to Coventry in mid-2008, as well as to New Jersey, corroborates the inference that these service issues were well know obstacles to sales and renewal of contracts that would be included in or indicated by the Reports. ¶ 33, 77, 79, 80, 85, 86. The First Circuit credited CW6 as corroborative of similar allegations. *CVS*, 716 F.3d at 243.

numerous adverse reports" regarding problems with a product).[17]  Scienter is further supported

because these contracts (Coventry, New Jersey, and Chrysler) were so large and important, and

comprised the vast majority of the $4.5 billion in PBM revenue lost in 2010.  *Rothman v.*

*Grego*r, 220 F.3d 81, 92 (2d Cir. 2000) (finding a strong inference of scienter based partly on

enormous losses).

### 3.  Defendants Attended Sales Meetings At Which Service Related Problems Were Discussed

Defendants were also kept apprised of contract developments and service issues during

monthly teleconferences with Account Executives and Senior Account advisors.  ¶68.  McLure

hosted the conference calls until early 2009, when Ryan replaced him.  *Id.*  Ryan and Rickard

also participated in quarterly conferences attended by Directors, Vice-Presidents, and Division-

Presidents "to discuss the progress of PBM contract negotiations," and at which "service issues

were commonly the subject of discussion."  ¶69.[18]

Accordingly, the strongest—and most plausible—inference is that Defendants knew or

recklessly disregarded the extensive service problems stemming from the post-merger

integration, which directly implicated sales and the retention of billions of revenue.  The success

of the PBM model hinged on client service because, as Defendants acknowledged, if plan

---

[17] *Cabletron*, 311 F.3d at 31-32 (internal reports contradicting statements support a strong inference of scietner).

[18] These allegations are supported by CW3, a Senior Account Advisor on the New Jersey account from 1999 through January 2009, and CW5, who was a Director and attended these meetings.  ¶33.  Defendants attack CW5's claims on the basis that CW5's employment overlapped with only the first month of the Class Period.  Def. Br. 21. This misses the point.  CW5 and CW3 provided information that supports the inference that Defendants continued the practice of these frequent meetings throughout the entire Class Period.  *See Cornwell v. Credit Suisse Group*, No. 08 Civ. 3758 (VM), slip op. at 18 (S.D.N.Y. Feb. 11, 2010) (finding that the existence of certain "reports and of the problems identified by the [CWs] before and during the Class Period ... suggest that analogous information was available to Defendants during the Class Period.").  The Court should accept this well-supported inference as true. Defendants' similar attempts to undermine other damning testimony of CWs by arguing that those CWs worked at the Company pre-Class Period fail because courts routinely hold that out-of-class-period allegations are relevant to the extent they shed light on Defendants' actionable class period conduct.  *See CVS, 7*16 F.3d at 241 (crediting out-of-class-period CW statement as "bolster[ing]" inference of loss causation).

participants were unsatisfied with service, existing contracts would not be renewed and new contracts would be lost.  ¶¶2, 57, 63. Along with jeopardizing billions in revenue during 2008-2009, the integration-related service issues also caused the Company to "unilaterally reduce[] prices on over 50 percent of its existing PBM contracts," in order to retain business.  ¶122.

### 4.    The Financial Impact Of The Service Problems And Their Pervasiveness Support A Strong Inference Of Scienter

The clear financial import of the integration failures to the Company generally, and their acknowledged importance by Defendants, further supports a strong inference of scienter.  *Boston Scientific*, 523 F.3d at 90-91 (knowledge imputed to key officials of problems with core business, supporting an inference of scienter); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (strong inference of scienter sufficiently alleged where misrepresentations and omissions by management concerned company's "most important products" and were thus much more likely to result from an intent to deceive or recklessness).[19]

Moreover, as detailed above in Section III, the service problems relating to the failed integration were systemic and well known, and went far beyond Coventry, New Jersey, and Chrysler, in ways that did or could directly impact the Company financially: (i) Defendants received numerous complaints from major contractors (¶¶77, 82, 88, 93, 100-05); (ii) there was significant turnover of high level employees (¶99); and (3) errors caused as many as 40,000 plan participants to go months without receiving appropriate medication at one time.  ¶91.

