# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF RHODE ISLAND

———————————————— x

RICHARD MEDOFF, Individually and On
Behalf Of All Others Similarly Situated,

               Plaintiff,

    vs.

CVS CAREMARK CORPORATION,
THOMAS M. RYAN, DAVID RICKARD, and
HOWARD McLURE,

               Defendants.

———————————————— x

Civil Action No. 1:09-cv-00554-JNL-PAS

**Oral Argument Requested**

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

BACKGROUND ...................................................................................................................2

I.      Lead Plaintiffs and Lead Counsel. ..........................................................................2

II.     Lead Plaintiffs' Applications for Representative Status. ..........................................4

III.    Lead Plaintiffs' Proffered Expert. ...........................................................................6

ARGUMENT .....................................................................................................................9

I.      LEAD PLAINTIFFS ARE NOT ADEQUATE UNDER RULE 23(a)(4). ......................10

        A.      Lead Counsel's Campaign Contributions Render Norfolk and Plymouth
                Conflicted...................................................................................................11

        B.      Lead Counsel Instigated Lead Plaintiffs' Suit Through Lead Counsel's
                Free "Monitoring Services." ........................................................................15

        C.      Lead Plaintiffs Have Provided Little to No Direction of This Lawsuit.................18

II.     LEAD PLAINTIFFS FAIL TO MEET THEIR BURDEN UNDER RULE
        23(b)(3). ...............................................................................................................20

        A.      *Comcast* Requires That Plaintiffs' Damages Model Comport with Their
                Theory of Liability.......................................................................................20

        B.      Lead Plaintiffs Fail to Specify a Damages Model, Much Less One that
                Comports with Their Theory of Liability. ..........................................................24

## TABLE OF AUTHORITIES

## FEDERAL CASES

*Andrews v. Bechtel Power Corp.*, 780 F.2d 124 (1st Cir. 1985) ...................................10

*Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001).................................11

*City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173 (S.D.N.Y. 2012)..............16

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 844 F. Supp. 2d
   498 (S.D.N.Y. 2012)...................................................................................................16

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ........................................... passim

*Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116
   (S.D.N.Y. 2014)..................................................................................................23, 25

*In re AT&T Corp. Sec. Litig.*, 455 F.3d 160 (3d Cir. 2006)..........................................12

*In re BP P.L.C. Sec. Litig.*, No. 10-md-2185, 2013 WL 6388408 (S.D. Tex. Dec.
   6, 2013) ...................................................................................................... passim

*In re BP P.L.C. Sec. Litig.*, No. 10-md-2185, 2014 WL 2112823 (S.D. Tex. May
   20, 2014) .............................................................................................22, 23, 24

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001)............................................15

*In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586 (C.D. Cal. 2009)..........14, 15

*In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17 (D. Mass. 2008)...........................11

*In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240 (N.D. Cal. 2013)............11, 14, 15, 16

*In re Discovery Zone Sec. Litig.*, 169 F.R.D. 104 (N.D. Ill. 1996)................................13

*In re Galileo Corp. S'holders Litig.*, 127 F. Supp. 2d 251 (D. Mass. 2001) ...............16

*In re IMAX Sec. Litig.*, 272 F.R.D. 138 (S.D.N.Y. 2010)......................................13, 14

*In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133 (N.D. Tex. 2014).........16, 18, 19

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) ........................................9, 21

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013) ...............20, 24

*In re Sonus Networks, Inc. Sec. Litig.*, 229 F.R.D. 339 (D. Mass. 2005) ...............10, 11

*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461 (S.D.N.Y. 2009) ................................10, 16, 17, 19

*Maywalt v. Parker & Parsley Petro. Co.*, 67 F.3d 1072 (2d Cir. 1995) ........................11

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ................................21

*Mowry v. JP Morgan Chase Bank, N.A.*, No. 06 C 4312, 2007 WL 1772142 (N.D. Ill. June 19, 2007) ................................................................13

*Roach v. T.L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015) ................................21, 22

*Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307 (E.D. Va. 2007) ................................19

*Swift v. First USA Bank*, No. 98 C 8238, 1999 WL 1212561 (N.D. Ill. Dec. 15, 1999) ................................................................14

*Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005) ................................11

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ................................9

## OTHER AUTHORITIES

7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1766 (3d ed.) ........................10

15 U.S.C. § 78u–4 ................................................................ passim

Federal Rule of Civil Procedure 23 ................................................ passim

H.R. Rep. No. 104-369 (1995) (Conf. Rep.) ........................................1, 10

John C. Coffee, Jr., '*Pay-to-Play' Reform: What, How, and Why?*, N.Y.L.J., May 21, 2009 ........................................................................13, 17

Mark Maremont, Tom McGinty, and Nathan Koppel, *Trial Lawyers Contribute, Shareholder Suits Follow*, Wall St. J., Feb. 3, 2010 ................................12

Model Rules of Prof'l Conduct R. 7.6 ................................................11, 12, 13

S. Rep. No. 104-98 (1995) ................................................................1, 10

Lead Plaintiffs' Motion for Class Certification should be denied for at least two independent reasons.

First, Lead Plaintiffs are not adequate class representatives under Federal Rule of Civil Procedure 23(a)(4).  The Chairmen of two of Lead Plaintiffs have received more than 150 political donations from Lead Counsel—including 11 donations just days after the stock drop at issue in this case—which creates both an appearance of impropriety and a conflict of interest. Further, all Lead Plaintiffs have effectively abdicated control over this case to counsel.  Indeed, at least two of Lead Plaintiffs were introduced to the idea of suing CVS Caremark Corporation[1] by counsel, who approached them pursuant to free "monitoring services" offered by the law firms.  Moreover, one Lead Plaintiff has exceeded the presumptive limit set forth in the Private Securities Litigation Reform Act ("PSLRA") by serving as lead plaintiff in more than five cases in three years.

That all Lead Plaintiffs have ceded control to counsel is confirmed by their conduct since being appointed.  In their recent depositions, Lead Plaintiffs demonstrated their lack of knowledge about the case—even about such rudimentary matters as the theory of liability, the procedural posture, and counsel's proposed course of discovery—as well as about other cases in which they have served as lead plaintiff.  A class representative may have been permitted to abdicate its oversight responsibilities twenty years ago, but times have changed.  Congress enacted the PSLRA precisely to protect "against lawyer-driven lawsuits by giving control of the litigation to lead plaintiffs."  H.R. Rep. No. 104-369, at 32 (1995) (Conf. Rep.); *accord* S. Rep. No. 104-98, at 6 (1995).