The problems were so pervasive that, on February 19, 2010, over a year after Ryan

---

[19] *South Ferry v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008) (in regard to scienter, "allegations regarding management's role … [1.] may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations .... [2.] may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information, [and 3.] may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.").

claimed that the Company had "completed the integration of both the organization and back end systems quickly and successfully," CVS Caremark admitted that it was still only in the "first inning" of integrating its PBM segments.  ¶¶71, 200.  *Scholastic*, 252 F.3d at 72 ("Pre-class data is relevant … to establish that at the start of the class period, defendants had a basis for [knowledge] … [j]ust as our cases have relied on post-class period data to confirm what a defendant should have known during the class period.").  Given the realities of the well-known and pervasive integration and service issues, and their financial impact on CVS Caremark, at the very least Defendants "recklessly turn[ed] a blind eye" to the fact that their statements were baseless.  *In re VeriFone, Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012).[20]

### C.     Defendants' Insider Trading Creates A Strong Inference of Scienter

Stock sales by insiders contribute to a strong inference of scienter if the sales are unusual in amount or occur at suspicious times.  *Boston Scientific*, 523 F.3d at 92; *Cabletron*, 311 F.3d at 40 (insider sales combined "with other [allegations] to produce a strong inference of scienter.").

Here, the insider sales are highly unusual, particularly when considered in context.  While Defendants were misrepresenting and concealing the reasons for contract losses and the failing PBM business, over the course of only three months Defendants disposed of more than 1 million shares of Company stock and reaped over $40 million in proceeds.  ¶¶9, 204.  Between August 7, 2009 and November 2, 2009, Company insiders made the following sales: McLure sold 500,000 shares of CVS Caremark stock, 98% of his personally held shares, for approximately

---

[20] Defendants' argument that there was "ample support" for Defendants' statements, and thus that the stronger inference is innocence, is nonsensical.  Def. Br. 19.  The fact that in 2009 CVS Caremark "PBM call centers were certified by JD Power & Assoc. for providing outstanding customer service" has nothing to do with Defendants' misleading assertions that the CVS Caremark business integration was complete and that the Company lost contracts for reasons other than service.  Defendants' contention that CVS "won $8 billion" in business in 2008 is also wrong. Def. Br. 19.  The Company simply "retained" that business, most of which was later lost because of the undisclosed service problems.  ¶125.  In any event, the Company won only $1.4 billion in 2010, while losing $4.5 billion because of service issues.

$17.7 million; Ryan sold 400,000 shares of CVS Caremark stock, approximately 22% of his personally held shares, for approximately $13.7 million; and Rickard sold 251,520 shares of Company stock, 52% of his personally held shares during the Class Period, for approximately $8.5 million.  ¶109.[21]

Defendants' contention that Lead Plaintiffs have not alleged the irregularity of these sales is unfounded.  Def. Br. 24.  The Complaint details how Defendants' Class Period selling pattern stands in stark contrast to their trading patterns of the preceding year, when Rickard sold no shares of CVS Caremark stock and McLure sold about half the percentage of holdings he sold during the Class Period.  ¶205.  Moreover, Ryan did not sell a single share for a year after the close of the Class Period, after the artificial inflation in CVS Caremark's share price had been removed.  ¶109.  Given the timing and the amount of the trading, the allegations support a strong inference of scienter.  *See Boston Scientific*, 523 F.3d at 92-93; *Cabletron*, 311 F.3d at 40-41.