Second, the Motion should be denied under Rule 23(b)(3) because Lead Plaintiffs have

---

[1] As of September 3, 2014, CVS Caremark Corporation changed its name to CVS Health Corporation. Because CVS Caremark Corporation was the name of this party during the period relevant to this action, it will be referred to herein generally as "CVS."

failed to demonstrate that damages consistent with the operative theory of liability are calculable on a class-wide basis. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). Lead Plaintiffs have not even *attempted* to show how a damages methodology might connect shareholder losses to the allegations remaining in the case. Instead, Lead Plaintiffs rest their case on a generic methodology, accompanied by their expert's assurance that, at some point in the future, he will create a damages model that separates out the effect of allegedly actionable disclosures from the effect of events that this Court and the First Circuit have held are not actionable. This unsupported promise falls far short of the Supreme Court's requirement that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [an actionable] theory" of liability. *Id.* Without an affirmative showing from Lead Plaintiffs that a damages methodology can track the operative liability theory, the Motion must fail. *See In re BP P.L.C. Sec. Litig.* ("*BP I*"), No. 10-md-2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013).

## BACKGROUND

### I.  Lead Plaintiffs and Lead Counsel.

Lead Plaintiffs are a group of "Massachusetts Retirement Systems"—namely, the City of Brockton Retirement System ("Brockton"), Norfolk County Retirement System ("Norfolk"), and Plymouth County Retirement System ("Plymouth"). Order Appointing Lead Pl. & Approving Selection of Lead & Liaison Counsel (Mar. 1, 2010) (Dkt. 28). Lead Counsel are the law firms of Labaton Sucharow LLP ("Labaton") and Robbins Geller Rudman & Dowd LLP ("Robbins Geller"). *Id.*

Labaton attorneys have been making political contributions to the leadership of Norfolk and Plymouth for years, while at the same time securing their business as counsel in various

securities class actions.  In the case of Norfolk and Plymouth, the County Treasurer serves as Chairman of the respective County Retirement Board.  Connolly Tr. at 42:24–25, 43:1 (Blumenstein Decl., Ex. 1);[2] Plymouth County Retirement Association Board Members, http://pcr-ma.org/Pages/PCRA_Webdocs/members (last visited Mar. 20, 2015) (Blumenstein Decl., Ex. 2).  Between 2006 and the present, Joseph Connolly served as Treasurer of Norfolk County (and therefore Chairman of Norfolk); Thomas J. O'Brien served as Treasurer of Plymouth County (and therefore Chairman of Plymouth).  During that time frame, 25 Labaton lawyers made 153 separate campaign contributions to Mr. Connolly and Mr. O'Brien, including 11 donations to Mr. O'Brien on November 15, 2009, less than two weeks after CVS's stock drop, even though Mr. O'Brien was not up for re-election until 2014.  *See* Mass. Office of Campaign & Political Finance, Contributions & Expenditures, http://www.ocpf.us/Reports/SearchItems (last visited Mar. 20, 2015) (Blumenstein Decl., Ex. 3) (hereinafter, "OCPF Rpts.").  None of the attorneys who made those contributions resides in Norfolk County or Plymouth County.  OCPF Rpts.

Lead Counsel also maintain "portfolio monitoring agreements" with Lead Plaintiffs.  *See* Farmer Tr. 33:8–25, 234:11–20 (Blumenstein Decl., Ex. 4); Connolly Tr. 159:14–25.  Under these agreements, Lead Plaintiffs provide Labaton and Robbins Geller access to their investment portfolios so the firms can monitor their holdings for potential cases to bring.  *See* Farmer Tr. 53:15–18 ("As a general rule, I'm assuming they're willing to do it, because if they find a case, they'd like to be the counsel on the lead plaintiff case."); *see also* Farmer Tr. 35:11–12, 237:11–16; Connolly Tr. 161:16–18.  Plymouth and Brockton engaged Lead Counsel after Lead Counsel

---

[2] Defendants deposed representatives of Lead Plaintiffs on February 10 and 11, 2015.  Brockton and Plymouth both designated William R. Farmer to testify on their behalf.  Mr. Farmer is Brockton's Board Chairman and Plymouth's Executive Director.  Farmer Tr. 22:14–15, 224:2–3.  Norfolk designated Mr. Connolly to testify on its behalf.

brought the CVS stock drop to their attention through these "monitoring services."  Farmer Tr. 41:1–8, 289:21–24.   Norfolk's representative refused to state whether it, too, retained Lead Counsel because of counsel's monitoring, claiming privilege.  Connolly Tr. 162:6–12.

## II.   Lead Plaintiffs' Applications for Representative Status.

"The Massachusetts Retirement Systems" filed a motion to be appointed Lead Plaintiff in January 2010 (which was granted), and have now filed a Motion for Class Certification.  (Dkt. 10, 94–100).   Norfolk's certification in support of the January 2010 Motion stated that it had been appointed lead plaintiff in five other cases in the last three years—meaning that its appointment here exceeded the presumptive five-case limit under the PSLRA.  Cert. of Named Pl. Pursuant to Fed. Sec. Laws at 7 (Jan. 19, 2010) (Dkt. 12-3); *see* 15 U.S.C. § 78u-4(a)(3)(B)(vi).  Norfolk has since been appointed in four more securities class actions.  *See In re Health Mgmt. Assocs., Inc.*, No. 12-cv-46 (M.D. Fla.); *Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l*, No. 5:12-cv-195 (E.D. Ky.); *In re DG FastChannel, Inc. Sec. Litig.*, No. 10-cv-6523 (S.D.N.Y.); *Pipefitters Local No. 636 Def. Benefit Plan v. Tekelec*, No. 11-cv-004 (E.D.N.C.). Labaton, Robbins Geller, or both firms have represented Norfolk in all ten of these cases.

The current Motion is supported by certifications that tout Lead Plaintiffs' adequacy as class representatives.  Those certifications claim, among other things:

- That as "large, sophisticated institutional investor[s], [they] are committed to vigorously prosecuting this litigation."  Decl. of William R. Farmer for the City of Brockton Ret. Sys. ¶ 5 (Feb. 6, 2015) (Dkt. 98) ("Brockton Decl."); Decl. of Joseph Connolly ¶ 5 (Feb. 6, 2015) (Dkt. 100) ("Norfolk Decl."); Decl. of William R. Farmer for Plymouth Cnty. Ret. Sys. ¶ 5 (Feb. 6, 2015) (Dkt. 99) ("Plymouth Decl.").

- That Lead Plaintiffs have "reviewed and monitored the progress of this litigation and the active participation of Lead Counsel … in its prosecution."  Brockton Decl. ¶ 6; Norfolk Decl. ¶ 6; Plymouth Decl. ¶ 6.

- That Lead Plaintiffs intend "to continue to provide fair and adequate representation by, among other things, directing the efforts of [counsel]."

Brockton Decl. ¶ 8; Norfolk Decl. ¶ 8; Plymouth Decl. ¶ 8.

Lead Plaintiffs' depositions, however, tell a different story. Their testimony demonstrates that Lead Plaintiffs have effectively exercised no direction or control over this litigation:

- Mr. Farmer testified that he "didn't make the decision to sue" Defendants, because he did not "know whether it's a good case or a bad case." Farmer Tr. 142:21–143:3.