Defendants' August sales are particularly suspect because they occurred ***only days*** after Defendants expressed "great confidence" in the Company's ability to retain current clients. ¶¶205-06; *see Stevelman v. Alies Research Inc.*, 174 F.3d 79, 85-86 (2d Cir. 1999) (sale of officer's stock in proximity to allegedly false optimistic statements showed their unusual and suspicious nature).  The day after Defendants issued these positive statements, on August 5, 2009, Defendants were informed that the New Jersey Contract – valued at over $1 billion per year – was terminated.  ¶¶107, 206.  On August 7, 2009, only two days after Defendants learned this fact but before this information was disclosed to the market, Ryan and McLure collectively sold over 600,000 shares of their CVS Caremark stock for proceeds of more than $20 million. ¶¶107, 109, 206.  Rickard sold $8.5 million worth of Company stock only 10 days later, on

---

[21] Even if the Court were to include vested options, these percentages are significant: McLure (60%), Ryan (7%) and Rickard (19.6%).  *See* MTD Opp. at 47, n.24.

August 17, 2009.  ¶¶107, 109.  Importantly, all of Rickard's and McLure's Class Period sales,

and 99.6% of Ryan's sales, took place *after* Defendants' statements regarding CVS Caremark's

2010 outlook and *after* the receipt of the August 5, 2009 letter confirming the loss of the New

Jersey account, and ended just *three days before* Defendants revealed the truth concerning their

"misstatements regarding the integration of CVS and Caremark."  *CVS*, 716 F.3d at 242.[22]

    Defendants assert that McLure's and Rickard's insider trading is not probative of scienter

because their sales were made pursuant to Rule 10b5-1 trading plans.  *See* Def. Br. 24-25.[23]

They are wrong.  First, reliance on the existence of a 10b5-1 plan is a statutory affirmative

defense at trial and is thus premature.[24]  Also, the existence of the trading plans here does not

support innocence because the plans were adopted *during the Class Period*, when Defendants

possessed material non-public information.[25]  *See George v. China Automotive,* 2012 U.S. Dist.

LEXIS 111730, at *26 (S.D.N.Y. Aug. 8, 2012) (defendants cannot invoke 10b5-1 trading plan

entered into during the class period "to disarm any inference of scienter raised by the Individual

Defendants' sales of [] stock"); *see In re Biogen Idec Sec. Litig.*, 2007 US Dist. LEXIS 98076, at

---

[22] Defendants advance various arguments to explain away their stock sales.  For example, they argue that Rickard sold his stock in connection with his retirement from CVS Caremark.  *See* Def. Br. 24.  However, stock sales associated with retirement do not necessarily negate scienter, as an inference that the retiree participated in inflating the stock price to fund retirement activities is equally compelling.  *See Goldman v. Belden*, 754 F.2d 1059, 1071 (2d Cir. 1985) (holding that the "whether [] retirement was the motivation for [defendant's] stock sales is a question … inappropriate for decision even on a summary judgment motion").

[23] The notion that 10b5-1 trading plans provide an innocent explanation for insider sales has recently been refuted.  On November 27, 2012, the *Wall Street Journal* published an article entitled "'Executives' Good Luck in Trading Own Stock'" that demonstrated that insiders manipulate their 10b5-1 trading plan to realize gains and avoid losses.

[24] *See Boston Scientific*, 523 F.3d at 92 (insider trading allegations contributed to a strong inference of scienter even if a 10b5-1 trading plan existed because, absent discovery, there was no evidence of "when the trading plans went into effect, that such trading plans removed entirely from defendants' discretion the question of when sales would occur, or that they were unable to amend these trading plans"); *In re Arthrocare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 722 (W.D. Tex. 2010) (10b5-1 trading plan is not considered on a motion to dismiss because "the existence of such a plan is an affirmative defense, which requires evidence of the plan itself and of details such as the date the plan was entered into and whether it wholly removed trades from the defendants discretion.").

[25] For this reason, *Stiegele ex. rel. Viisage Tech. v. Bailey*, No. 05-10677-MLW, 2007 U.S. Dist. LEXIS 86469, at *34 (D. Mass. Aug. 23, 2007) is not analogous to the case at bar; there, the insider sales at issue were made pursuant to a "pre-existing" 10b5-1 trading plan.