- When asked, "Have you given your lawyers any direction in this case, or have you just received updates?", Mr. Farmer responded, "I've just received updates." Farmer Tr. 211:15–18.

- When asked, "How have you directed this litigation to date?", Mr. Connolly responded, "On advice of counsel to move in the direction that they suggest we should move." Connolly Tr. 151:3–6.

- Neither Mr. Connolly nor Mr. Farmer knew: (1) whether CVS's document production is substantially complete, (2) when fact discovery ends, (3) what depositions have been noticed, or (4) who Lead Counsel intends to depose. Connolly Tr. 145:9–148:4; Farmer Tr. 210:15–211:14.

- Neither Mr. Connolly nor Mr. Farmer could name Lead Plaintiffs' expert—even though Professor Steven Feinstein had filed a report in support of their Motion for Certification just four days before the depositions. Connolly Tr. 149:10–15; Farmer Tr. 211:3–7.

Nor should Lead Plaintiffs' participation be expected to increase in the future. Mr. Connolly could not testify to the status of four of the five cases in which Norfolk certified that it had served as lead plaintiff. Connolly Tr. 139:3–139:24. And as to the fifth, *Colonial Bancgroup Inc.*, he testified that the case was on appeal. *Id.* In fact, however, it appears that the case was never on appeal. Dkt. Rpt., *In re Colonial Bancgroup, Inc. Sec. Litig.*, No. 2:09-cv-104 (M.D. Ala.) (Blumenstein Decl., Ex. 5). Rather, a settlement in principal had been reached in October 2014, and a final stipulation of settlement had been signed just eight days before Mr. Connolly's deposition. Lead Pls.' Mem. of Law in Supp. of Mot. for Prelim. Approval of Settlement with Remaining Defs. 6, *In re Colonial Bancgroup, Inc. Sec. Litig.*, No. 2:09-cv-104 (M.D. Ala. Feb.

18, 2015) (Dkt. 549) (Blumenstein Decl., Ex. 6).  In stark contrast to Mr. Connolly's testimony, the memorandum filed by Labaton and Robbins Geller in support of the *Colonial* settlement stated that "Lead Plaintiffs … have closely monitored this litigation from the outset, were involved in the negotiation process that led to the Settlement, and recommended that the Settlement be approved."  *Id.* at 3.

Indeed, Norfolk has shown itself to be unable even to keep track of its cases.  On December 8, 2014, Mr. Connolly filed a Certification in *Levy v. Gutierrez*, No. 14-cv-443-JL (D.N.H.) stating that "[d]uring the three years prior to this certification, [Norfolk] has not served as a representative party on behalf of a class in any federal securities class actions."  (Dkt. 23-4).  This statement neglects to mention (1) *In re Colonial Bancgroup, Inc. Securities Litigation*, No. 09-cv-00104 (M.D. Ala.), in which Norfolk served as Lead Plaintiff from May 2009 until March 2015; (2) *Norfolk County Retirement System v. Tempur-Pedic International Inc.*, No. 5:12-cv-0195 (E.D. Ky.), in which Norfolk has been part of a lead plaintiff group since December 3, 2012; and (3) the case at bar.

## III.    Lead Plaintiffs' Proffered Expert.

Lead Plaintiffs submitted Professor Steven P. Feinstein's Report on Market Efficiency in support of their Motion for Class Certification.  (Dkt. 96) ("Feinstein Report").  Like Lead Plaintiffs, Prof. Feinstein is a frequent participant in securities class actions.  He has testified in at least twenty-four such matters within the past four years.  Feinstein Report Ex. 3.  Robbins Geller retained him in ten of these matters.  Feinstein Tr. 15:9–13 (Blumenstein Decl., Ex. 7).  In the past five months alone, Prof. Feinstein has testified on behalf of Robbins Geller clients—all plaintiffs—six times.  Feinstein Tr. 20:24–21:7.

The Feinstein Report purports to examine whether CVS common stock traded in an efficient market during the proposed class period and to "explain how per share damages would

be measured for each member of the proposed class."   Feinstein Report ¶¶ 1, 151.   Prof.

Feinstein conducted an "event study"—which seeks to measure a stock's price movement in

response to new information entering the marketplace—to determine whether CVS stock traded

in an efficient market with respect to "objectively screened important allegation-related

announcements."   *Id.* ¶¶ 84–86.   He identified two dates on which, according to him, information

related to the alleged misrepresentations became public and would be expected to elicit a

reaction in the stock price:   January 9, 2009 and November 5, 2009.   *Id.* ¶¶ 98–99.   Prof.

Feinstein characterized the disclosures on both dates as "partially corrective."   *Id.* ¶ 99.   He

concluded that the market reacted efficiently to the so-called "allegation-related announcements"

on both dates.   *Id.* ¶¶ 118, 123.

The Feinstein Report also purports to offer a "per share damage methodology."   *Id.* at

35–36 (capitalization omitted).   This "methodology" is a generic boilerplate overview of how

damages might theoretically be calculated in any securities action:   (1) conduct an "empirical

analysis" to determine losses caused by alleged corrective disclosures, "controlling for

potentially non-fraud related information"; (2) create an "inflation ribbon" indicating how much

fraud inflation was in the stock price on each date during the purported class period; and (3)

calculate per share damages.   *Id.* ¶ 151.   The Feinstein Report offers no explanation as to how

any of these steps would actually be executed and nowhere connects these general concepts to

this specific case.

At his deposition, Prof. Feinstein stated that, for the purpose of his event study, he

considered "allegation-related" announcements to be those having "to do with service issues at

the PBM division."   Feinstein Tr. 65:8–11.   Prof. Feinstein conceded, however, that actionable

misrepresentations in this case are limited to those specifically involving PBM service issues

*arising out of the integration of CVS and Caremark. Id.* at 76:4–8. He further acknowledged that a corrective disclosure must reveal previously concealed information about PBM service issues related to the merger and integration. *Id.* at 76:4–22. But Prof. Feinstein could not identify any specific misrepresentation that was corrected on either of the two alleged corrective disclosure dates, or any specific statement that supposedly was corrective on January 9, 2009. *Id.* at 90:5–23, 97:5–15, 97:24–98:3. Nor did he appear to realize that the one statement the Court concluded may be actionable occurred on that date. *Id.* at 93:6–19; *see* Mem. Order 8–13 (Dec. 31, 2013) (Dkt. 64).

Prof. Feinstein stated that the corrective disclosure on November 5, 2009 "was that the PBM business, rather than growing up to five percent per year … would .... actually fall 10 to 12 percent. And then … the company specifically admitted that it was because of service issues." Feinstein Tr. 96:22–97:4. Prof. Feinstein agreed, however, that any allegation based on a revision of earnings projections was not a potential basis for liability—as he must, given that this theory of liability has been held inactionable.[3] Feinstein Tr. 99:4–11; *see* Op. & Order 23–24 (Jun. 8, 2012) (Dkt. 50); Slip Op. 19 (1st Cir. May 24, 2013) (Dkt. 56).