*40 (D. Mass. Oct. 25, 2007) ("The attempt to use such trading plans as a non-suspicious explanation is undermined ... when such plans are entered into during the Class Period.").[26]

At the time Rickard and McLure adopted their Rule 10b5-1 trading plans (March 19, 2009 and June 19, 2009, respectively), Defendants knew that the Company's customers were at the highest risk for terminating their contracts with CVS Caremark.[27]  Indeed, under circumstances such as those alleged here, a 10b5-1 trading plan may contribute to an inference of scienter because "'a clever insider might 'maximize' their gain from knowledge of an impending price drop over an extended amount of time.'" *Freudenberg v. E*Trade. Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010).

Accordingly, Defendants' sales "combine with other aspects of the complaint to produce a strong inference of scienter overall." *Cabletron*, 311 F.3d at 40.

### D.   Defendants' Announcement Of A Settlement With The SEC Stemming From The Same Facts At The Core Of This Complaint Further Supports Scienter

Defendants' $20 million SEC settlement, announced August 2, 2013, resolved "a number of alleged violations of the Securities Act of 1933 and the Securities Exchange Act of 1934, **including certain anti-fraud provisions**." *See supra* n.2; ¶201.  The settlement relates to facts at the very core of this case, including "public disclosures made by the Company in 2009 concerning its PBM … business[] and information concerning ownership and transactions in the Company's securities by certain officers of the Company." *Id.*

Simply put, this settlement, **which is 20 times higher than the median SEC/Company settlement in 2012**, undercuts Defendants' arguments.  Courts regularly find that SEC

---

[26] Defendants' reliance on *In re Int'l Rectifier Corp. Sec. Litig.,* 2008 U.S. Dist. LEXIS 44872, at *62 (C.D. Cal. May 23, 2008) for the contrary position is misplaced because the insider sales at issue there were not suspicious given the lengthy four year class period.

[27] *See* Exs. 11 and 12 of Def.'s MTD. Declaration ECF. No. 62 (Defendants' declaration incorrectly lists these 10b-5 plans as exhibits 8 and 9).

settlements relating to the allegations in a securities fraud complaint support a strong inference of scienter. *See BMS*, 586 F.Supp.2d at 168 (holding that Defendants "pleading guilty to … making false statements" relating to the subject matter of the fraud "provid[ed] strong circumstantial evidence of conscious misbehavior or recklessness."); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 706 (S.D. Tex. 2002). *See supra* n. 2.

## **CONCLUSION**

For all the reasons stated herein, Lead Plaintiffs respectfully submit that Defendants' motion to dismiss should be denied in its entirety.

DATED: August 16, 2013

ORR & RENO
WILLIAM L. CHAPMAN
One Eagle Square, P.O. Box 3550
Concord, NH  03302-3550
Telephone: 603/224-2381
603/223-9007 (fax)


*Of Counsel*


ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT ROTHMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Counsel for Lead Plaintiff*
*City of Brockton Retirement System and*
*Co-Lead Counsel for the Class*

BARRY J. KUSINITZ (RI Bar No. 1404)

         /s/ Barry J. Kusinitz
        BARRY J. KUSINITZ

155 South Main Street, Suite 405
Providence, RI 02903
Telephone: 401/831-4200
Fax: 401/831-7053
bkusinitz@bdglawyers.com

*Liaison Counsel*

LABATON SUCHAROW LLP
JOSEPH A. FONTI
SERENA HALLOWELL
140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
Fax: 212/818-0477

*Counsel for Lead Plaintiffs*
*Plymouth County Retirement System and*
*Norfolk County Retirement System and*
*Co-Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of Supplemental Briefing In

Further Opposition To Defendants' Motion To Dismiss Following The Ruling Of The First

Circuit Court Of Appeals. was filed electronically with the Clerk of Court using the CM/ECF

system, which will send notification of such filing to all counsel of record on the 16th day of

August, 2013.

                                                     /s/ Joseph A. Fonti
                                                  JOSEPH A. FONTI