Prof. Feinstein repeatedly testified that he has not constructed a damages model specific to this case. Feinstein Tr. at 42:1–5, 42:11–14, 43:18–44:1, 45:7–8, 47:15–17, 94:7–8, 96:11–14, 97:7–15, 101:22–23, 102:3–9, 104:12–105:3, 105:20–21, 110:7–12. And he acknowledged that there were a number of difficult choices that he would have to make in order to do so:

- He conceded that confounding events affected CVS's stock price on the dates of both alleged corrective disclosures. *Id.* at 90:24–91:2, 93:6–19, 100:2–7. But he has not isolated the effects of the confounding information unrelated to the

---

[3] Lead Plaintiffs initially claimed that a statement related to earnings per share made on August 4, 2009 was an actionable misstatement. *See* Corrected Consolidated Class Action Compl. ¶¶ 160, 165 (June 1, 2010) (Dkt. 33). But this Court held that Defendants could not be held liable for the August 4 projection because it was a forward-looking statement protected by the PSLRA's safe harbor provision. Op. & Order 23–24. Lead Plaintiffs did not challenge this holding in their appeal to the First Circuit.

alleged misrepresentations—and acknowledged that disaggregating such information "might be very difficult." *Id.* at 96:8–14.

- He has not determined whether the purported revelation of the alleged misrepresentations took the form of a true corrective disclosure or the materialization of a concealed risk. *Id.* at 107:10–16.

- He has not determined when the alleged artificial inflation entered CVS's stock price as a result of the alleged misrepresentations, when it exited, or if any inflation still existed subsequent to November 5, 2009. *Id.* at 42:1–45:8, 105:4–106:2.

- He has not determined whether inflation in the stock price fluctuated or remained constant during the purported class period, or how he would make that determination. *Id.* at 102:10–104:22.

- He has not determined the limits that the PSLRA's "bounce back" provision would impose on putative class members' alleged damages.[4] *Id.* at 108:14–20.

## <u>ARGUMENT</u>

Lead Plaintiffs bear a significant burden in seeking certification under Rule 23. "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (internal quotation marks omitted); *accord Comcast*, 133 S. Ct. at 1432; *In re Nexium Antitrust Litig.*, 777 F.3d 9, 17–18 (1st Cir. 2015). Accordingly, Lead Plaintiffs must present evidence showing that "'there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation." *Comcast*, 133 S.Ct. at 1432 (quoting *Dukes*, 131 S.Ct. at 2551). Lead Plaintiffs "must also

---

[4] The bounce back provision caps a plaintiff's recoverable damages at the difference between the price at which the plaintiff purchased a security and "the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market," or, if the plaintiff sold the stock within the 90 days, the mean trading price during the period between the corrective disclosure and the sale. 15 U.S.C. § 78u–4(e). Based on CVS's calculation of the 90-day mean, Prof. Feinstein acknowledged that any class member who purchased stock during approximately the first half of the class period and held it for 90 days after November 5, 2009 would have no legally recoverable damages. Feinstein Tr. 112:21–113:21, 116:18–117:2.

9

satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  *Id.*  They invoke

Rule 23(b)(3), which requires them to demonstrate that "questions of law or fact common to

class members predominate over any questions affecting only individual members."

## I.      LEAD PLAINTIFFS ARE NOT ADEQUATE UNDER RULE 23(a)(4).

Lead Plaintiffs must affirmatively demonstrate that they "will fairly and adequately

protect the interests of the class."   Fed. R. Civ. P. 23(a)(4).   In assessing a lead plaintiff's

adequacy, courts often articulate the standard as requiring "first that the interests of the

representative party will not conflict with the interest of any of the class members, and second,

that counsel chosen by the representative party is qualified, experienced and able to vigorously

conduct the proposed litigation."  *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.

1985).   But other courts acknowledge that the Rule also requires an assessment of the lead

plaintiff itself.  *See, e.g.*, *In re Sonus Networks, Inc. Sec. Litig.*, 229 F.R.D. 339, 342 (D. Mass.

2005); 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1766 (3d ed.).   And

courts routinely consider lead plaintiffs' knowledge and control of the litigation, as they should

in light of the PSLRA's emphasis on ensuring that litigation is plaintiff-driven, not lawyer-

driven.  S. Rep. No. 104-98, at 4 (1995) (expressing the intent to "empower investors so that

they—not their lawyers—exercise primary control over private securities litigation"); *accord*

H.R. Rep. No. 104-369, at 32 (1995) (Conf. Rep.).   In applying the adequacy requirement,

therefore, courts are mindful that the PSLRA was "intended to curtail the vice of 'lawyer-driven'

litigation, *i.e.*, lawsuits that, because of the huge potential fees available in contingent securities

fraud class actions, were initiated and controlled by the lawyers and appeared to be litigated

more for their benefit than for the benefit of the shareholders they ostensibly represented."  *Iron*

*Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616

F. Supp. 2d 461, 463 (S.D.N.Y. 2009).

Thus, to satisfy Rule 23(a)(4), a lead plaintiff must demonstrate that it is willing and able to fulfill "the crucial responsibility required of a class representative, directing and controlling the litigation rather than unduly deferring to lead counsel." *Sonus*, 229 F.R.D. at 342–43; *accord In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 24 (D. Mass. 2008); *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) (Lead plaintiffs must affirmatively demonstrate that they are "sufficiently informed about the litigation to manage the litigation effort."); *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 484 (5th Cir. 2001); *Maywalt v. Parker & Parsley Petro. Co.*, 67 F.3d 1072, 1077–78 (2d Cir. 1995) (Lead plaintiffs are inadequate if they "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." (brackets and internal quotation marks omitted)).

In this case, Lead Plaintiffs' relationship with Lead Counsel renders them inadequate under Rule 23(a)(4).   Norfolk and Plymouth are conflicted by the political contributions bestowed upon their leadership by Lead Counsel.   Moreover, the monitoring agreements of all Lead Plaintiffs, as well as their lack of direction and knowledge concerning this litigation, evidence that Lead Plaintiffs have indeed abdicated control over this lawsuit to Lead Counsel.

### A.   Lead Counsel's Campaign Contributions Render Norfolk and Plymouth Conflicted.

"[N]o one should take on the fiduciary responsibility of class counsel when it might reasonably appear that their selection was based on political campaign contributions rather than merit."   *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 256–57 (N.D. Cal. 2013). Indeed, the ABA Model Rules of Professional Conduct warn against such appearances of impropriety.   Rule 7.6 admonishes:   "A lawyer or law firm shall not accept a government legal engagement … if the lawyer or law firm makes a political contribution or solicits political

contributions for the purpose of obtaining or being considered for that type of legal engagement or appointment."  Model Rules of Prof'l Conduct R. 7.6 (2014 ed.).  And while no equivalent to Rule 7.6 has been adopted in this jurisdiction, the reasoning behind the rule has force in these circumstances:  "when lawyers make or solicit political contributions in order to obtain an engagement for legal work awarded by a government agency … the public may legitimately question whether the lawyers engaged to perform the work are selected on the basis of competence and merit.  In such a circumstance, the integrity of the profession is undermined."  Model Rule 7.6 cmt. 1.

Labaton lawyers have made 153 campaign donations to the Chairmen of Norfolk and Plymouth, including 11 donations to Plymouth's Chairman on November 15, 2009—two days before the initial complaint in this case and approximately three years in advance of the Chairman's next election.  *See* OCPF Rpts.  And although Mr. Connolly testified that the donations from Lead Counsel did not affect his decision to engage Labaton, Connolly Tr. 172:8–174:6, this denial does not remove the appearance of impropriety that arises when a lawyer accepts a government engagement after making political contributions to the entity that retains him.  *See* Model Rule 7.6; *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 168 (3d Cir. 2006) (It is "problematic" when "a law firm makes campaign contributions to elected officials who control governmental pension funds and is selected as the fund's lead counsel.").  Indeed, the appearance of impropriety was enough to invite scrutiny by the *Wall Street Journal*, which published a front-page story discussing this case and Labaton's corresponding campaign contributions.  Mark Maremont, Tom McGinty, and Nathan Koppel, *Trial Lawyers Contribute, Shareholder Suits Follow*, Wall Street J., Feb. 3, 2010, at A1 (Blumenstein Decl., Ex. 8).

Counsel likely will protest that they did not donate "to obtain an engagement for legal

work awarded by a government agency," Model Rule 7.6 cmt. 1, but it is hard to imagine what else would have prompted them.  Why would a lawyer from Garden City, New Jersey, for example, donate to a Plymouth County Treasurer who is years away from his next election, less than two weeks after the stock drop at issue in this case?  *See* OCPF Rpts.; *see also* John C. Coffee, Jr., '*Pay-to-Play' Reform:  What, How, and Why?*, N.Y.L.J., May 21, 2009 ("[T]he plaintiffs' bar is today deeply entangled in the business of soliciting pension funds.  This is a necessary consequence of the PSLRA, which has left securities litigation highly profitable in the current environment but made public pension funds the principal distributor of this largess.").

Not only does this donation-retention dynamic create an appearance of impropriety, it also creates a conflict of interest between Plymouth and Norfolk and absent class members.  A "key element" in assessing adequacy "is the relationship between the class representative and class counsel."  *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 155 (S.D.N.Y. 2010) (collecting authority).  And "when the possible recovery for each plaintiff as a member of the class is an amount dwarfed by the attorney's fees which could be awarded to class counsel, it is likely that a conflict of interest exists when there is a close relationship between class counsel and named representatives." *Mowry v. JP Morgan Chase Bank, N.A.*, No. 06 C 4312, 2007 WL 1772142, at *3–4 (N.D. Ill. June 19, 2007) (brackets and internal quotation marks omitted).  It was just such a situation that led one district court to refuse to certify a class with two lead plaintiffs who also served as lead counsel's long-term stock brokers.  *See In re Discovery Zone Sec. Litig.*, 169 F.R.D. 104, 109 (N.D. Ill. 1996).  There, the court found that the relationship between counsel and plaintiffs created an insurmountable conflict: "the possibility of receiving more investment business from class counsel" gave lead plaintiffs "more incentive to maximize fees for the attorneys than to ensure adequate recovery for the class." *Id.*  Similarly, the district court in *In re*

*IMAX Securities Litigation* declined to certify a class due to the close personal and financial relationship between plaintiffs and counsel. *See* 272 F.R.D. at 155–57.

The campaign contributions at issue here pose the same problem:  Plymouth and Norfolk have good reason to maintain their mutually beneficial relationship with Lead Counsel, which the absent class members do not share.   That dynamic is unacceptable under Rule 23(a)(4). *See In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 604–05 (C.D. Cal. 2009) (Campaign contributions are "relevant to attorney-class conflicts and the willingness of [lead plaintiff] to monitor its attorneys and make decisions for the benefit of the class rather than its attorneys."); *Swift v. First USA Bank*, No. 98 C 8238, 1999 WL 1212561, at *6 (N.D. Ill. Dec. 15, 1999) ("The relationship between counsel and the class representative … can disqualify the named representative when the appearance exists that the representation was motivated by an expectation of a return favor.").

Although some courts have appointed class representatives despite campaign contributions from class counsel, they have required proof of a disconnect between the contributions and the lawyers' retention.  In *Diamond Foods*, for example, the court appointed the Public Employees' Retirement System of Mississippi ("MissPERS") as class representative, despite the court's concern that the Mississippi Attorney General had used the case "as a reward for campaign contributions."  295 F.R.D. at 256.  The court resolved its concerns, however, only after MissPERS "and the proposed law firms were required to disclose to the Court any campaign contributions made directly or indirectly to any fundraiser or political campaign in Mississippi." *Id.*  In addition, the court required MissPERS "to explain the due diligence undertaken with respect to the selection of counsel, including the reasons for selecting counsel over other candidates." *Id.*  The court then "carefully vetted" MissPERS's "proposal for class

14

counsel," including "the reasons for selecting counsel, and the proposed fee structure." *Id.*[5]

Here, the record contains no evidence regarding the process by which Lead Plaintiffs selected counsel (other than through monitoring agreements), the due diligence (if any) undertaken with respect to that selection, the reasons for selecting counsel over other candidates (if any), or Lead Plaintiffs' proposed fee structure. Therefore, even under the reasoning employed by those courts that have appointed class representatives that received campaign contributions, Norfolk and Plymouth are inadequate.

The Motion cannot be saved by the fact that the City of Brockton did not receive any political contributions. Lead Plaintiffs sought to be appointed together as a group in order to ensure that they would have "the greatest loss sustained by any moving Class member or Class member group." Mem. in Supp. of Mot. of Mass. Ret. Sys. for Appointment as Lead Pl. and Approval of Selection of Lead and Liaison Counsel at 2 (Jan. 19, 2010) (Dkt. 11). Having moved as a group, they must rise or fall together. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 223 n.3 (3d Cir. 2001) ("[T]here is *one* lead plaintiff under the Reform Act: an individual, an institution or a properly-constituted group.").

### B.   Lead Counsel Instigated Lead Plaintiffs' Suit Through Lead Counsel's Free "Monitoring Services."

The relationship between Lead Plaintiffs and Lead Counsel is also problematic because of the "portfolio monitoring agreements" between them. A monitoring agreement, "on its face, creates a clear incentive for [counsel] to discover 'fraud' in the investments it monitors and to recommend to the Fund's non-lawyer administrator (and, through him, to the trustees) that the

---

[5] *See also In re Cendant Corp. Litig.*, 264 F.3d 201, 270 n.49 (3d Cir. 2001) (opining that courts should require lead plaintiff to "submit a sworn declaration describing the process by which it selected counsel and attesting to the degree to which the selection process was or was not influenced by any elected officials"); *Countrywide*, 273 F.R.D. at 604–05 (denying adequacy challenge where retirement fund's "career staff" had followed "reasonable ethics protocols" in conducting due diligence regarding class counsel's application).

Fund, at no cost to itself, bring a class action lawsuit." *Iron Workers*, 616 F. Supp. 2d at 464 (addressing a motion to be appointed lead plaintiff). Thus, "the practice fosters the very tendencies toward lawyer-driver litigation that the PSLRA was designed to curtail," *id.*, and raises a red flag concerning who is in actual control of the litigation. *See Diamond Foods*, 295 F.R.D. at 255; *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 844 F. Supp. 2d 498, 503 (S.D.N.Y. 2012) (monitoring agreements foster the tendency to "allege 'fraud' every time a corporation's stock price drops"); *cf. In re Galileo Corp. S'holders Litig.*, 127 F. Supp. 2d 251, 260 (D. Mass. 2001) ("Congress sought to reform private securities litigation to discourage unmeritorious class actions, *including actions brought because of a decline in stock prices*." (emphasis added)).

Some courts have held that monitoring agreements do not automatically render a proposed class representative inadequate, *see City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 180 (S.D.N.Y. 2012), but such arrangements must still factor into the Court's review. In other words, a monitoring arrangement "may not [be] dispositive on the issue of whether the [lead plaintiff] would be an adequate Class Representative, but it strongly suggests that this is a lawyer and not a client-driven suit." *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 149 (N.D. Tex. 2014). The *Iron Workers* case draws a useful distinction along these lines. There, the court found the Iron Workers' pension fund to be inadequate, in part because of its monitoring agreement with lead counsel. *Iron Workers*, 616 F. Supp. 2d at 464–66. But the court then appointed MissPERS as class representative, even though it "too employs plaintiffs' firms to 'monitor' its investments free of charge." *Id.* at 466. The court held that MissPERS was adequate, notwithstanding its monitoring agreements, because it (1) used over 10 firms to monitor its investments, and "play[ed] off one against the other"; (2) used a "group of lawyers in

the Attorney General's Office" to evaluate the "monitoring firms' recommendations"; and (3) became aware of the "basis for this particular litigation" through a firm with which MissPERS did not have a monitoring agreement. *Id.* (internal quotation marks omitted).

Lead Plaintiffs share none of the characteristics that prompted the court to accept MissPERS's monitoring agreements. Unlike MissPERS, Lead Plaintiffs have presented no evidence that they leveraged monitoring agreements with multiple firms to assess the soundness of Lead Counsel's suggestion that they sue Defendants in this case. *See* Connolly Tr. 162:2–12; Farmer Tr. 146:1–7, 293:5–13. There are no lawyers employed by Lead Plaintiffs to assess and oversee the litigation, let alone a "group of lawyers" like MissPERS used. And, unlike MissPERS, Lead Plaintiffs became aware of the purported basis for this case through their monitoring agreements with Lead Counsel. *See Iron Workers*, 616 F. Supp. 2d at 464–66; *see also* Coffee, *supra* (Suggesting that the "dividing line" regarding the propriety of monitoring agreements "probably should be between institutional investors that have an active in-house counsel and those that do not," reasoning that "[i]n the latter case, the law firm effectively controls the client, and thus the problems that the PSLRA sought to end with its lead plaintiff reform resurface again.").

Moreover, at least one Lead Plaintiff—Norfolk—has exceeded the PSLRA's general rule that "a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period." 15 U.S.C. § 78u-4(a)(3)(B)(vi). The PSLRA grants courts discretion to exceed the presumptive limit, but only if doing so is "consistent with the purposes" of the Act. *Id.* Here, just the opposite is true: Norfolk's Treasurer receives political donations from Labaton; Norfolk receives monitoring services from

17

Labaton; it signs up repeatedly to be a lead plaintiff for Labaton; and it fails to exercise the expected control or direction over those lawsuits.

### C.    Lead Plaintiffs Have Provided Little to No Direction of This Lawsuit.

Lead Plaintiffs have filed boilerplate certifications stating that they have "monitored" and "directed" this litigation.   But as set forth above, Lead Plaintiffs' "direction" has been non-existent.   They also lack basic knowledge about the facts.   For example:

- Mr. Connolly testified (incorrectly) that the purported class period ends in March or April 2009.   Connolly Tr. 96:5–9.   But Norfolk's stock purchases occurred after that—in May, August and September 2009.   *Id.* at 98:8–101:13.

- Messrs. Connolly and Farmer testified that they do not know why the purported class period begins on October 30, 2008.   Farmer Tr. 93:12–94:4; Connolly Tr. 124:24–125:7.

- Messrs. Connolly and Farmer testified that they do not know whether Defendants ever corrected the alleged misstatements.   Farmer Tr. 193:22–194:12; Connolly Tr. 127:8–17.

- Mr. Farmer testified that the price of CVS stock dropped on November 5, 2009— the alleged corrective disclosure date—because Mr. Ryan announced that the Company's earnings per share would fall short of his August 2009 statement. Farmer Tr. 208:13–18.   But Mr. Ryan's August 4 statement is no longer a part of this case.   *See* Op. and Order at 23 (June 28, 2012) (Dkt. 50) ("[D]efendants cannot be liable with respect to the August 2009 earnings prediction." (internal quotation marks omitted)).

Lead Plaintiffs are materially indistinguishable from those in *Kosmos*.   In that case, the court denied a certification motion from the Nursing Home and Related Industries Pension Plan because "[t]he only evidence submitted by the Pension Plan in support of its claims of adequacy [wa]s the Declaration of its Board Chair," which "contains little more than formulaic, boiler-plate assertions over two pages of substantive text."   *Kosmos*, 299 F.R.D. at 146 (footnote omitted).   Those "boiler-plate assertions" did not carry the lead plaintiff's burden, and the lead plaintiff's deposition testimony just made matters worse.   *Id.* at 150.   In so holding, the court noted, *inter alia*, that: (1) the lead plaintiff and counsel "maintain the type of close affiliation that

18

calls into question whether the Plan or its counsel is the one actually pursuing the case"; (2) "it was Robbins Geller who first informed the Plan it had been damaged," pursuant to a portfolio monitoring agreement; (3) the lead plaintiff's representative "conceded in her deposition that all of the documents she reviewed in preparation for the deposition were provided to her by counsel"; and (4) the lead plaintiff was "unsure about whether Kosmos' stock had dropped after the Plan purchased it or what might have caused it to drop—pretty much the key factual underpinning of the case." *Id.* at 148–49.

So too here, the only evidence that Lead Plaintiffs have proffered are boilerplate declarations that are almost identical to the sworn statement that the court reviewed in *Kosmos*. *See* Brockton Decl.; Norfolk Decl.; Plymouth Decl.; *Kosmos*, 299 F.R.D. at 142 n.64. In this case, as there, the declarations "fail[] to demonstrate adequacy." *Kosmos*, 299 F.R.D. at 147. And here, as there, Lead Plaintiffs' deposition testimony undermines rather than salvages their deficient proffer, rendering them inadequate under Rule 23(a)(4). *See id.* at 148–49; *see also Iron Workers*, 616 F. Supp. 2d at 466 (denying a motion to be appointed lead plaintiff where the institutional investor "was not particularly sophisticated in evaluating securities class actions and, indeed, had only a rough idea of what this lawsuit was all about"); *id.* (holding that the institutional investor "is in no position to adequately monitor the conduct of this complex litigation when it has not even taken the necessary steps to assure itself that the advice it is getting from its monitors is disinterested, let alone take the necessary steps to find out much about the lawsuit it is being asked to oversee"); *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 316 (E.D. Va. 2007) (denying class certification because "plaintiff has not demonstrated that he, rather than his counsel, is in control of the litigation").

That Mr. Connolly could not say what was happening in any of the five other cases in

which Norfolk certified having served as lead plaintiff—including the one where the final terms of settlement had been signed only days before—only confirms that the Court should not expect more robust participation in the future.

## II.     LEAD PLAINTIFFS FAIL TO MEET THEIR BURDEN UNDER RULE 23(b)(3).

In addition to failing to demonstrate that Lead Plaintiffs are adequate class representatives, the Motion must be denied for a second, independent reason: Lead Plaintiffs have not met their burden of demonstrating that common issues predominate with respect to damages.  *See* Fed. R. Civ. P. 23(b)(3).  Specifically, Lead Plaintiffs ignore the requirement of *Comcast Corp. v. Behrend* that, for a class to be certified, a plaintiff must establish that damages can be measured on a class-wide basis consistent with the operative theory of liability.  *See* 133 S. Ct. at 1433; *BP I*, 2013 WL 6388408, at *17.

Courts have recognized that "*Comcast* signals a significant shift in the scrutiny required for class certification."  *BP I*, 2013 WL 6388408, at *17; *accord In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013) ("Before [*Comcast*], the case law was far more accommodating to class certification under Rule 23(b)(3).").

### A.     *Comcast* Requires That Plaintiffs' Damages Model Comport With Their Theory of Liability.

In *Comcast*, the Supreme Court reversed a grant of class certification because plaintiffs failed to demonstrate that their damages model could be applied on a class-wide basis consistent with the operative theory of liability.  Plaintiffs advanced four theories of antitrust liability at the class certification stage, but the class was certified with respect to only one of these theories. Plaintiffs' damages model did not account for this fact, and failed to isolate damages attributable to the one remaining theory.  *Comcast*, 133 S. Ct. at 1431.  The Supreme Court held that class certification was erroneous because "a model purporting to serve as evidence of damages in [a]

20

class action must measure only those damages attributable to [an actionable] theory" of liability. *Id.* at 1433.  This is so because, if a model "does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*  Without this requirement, the Court observed, "at the class-certification stage *any* method of measurement [would be] acceptable so long as it [could] be applied classwide," and "[s]uch a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.*

Although some courts have held that *Comcast* does not *require* plaintiffs to establish that damages are calculable on a class-wide basis to fulfill their burden to show predominance, it is clearly a factor for courts to consider in determining whether certification is proper under Rule 23(b)(3).  *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015) ("*Comcast* reiterated that damages questions should be considered at the certification stage when weighing predominance issues … [and] 'the fact that damages may have to be ascertained on an individual basis is … a factor that we must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues.'" (third alteration in original) (quoting *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008)).

More importantly, in the wake of *Comcast*, courts have refused to certify a class because a plaintiff failed to link a damages model to the operative theory of liability.  Thus, the First Circuit has emphasized that, after *Comcast*, "at class certification, the damages calculation must reflect the liability theory."  *In re Nexium Antitrust Litig.*, 777 F.3d at 23; *id.* at 18 (the *Comcast* plaintiffs failed to demonstrate predominance because they "relied on 'a methodology that identifie[d] damages that [were] not the result of the wrong,'" and therefore "did not establish

21

that 'damages [were] capable of measurement on a classwide basis'" (quoting *Comcast*, 133 S. Ct. at 1434, 1433)); *accord Roach*, 778 F.3d at 407 ("[A] model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury."). If it does not, a class cannot be certified. *See In re BP P.L.C. Sec. Litig.* ("*BP II*"), No. 10-md-2185, 2014 WL 2112823, at *12 (S.D. Tex. May 20, 2014); *BP I*, 2013 WL 6388408, at *17.

Particularly instructive are two class certification decisions issued in *In re BP P.L.C. Securities Litigation*. In that putative securities fraud class action, the plaintiffs alleged that BP had misrepresented the extent of its efforts to implement certain process safety improvements prior to the Deepwater Horizon explosion, and thereby misstated the risk of such a catastrophic event. *BP I*, 2013 WL 6388408, at *11. The alleged revelation of these misstatements was the materialization of the undisclosed risk: the explosion itself. *BP II*, 2014 WL 2112823, at *4. Plaintiffs' "damages model" submitted in support of class certification consisted only of an expert's unsupported assurance that, at some point in the future, he would calculate class damages. *BP I*, 2013 WL 6388408, at *15.

In opposition, BP noted that certain commonly utilized measures of damages—employed by the plaintiffs' expert in the past—would be inconsistent with plaintiffs' theories of liability. *Id.* at *16–17. Defendants surmised that plaintiffs' expert would likely use a "constant dollar" method of determining the amount of inflation in the stock price—essentially "equat[ing] the amount of a stock price-drop on a given corrective disclosure day … with the 'inflation' created by a preceding misrepresentation." *Id.* at *7. Defendants pointed out that this method of determining damages was not consistent with plaintiffs' theory of liability because it would compensate investors for "the full value of the stock price drop from the materialization of [a]

risk," when, based on plaintiffs' allegations, investor damages should be limited to the inflation resulting from the amount by which the risk was *understated* at the time of purchase. *Id.* at *16.

The plaintiffs responded that their yet-to-be-determined damages model would "provide options to the jury to disaggregate inflation by the type of misrepresentation." *Id.* at *17. But this assertion failed to "assuage the Court that the class-wide damages methodology proposed [would] track Plaintiffs' theories of liability." *Id.*; *accord Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141 (S.D.N.Y. 2014) ("[A] more precise specification of the damages calculation method is necessary to assure that the model is in fact linked with the theory of liability."); *BP II*, 2014 WL 2112823, at *12 ("Plaintiffs bear the burden of proving all relevant elements of Rule 23.  That burden is not met by asking the Court simply to trust them."). The court recognized that "purchasers' damages should be determined by how the market would have priced the additional, undisclosed risk of a process safety incident before one occurred—not how the market in reality priced the consequences of the Deepwater Horizon explosion." *BP II*, 2014 WL 2112823, at *10.  Because the plaintiffs had not shown that damages measuring this figure could be calculated—and thus "failed to meet *their burden* of showing that damages can be measured on a class-wide basis consistent with their theories of liability"—the court denied class certification. *BP I*, 2013 WL 6388408, at *17.

After this initial denial of class certification, the *BP* plaintiffs were permitted to renew their motion.  In support of their second motion, plaintiffs submitted a detailed damages model, but they again failed to measure damages attributable to the amount of undisclosed risk of an event happening, instead claiming that investors should be compensated for the entirety of losses attributable to that event's occurrence. *BP II*, 2014 WL 2112823, at *10–11.  The district court disagreed.  Instead, it found that this more specific damages model still did not track plaintiffs'

theory of liability—that investors had purchased a stock at a higher price than they would have had the market appreciated the true risk of a catastrophic event—and again refused to certify the class with respect to this theory of liability. *Id.* at *12.[6]

**B.    Lead Plaintiffs Fail to Specify a Damages Model, Much Less One that Comports with Their Theory of Liability.**

The same conclusion is warranted here.  Lead Plaintiffs have not demonstrated that their generic, boilerplate damages methodology is capable of measuring damages on a class-wide basis, much less that it has any connection to the operative liability theory.  This failure precludes class certification—particularly in this case where, as in *Comcast*, certain of Lead Plaintiffs' liability theories have been rejected or abandoned, and their expert has not accounted for that fact. *See* Op. and Order 23–24 (Jun. 8, 2012) (Dkt. 50); Slip Op. 19 (1st Cir. May 24, 2013) (Dkt. 56).

The Feinstein Report offers no evidence to support Lead Plaintiffs' assertion—contained in a footnote—that his methodology is "capable of calculating damages on a class-wide basis." Mem. of Law in Supp. of Pls. Mot for Class Cert. 19 n.11 (Feb. 5, 2015) (Dkt. 95).  Indeed, his "damages methodology" is nothing more than a general summary of how one might calculate damages in any securities action; he "asks the court simply to trust" that a future "empirical analysis" will accomplish that goal. *See BP II*, 2014 WL 2112823, at *12.  As set forth in detail above, however, Prof. Feinstein's "conclusory assertion" fails to account for numerous complications that he concedes will arise in this case, and is thus insufficient to show that damages are measurable on a class-wide basis. *See BP II*, 2014 WL 2112823, at *12; *see also Rail Freight*, 725 F.3d at 253 ("No damages model, no predominance, no class certification.");

---

[6] The district court did certify a sub-class of investors whose injuries were based on a different theory of liability that the court found was properly tied to plaintiffs' damages model. *BP II*, 2014 WL 2112823, at *12–14.

*Fort Worth Emps. Ret. Fund*, 301 F.R.D. at 142 ("[W]ithout assurance beyond [plaintiffs' expert's] say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis.").

Moreover, Lead Plaintiffs have made *no showing at all* that this generic damages methodology can accomplish the complicated task of addressing the operative theory of liability in this case.  Nor can they, when their expert has not made basic choices regarding damages calculations.  *See id.* at 141 ("a more precise specification of the damages calculation method is necessary to assure that the model is in fact linked with the theory of liability").  Indeed, Prof. Feinstein has provided a damages methodology less detailed than the *BP* plaintiffs' initial submission.  *Compare* Feinstein Report ¶ 151 (explaining that damages will be calculated by "empirical analysis"), *with BP I*, 2013 WL 6388408, at *15 ("[D]amages will be calculated by use of an event study.").  He has not attempted to disaggregate confounding information— including statements made on November 5, 2009 that are, without question, not actionable. Feinstein Tr. 96:8–14.  Thus, his generic methodology is unresponsive to the First Circuit's admonition that Lead Plaintiffs  must "prove how much of [the November 5, 2009 stock] drop resulted from revelations about CVS Caremark's integration, which are actionable, and how much resulted from disappointment in CVS Caremark's projected earnings, which is not actionable."  Slip Op. at 28 n.7.  And he has not disclosed how he might determine the amount of alleged inflation in the stock on each day during the purported class period.  Feinstein Tr. 102:10–104:22.  All of these complicating factors demonstrate the inadequacy of the damages methodology put forth by Lead Plaintiffs.  It thus cannot survive the "rigorous[] examin[ation]" to which courts must subject proposed damages models post-*Comcast*.  *See BP I*, 2013 WL 6388408, at *17.

## **CONCLUSION**

For the foregoing reasons, Defendants request that the Motion be denied.

Respectfully submitted,


By:   William R. Grimm
     William R. Grimm

HINCKLEY, ALLEN & SNYDER LLP
William R. Grimm (No. 1938)
Mitchell R. Edwards (No. 6942)
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
Telephone:  (401) 274-2000
Facsimile:  (401) 277-9600

WILLIAMS & CONNOLLY LLP
Steven M. Farina (admitted *pro hac vice*)
Margaret A. Keeley (admitted *pro hac vice*)
Katherine M. Turner (admitted *pro hac vice*)
Matthew H. Blumenstein (admitted *pro hac vice*)
David K. Baumgarten (admitted *pro hac vice*)
Leslie C. Mahaffey (admitted *pro hac vice*)
725 12th Street NW
Washington, DC 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029

*Counsel for Defendants*


Dated:  March 20, 2015

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully submit that oral argument would aid the Court in fully understanding the issues in Lead Plaintiffs' Motion, which presents complex issues of both fact and law.  Defendants thus respectfully request the opportunity for oral argument on this Motion be granted.  Defendants estimate that oral argument would be twenty minutes per side.


Respectfully submitted,


By:   William R. Grimm
        William R. Grimm

HINCKLEY, ALLEN & SNYDER LLP
William R. Grimm (No. 1938)
Mitchell R. Edwards (No. 6942)
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
Telephone:  (401) 274-2000
Facsimile:  (401) 277-9600

WILLIAMS & CONNOLLY LLP
Steven M. Farina (admitted *pro hac vice*)
Margaret A. Keeley (admitted *pro hac vice*)
Katherine M. Turner (admitted *pro hac vice*)
Matthew H. Blumenstein (admitted *pro hac vice*)
David K. Baumgarten (admitted *pro hac vice*)
Leslie C. Mahaffey (admitted *pro hac vice*)
725 12th Street NW
Washington, DC 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029

*Counsel for Defendants*


Dated:  March 20, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2015, a copy of the foregoing **DEFENDANTS'
MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION** and **REQUEST FOR ORAL ARGUMENT** was filed electronically via
ECF and served by mail on anyone unable to accept electronic filing.  Notice of this filing will
be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the
Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


 /s/ William R. Grimm
William R. Grimm #1938
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI  02903
401-274-2000
401-277-9600 (fax)
wgrimm@haslaw.com